# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CITY OF PROVIDENCE v. BATS GLOBAL MARKETS, INC., et al. | x<br>:<br>x | **Civil No. 1:14-cv-02811-JMF** |
| AMERICAN EUROPEAN INSURANCE COMPANY v. BATS GLOBAL MARKETS, INC., et al. | x<br>:<br>x | **Civil No. 1:14-cv-03133-JMF** |
| HAREL INSURANCE CO., LTD. v. BATS GLOBAL MARKETS, INC., et al. | x<br>:<br>x | **Civil No. 1:14-cv-03608-JMF** |
| FLYNN v. BANK OF AMERICA CORPORATION, et al. | x<br>:<br>x | **Civil No. 1:14-cv-04321-JMF** |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF JAMES J. FLYNN AND DOMINIC A. MORELLI FOR APPOINTMENT AS LEAD PLAINTIFFS AND <u>APPROVAL OF THEIR SELECTION OF LEAD COUNSEL</u>**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................2

ARGUMENT .............................................................................................................8

    I.   THE COURT SHOULD APPOINT MOVANTS AS LEAD PLAINTIFFS ....................8

        A.    The Procedure Required by the PSLRA .................................................8

            1.    Movants are Willing To Serve as Class Representatives............................9

            2.    Movants Are Adequate Lead Plaintiffs......................................................9

II.    MOVANTS SATISFY RULE 23 AND STANDING REQUIREMENTS .......................10

III.   THE COURT SHOULD APPROVE MOVANTS' CHOICE OF LEAD COUNSEL .....14

CONCLUSION............................................................................................................18

i

# TABLE OF AUTHORITIES

**Cases**

*Anwar, et al. v. Fairfield Greenwich Group, et al.*,
   1:09-cv-00118-VM-THK (S.D.N.Y.) ..................................................... 17

*Black v. Finantra Capital, Inc., et al.*,
   418 F.3d 203 (2d Cir. 2005)...................................................... 15, 16

*Blatt v. Merrill Lynch Fenner & Smith Inc.*,
   94 Civ. 2348 (JAG) (D.N.J.)................................................... 14, 15, 16

*Brecher, et al., v. Citigroup, Inc., et al.*,
   1:09-cv-07359-SHS (S.D.N.Y.) ..................................................... 17

*Chilton v. Smith Barney Fund Mgmt., LLC.*,
   Case No. 07-5257, 2010 WL 521023 (2d Cir. Feb. 16, 2010)............................. 1, 12

*Cohen v. Fiserv, Inc., et al.*,
   1:09-cv-00752-CMA-CBS (D. Colo.) ..................................................... 17

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ..................................................... 11

*Ellenburg v. JA Solar Holdings Co., Ltd.*,
   262 F.R.D. 262 (S.D.N.Y. 2009) ..................................................... 9

*Gen. Tel. Co. of the Sw. v. Falcon*,
   457 U.S. 147 (1982)................................................... 11

*Hevesi v. Citigroup, Inc.*,
   366 F.3d 70 (2d Cir. 2004)................................................... 1, 13

*In re Avista Corp. Sec. Litig.*,
   No. CV-02-0328-FVS, 2007 WL 456833 (E.D. Wash. Dec. 20, 2007) ................................... 16

*In re Brand Name Prescription Drugs Antitrust Litigation*,
   No. 94 C 897 (N.D. Ill.) ..................................................... 15

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)................................................... 10

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*,
   09-cv-03690-WJH (N.D. Ill.)................................................... 17

*In re Donnkenny Inc. Sec. Litig.*,
   171 F.R.D. 156 (S.D.N.Y. 1997) ........................................................................ 14

*In re Drexel Burnham Lambert Group, Inc.*,
   960 F.2d 285 (2d Cir. 1992)............................................................................... 12

*In Re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   Nos. MDL-1446, Civ.A. H-01-3624, 2004 WL 405886 (S.D. Tex. Feb. 25, 2004) ............... 13

*In re eSpeed, Inc. Sec. Litig.*,
   232 F.R.D. 95 (S.D.N.Y. 2005) ........................................................................ 10

*In re Flag Telecom Holdings, Ltd., Sec. Litig.*,
   308 F. Supp. 2d 249 (S.D.N.Y. 2004)................................................................ 12

*In re Fuwei Films Sec. Litig.*,
   247 F.R.D. 432 (S.D.N.Y. 2008) ...................................................................... 12

*In re Global Crossing Ltd. Sec. Litig.*,
   No. 02 Civ. 910 (GEL) (S.D.N.Y.)..................................................................... 16

*In re IPO Sec. Litig.*,
   671 F.Supp.2d 467 (S.D.N.Y. October 5, 2009)................................................. 16

*In re MetLife Demutualization Litig.*,
   689 F.Supp.2d 297 (E.D.N.Y. Feb. 12, 2010) .................................................... 16

*In re NASDAQ Market-Makers Antitrust Litig.*,
   172 F.R.D. 119 (S.D.N.Y. 1997) ................................................................. 11, 12

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................. 14, 15

*In re Natural Gas Commodity Litigation*,
   Index No. 03 CV 6186 (VM) (AJP)(S.D.N.Y.) .................................................. 15

*In Re Nw. Corp. Sec. Litig.*,
   299 F. Supp. 2d 997 (D.S.D. 2003) .................................................................. 13

*In re Oxford Health Plans, Inc., Sec. Litig.*,
   182 F.R.D. 42 (S.D.N.Y. 1998) ........................................................................ 11

*In re Soybeans Futures Litigation*,
   89 Civ. 7009 (CRN) (N.D. Ill.)........................................................................ 14

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999)........................................................................... 14, 15

*In re TCW/DW North American Government Income Trust Securities Litigation*,
   941 F.Supp. 326 (S.D.N.Y. 1996) ....................................................................................... 16

*Kaplan v. E.F. Hutton Group, Inc., et al.*,
   Civ. Action No. 88-00889 (N.Y. Sup.  Ct.) ........................................................................ 15

*Kohen v. Pacific Inv. Management Co. LLC*,
   No. 05-C-4681 (RAG) (N.D. Ill. 2011) ............................................................................... 15

*Lapiner v. Camtek, Ltd. et al.*,
   3:08-cv-01327-MMC (N.D. Cal.) ......................................................................................... 17

*Prado-Steiman v. Bush*,
   221 F.3d 1266 (11th Cir. 2000) ........................................................................................... 11

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)................................................................................................. 11

*Sternfeld, et al. v. Fiserv, Inc.*, et al.,
   1:09-cv-05400-BSJ-FM (S.D.N.Y.) .................................................................................... 17

*Weinberg v. Atlas Air Worldwide Holdings, Inc.*,
   216 F.R.D. 248, 253 (S.D.N.Y. 2003) ................................................................................. 12

**Statutes**

15 U.S.C. §77z-1....................................................................................................................... 1

15 U.S.C. §77z-1(a)(1)............................................................................................................... 8

15 U.S.C. §77z-1(a)(3)(A)(i)(II) .......................................................................................... 9, 11

15 U.S.C. §77z-1(a)(3)(B) ......................................................................................................... 8

15 U.S.C. §77z-1(a)(3)(B)(i) ..................................................................................................... 9

15 U.S.C. §77z-1(a)(3)(B)(iii)(I) ......................................................................................... 9, 10

15 U.S.C. §77z-1(a)(3)(B)(iii)(I)(aa) ................................................................................... 9, 11

15 U.S.C. §77z-1(a)(3)(B)(iii)(II) ........................................................................................ 9, 10

15 U.S.C. §77z-1(a)(3)(B)(iii)(II)(aa)...................................................................................... 14

15 U.S.C. §77z-1(b)(1) ................................................................................................ 11

**Other Authorities**

Haim Bodek, THE PROBLEM OF HFT: COLLECTED WRITINGS ON HIGH FREQUENCY TRADING &
    STOCK MARKET STRUCTURE REFORM 27 (2013) ...................................................................... 4

Michael Lewis, *Flash Boys: A Wall Street Revolt* at 208 & footnote (2014) ................................... 5

Scott Patterson, DARK POOLS: HIGH SPEED TRADERS, AI BANDITS, AND THE THREAT TO THE
    GLOBAL FINANCIAL SYSTEM (rev. ed. 2013) ............................................................................ 3

*Securities Class Action Alert* letter dated August 17, 2000) ......................................................... 15

Stanislav Dolgopolov*, High-Frequency Trading, Order Types, And The Evolution Of The
    Securities Market Structure: One Whistleblower's Consequences For Securities Regulation*,
    U. Ill. J. L., TECH. & POL'Y 145, 147-54 (2014) ........................................................................ 3

Stanislav Dolgopolov, *The Maker-Taker Pricing Model and Its Impact on the Securities Market
    Structure: A Can of Worms for Securities Fraud?* 31-32 (March 2014) .................................... 5

Tom Steinert-Threlkeld, *Out of Order*, TRADERS MAG., Jan. 2013 ............................................... 3

## PRELIMINARY STATEMENT

Pursuant to the provisions of the Private Securities Litigation Reform Act ("PSLRA"), James J. Flynn and Dominic A. Morelli ("Movants") respectfully submit this memorandum of law in support of their motion to be appointed as lead plaintiffs, and for approval of Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart") as lead counsel ("Counsel") in this action.

Congress passed the PSLRA to place securities class actions in the hands of investors with the largest financial interest in the outcome of the action that are qualified to serve. *See* 15 U.S.C. §77z-1. The Movants have a substantial financial interest in this class action. Courts are also required by the PSLRA to make a limited Rule 23 analysis, determining whether the presumptive lead plaintiffs are typical of other class members and adequate to serve on behalf of the class. In their complaint, *Flynn v. Bank of America Corp*, 14-cv-4321 (JMF) (the "Complaint" or "*Flynn*"), Movants develop the claims against the defendants named therein to a much greater extent than any other complaints known to Movants, in that rather than just focus on speed of data access as the critical factor in determining the wrongful nature and success of defendants' actions, *Flynn* alleges in great detail that it is the existence and use of predatory order types that has allowed defendants to carry out their allegedly illegal scheme and course of conduct.

Movants also satisfy the PSLRA's limited Rule 23 analysis. It is well settled in the Second Circuit that a lead plaintiff need not have standing to represent every possible security at issue. *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 83 (2d Cir. 2004). In *Chilton v. Smith Barney Fund Mgmt., LLC.*, Case No. 07-5257, 2010 WL 521023 at *1 (2d Cir. Feb. 16, 2010), the Second Circuit affirmed the district court's finding that an investor in one mutual fund can

represent investors in 103 other funds as lead plaintiff. The Second Circuit rejected competing movants' claim that the lead plaintiff needed standing in every fund. *See id.*

Accordingly, Movants' claims are typical of those of all other investors, and Movants are adequate to represent all Class members, regardless of the particular securities Class members purchased or sold. Furthermore, Movants represent both purchasers and sellers of stock as well as stock options.

As described herein, Counsel is highly experienced in the litigation of many varieties of market manipulation cases and other forms of complex securities, commodities and antitrust cases, and is thus ideally suited to represent all Class members.

For all the reasons described in this memorandum, Movants' motion should be granted in its entirety.

## STATEMENT OF FACTS

This securities class action is brought on behalf of public investors who purchased and/or sold shares of stock in the United States (the "Plaintiff Class") between April 18, 2009 and the present (the "Class Period") and who suffered trading losses caused in part by the allegedly illegal and manipulative high frequency and high volume trading methods of a sophisticated class of technology-driven entities known commonly as "high frequency traders" (the "HFT Defendants"). These allegedly illegal and manipulative methods were carried out on registered public stock exchanges with the full knowledge, approval and participation of such stock exchange principals (the "Exchange Participants") as well as on United States-based alternative trading systems ("ATSs").

This alleged scheme and wrongful course of business could not have been successful without the active participation of a defendant class of the brokerage firms entrusted to transact fairly and honestly in the purchase and sale of securities on behalf of their clients (the "Brokerage

Firm Defendants"), and that collaborated with the Exchange Participants and the HFT Defendants in designing a large array of special predatory order types[1] to take advantage of anomalies and other special opportunities available on each of the Exchange Participant's markets so that, coupled with the unfair and uncompetitive speed of access available to the HFT Defendants, the HFT Defendants were able to manipulate order flows, the appearance of liquidity and bid and asked spreads, to the economic harm of other market participants who had no access to and no knowledge of these special predatory order types. These and other devices, contrivances, manipulations and artifices to defraud as alleged herein were designed in a manner to and did manipulate the U.S. securities markets and the trading of equities on those markets, wrongfully diverting billions of dollars annually from Plaintiffs and the Plaintiff Class to themselves.[2]

---

[1] Even a representative of a leading securities industry group admitted that "there are predatory order types that some may argue also add liquidity, but get in the way of institutional orders." Tom Steinert-Threlkeld, *Out of Order*, TRADERS MAG., Jan. 2013, at 20, 22 (quoting Jennifer Setzenfand, Chairman of the Security Traders Association); *see also* Scott Patterson, DARK POOLS: HIGH SPEED TRADERS, AI BANDITS, AND THE THREAT TO THE GLOBAL FINANCIAL SYSTEM (rev. ed. 2013) at 318 ("Order types are being created to attract predatory traders.") (quoting Justin Kane, Rainier Investment); see also Stanislav Dolgopolov, *High-Frequency Trading, Order Types, And The Evolution Of The Securities Market Structure: One Whistleblower's Consequences For Securities Regulation*, U. Ill. J. L., TECH. & POL'Y 145, 147-54 (2014), *available at* http://ssrn.com/abstract=2314574.

[2] The 14 financial services firms identified in the Complaint were the largest brokerage firms serving institutional and retail investors in the United States during the Class Period, and collectively with all similarly situated brokerage firms, are referred to herein as the "Brokerage Firm Defendants." In addition to trading on the accounts of their customers, certain of these Brokerage Firm Defendants also operated in-house alternate trading systems (sometimes referred to herein as "dark pools"), as well as proprietary high frequency trading desks. The 13 financial services firms identified in the Complaint, who also sometimes traded securities on behalf of investors but whose primary business was operating the largest proprietary U.S.-based high frequency trading operations during the Class Period, are referred to herein collectively with all similarly situated high frequency trading firms as the "HFT Defendants." To the extent the Brokerage Firm Defendants operated in-house high frequency trading desks, those operations are also included within the definition of the HFT Defendants.

Contrary to the duties imposed upon them by law, U.S. Securities and Exchange Commission ("SEC") rules and their own regulations, the Exchange Participants together with the Brokerage Firm Defendants and the HFT Defendants participated in the scheme and wrongful course of business complained of herein whereby certain market participants were provided with material, non-public information so that those market participants could use the informational advantage obtained to manipulate the U.S. securities market to the detriment of Plaintiffs and the Plaintiff Class.

Notwithstanding their legal obligations and duties to provide for orderly and honest trading and to match the bids and orders placed on behalf of all investors at the best available price, the Complaint alleges that the Exchange Participants and the Brokerage Firm Defendants encouraged and enabled the HFT Defendants to develop new forms of self-serving and predatory orders that would disadvantage the general investor but would induce more business to the Exchange Participants and the Brokerage Firm Defendants, and actively supported the approval and use of such special order types with the SEC. The Complaint further alleges that the HFT Defendants received substantial kickback payments in the form of rebates in return for providing liquidity for the ATSs run by the Brokerage Firm Defendants and the markets run by Exchange Participants, and the HFT Defendants also received access to material trading data via preferred access to exchange floors and/or through proprietary trading products.[3] Likewise, in exchange

---

[3] These practices are often described as examples of HFT scalping, fueled by the superior speed and access to timely market information available to the HFT Defendants: "HFT scalping relies on superior queue position, avoidance of market sweeps, and rebate capture. Special order types and knowledge of market microstructure that make alpha-less micro-spread capture a lucrative trading strategy." Haim Bodek, THE PROBLEM OF HFT: COLLECTED WRITINGS ON HIGH FREQUENCY TRADING & STOCK MARKET STRUCTURE REFORM 27 (2013). Overall, according to Bodek, certain strategies used in HFT scalping "are favorably subsidized by rebate in the maker-taker market model." *Id.* at 19-20. As Bodek goes on to observe: "HFT scalps micro-edges and rebates. Tiered rebates subsidize opportunity costs and realized losses, turning scratch trades

for kickback payments, the Brokerage Firm Defendants provided access to their customers' bids and offers, and directed their customers' trades to stock exchanges and ATSs that the Brokerage Firm Defendants knew had been rigged and were subject to informational asymmetries as a result of Defendants' alleged scheme and wrongful course of business, all of which operated to the detriment of Plaintiffs and the Class.[4] Defendants' predatory practices included the Brokerage Firm Defendants selling "special access" to material data, including orders made by Plaintiffs and the Plaintiff Class so that the HFT Defendants could then trade against them using the informational asymmetries and other market manipulation detailed herein. *Flash Boys* at 168-72 and 242-43.

The Complaint alleges that Defendants utilized devices, contrivances, manipulations and artifices to defraud, which operated as a fraud and deceit on Plaintiffs and the Plaintiff Class in violation of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC rules promulgated thereunder.[5] Defendants' misconduct rigged the market and manipulated the prices at which shares were traded during the Class Period, causing substantial damage to Plaintiffs and the Plaintiff Class as a result thereof.[6]

---

into winners." *Id.* at 22. *See also* Stanislav Dolgopolov, *The Maker-Taker Pricing Model and Its Impact on the Securities Market Structure: A Can of Worms for Securities Fraud?* 31-32 (March 2014) *(available at:* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2399821).

[4] Estimates of the commissions paid to all Wall Street banks for stock market trades in 2013 alone range between $9.3 billion (citing Greenwich Associates) and $13 billion (citing the Tabb Group). Michael Lewis, *Flash Boys: A Wall Street Revolt* at 208 & footnote (2014) ("*Flash Boys*").

[5] Those rules include SEC Regulation National Market System ("Reg NMS"), enacted in 2007, which requires that investors receive the best price executions for their bids and orders.

[6] Since the publication of *Flash Boys*, the U.S. Federal Bureau of Investigation ("FBI") and the Justice Department ("DOJ") have both announced they are investigating high frequency trading. The DOJ is investigating whether the activities violated the federal insider trading prohibitions. Likewise, New York Attorney General Eric Schneiderman (the "NY AG"), the

**Defendants' Alleged Scheme and Wrongful Course of Business**

For at least the last five years, the Complaint alleges that various of the Defendants routinely engaged in at least the following predatory order practices and other manipulative, self-dealing and deceptive conduct:

- **"*spam and cancel orders*"** – HFT is all about being first in the order queue, and that has always been HFT's primary alpha. While speed matters, the core HFT alpha can only be realized if the trader knows what order type to send and when to send it.  In the early days after the passage of Reg NMS and Rule 610 banning locked markets, HFT traders found a way to gain an unfair market advantage by utilizing "spam and cancel" orders developed in collusion with the Exchange participants.  The Exchange Participants would commonly price-slide orders rather than cancel them in order to preserve volume on their exchanges, but in order to attract and keep the HFT Defendants as active participants, they needed to develop special order types for the HFT Defendants whereby they could quickly cancel and re-enter orders rather than have them slid, thereby gaining valuable price discovery regarding the order book and achieving queue priority and access to rebates.  In many cases, institutions had no idea that their orders were being slid away from the top of the book.

- **"*hide and light orders*"** – the HFT Defendants use "hide and light" orders as a strategy to avoid the Rule 610 ban on locked markets.  Where a regular order would be price-slid back a tick and "lit" at the slid price, these new "hide and light" orders would be priced instead to lock an away market.  The hidden price was permitted to lock an away market because it was not a displayed price and thus not considered a Protected Quotation under Reg NMS.  Since the name of the game was achieving a superior order queue position, these orders solved the problem by "lighting" the hidden order automatically when the order would no longer result in a violation of Rule 610 when the away market unlocked.  These order types give tremendous advantages to the HFT Defendants who are empowered by the Participating Exchanges to use them, especially to the disadvantage of competing institutional orders.

- **"*immediate or cancel intermarket sweep orders*"** - intermarket sweep orders ("ISOs") were created as a special exception to Rule 611 to allow institutions to sweep through multiple levels of the order book, and are executed without any requirement to check away market pricing or to apply trade-through protections.  The HFT Defendants leverage this exception with their speed to get ahead of the

---

Commodity Futures Trading Commission ("CFTC"), and the SEC are also reportedly probing the unlawfulness of high frequency trading.

slow Stock Information Provider ("SIP") data feeds relied upon by many in the marketplace for their latest price movement information. Using the "immediate or cancel" ("IOC") variety of the ISO order, the HFT Defendants regularly instruct exchanges either to immediately execute an order or to cancel it, with no requirement to check if the order trades through any "protected" quotation at an away exchange. By this means, in volatile market conditions, the HFT Defendants gain an unfair advantage by being able to use their speed and ability to use the special IOC ISOs to access rapidly diminishing liquidity and thus out-maneuver those dependent on the SIP feed, which often slows down further in fast market conditions.

- **"day ISO orders"** – day ISOs were originally carved out of Rule 610 to provide institutions with a way to sweep a particular offering price level and then bid aggressively at that level for the remainder. Given that such orders enter the market as protected quotations, the HFT Defendants have regularly used day ISOs as an excellent way to step ahead of all orders currently resting on the book at the same price, but which were price-slid or hidden to comply with Rule 610 and the ban on locked markets. The HFT Defendants also knew that they could exploit day ISOs to get ahead of slow SIP feeds while also stepping ahead of "hide and light" orders already on the books. The HFT Defendants thereby regularly jump the queue entirely and use that position to post liquidity at new, aggressive price levels well ahead of traders depending upon latest price information from the slow SIP feeds.

- **"electronic front-running"** – where, in exchange for kickback payments, the HFT Defendants are provided early notice of investors' intentions to transact by being shown initial bids and offers placed on exchanges and other trading systems by their brokers, and then race those *bona fide* securities investors to the other securities exchanges, transact in the desired securities at better prices, and then go back and transact with the unwitting initial investors to the their financial detriment;

- **"rebate arbitrage"** – where the HFT and Brokerage Firm Defendants obtain kickback payments from the securities exchanges without providing the liquidity that the kickback scheme was purportedly designed to entice;

- **"slow-market (or latency) arbitrage"** – where the HFT Defendants are shown changes in the price of a stock on one exchange, and pick off orders sitting on other exchanges, before those exchanges are able to react and replace their own bid/offer quotes accordingly, which practices are repeated to generate billions of dollars more a year in illicit profits than front-running and rebate arbitrage combined;

- **"spoofing"** – where the HFT Defendants send out orders with corresponding cancellations, often at the opening or closing of the stock market, in order to manipulate the market price of a security and/or induce a particular market reaction;

- *"layering"* – where the HFT Defendants send out waves of false orders intended to give the impression that the market for shares of a particular security at that moment is deep in order to take advantage of the market's reaction to the layering of orders; and

- *"contemporaneous trading"* – whereby obtaining material, non-public information concerning the trading intentions of Plaintiff and the Plaintiff Class and then transacting against them, Defendants violate the federal securities laws, including §20A of the Exchange Act.

The Complaint alleges that Defendants' wrongful acts and unlawful practices constitute the manipulative use of devices and contrivances in violation of the Exchange Act and the SEC rules promulgated thereunder and constitute a scheme and wrongful course of business that has operated as a fraud or deceit on investors on U.S.-based exchanges and alternate trading systems for at least the past five years.

## ARGUMENT

## I.   THE COURT SHOULD APPOINT MOVANTS AS LEAD PLAINTIFFS

### A.   The Procedure Required By The PSLRA

The PSLRA establishes the procedure for appointment of the lead plaintiff in "each private action arising under [the Securities Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure."  Sections 27(a)(1) and (a)(3)(B), 15 U.S.C. §§ 77z-1(a)(1) and (a)(3)(B).

The PSLRA provides a presumption that the most "adequate plaintiff" to serve as lead plaintiff is the "person or group of persons" that:

    i)   has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

    ii)   in the determination of the court, has the largest financial interest in the relief sought by the class; and

    iii)   otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

Section 27(a)(3)(B)(iii)(I), 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I).  The presumption may be rebutted only upon proof by a class member that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  Section 27(a)(3)(B)(iii)(II), 15 U.S.C. § 77z-1(a)(3)(B)(iii)(II).  *See also Ellenburg v. JA Solar Holdings Co., Ltd.*, 262 F.R.D. 262, 265 (S.D.N.Y. 2009).

As set forth below, Movants satisfy the foregoing criteria and they are not aware of any unique defenses that Defendants could raise against them.  Therefore, Movants are entitled to the presumption that they are the most adequate plaintiffs to represent the Class and, as a result, should be appointed lead plaintiff in this action.

### 1.   Movants Are Willing To Serve As Class Representatives

Movants have filed a timely lead plaintiff motion.  Specifically, this motion was filed within the 60-day period after the notice published for the first-filed case, *City of Providence v. BATS Global Markets, Inc.*, 1:14-cv-02811 (JMF).  Movants attached their certifications to the Complaint, attesting to their willingness to serve as representatives and provide testimony at deposition and trial, if necessary.  Accordingly, Movants satisfy the first requirement to serve as lead plaintiffs for the Class.  Section 27(a)(3)(B)(iii)(I)(aa), 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(aa).

### 2.   Movants Are Adequate Lead Plaintiffs

Under the PSLRA, any member of the purported class may move for appointment as lead plaintiff within 60 days of the publication of notice that the action has been filed.  *See* 15 U.S.C. § 77z-1(a)(3)(A)(i)(II).  Subsequently, the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . ." 15 U.S.C. § 77z-1(a)(3)(B)(i).

Movants have a financial interest in this action of over $180,000.  Movants believe this loss constitutes a significant financial interest in the outcome of the action.  As such, Movants are adequate lead plaintiffs and should be appointed as lead plaintiffs.

## II.       MOVANTS SATISFY RULE 23 AND STANDING REQUIREMENTS

When a putative securities fraud class action complaint is filed, the PSLRA directs district courts to "adopt a presumption" that the most adequate plaintiff is the one with "the largest financial interest in the relief sought by the class" and who "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  Id. § 77z-1(a)(3)(B)(iii)(I). After the presumptive lead plaintiff is identified, other movants may seek to rebut the presumption with a showing either that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class; or is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C §77z-1(a)(3)(B)(iii)(II); *see In re Cendant Corp. Litig.*, 264 F.3d 201, 268 (3d Cir. 2001) (noting that the PSLRA "is quite specific" that rebuttal may only be made upon such a showing by a member of the putative class).

As the Third Circuit has explained, this "initial inquiry" into whether the movant with the largest loss satisfies Rule 23 is "confined to determining whether the movant has made a prima facie showing of typicality and adequacy."  *Cendant*, 264 F.3d at 263; *see also In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 102 (S.D.N.Y. 2005) (the Rule 23 analysis in the context of a lead plaintiff "need not be as complete as would a similar determination for the purpose of class certification").  At this stage, the movant "need only make a preliminary showing that it satisfies [the typicality and adequacy] requirements."  *Cendant*, 264 F.3d at 264 (quotations omitted) (alteration in original); *eSpeed*, 232 F.R.D. at 102.

10

The reasons for this limitation are plain.  At the time the district court selects a lead plaintiff, the allegations are still amorphous, and there is only a minimal factual record.  The lead plaintiff inquiry is conducted at the outset of the litigation, and movants for lead plaintiff may not even have filed their own complaints in the action.  *See* 15 U.S.C. §77z-1(a)(3)(A)(i)(II); 77z-1(a)(3)(B)(iii)(I)(aa).  Typically, after the appointment of lead plaintiffs, a new, consolidated amended complaint will be filed by the newly appointed lead plaintiff.  During this process, and during the pendency of any motion to dismiss, all discovery against the defendants is stayed.  *See* 15 U.S.C. §77z-1(b)(1).  Under such circumstances, it would literally be impossible for a court to undertake the fact-intensive inquiry that usually accompanies a motion for class certification.  *See Prado-Steiman v. Bush*, 221 F.3d 1266, 1280-83 (11th Cir. 2000) (highlighting the fact-specific nature of the Rule 23 inquiry); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467-68 (4th Cir. 2006) (same).

Here, Movants' certifications establish that they meet the typicality requirement of Rule 23 because they: (i) suffered the same injuries as the absent class members; (ii) suffered as a result of the same course of conduct by Defendants; and (iii) their claims are based on the same legal issues.  *See Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993); *see also In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42, 50 (S.D.N.Y. 1998) (typicality inquiry analyzes whether plaintiffs' claims "arise from the same conduct from which other class members' claims and injuries arise").  Rule 23 does not require that the named plaintiffs be identically situated with all class members.  It is enough if their situations share a common issue of law or fact.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 127 (S.D.N.Y. 1997).  A finding of commonality frequently supports a finding of typicality.  *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) (noting how the commonality and typicality requirements

"merge").  Here, the questions of law and fact common to the members of the Class and which

may affect individual Class members include the following:

- whether the Securities Exchange Act of 1934 was violated by Defendants' acts as alleged in the Complaint; and
- whether the members of the Class sustained damages and, if so, what is the proper measure of damages.

These questions apply equally to Movants as to all members of the purported Class.

Because Movants' claims are based on the same legal theories and "arise from the same course

of conduct that gives rise to the claims of other Class members," the typicality requirement is

satisfied.  *See NASDAQ Market-Makers*, 172 F.R.D. at 126; *In re Fuwei Films Sec. Litig.*, 247

F.R.D. 432, 436 (S.D.N.Y. 2008) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d

285, 291 (2d Cir. 1992)).

As noted, the Second Circuit recently found that an investor in one mutual fund can

represent investors in other funds as lead plaintiff.  In *Chilton*, 2010 WL 521023 at *1, Local 649

Engineers Annuity ("Local 649"), the movant with the largest financial interest, invested in one

of 105 related mutual funds.  The competing movants, who invested in certain of the funds but

had a smaller financial interest, claimed Local 649 could not be appointed lead plaintiff because

it did not have standing in every single fund and thus, was atypical under Rule 23.  The Second

Circuit rejected that argument, holding that Local 649 was properly appointed lead plaintiff:

> The Rule 23 requirements applicable here mandate that "the claims or
> defenses of the representative parties [be] typical of the claims or defenses
> of the class," Fed. R. Civ. P. 23(a)(3) (the "typicality" requirement), and
> that "the representative parties ... fairly and adequately protect the interests
> of the class," Fed. R. Civ. P. 23(a)(4) (the "adequacy" requirement)....
> We are…satisfied that Local 649 meets the class requirements of Rule 23.

*Chilton*, 2010 WL 521023 at *1.  *See also In re Flag Telecom Holdings, Ltd., Sec. Litig.*, 308 F.

Supp. 2d 249, 257 (S.D.N.Y. 2004) ("a party named 'lead plaintiff under the PSLRA need not

have standing to sue on each individual claim asserted in the complaint...,"); *Weinberg v. Atlas*

*Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 253 (S.D.N.Y. 2003) ("it is well established that the [l]ead [p]laintiff's claims do not have to be identical to the other class members' claims and in fact, the idea that there should [be] multiple [l]ead [p]laintiffs with standing to sue on all possible causes of action has been rejected by the Southern District"); *In Re Enron Corp. Sec., Derivative & "ERISA" Litig.*, Nos. MDL-1446, Civ.A. H-01-3624, 2004 WL 405886 at *2 (S.D. Tex. Feb. 25, 2004) (the "[c]ourt would deal with issues regarding standing and the creation of classes or subclasses at class certification time"); *In Re Nw. Corp. Sec. Litig.*, 299 F. Supp. 2d 997, 1007 (D.S.D. 2003) ("it is not a requirement that a lead plaintiff under the PSLRA suffer losses on each type of security that may be at issue in the class action").

Indeed, the Rule 23 requirements in the context of lead plaintiff appointment are more limited than the requirements at the class certification stage. In the context of a lead plaintiff appointment, the Second Circuit has explained that:

> Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action. Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim.

*Hevesi*, 366 F.3d at 82.  This is because "any requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff-namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole."  *Id*. at 83 n.13.  Nor is there any danger that an abbreviated Rule 23 inquiry for a lead plaintiff appointment will endanger the class's interests; when it comes time for class certification, additional named plaintiffs can be added to satisfy the full panoply of Rule 23 requirements and "to aid the lead plaintiff in representing a class." *Hevesi*, 366 F.3d at 83.

## III.   THE COURT SHOULD APPROVE MOVANTS' CHOICE OF LEAD COUNSEL

Pursuant to the PSLRA, the proposed lead plaintiff shall, subject to court approval, select and retain counsel to represent the class.  *See In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 158 (S.D.N.Y. 1997).  The Court should not disturb the lead plaintiff's choice of counsel unless it is necessary to "protect the interests of the class."  15 U.S.C. § 77z-1(a)(3)(B)(iii)(II)(aa).  In that regard, Movants request the appointment of the law firm of Lovell Stewart Halebian Jacobson LLP as lead counsel in this case[7].

Lovell Stewart Halebian Jacobson LLP and its predecessors (the "Firm"), as Court-appointed lead or co-lead class counsel, have succeeded in obtaining billions of dollars of recoveries in class actions alleging that an investment or other product, a security, a commodity futures contract or the exchange itself did not perform or operate or charge as it should.  This includes five different class action settlements that recovered, after deduction for all costs and attorneys fees, one hundred cents on each dollar of losses[8] of each claiming class member:

- *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 471 (S.D.N.Y.  1998) ("*NASDAQ*") ($1,027,000,000);

- *In re Sumitomo Copper Litigation*, 74 F. Supp. 2d 393, 395 (S.D.N.Y. 1999) ("*Sumitomo*") ($149,600,000);

- *Blatt v. Merrill Lynch Fenner & Smith Inc.*, 94 Civ. 2348 (JAG) (D.N.J.) ("*Blatt*") ($70,000,000);

- *In re Soybeans Futures Litigation*, 89 Civ. 7009 (CRN) (N.D. Ill.) ($21,500,000); and

---

[7] *See Exhibit A* for a complete firm resume.

[8] "Losses" means single, actual damages, exclusive of trebling and also exclusive of any prejudgment interest.

- *Kaplan v. E.F. Hutton Group, Inc., et al.*, Civ. Action No. 88-00889 (N.Y. Sup. Ct.) ($8,180,000).

Three of the above mentioned settlements represented, at the time of approval, the largest class action settlement in the history of the applicable federal statute. *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 471 (S.D.N.Y. 1998) ("this all-cash settlement [for $1,027,000,000], achieved through 'four years of hard-fought litigation,' apparently is the largest recovery (class action or otherwise) in the hundred year history of the state and federal antitrust laws."); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 395 (S.D.N.Y. 1999) ("The recovery is the largest class action recovery in the 75 plus year history of the Commodity Exchange Act"); *Blatt v. Merrill Lynch Fenner & Smith Inc.*, 94 Civ. 2348 (JAG) (D.N.J.) ("by far the largest settlement" of class action claims under the Investment Company Act, *Securities Class Action Alert* letter dated August 17, 2000).[9]

Lovell Stewart has extensive experience with market price manipulation cases, and has taken such cases to successful jury verdicts upheld on appeal. *See, e.g.*, *Black v. Finantra*

---

[9] Furthermore, Lovell Stewart was one of the Court appointed class counsel in two separate class actions that achieved settlements that represented the second largest class action recovery in the history of the respective statutes:

- In *In re Natural Gas Commodity Litigation*, Index No. 03 CV 6186 (VM) (AJP)(S.D.N.Y.), Lovell Stewart was appointed as co-lead counsel by the Honorable Victor Marrero and plaintiffs achieved the second largest class action recovery in the history of the CEA ($100,800,000); *see also Kohen v. Pacific Inv. Management Co. LLC*, No. 05-C-4681 (RAG) (N.D. Ill. 2011) (holders of short positions on ten-year Treasury note futures contracts recover $118,750,000, becoming the second largest class action recovery in the history of the CEA at that time).

- In *In re Brand Name Prescription Drugs Antitrust Litigation*, No. 94 C 897 (N.D. Ill.), One of Lovell Stewart's partners was appointed to the Executive Committee by the Honorable Charles P. Kocoras, and helped achieve the second largest class action settlement up to that time in the history of the federal antitrust laws ($696,657,000 plus other relief).

*Capital, Inc.*, 418 F.3d 203, 208-09 (2d Cir. 2005) (artificially inflated stock price); *Strobl v. New York Mercantile Exch.*, 768 F.2d 22 (2d Cir.), *cert. denied sub nom. Simplot v. Strobl*, 474 U.S. 1006 (1985) (artificially depressed potato futures prices).  Lovell Stewart is also familiar with all types of complex securities claims requiring innovative thinking to prevail on difficult or novel facts.  For example, in the *Blatt v. Merrill Lynch* action, an investment company with a complex investment strategy allegedly did not describe the material risks concerning how the fund would perform, and this allegedly rendered the fund's representations misleading.  In analyzing and prosecuting that very complex fund claim, Lovell Stewart obtained the largest class action recovery in the history of the Investment Company Act to that point.  *See also*, *e.g.*, *In re TCW/DW North American Government Income Trust Securities Litigation,* 941 F.Supp. 326 (S.D.N.Y. 1996) (95 Civ. 0167) (investment company did not disclose risks of its complex investment strategy involving hedging and transactions in volatile derivatives; $30,000,000 settlement).

More generally, Lovell Stewart has tried numerous securities actions and first tried a federal securities derivative and class action matter in 1981; the firm has served as Court appointed lead or executive committee counsel in numerous other successful securities class actions since then.  *See, e.g., Black v. Finantra Capital, Inc., et al.*, 418 F.3d 203 (2d Cir. 2005), *In re IPO Sec. Litig.*, 671 F.Supp.2d 467 (S.D.N.Y. October 5, 2009) (No. 21 MC 92) (SAS) ($586,000,000 settlement);  *In re Global Crossing Ltd. Sec. Litig., No. 02 Civ. 910 (GEL) (S.D.N.Y.)* ($340,000,000 in settlements);  *In re MetLife Demutualization Litig.*, 689 F.Supp.2d 297 (E.D.N.Y. Feb. 12, 2010) ($50,000,000 settlement); *In re Avista Corp. Sec. Litig.,* No. CV-02-0328-FVS, 2007 WL 456833 (E.D. Wash. Dec. 20, 2007) (settlement).

More recently, Lovell Stewart has been appointed lead counsel, co-lead counsel or interim co-lead counsel in numerous securities and other complex financial class actions in which a mutual fund, a retirement account, or a security or a futures contract did not perform as it should. *E.g.*, *Anwar, et al. v. Fairfield Greenwich Group, et al.*, 1:09-cv-00118-VM-THK (S.D.N.Y.); *Brecher, et al., v. Citigroup, Inc., et al.*, 1:09-cv-07359-SHS (S.D.N.Y.); *Sternfeld, et al. v. Fiserv, Inc.*, et al., 1:09-cv-05400-BSJ-FM (S.D.N.Y.); *Cohen v. Fiserv, Inc., et al.*, 1:09-cv-00752-CMA-CBS (D. Colo.); *Lapiner v. Camtek, Ltd. et al.*, 3:08-cv-01327-MMC (N.D. Cal.); *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 09-cv-03690-WJH (N.D. Ill.).

During the last three years, noteworthy settlements of cases in which the Firm has been involved include:

- Price fixing thin film transistor liquid crystal display panels ($1.1 billion approved settlement);

- Manipulating exchange-based initial public offering security prices (approved final settlement $570 million settlement);

- Fixing the prices of freight forwarding shipments (approved partial settlements so far of $134 million);

- Manipulating treasury note futures contract prices ($118,750,000 settlement);

- Misrepresenting facts and manipulating investment results (proposed partial settlements of $85.25 million);

- Manipulating natural gas futures contract prices ($77.1 million settlement);

- Manipulating exchange-based platinum and palladium futures contract prices (proposed partial settlement of $48,400,000 plus a $35 million judgment and assignment);

- Fixing the prices of exchange-based milk futures contracts and physical cheese and milk (proposed partial settlement for $46 million).

## CONCLUSION

For the foregoing reasons, Movants respectfully request that this Court: (1) appoint

Movants as lead plaintiffs in the captioned, and all subsequently-filed, related actions; and (2)

approve Movants' selection of lead counsel.

Dated: June 17, 2014

                      Respectfully submitted,

                      **LOVELL STEWART HALEBIAN JACOBSON LLP**

                      */s/ Victor E. Stewart*
                      Victor E. Stewart (vestewart@lshllp.com)
                      61 Broadway, Suite 501
                      New York, NY 10006
                      Telephone: (212) 608-1900
                      Facsimile:  (212) 719-4677

                      **Counsel for Movants and Proposed Lead Counsel for the Class**