**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF PROVIDENCE, RHODE ISLAND,
PLUMBERS AND PIPEFITTERS
NATIONAL PENSION FUND,
EMPLOYEES' RETIREMENT SYSTEM OF
THE GOVERNMENT OF THE VIRGIN
ISLANDS, STATE-BOSTON RETIREMENT
SYSTEM, AND FÖRSTA AP-FONDEN,
individually and on behalf of all others
similarly situated,

          Plaintiffs,

     v.

BATS GLOBAL MARKETS, INC., *et al.*,

        Defendants.

**Civil Action No. 1:14-cv-02811-JMF**
**(consolidated)**

**MEMORANDUM OF LAW IN SUPPORT OF EXCHANGE DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**
**PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ...........................................................................................5

    A.    Exchanges And The Exchange Act.................................................5

    B.    Regulation NMS ...............................................................................7

    C.    The NMS Plans.................................................................................8

    D.    Proprietary Data Feeds And Co-Location.....................................9

        1.    Proprietary Feeds Have Been Approved By The SEC .............9

        2.    Co-Location Services Have Been Approved By The SEC.......10

    E.    The Exchange Act's And Regulation NMS's Application To The Timeliness Of Consolidated Market Data............................................12

    F.    Order Types And Processing Of Trades .............................................13

    G.    Payment For Order Flow ...................................................................15

    H.    The Consolidated Amended Complaint.............................................16

ARGUMENT ...............................................................................................17

I.    The Court Lacks Subject Matter Jurisdiction Because The Exchange Act Provides The Exclusive Procedure For Reviewing Plaintiffs' Claims. ...........................................18

    A.    Plaintiffs' Claims Are Subject To Review By The SEC Under The Exchange Act's Comprehensive Review Process.................................18

    B.    Plaintiffs Cannot Bypass The Exchange Act's Review Process By Suing In Federal District Court. ..................................................................21

II.    Plaintiffs' Claims Are Barred By Absolute Immunity. ........................................24

    A.    The Exchanges Are Immune From Private Damages Suits Challenging Their Regulatory Activities................................................................24

    B.    Because Plaintiffs Seek Damages Allegedly Caused By The Exchanges' Failure To Properly Exercise Their Regulatory Functions, Their Claims Are Barred By Absolute Immunity.........................................................26

# TABLE OF CONTENTS
(continued)

**Page**

1. The Exchanges' Implementation Of The National Market System Is A Core Regulatory Function Under The Exchange Act. ......................26

2. Plaintiffs' Claims Based On Complex Order Types And PFOF Programs Are Also Barred By The Exchanges' Absolute Immunity.................................................................................................29

3. Plaintiffs Cannot Plead Around Absolute Immunity By Invoking Supposed "Profit" Motivations.................................................32

III. The Consolidated Amended Complaint Fails To State A Claim.....................................35

A. Plaintiffs Fail To State A Claim Under Section 6(b) Of The Exchange Act.........35

B. Plaintiffs Fail To State A Claim Under Section 10(b) Of The Exchange Act And The SEC's Rule 10b-5.................................................................37

1. Plaintiffs Do Not Have Standing To Assert A Claim Under Section 10(b) And Rule 10b-5. ..............................................................37

2. Plaintiffs Fail To Plead A Claim For Market Manipulation. ....................39

3. The Plaintiffs Fail To Plead Any Deceptive Acts By The Exchanges. ...............................................................................43

4. Plaintiffs Do Not Plead Reliance. ...............................................46

5. Plaintiffs Fail To Allege Loss Causation ....................................47

6. Plaintiffs Fail To Plead Scienter ...............................................48

CONCLUSION.................................................................................49

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Achtman v. Kirby, McInerney & Squire, LLP,*
    464 F.3d 328 (2d Cir. 2006) ..................................................................................17

*Affiliated Ute Citizens v. United States,*
    406 U.S. 128 (1972)............................................................................................46

*Altman v. SEC,*
    687 F.3d 44 (2d Cir. 2012) (per curiam)...........................................................18, 22

*Am. Benefits Grp. v. NASD,*
    No. 99-cv-4733, 1999 WL 605246 (S.D.N.Y. Aug., 10, 1999) ...............................24

*Anschutz Corp. v. Merrill Lynch & Co.,*
    90 F.3d 98 (2d Cir. 2012) ..................................................................................42

*Arneil v. Ramsey,*
    50 F.2d 774 (2d Cir 1977) ..................................................................................46

*Arneil v. Ramsey,*
    14 F. Supp. 334 (S.D.N.Y. 1976) ....................................................................46, 47

*ASARCO LLC v. Goodwin,*
    756 F.3d 191 (2d Cir. 2014) .................................................................................5

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ..............................................................................40, 48

*Baird v. Franklin,*
    141 F.2d 238 (2d Cir. 1944) ...............................................................................36

*Baiul v. Williams Morris Agency, LLC,*
    No. 13-cv-8683, 2014 WL 1804526 (S.D.N.Y. May 6, 2014)..................................49

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)........................................................................................46, 47

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................................17

*Bernard v. Cnty. of Suffolk,*
    356 F.3d 495 (2d Cir. 2004) ...............................................................................34

## **TABLE OF AUTHORITIES**
(continued)

**Cases** (continued)                                                                                          **Page(s)**

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975)...............................................................................................37, 38

*Brawer v. Options Clearing Corp.*,
    807 F.2d 297 (2d Cir. 1986)........................................................................................36

*Brawer v. Options Clearing Corp.*,
    633 F. Supp. 1254 (S.D.N.Y. 1986)...........................................................................36

*Castillo v. Dean Witter Discover & Co.*,
    No. 97 Civ. 1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998)................................43

*Cent. Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ...................................................................................................42

*Citadel Sec., LLC v. Chi. Bd. Options Exch., Inc.*,
    No. 13-cv-5833 (N.D. Ill. Aug. 4, 2014) ................................................15, 19, 24, 31

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)........................................................................................44

*City of Tacoma v. Taxpayers of Tacoma*,
    357 U.S. 320 (1958)....................................................................................................22

*Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*,
    No. 11-cv-9358, 2012 WL 345902 (S.D.N.Y. Jan. 31, 2012) ............................18, 22

*Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*,
    No. 11-cv-9358, 2011 WL 7138696 (S.D.N.Y. Dec. 30, 2011) ................................21

*Cook v. NASD*,
    31 F. Supp. 2d 1245 (D. Colo. 1998)....................................................................19, 24

*D'Alessio v. NYSE, Inc.*,
    125 F. Supp. 2d 656 (S.D.N.Y. 2000)........................................................................25

*D'Alessio v. NYSE, Inc.*,
    258 F.3d 93 (2d Cir. 2001)....................................................................................25, 32

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) (per curiam).................................................................47

### TABLE OF AUTHORITIES
(continued)

**Cases** (continued)                                                                                       **Page(s)**

*Desiderio v. NASD,*
    191 F.3d 198 (2d Cir. 1999)..................................................................................36

*Dexter v. Depository Trust & Clearing Corp.,*
    219 F. App'x 91 (2d Cir. 2007) .....................................................................32, 34

*Dexter v. Depository Trust & Clearing Corp.,*
    406 F. Supp. 2d 260 (S.D.N.Y. 2005)......................................................32, 33, 34

*DL Capital Grp., LLC v. NASDAQ Stock Mkt., Inc.,*
    409 F.3d 93 (2d Cir. 2005)........................................................................ *passim*

*Dura Pharms. Inc. v. Broudo,*
    544 U.S. 336 (2005)..........................................................................................47

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009)................................................................................44

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)....................................................................................39, 48

*Feins v. Am. Stock Exch., Inc.,*
    81 F.3d 1215 (2d Cir. 1996)...............................................................................36

*Fezzani v. Bear, Stearns & Co.,*
    716 F.3d 18 (2d Cir. 2013)......................................................................39, 42, 46

*Fezzani v. Bear, Stearns & Co.,*
    No. 99-cv-0793, 2005 WL 6251885 (S.D.N.Y. Apr. 7, 2005) ................................46

*Fezzani v. Bear, Stearns & Co.,*
    384 F. Supp. 2d 618 (S.D.N.Y. 2004).....................................................39, 40, 47

*First Jersey Inc. v. Bergen,*
    605 F.2d 690 (3rd Cir. 1979)……………………………………...………………………..24

*Fraser v. Fiduciary Trust Co.,*
    No. 04-cv-6958, 2005 WL 6328596 (S.D.N.Y. June 23, 2005) ..............................38

*Garber v. Legg Mason, Inc.,*
    347 F. App'x 665 (2d Cir. 2009) ..........................................................................5

## **TABLE OF AUTHORITIES**
(continued)

**Cases** (continued)                                                                 **Page(s)**

*Gustafson v. Strangis*,
    572 F. Supp. 1154 (D. Minn. 1983) ........................................................36

*Hayden v. NYSE, Inc.*,
    4 F. Supp. 2d 335 (S.D.N.Y. 1998) ........................................................21

*Hundahl v. United Benefit Life Ins. Co.*,
    465 F. Supp. 1349 (N.D. Tex. 1979) ......................................................40

*In re Charter Commc'ns Inc. Sec. Litig.*,
    552 U.S. 148 (2008) ..............................................................................40

*In re Charter Commc'ns Inc. Sec. Litig.*,
    443 F.3d 987 (8th Cir. 2006) .................................................................40

*In re Citigroup Auction Rate Sec. Litig.*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009) ............................................43, 47

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013) ............................................34, 35

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008) ...................................................45

*In re JP Morgan Auction Rate Sec. (ARS) Mktg. Litig.*,
    No. 10-md-2157, 2014 WL 4953554 (S.D.N.Y. Sept. 30, 2014) ................42, 44, 45

*In re NYSE Specialists Sec. Litig.*,
    503 F.3d 89 (2d Cir. 2007) ............................................................ *passim*

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
    548 F.3d 110 (D.C. Cir. 2008) ...............................................21, 22, 25, 33

*Jablon v. Dean Witter & Co.*,
    614 F.2d 677 (9th Cir. 1980) .................................................................36

*Kleinman v. Elan Corp.*,
    706 F.3d 145 (2d Cir. 2013) ..................................................................48

*Levitt v. J.P. Morgan Sec. Inc.*,
    710 F.3d 454 (2d Cir. 2013) ..................................................................47

# TABLE OF AUTHORITIES
(continued)

**Cases** (continued)                                                                                   **Page(s)**

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000).........................................................................................17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD*,
    616 F.2d 1363 (5th Cir. 1980) ....................................................................................18

*Mihalakis v. Pac. Brokerage Servs., Inc.*,
    No. 91 Civ. 994, 1991 WL 280236 (S.D.N.Y. Dec. 23, 1991)..................................36

*Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004).....................................................................................37, 38

*Orman v. Charles Schwab & Co.*,
    688 N.E.2d 620 (Ill. 1997) ......................................................................................15, 16

*Piemonte v. Chi. Bd. Options Exch., Inc.*,
    405 F. Supp. 711 (S.D.N.Y. 1975)..........................................................................45, 47

*Rajamin v. Deutsche Bank Nat'l Trust Co.*,
    757 F.3d 79 (2d Cir. 2014).........................................................................................37

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................................................43

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977)...............................................................................................37, 39

*Schreiber v. Burlington N., Inc.*,
    472 U.S. 1 (1985).......................................................................................................42

*SEC v. Tourre*,
    4 F. Supp. 3d 579 (S.D.N.Y. 2014)............................................................................19

*SEC v. Wang*,
    944 F.2d 80 (2d Cir. 1991).........................................................................................19

*Shields v. Citytrust Bancorp., Inc.*,
    25 F.3d 1124 (2d Cir. 1994).......................................................................................43

*Shmueli v. City of New York*,
    424 F.3d 231 (2d Cir. 2005).......................................................................................33

## TABLE OF AUTHORITIES
(continued)

**Cases** (continued)                                                                   **Page(s)**

*Sparta Surgical Corp. v. NASD*,
    159 F.3d 1209 (9th Cir. 1998) ................................................................25

*Spears v. Metropolitan Life Ins. Co.*,
    No. 2:07-cv-88, 2009 WL 2408928 (N.D. Ind. Aug. 4, 2009) ................................38

*Standard Inv. Chartered v. NASD*,
    No. 07-cv-2014, 2007 WL 1296712 (S.D.N.Y. May 7, 2007) ................................19

*Standard Inv. Chartered, Inc. v. NASD*,
    637 F.3d 112 (2d Cir. 2011) (per curiam)................................................24, 25, 26

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ................................................................46

*Swirsky v. NASD*,
    124 F.3d 59 (1st Cir. 1997) ................................................................24

*Tannenbaum v. Walco Nat'l Corp.*,
    No. 83-cv-6815, 1984 WL 2374 (S.D.N.Y. Jan. 27, 1984) ................................38

*Telecomms. Research & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ................................................................22

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
    551 U.S. 308 (2007) ................................................................48

*The NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
    No. 13-2657-cv (2d Cir. Oct. 31, 2014)................................................28, 29

*United States v. O'Hagan*,
    521 U.S. 642 (1997)................................................................45

*Walck v. Am. Stock Exch., Inc.*,
    687 F.2d 778 (3d Cir. 1982)................................................................36

*Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*,
    379 U.S. 411 (1965)................................................................22

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011)................................................................42

## TABLE OF AUTHORITIES
(continued)

**Cases** (continued)                                                      **Page(s)**

*Winer Family Trust v. Queen,*
   503 F.3d 319 (3d Cir. 2007).................................................................37

*Wright v. Ernst & Young LLP,*
   152 F.3d 169 (2d Cir. 1998)................................................................42

**Statutes**

15 U.S.C. § 78c(a)(26) ...........................................................................5

15 U.S.C. § 78f(a) ...................................................................................5

15 U.S.C. § 78f(b)(4) .............................................................................31

15 U.S.C. § 78f(b)(5) .........................................................................5, 30

15 U.S.C. § 78k-1(a)(1)(C) ....................................................................5

15 U.S.C. § 78k-1(a)(1)(D) .................................................................6, 26

15 U.S.C. § 78k-1(a)(3)(B) ...........................................................*passim*

15 U.S.C. § 78k-1(c)(1) ..........................................................................6

15 U.S.C. § 78k-1(c)(1)(D) .....................................................................6

15 U.S.C. § 78s .....................................................................................18

15 U.S.C. § 78s(c) .................................................................................36

15 U.S.C. § 78s(h)(1) ............................................................................19

15 U.S.C. § 78t(e) .................................................................................42

15 U.S.C. § 78u(d) ................................................................................19

15 U.S.C. § 78u(d)(3)(A) .......................................................................36

15 U.S.C. § 78u-3 .................................................................................19

## TABLE OF AUTHORITIES
(continued)

**Statutes** (continued)                                          **Page(s)**

15 U.S.C. § 78u-4(a)(2)(iv)........................................................38

15 U.S.C. § 78u-4(b)(1)(B)........................................................43

15 U.S.C. § 78u-4(b)(2)............................................................48

15 U.S.C. § 78u-4(b)(2)(A)........................................................48

15 U.S.C. § 78u-4(b)(4)........................................................43, 47

15 U.S.C. § 78y.....................................................................21

15 U.S.C. § 78y(a)(1)..............................................................18

**Rules and Regulations**

17 C.F.R. Part 242.................................................................27

17 C.F.R. §§ 242.600–613 *et seq.*...................................................7

17 C.F.R. § 242.601.................................................................8

17 C.F.R. § 242.602.................................................................8

17 C.F.R. § 242.603(a)...........................................................8, 12

17 C.F.R. § 242.603(b)........................................................7, 8, 27

17 CF.R. § 242.608.................................................................8

17 C.F.R. § 242.608(a)............................................................27

17 C.F.R. § 242.608(b)............................................................27

17 C.F.R. § 242.608(c).............................................................9

17 C.F.R. § 242.608(d).........................................................18, 20

17 C.F.R. § 242.608(d)(1).........................................................20

17 C.F.R. § 242.608(d)(3)......................................................22, 23

17 C.F.R. § 242.610...............................................................14

## TABLE OF AUTHORITIES
(continued)

**Rules and Regulations** (continued)                                         **Page(s)**

17 C.F.R. § 242.610(c)............................................................................................16

17 C.F.R. § 242.611..............................................................................................14

BATS Exchange Rule 11.9.....................................................................................15

CHX Rules Art. 1, Rule 2......................................................................................15

EDGA Rule 11.5....................................................................................................15

EDGX Rule 11.5....................................................................................................15

Fed. R. Civ. P. 9(b)...............................................................................................39

NASDAQ Stock Market Rule 4751(f)...................................................................15

NYSE Arca Rule 7.31............................................................................................15

NYSE Rule 13........................................................................................................15

## Other Authorities

Concept Release, Competitive Developments in the Options Markets,
   69 Fed. Reg. 6124 (Feb. 9, 2004) ......................................................................31

Exchange Act Release No. 34-10787, 39 Fed. Reg. 17,799 (May 20, 1974)..................8

Exchange Act Release No. 34-15009, 43 Fed. Reg. 34,851 (Aug. 7, 1978) .................8

Exchange Act Release No. 34-16589, 45 Fed. Reg. 12,377 (Feb. 26, 1980) ..............13

Exchange Act Release No. 34-28146, 55 Fed. Reg. 27,917 (July 6, 1990)..................8

Exchange Act Release No. 34-42208, 64 Fed. Reg. 70,613 (Dec. 17, 1999)........6, 7, 8

Exchange Act Release No. 34-43290, 65 Fed. Reg. 57,213 (Sept. 21, 2000) .............15

Exchange Act Release No. 34-43313, 65 Fed. Reg. 58,135 (Sept. 27, 2000) ...............8

Exchange Act Release No. 34-43462, 65 Fed. Reg. 64,466 (Oct. 27, 2000) ..............15

Exchange Act Release No. 34-47090, 68 Fed. Reg. 141 (Jan. 2, 2003)......................15

Exchange Act Release No. 34-47948, 68 Fed. Reg. 33,749 (June 5, 2003)................15

**TABLE OF AUTHORITIES**
(continued)

**Other Authorities** (continued)                                            **Page(s)**

Exchange Act Release No. 34-48053, 68 Fed. Reg. 37,880 (June 25, 2003) ...............................15

Exchange Act Release No. 34-49325, 69 Fed. Reg. 11,126 (Mar. 9, 2004) ...........................8, 27

Exchange Act Release No. 34-51808, 70 Fed. Reg. 37,496 (June 29, 2005) ...................... *passim*

Exchange Act Release No. 34-51149, 70 Fed. Reg. 7531 (Feb. 14, 2005) ...............................32

Exchange Act Release No. 34-53382, 71 Fed. Reg. 11,251 (Mar. 6, 2006) ................................32

Exchange Act Release No. 34-53128, 71 Fed. Reg. 3550 (Jan. 23, 2006) ..................................32

Exchange Act Release No. 34-58375, 73 Fed. Reg. 49,498 (Aug. 21, 2008) ..............................32

Exchange Act Release No. 34-59039, 73 Fed. Reg. 74,770 (Dec. 9, 2008) ..................................9

Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293 (Mar. 26, 2009) .........................10, 49

Exchange Act Release No. 34-59714, 74 Fed. Reg. 17,264 (Apr. 14, 2009) .............................49

Exchange Act Release No. 34-61097, 74 Fed. Reg. 64,788 (Dec. 8, 2009) ...............................15

Exchange Act Release No. 34-61680, 75 Fed. Reg. 12,590 (Mar. 16, 2010) ..............................11

Exchange Act Release No. 34-61698, 75 Fed. Reg. 13,151 (Mar. 18, 2010) ..............................32

Exchange Act Release No. 34-61885, 75 Fed. Reg. 20,018 (April 16, 2010) .............................10

Exchange Act Release No. 34-62181, 75 Fed. Reg. 31,488 (June 3, 2010) .................................10

Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594 (Jan. 21, 2010) .......................... *passim*

Exchange Act Release No. 34-62397, 75 Fed. Reg. 38,860 (July 6, 2010) ...................................11

Exchange Act Release No. 34-62534, 75 Fed. Reg. 43,590 (July 26, 2010) ................................15

Exchange Act Release No. 34-62716, 75 Fed. Reg. 51,295 (Aug. 19, 2010) ..............................32

Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299 (Sept. 27, 2010) .......................11, 49

Exchange Act Release No. 34-63777, 76 Fed. Reg. 5630 (Feb. 1, 2011) ...................................30

Exchange Act Release No. 34-65761, 76 Fed. Reg. 72,230 (Nov. 22, 2011) ..............................15

Exchange Act Release No. 34-67093, 77 Fed. Reg. 33,798 (June 7, 2012) .................................15

**TABLE OF AUTHORITIES**
(continued)

**Other Authorities** (continued)                                                                 **Page(s)**

Exchange Act Release No. 34-67412, 77 Fed. Reg. 42,022 (July 17, 2012)...............................15

Exchange Act Release No. 34-69419, 78 Fed. Reg. 24,449 (Apr. 25, 2013) ...............................30

Exchange Act Release No. 34-69538, 78 Fed. Reg. 28,671 (May 15, 2013) ...............................15

Exchange Act Release No. 34-70637, 78 Fed. Reg. 62,745 (Oct. 22, 2013) ...............................15

Exchange Act Release No. 34-64553 (May 26, 2011), 2011 WL 2098098 .................................19

Exchange Act Release No. 34-72676, 79 Fed. Reg. 44,520 (July 31, 2014)...............................15

Exchange Act Release No. 34-72812, 79 Fed. Reg. 48,824 (Aug. 18, 2014) ..............................15

Exchange Act Release No. 34-73333, 79 Fed. Reg. 62,223 (Oct. 16, 2014) ........................15, 49

*In re Chi. Bd. Options Exch., Inc.*, Exchange Act Release No. 34-69726
    (June 11, 2013).....................................................................................................13

*In re NASDAQ Stock Mkt., LLC*, Exchange Act Release No. 34-69655
    (May 29, 2013)......................................................................................................13

*In re NYSE LLC*, Exchange Act Release No. 34-67857 (Sept. 14, 2012) .................12, 13, 20, 24

Thomas Lee Hazen, *The Law of Securities Regulation* (6th ed. 2009)........................................40

H.R. Rep. No. 94-229, 94th Congress, 1st Sess. (1975)..........................................................6, 27

Mary Jo White, *Enhancing Our Equity Market Structure* (June 5, 2014)....................................13

Report of the Advisory Committee on Market Information: A Blueprint for
    Responsible Change (Sept. 14, 2001) ....................................................................................8

S. Rep. No. 1455, 73rd Cong., 2d Sess. (1934) .......................................................................40

S. Rep. No. 94-75, 94th Cong., 1st Sess. (1975) ...............................................................6, 7, 30

Defendants BATS Global Markets, Inc. ("BATS"), Chicago Stock Exchange, Inc. ("CHX"), Direct Edge ECN, LLC ("Direct Edge"), The NASDAQ Stock Exchange LLC ("NASDAQ"), NASDAQ OMX BX, Inc., New York Stock Exchange, LLC ("NYSE"), and NYSE Arca, Inc. (collectively, "Exchanges") respectfully submit this memorandum of law in support of their motion under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Consolidated Amended Complaint ("CAC").[1]  The Court lacks subject matter jurisdiction over this lawsuit because Plaintiffs' claims are subject to exclusive review by the Securities and Exchange Commission ("SEC") and, on appeal, a federal court of appeals.  Plaintiffs' claims also fail because those claims are barred by the absolute immunity afforded to self-regulatory organizations such as the Exchanges.  Further, Plaintiffs have no private right of action to sue under Section 6 of the Securities Exchange Act of 1934 ("Exchange Act"), and they have not adequately pleaded a violation of Section 10(b) of the Exchange Act or the SEC's Rule 10b-5.

## PRELIMINARY STATEMENT

In April, City of Providence filed the first of these four consolidated actions against broad classes of defendants that included virtually every brokerage and high-frequency trading firm in the country, as well as 16 national securities exchanges.  *See* D.E. 2 ("Complaint") ¶¶ 19–59, 68.  The complaint alleged that so-called "high-frequency traders" engaged in a number of predatory trading practices.  *Id.* ¶ 6.  It further alleged that the national securities exchanges (as well as alternative trading venues) and brokerage firms provided the high-frequency traders with "material, non-public information" that allowed the high-frequency traders to engage in the

---

[1]  On October 22, 2014, BATS and Direct Edge were granted leave by the Court to file separate moving and reply memoranda in support of the motion to dismiss.  *See* D.E. 232.  Following completion of this joint memorandum on behalf of all Exchanges, BATS and Direct Edge determined that a separate moving brief would be duplicative and an unnecessary burden on the Court.  BATS and Direct Edge reserve their rights to file a separate reply memorandum.

allegedly predatory trading practices.  *See*, *e.g.*, *id.* ¶¶ 3–4, 8–9.  In the CAC, however, Plaintiffs have retreated from their ambitious attempt to sue nearly every entity in the financial markets and have narrowed their claims to eight defendants.

Incredibly, the remaining eight defendants are not the high-frequency traders alleged to have actually engaged in the supposed predatory trading, or the broker-dealers who allegedly disregarded their obligations to their clients, but rather seven national securities exchanges and one financial institution that runs an alternative trading venue.  At its core, the CAC alleges that the Exchanges aided and abetted the high-frequency traders by providing "co-location services" and offering "proprietary feeds," which the CAC contends gave high frequency traders early access to material, non-public information, and then allowed the high-frequency traders to profit from this information by executing complex orders on the Exchanges and by taking advantage of the Exchanges' payment for order flow ("PFOF") fee structures.  *See* CAC ¶¶ 7, 30.

The CAC fails for a multitude of reasons, as detailed below, but most fundamentally it fails because the SEC actively oversees and has approved the exact services about which Plaintiffs complain in the CAC:  co-location services, proprietary feeds, order types, and fee schedules.  The SEC has ruled that these services are consistent with the requirements of the Exchange Act and the rules and regulations thereunder, including particularly Regulation NMS, which regulates the Exchanges' dissemination of market data.  Under Regulation NMS, the Exchanges transmit information about securities transactions and quotes to a processor, which then disseminates to investors a "consolidated feed" of the information obtained from all relevant exchanges.  The Exchanges also offer separate proprietary data feeds of exchange-specific data to anyone that wishes to subscribe to them, and some Exchanges offer co-location services, which allow customers "to "situat[e] [their] servers in close proximity to the Exchanges' own

order matching servers."  CAC ¶ 7.  Both proprietary data feeds and co-location can result in reduced latencies (*i.e.*, receiving the exchange-specific data faster).

The core premise of Plaintiffs' claims is that high-frequency trading ("HFT") firms are able to profit at other investors' expense because of this reduced latency.  Yet, contrary to Plaintiffs' theory, the SEC has specifically determined that reduced latency does not offend Regulation NMS, and that the law does not require recipients of the respective channels of market information to *receive* information at the same time.  The SEC has expressly authorized the Exchanges to offer unconsolidated proprietary feeds as well as to offer co-location services, even though it acknowledges that these services would result in faster transmission speeds for investors using them.  In addition, the SEC has regularly approved the various order types that the Exchanges have made available to investors to execute their trades, as well as the PFOF fees charged by the Exchanges, finding that the order types and PFOF fees are consistent with the Exchange Act's requirements of protecting investors and the public interest.  Plaintiffs' fundamental theory of fraud has thus been rejected by the very agency charged with administering the statute under which Plaintiffs sue.

The claims against the Exchanges should be dismissed on the following threshold grounds:

*First*, this Court lacks subject matter jurisdiction because Plaintiffs' claims are subject to exclusive review by the SEC and, on appeal, a federal court of appeals.  The Exchange Act and Regulation NMS provide multiple avenues by which Plaintiffs could have obtained SEC review of their claims.  The Exchange Act also provides for direct appellate review of SEC decisions by a federal court of appeals.  As the Second Circuit and this Court have recognized in analogous

cases, because this review process provides no role for district courts, this Court lacks subject matter jurisdiction over Plaintiffs' claims.  *See infra* Part I.

*Second*, Plaintiffs' damages claims are barred by absolute immunity, which protects the Exchanges from damages claims for conduct within their responsibilities under the Exchange Act and the SEC's implementing regulations.  Plaintiffs' case depends critically on their assertion that the Exchanges wrongfully provided HFT firms with earlier access to market data.  The dissemination of market data under Regulation NMS, however, is a core regulatory function of the Exchanges, and accordingly Plaintiffs cannot pursue claims that the Exchanges improperly executed that regulatory function.  Plaintiffs' challenge to the Exchanges' provision of complex order types and PFOF programs is similarly barred, as these are simply the vehicles through which HFT firms supposedly used their informational advantage, and thus cannot be separated from Plaintiffs' allegations regarding dissemination of market data.  In addition, the Exchanges' selection of particular order types is part of their delegated function to regulate trading in their markets, and PFOF programs are designed to increase market liquidity and performance for the benefit of all investors, and thus are similarly regulatory in nature.  However characterized, therefore, Plaintiffs' claims are barred by absolute immunity.  *See infra* Part II.

In addition to the above grounds for dismissal, the CAC fails to state a claim upon which relief could be granted.  Plaintiffs' claim under Section 6(b) of the Exchange Act (Count II of the CAC) fails because Plaintiffs lack any private right of action to enforce that provision.  *See infra* Part III.A.  Their claim under Section 10(b) of the Exchange Act, and the SEC's Rule 10b-5 promulgated thereunder (Count I of the CAC), fails because, among other things, it does not identify the particular securities and transactions from which their losses supposedly arise, as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and does not plead

any actionable manipulative or deceptive acts by the Exchanges or any of the other required

elements of a claim for securities fraud, let alone plead those elements with particularity as

required by the PSLRA.  *See infra* Part III.B.

## BACKGROUND[2]

### A.     Exchanges And The Exchange Act

The Exchanges are national securities exchanges registered with the SEC under Section

6(a) of the Exchange Act.  15 U.S.C. § 78f(a); *see also* CAC ¶¶ 24–31.  Registered national

securities exchanges are "self-regulatory organizations" ("SROs") under the Exchange Act.  15

U.S.C. § 78c(a)(26); *see also*, *e.g.*, CAC ¶¶ 26, 73.  In the Exchange Act and its amendments,

Congress established a comprehensive system to regulate the functioning of the securities

markets and those who participate in them.  Under the Act, Congress has delegated to SROs,

including securities exchanges, the responsibility to operate and maintain fair and orderly

markets, subject to supervision by the SEC.  15 U.S.C. §§ 78f(b)(5), 78k-1(a)(1)(C).  The

regulatory powers and responsibilities delegated to the Exchanges under the Act include

"planning, developing, operating, [and] regulating" their markets.  *Id.* § 78k-1(a)(3)(B); *see also*

*DL Capital Grp., LLC v. NASDAQ Stock Mkt., Inc.*, 409 F.3d 93, 95 (2d Cir. 2005).

Dissemination of information about trading is and always has been a core function of

exchanges.  Indeed, the Second Circuit has recognized that "safeguarding the integrity of market

information was one of the purposes behind the regulation of the securities markets in the first

---

2   The facts in this Background section are drawn from (1) the CAC, whose well-pleaded factual
allegations are assumed to be true solely for purposes of this motion; (2) the relevant legal and
regulatory background; (3) the Exchanges' plans under Regulation NMS, which are referred to in
the CAC, relied upon by Plaintiffs, and thus properly before the Court, *see*, *e.g.*, *ASARCO LLC v.
Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014), *pet. for cert. filed*, No. 14-332 (U.S. Sept. 18, 2014);
and (4) SEC filings, the fact and content of which the Court is entitled to consider under long-
standing precedent, *see*, *e.g.*, *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009)
(summary order).

place." *DL Capital*, 409 F.3d at 98.  Before 1975, however, the various exchanges reported

trades and quotes solely on their own markets.  CAC ¶ 40.  Congress and the SEC perceived a

need for investors to receive consolidated market information.  As a result, in 1975, Congress

made significant amendments to the Exchange Act and, as relevant here, mandated the creation

of a "national market system" to promote the "linking of all markets for qualified securities

through communication and data processing facilities."  15 U.S.C. § 78k-1(a)(1)(D); *see also*

CAC ¶ 41.  In particular, Congress specifically authorized the SEC to require SROs to "act

jointly . . . in planning, developing, operating, or regulating a national market system," 15 U.S.C.

§ 78k-1(a)(3)(B), and gave the SEC "broad authority to oversee the implementation, operation,

and regulation" of that system, S. Rep. No. 94-75, 94th Cong., 1st Sess. 8–9 (1975).

　　　In Section 11A of the Exchange Act, Congress directed the SEC to "impose" rules "as

necessary or appropriate for the protection of investors or maintenance of fair and orderly

markets" to ensure that investors "may obtain on terms which are not unreasonably

discriminatory . . . information with respect to quotations for and transactions in such securities

as is published or distributed by any self-regulatory organization or securities information

processor."  15 U.S.C. § 78k-1(c)(1)(D); *see also* CAC ¶ 41.  Section 11A gives the SEC

"pervasive rulemaking power to regulate securities communications systems," H.R. Rep. No. 94-

229, 94th Cong., 1st Sess. 93 (1975) (Conf. Rep.), *reprinted in* 1975 U.S.C.C.A.N. 321, 324, and

it explicitly requires the Exchanges to comply with rules and regulations promulgated by the

SEC governing "distribution" of information "with respect to quotations for and transactions in

[securities]," 15 U.S.C. § 78k-1(c)(1).  Thus, "market information, at least since 1975, has been

subject to comprehensive regulation under the Exchange Act."  Exchange Act Release No. 34-

42208, 64 Fed. Reg. 70,613, 70,615 (Dec. 17, 1999) ("Market Data Concept Release").

Importantly, Congress did not envision that SEC rulemaking alone would create the national market system, but rather that regulation would facilitate its establishment.  *See* S. Rep. No. 94-75, 94th Cong., 1st Sess. 8 (1975) ("Section 11A(a)(2) . . . directs the [SEC] to facilitate the establishment of a national market system in accordance with the foregoing findings and objectives.").  The SEC's role, in significant part, is one of active and engaged oversight—to "assure that the system develops and operates in accordance with Congressionally determined goals and objectives." *Id.* at 9.  In performing the role mandated by Congress, the SEC, by design, relies on the efforts of SROs in developing, operating, and regulating the system. *See* 15 U.S.C. § 78k-1(a)(3)(B).  Indeed, the SEC has emphasized that "it [is] the SROs who should be primarily responsible for disseminating consolidated information . . . [b]ecause of their unique role in the statutory scheme, including their obligation to enforce the federal securities laws subject to the [SEC's] review."  Market Data Concept Release, 64 Fed. Reg. 70,620 (internal quotation marks omitted).

### B.      Regulation NMS

The SEC has promulgated several regulations to comply with the congressional directive in Section 11A of the Exchange Act.  The most recent such regulation is Regulation NMS, 17 C.F.R. §§ 242.600–.613 *et seq*., which was adopted in 2005.  *See* Exchange Act Release No. 34-51808, 70 Fed. Reg. 37,496 (June 29, 2005) ("NMS Adopting Release"); *see also* CAC ¶ 43. Rule 603 of Regulation NMS requires exchanges to "act jointly pursuant to one or more effective national market system plans to disseminate consolidated information, including a national best bid and national best offer, on quotations for and transactions in NMS stocks."  17 C.F.R. § 242.603(b).  Under the rule, exchanges are required to distribute quotation and transaction information on "terms that are fair and reasonable," and that "are not unreasonably

discriminatory." *Id.* § 242.603(a); *see also* CAC ¶ 75.  Regulation NMS's approach was the product of years of continuous and comprehensive regulatory consideration.[3]

Regulation NMS requires that every national securities exchange (or group of exchanges) that trades NMS stocks file a plan ("NMS Plan"), to be approved by the SEC, for consolidated reporting of (i) best bid and best offer quotations and (ii) all transactions in listed securities.  17 C.F.R. §§ 242.601, .602, .603(b), .608.

### C.     The NMS Plans

There are three plans for disseminating consolidated stock information: the CTA Plan and CQ Plan (covering transactions and quotes, respectively, for securities listed on the NYSE and stock exchanges other than NASDAQ); and the NASDAQ UTP Plan (covering transactions and quotes for securities listed on NASDAQ).  "These plans govern all aspects of the arrangements for disseminating market information" regarding NMS stocks.  Market Data Concept Release, 64 Fed. Reg. 70,615.  The SEC has approved each of these plans.[4]

Under each NMS Plan, the participating Exchanges transmit information on transactions and quotes on their individual exchanges to a securities information processor ("Processor"), which then consolidates the information and transmits the consolidated information to parties who purchase it, either directly or through vendors.  *See* CAC ¶¶ 42, 106.  Each of the SEC-

---

[3]   *See*, *e.g.*, Exchange Act Release No. 34-43313, 65 Fed. Reg. 58,135 (Sept. 27, 2000) (providing notice of the establishment of the SEC's Advisory Committee on Market Information); Report of the Advisory Committee on Market Information: A Blueprint for Responsible Change (Sept. 14, 2001) (providing recommendations to the SEC regarding the regulation of market information), *available at* http://www.sec.gov/divisions/marketreg/ marketinfo/finalreport.htm; Exchange Act Release No. 34-49325, 69 Fed. Reg. 11,126, 11,184–85 (Mar. 9, 2004) (publishing proposed Regulation NMS for public comment); NMS Adopting Release, 70 Fed. Reg. 37,496, 37,569 (adopting Regulation NMS and amendments to the NMS Plans).

[4]   *See* Exchange Act Release No. 34-10787, 39 Fed. Reg. 17,799 (May 20, 1974); Exchange Act Release No. 34-15009, 43 Fed. Reg. 34,851, 34,856 (Aug. 7, 1978); Exchange Act Release No. 34-28146, 55 Fed. Reg. 27,917, 27,924 (July 6, 1990).

approved NMS Plans provides for self-regulation of the process of producing consolidated market information.  Each plan, for example, establishes a governing body, made up of representatives of the Exchanges that participate in the plan.  Each NMS Plan also has an administrator, which manages its day-to-day operations.  And, under Rule 608(c) of Regulation NMS, each Exchange not only must comply with any effective NMS plan, but also "shall, absent reasonable justification or excuse, enforce compliance with any such plan."  17 C.F.R. § 242.608(c).

### D.  Proprietary Data Feeds And Co-Location

#### 1.  Proprietary Feeds Have Been Approved By The SEC

In addition to sending market data to the Processors for consolidation, the Exchanges are permitted to disseminate the same last sale data and best bid and offer quotes they send to the Processors through what the CAC calls "direct" or "alternative" feeds (also known as "proprietary" feeds).[5]  When it promulgated Regulation NMS, the SEC approved the use of proprietary feeds because doing so "would allow investors and vendors greater freedom to make their own decisions regarding the data they need."  NMS Adopting Release, 70 Fed. Reg. 37,566; *see also*, *e.g.*, Exchange Act Release No. 34-59039, 73 Fed. Reg. 74,770, 74,780 (Dec. 9, 2008) (allowing the independent dissemination of unconsolidated data by exchanges because it "allows greater flexibility for market forces to determine data products and fees").  Exchanges submit to the SEC for review specific proposals to offer proprietary feeds.  Exchanges also file for SEC review of the fees they charge (if any) for their proprietary feeds.  Rule 603(a)'s distribution

---

[5]   In addition to disseminating the same information they send to the Processors, the Exchanges are permitted to offer proprietary feeds of additional information not sent to the Processors, such as "depth of order book" information relating to the balance of orders on an exchange's order book.  *See*, *e.g.*, CAC ¶ 111.  The provision of this additional data to other customers has also been approved by the SEC.  *See* Exchange Act Release No. 34-59039, 73 Fed. Reg. 74,780–81.

standards apply fully to proprietary feeds related to NMS stocks, and they require exchanges that offer proprietary feeds to do so on terms that are fair and reasonable and not unreasonably discriminatory.

In approving exchange applications to offer proprietary feeds of the same data that the Exchanges transmit to the Processors, the SEC has expressly recognized that the proprietary feeds cater to "traders who are very latency [*i.e.*, transmission speed] sensitive [and] who desire to use [the data] to power certain trading algorithms or smart order routers."  Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293, 13,294 (Mar. 26, 2009) (order approving proprietary feed of last-sale data by NYSE).  In other words, these proprietary feeds offer speed advantages over the consolidated data feeds that "can be measured in tens of milliseconds," advantages that are significant to traders who use sophisticated computer programs to trade.  *Id*. at 13,294 n.7; *see also* CAC ¶ 49.  With full knowledge of these differences, the SEC has approved proprietary feeds offered by the Exchanges.  The SEC expressly found that proprietary feeds are "consistent with the requirements of the [Exchange] Act and the rules and regulations thereunder," including Section 6(b)(5)'s "require[ment] . . . to protect investors and the public interest."  74 Fed. Reg. at 13,294.[6]  Moreover, proprietary feeds are available to anyone willing to pay the fees that the SEC has permitted for them.

### 2.    Co-Location Services Have Been Approved By The SEC

Plaintiffs also challenge the co-location services offered by some of the Exchanges. These services allow customers to place computer servers in close physical proximity to the

---

[6]   *See also*, *e.g.*, Exchange Act Release No. 34-62181, 75 Fed. Reg. 31,488, 31,489 (June 3, 2010) (approving proprietary feed of NYSE best bid and best offer quotes, while recognizing it as "likely to be a premium service, used by investors most concerned with receiving NYSE BBO Information on a low latency basis"); Exchange Act Release No. 34-61885, 75 Fed. Reg. 20,018 (April 16, 2010) (approving multiple proprietary feeds offered by BATS).

Exchanges' computer systems in order (among other things) to receive market information more quickly. CAC ¶ 101. The SEC regulates co-location services because it "views co-location services as being a material aspect of the operation of the facilities of an exchange," and thus concludes that "co-location services offered by registered exchanges are subject to the Exchange Act." Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594, 3610 & n.76 (Jan. 21, 2010) ("EMS Concept Release"). Accordingly, "[e]xchanges that intend to offer co-location services must file proposed rule changes" with the SEC and "receive approval of such rule changes" from the SEC. *Id.* at 3610.

The SEC expressly acknowledges that "[m]any proprietary firm strategies are highly dependent upon speed" and that "[c]o-location is one means to save micro-seconds of latency," allowing these traders to be "faster than competitors." EMS Concept Release, 75 Fed. Reg. 3610; *see also* Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299 (Sept. 27, 2010) ("Users that receive co-location services normally would expect reduced latencies in sending orders to the Exchange and receiving market data from the Exchange."). With full knowledge and acceptance of the increased speed offered by co-location, the SEC has approved that practice, finding it to be "consistent with the requirements of the [Exchange] Act and the rules and regulations thereunder," including Section 6(b)(5)'s "require[ment] . . . to protect investors and the public interest." *E.g.*, Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299 (approving NYSE co-location services); Exchange Act Release No. 34-62397, 75 Fed. Reg. 38,860 (July 6, 2010) (approving NASDAQ co-location services); Exchange Act Release No. 34-61680, 75 Fed. Reg. 12,590 (Mar. 16, 2010) (approving CHX co-location services).

**E.      The Exchange Act's And Regulation NMS's Application To The Timeliness Of Consolidated Market Data**

Under Section 11A of the Exchange Act and Rule 603(a) of Regulation NMS, the Exchanges are required to transmit market information to their respective Processors on terms that are "fair and reasonable" and "not unreasonably discriminatory."  17 C.F.R. § 242.603(a). The SEC has interpreted Rule 603 to require exchanges to *send* data to the Processors no later than they transmit data through proprietary feeds, but—importantly—not to require that all subscribers *receive* the consolidated feed at the same time or earlier than other customers who receive data through the proprietary feeds.  *See In re NYSE LLC*, Exchange Act Release No. 34-67857, at 2 (Sept. 14, 2012).  Thus, Plaintiffs are simply mistaken when they assert that Regulation NMS "require[s] . . . that the [Processors] transmit [market] data so as *to be received* by all market participants at the same time."  CAC ¶ 108 (emphasis added).

During the notice and comment period for Regulation NMS, the SEC unequivocally stated that "Rule 603(a) will not require a market center to synchronize the delivery of its data to end-users with delivery of data by a Network processor to end-users."  NMS Adopting Release, 70 Fed. Reg. 37,496, 37,567.  Indeed, the SEC has recognized that, even if an exchange sends data to a Processor and to a proprietary feed at the same time, the amount of time required for consolidation will inevitably cause the consolidated data to reach subscribers slightly later than the proprietary data.  *See In re NYSE*, Exchange Act Release No. 34-67857, at 9; EMS Concept Release, 75 Fed. Reg. 3594, 3601, 3611.  For a variety of reasons, including the laws of physics,

it is impossible to ensure that every subscriber receives consolidated information at the same time or earlier than other customers receive proprietary feeds.[7]

The SEC actively exercises its oversight authority and has not hesitated to bring enforcement proceedings against exchanges for a variety of reasons in recent years,[8] and in particular has exercised its authority to enforce Rule 603.  *See* CAC ¶¶ 259–262.  In 2012, the SEC brought a cease-and-desist proceeding against NYSE and NYSE Euronext for alleged violations of Regulation NMS.  *In re NYSE*, Exchange Act Release No. 34-67857, at 2, 9–10; *see also* CAC ¶ 260.  In recent months, the Chair of the SEC has again reiterated the agency's focus on the question of consolidated data latency.[9]

## F.    Order Types And Processing Of Trades

The Exchanges' responsibility to regulate their exchanges pursuant to the Exchange Act includes not only determining who may trade and what may be traded on the exchanges, but also how trading will be conducted.  *See, e.g.*, 15 U.S.C. § 78k-1(a)(3)(B) (noting that exchanges must "operat[e]" the "national market system").  A critical part of this latter responsibility

---

[7]  The SEC confronted this issue in 1980, when it first required exchanges to permit purchasers of consolidated feeds to retransmit those feeds to others.  In response to concerns that some vendors' high-speed transmissions of consolidated data might reach their subscribers earlier than the same information would reach others, the SEC found that any requirement of simultaneous delivery would be "technically and economically difficult to satisfy" and that there was no way to "ensure that all vendor subscribers receive transaction information at the same time." Exchange Act Release No. 34-16589, 45 Fed. Reg. 12,377, 12,384 (Feb. 26, 1980).

[8]   *See, e.g., In re Chi. Bd. Options Exch., Inc.*, Exchange Act Release No. 34-69726 (June 11, 2013); *In re NASDAQ Stock Mkt., LLC*, Exchange Act Release No. 34-69655 (May 29, 2013).

[9] *See* Mary Jo White, *Enhancing Our Equity Market Structure* (June 5, 2014) (noting that algorithmic traders "use a variety of low-latency tools, including co-located servers in trading data facilities and direct data feeds from trading venues rather than the slower consolidated data feeds of the [Processors]" and stating that the SEC "will continue to focus the efforts of the exchanges and FINRA in minimizing consolidated data latency"), *available at* http://www.sec.gov/News/Speech/Detail/Speech/1370542004312.

includes the adoption of electronic order types, which are "preprogrammed commands traders use to tell the Exchanges how to handle their bids and offers."  CAC ¶ 4.

Exchanges "typically offer a wide range of order types for trading on their automated systems."  EMS Concept Release, 75 Fed. Reg. at 3598.  "Some of their order types are displayable in full if they are not executed immediately," while "[o]thers are undisplayed, in full or in part."  *Ibid.*  Exchanges are "required to file a public order type description with the SEC describing the functioning of the [particular] order type."  CAC ¶ 137; *see also* EMS Concept Release 75 Fed. Reg. at 3598 (noting that exchanges' "proposed rule changes publicly disclose, among other things, the trading services [*i.e.*, order types] and fees of the exchanges").

In adapting to electronic exchanges that no longer rely on brokers to manually transact trades on physical trading floors, the Exchanges have adopted complex order types by rule, to allow investors to replicate the flexibility and complexity that could occur in human interactions, but with the speed and efficiency of automated execution of market orders.  Many of these rule changes and approvals have been spurred by the requirements of Regulation NMS, including particularly Rules 610 (the "Locked and Crossed Markets Rule") and 611 (the "Order Protection Rule").  *See* 17 C.F.R. §§ 242.610, .611.  For example, Rule 611 prohibits exchanges from executing trades when a better price was available on a different exchange, but the SEC created an exception for "Intermarket Sweep Orders" that exchanges use in various forms to avoid violations of Rule 611.  *See* CAC ¶¶ 158-159; *see also id.* ¶¶ 140-141 (discussing "Price to Comply" order type developed to avoid violations of Rule 610).

Although Plaintiffs allege that certain exchanges have not filed all of their order types with the SEC, *see* CAC ¶¶ 182, 186, 188-191, 203, 205, the Exchanges' rules, which are publicly available and approved by the SEC, describe the available order types on each exchange, *see*

NASDAQ Stock Market Rule 4751(f) (defining order types available); NYSE Rule 13 ("Orders and Modifiers"); NYSE Arca Rule 7.31 ("Orders and Modifiers"); BATS Exchange Rule 11.9 ("Orders and Modifiers"); EDGA and EDGX Rules 11.5 ("Orders and Modifiers"); CHX Rules Art. 1, Rule 2 ("Order Types, Modifiers, and Related Terms").  Thus, the complex order types detailed in the complaint have either been expressly or implicitly permitted by the SEC, and all are subject to SEC review.[10]

### G.     Payment For Order Flow

Many exchanges also have adopted SEC-approved rules governing PFOF fees imposed on certain market-makers and specialists in connection with certain transactions.[11]  PFOF programs seek to attract order flow to the exchanges' markets, and thereby enhance liquidity available to investors in a particular market.  *See* EMS Concept Release, 75 Fed. Reg. at 3598; *see also*, *e.g.*, *Citadel Sec., LLC v. Chi. Bd. Options Exch., Inc.*, No. 13-cv-5833, slip op. at 2 (N.D. Ill. Aug. 4, 2014) ("[PFOF] fees were imposed to attract 'order flow' to a market, thereby increasing market liquidity and benefitting investors."); *Orman v. Charles Schwab & Co.*, 688 N.E.2d 620, 623 (Ill. 1997) (noting the SEC's acknowledgment that order flow payments

---

[10]    *See* Exchange Act Release No. 34-67412, 77 Fed. Reg. 42,022 (July 17, 2012); Exchange Act Release No. 34-65761, 76 Fed. Reg. 72,230 (Nov. 22, 2011); Exchange Act Release No. 34-62534, 75 Fed. Reg. 43,590 (July 26, 2010); *see also* Exchange Act Release No. 34-72812, 79 Fed. Reg. 48,824 (Aug. 18, 2014); Exchange Act Release No. 34-72676, 79 Fed. Reg. 44,520 (July 31, 2014); Exchange Act Release No. 34-73333, 79 Fed. Reg. 62,223 (Oct. 16, 2014); Exchange Act Release No. 34-70637, 78 Fed. Reg. 62,745 (Oct. 22, 2013); Exchange Act Release No. 34-69538, 78 Fed. Reg. 28,671 (May 15, 2013); Exchange Act Release No. 34-67093, 77 Fed. Reg. 33,798 (June 7, 2012); Exchange Act Release No. 34-61097, 74 Fed. Reg. 64,788 (Dec. 8, 2009).

[11]    *See*, *e.g.*, Exchange Act Release No. 34-48053, 68 Fed. Reg. 37,880 (June 25, 2003); Exchange Act Release No. 34-47948, 68 Fed. Reg. 33,749 (June 5, 2003); Exchange Act Release No. 34-47090, 68 Fed. Reg. 141 (Jan. 2, 2003); Exchange Act Release No. 34-43462, 65 Fed. Reg. 64,466 (Oct. 27, 2000); Exchange Act Release No. 34-43290, 65 Fed. Reg. 57,213 (Sept. 21, 2000).

produce economic benefits to customers, including increased competition).  PFOF programs are

not novel; they have been implemented in various forms (with approval by the SEC) since the

early 1980s.  *See Orman*, 688 N.E.2d at 623–25.

Plaintiffs challenge a particular type of PFOF program known as a "maker/taker" model,

in which "non-marketable, resting orders that offer (make) liquidity at a particular price receive a

liquidity rebate if they are executed, while incoming orders that execute against (take) the

liquidity of resting orders are charged an access fee."  EMS Concept Release, 75 Fed. Reg. at

3598–99.  Plaintiffs acknowledge, however, that the maker/taker model has been approved

directly by the SEC in Regulation NMS.  *See* CAC ¶ 46 ("Reg[ulation] NMS cemented this

pricing practice by allowing exchanges to continue charging [PFOF] fees to so-called 'takers' of

liquidity, while not charging so-called 'makers'"); *see also* 17 C.F.R. § 242.610(c).

## H.    The Consolidated Amended Complaint

Plaintiffs allege that the Exchanges' use of proprietary feeds and co-location services

provided HFT firms with earlier access to market information than other investors, and that the

Exchanges facilitated the HFT firms' use of this informational advantage through complex order

types and PFOF fees.  *See*, *e.g.*, CAC ¶ 7.  According to Plaintiffs, the Exchanges caused non-

HFT members of the investing public to "purchase and sell shares at distorted and manipulated

prices."  *Id.* ¶ 273.  Plaintiffs assert that this conduct constitutes securities fraud in violation of

Section 10(b) of the Exchange Act and the SEC's Rule 10b-5.  *See id.* ¶¶ 272–278.  In addition,

they allege that the Exchanges have violated their responsibilities as registered national securities

exchanges, in contravention of Section 6(b) of the Exchange Act.  *See id.* ¶¶ 279–284.

Tellingly, Plaintiffs' prayer for relief seeks sweeping changes to the current structure of

the securities markets, including by prohibiting practices that the SEC has approved.  For

example, although the SEC has expressly declined to require all recipients to receive market data

from the consolidated feeds and any proprietary feeds at the same time, Plaintiffs ask this Court to enter an order "directing [the Exchanges] to ensure that customer bid and offer prices are provided to all investors and trading entities at the same time."  CAC Prayer for Relief ¶ E. Similarly, although the SEC has approved the Exchanges' PFOF plans, and even Plaintiffs acknowledge that Regulation NMS permits maker/taker PFOF models, Plaintiffs ask this Court to "prohibi[t] [the Exchanges] from providing a financial incentive in the form of rebates or otherwise to HFT and brokerage firms for placing orders and bids on those exchanges."  *Ibid.* And while the SEC has approved co-location services, Plaintiffs ask this Court to prohibit them by judicial fiat.  *See ibid.* (seeking an order "prohibiting Defendants from providing an informational advantage to any HFT firm via paid-for reduced latency services").

## ARGUMENT

The CAC should be dismissed because the Court lacks subject matter jurisdiction and because the CAC fails to state a claim upon which relief can be granted.  "A case is properly dismissed . . . under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. . . .  A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  For a complaint to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Although the Court must accept all well-pleaded factual allegations in the CAC, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (alterations and internal quotation marks omitted).  Under these settled legal standards, the CAC should be dismissed.

17

**I.      The Court Lacks Subject Matter Jurisdiction Because The Exchange Act Provides The Exclusive Procedure For Reviewing Plaintiffs' Claims.**

When Congress chose to rely upon SROs for the regulation of the securities markets, it created a "complex self-regulatory scheme" enforced by the SEC using a "broad . . . range of administrative remedies . . . for those aggrieved by [SRO] action." *Merrill Lynch, Pierce, Fenner & Smith*, *Inc. v. NASD*, 616 F.2d 1363, 1368 (5th Cir. 1980).  Under the Exchange Act's two-tiered review procedure, any allegation that the Exchanges violated the Exchange Act or Regulation NMS must first be presented to the SEC.  *See*, *e.g.*, 15 U.S.C. § 78s; *see also* 17 C.F.R. § 242.608(d) (authorizing SEC review of challenges to market-data dissemination).  Any party aggrieved by a final order of the SEC can then seek further review, but only in a federal court of appeals.  *See*, *e.g.*, 15 U.S.C. § 78y(a)(1).  The Exchange Act does not permit Plaintiffs to circumvent this review procedure by proceeding in district court on claims like these.  This Court accordingly lacks jurisdiction over Plaintiffs' claims.  *See*, *e.g.*, *Altman v. SEC*, 687 F.3d 44, 46 (2d Cir. 2012) (per curiam) (affirming dismissal for lack of subject matter jurisdiction where plaintiff failed to exhaust administrative remedies); *Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*, No. 11-cv-9358, 2012 WL 345902, at *1 (S.D.N.Y. Jan. 31, 2012) ("*Cleantech II*") (dismissing for lack of subject matter jurisdiction for failure to exhaust administrative remedies).

**A.      Plaintiffs' Claims Are Subject To Review By The SEC Under The Exchange Act's Comprehensive Review Process.**

Plaintiffs directly challenge the Exchanges' alleged failure to fulfill their responsibilities as national securities exchanges under the Exchange Act and Regulation NMS.  Indeed, that is the core theory behind their entire case:  Plaintiffs assert that the Exchanges "failed to discharge the[ir] obligations" to "operat[e] their securities exchanges in the public interest and for the

protection of investors." CAC ¶ 281.  They similarly assert that the Exchanges' use of

proprietary data feeds "contraven[ed]" Regulation NMS.  *Id.* ¶ 108.

 For two independent reasons, Plaintiffs' claims that the Exchanges violated the Exchange

Act and Regulation NMS must be adjudicated by the SEC.

 **1.** <u>Exchange Act</u>.  The Exchange Act directly provides for review of Plaintiffs'

allegations.  The SEC retains "plenary" authority under the Exchange Act to "remedy the acts

and omissions of self-regulatory organizations."  *Cook v. NASD*, 31 F. Supp. 2d 1245, 1248 (D.

Colo. 1998); *see also*, *e.g.*, *Citadel*, No. 13-cv-5833, slip op. at 3.  Congress has given

"formidable oversight power" to the SEC to "supervise, investigate, and discipline" SROs for

"*any* possible wrongdoing."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 101 (2d Cir. 2007)

(emphasis added); *see also Standard Inv. Chartered v. NASD*, No. 07-cv-2014, 2007 WL

1296712, at *7 (S.D.N.Y. May 7, 2007) (noting the SEC's "numerous powers" to remedy

complaints by those claiming to be aggrieved by SRO action).  Among other things:

- The SEC may censure SROs for violating the Exchange Act or SEC regulations.  *See* 15 U.S.C. § 78s(h)(1); *Standard Inv. Chartered*, 2007 WL 1296712, at *7.

- The SEC can suspend the registration, or otherwise limit the activities, of an SRO that has failed to comply with the Exchange Act or SEC regulations.  *See* 15 U.S.C. § 78s(h)(1); *see also Standard Inv. Chartered*, 2007 WL 1296712, at *7.

- The SEC can bring administrative proceedings or sue in federal court to obtain injunctive relief, disgorgement, civil penalties, and/or the appointment of a receiver to remedy SRO violations of the Exchange Act or SEC regulations.  *See*, *e.g.*, 15 U.S.C. § 78u(d); 15 U.S.C. § 78u-3; *Standard Inv. Chartered*, 2007 WL 1296712, at *6; *SEC v. Tourre*, 4 F. Supp. 3d 579, 588–599 (S.D.N.Y. Mar. 12, 2014); *SEC v. Wang*, 944 F.2d 80, 81–82 (2d Cir. 1991); Exchange Act Release No. 34-64553 (May 26, 2011), *available at* 2011 WL 2098098.

 Plaintiffs complain that the Exchanges provided preferential access to market data to

HFT firms, and then encouraged them to take advantage of that preferential access at the expense

of other market participants—all in violation of the Exchange Act.  The SEC is vested with

authority to resolve these claims under the Exchange Act, and to provide appropriate remedies in the event that it finds there has been a violation. Indeed, the SEC has proven itself ready, willing, and able to pursue enforcement proceedings against an exchange for market-data violations. *See In re NYSE*, Exchange Act Release No. 34-67857.

      **2.**   <u>Regulation NMS</u>. Regulation NMS also creates a review procedure for the SEC to "entertain appeals in connection with the implementation or operation of any effective national market system plan." 17 C.F.R. § 242.608(d). In particular, "*[a]ny action* taken or failure to act by any person in connection with an effective national market system plan . . . *shall be subject to review by the [SEC]*, on its own motion or upon application by any person aggrieved thereby." *Id.* § 242.608(d)(1) (emphases added). Plaintiffs' challenges to proprietary data feeds and co-location services address "action[s] taken" by the Exchanges "in connection with an effective national market system plan," *ibid.*, and thus they had the opportunity to complain to the SEC about those actions.

      Significantly, Plaintiffs' case rests on their assertion that proprietary data feeds and co-location services violate Regulation NMS. Complex order types and maker/taker PFOF programs are simply the *vehicles* through which the Exchanges supposedly facilitated and encouraged the use of HFT firms' alleged informational advantage. The complex order types are objectionable, Plaintiffs allege, because they provide "[t]he ability to gain access to the top of an exchange's 'order book,' or the queue of buy and sell orders that are typically ranked by price and when they were received," CAC ¶ 121, which in turn allows HFT firms to "take advantage of th[eir] speed advantage," *id.* ¶ 100. Similarly, Plaintiffs allege that maker/taker PFOF programs are objectionable because they "incentiviz[e]" "HFT firms, which were way out ahead of the rest of the market by micro- if not milliseconds," to "create more interest in the stock by

pinging more exchanges . . . in order to close the trade on an exchange that would pay them the largest rebate rather than charging them a fee to transact." *Id.* ¶ 217.  If the SEC were to change course and require the Exchanges to eliminate proprietary data feeds and co-location services, then Plaintiffs would have no basis for claiming that HFT firms have an informational advantage, or any harm from that supposed advantage.  Thus, the SEC has authority under Regulation NMS to address the central element on which Plaintiffs' entire theory of liability depends:  early access to market information, through proprietary data feeds and co-location services.

### B.     Plaintiffs Cannot Bypass The Exchange Act's Review Process By Suing In Federal District Court.

Congress has created a two-tiered process for reviewing SRO actions under the Exchange Act that did not include *any* role for the district courts.  Congress adopted a "self-contained process" to "review and remedy . . . complaints" about SRO actions such as those challenged here.  *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008).  As a result, district courts lack subject matter jurisdiction over claims against SROs raising issues that "Congress intended to subject to the comprehensive enforcement structure created by the Exchange Act."  *Hayden v. NYSE, Inc.*, 4 F. Supp. 2d 335, 340 (S.D.N.Y. 1998).  This remains true "[w]hether or not Plaintiff[s] choos[e] to avail [themselves] of this process." *Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*, No. 11-cv-9358, 2011 WL 7138696, at *4 (S.D.N.Y. Dec. 30, 2011) ("*Cleantech I*") (dismissing challenge to SRO action for lack of jurisdiction).

The Second Circuit has recognized that the Exchange Act's provision allowing review of SEC decisions by the federal courts of appeals under 15 U.S.C. § 78y "generally preclude[s] *de novo* review in the district courts, requiring litigants to bring challenges 'in the Court of Appeals

or not at all.'" *Altman*, 687 F.3d at 45–46 (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357

U.S. 320, 336 (1958)).  Another judge of this Court has similarly recognized, in *Cleantech II*,

that litigants cannot pursue claims in district court that could be raised through the Exchange

Act's review process, because that statute "sets forth a specific and comprehensive scheme" for

reviewing challenged SRO actions, "including review by the SEC and the United States Courts

of Appeals."  2012 WL 345902, at *1 (citations omitted).  Similarly, the D.C. Circuit

emphasized in *Series 7* that the Exchange Act's "multiple layers of review evince Congress's

intent to direct challenges" into "avenues Congress created."  548 F.3d at 114.[12]

Because Plaintiffs' claims impermissibly seek to challenge SRO actions outside of the

"avenues Congress created," *Series 7*, 548 F.3d at 114, this Court lacks jurisdiction to entertain

those claims.  And it would be particularly appropriate for this Court to hold that it lacks

jurisdiction because Section 11A of the Exchange Act and Regulation NMS vest the SEC—not

federal district courts—with authority to evaluate whether any action or failure to act constitutes

a violation of Regulation NMS.  Under the regulation, proceedings before the SEC "shall" be

dismissed if the SEC determines that the underlying action or failure to act was "consistent with

the public interest, the protection of investors, the maintenance of fair and orderly markets, and

the removal of impediments to, and the perfection of the mechanisms of a national market

system."  17 C.F.R. § 242.608(d)(3).  If the SEC concludes that an exchange has violated

---

[12]   This exclusivity rule holds true not only under the Exchange Act with respect to SROs, but
also under many similar two-step systems in which a federal statute gives jurisdiction first to a
federal agency and then to a federal court of appeals.  "By lodging review of agency action in the
Court of Appeals, Congress manifested an intent that the appellate court exercise *sole*
jurisdiction over the class of claims covered by the statutory grant of review power."
*Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) (emphasis added).
Under those circumstances, a federal statute channeling review to the agency and then to a court
of appeals creates the exclusive procedure for a judicial challenge, even if there is no "express
statutory command of exclusiveness."  *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*,
379 U.S. 411, 422 (1965).

Regulation NMS, the regulation grants broad authority to the SEC to determine an appropriate remedy, providing that the SEC "shall" set aside the challenged action or omission "and/or require such action" as "the [SEC] deems necessary or appropriate."  *Ibid.*

It would undermine Congress's goal in creating the national market system overseen by the SEC, and the SEC's goal in promulgating Regulation NMS, if the determination of what standard of liability to apply or what remedy was "necessary or appropriate" for a given breach were decided by courts or juries, rather than by the SEC under the authority granted to it by Congress.  Indeed, the SEC has considered—and *rejected*—the central assertion on which the CAC is based.  Plaintiffs complain that the users of proprietary feeds and co-location services receive market data earlier than other investors, and that this enables those users to employ various methods (such as complex order types) to profit at other investors' expense.  *See*, *e.g.*, CAC ¶ 7.  Plaintiffs maintain that this practice is illegal because Regulation NMS "require[s] . . . that the [Processors] transmit [market] data so as *to be received* by all market participants at the same time."  *Id.* ¶ 108 (emphasis added).  But Regulation NMS does not say that, and the SEC plainly does not accept this interpretation of its regulation.

In adopting Regulation NMS, the SEC made clear that it was prohibiting an SRO or broker-dealer only from *sending* data to a vendor or user any sooner than it *sends* the data to a Processor, not requiring exchanges to "synchronize the delivery of [their] data to end-users with delivery of [consolidated] data by a Network processor to end-users."  NMS Adopting Release, 70 Fed. Reg. 37,496, 37,567.  In other words, the SEC has rejected the notion—essential to Plaintiffs' claims—that the Exchanges must police the order in which data *arrives* at end users.  The SEC recently reiterated its acceptance of the fact that "information from a Network Processor generally reaches market participants later than information from exchanges'

proprietary feeds." *In re NYSE*, Exchange Act Release No. 34-67857, at 9; *see also* EMS

Concept Release, 75 Fed. Reg. at 3601.  Plaintiffs thus ask this Court and a jury to impose

liability for conduct that the SEC has decided does not offend the legal standards they invoke.

Plaintiffs seek to sidestep the process that Congress and the SEC have created for

reviewing the Exchanges' conduct, and to have this Court adopt their preferred view of how the

nation's securities markets should function.  This Court should decline their invitation and

conclude that federal district courts cannot bypass Congress's orderly system of review by the

SEC and, on appeal, the federal courts of appeals.[13]

## II. Plaintiffs' Claims Are Barred By Absolute Immunity.

### A. The Exchanges Are Immune From Private Damages Suits Challenging Their Regulatory Activities.

An unbroken chain of Second Circuit decisions has left "no question that an SRO and its

officers are entitled to absolute immunity from private damages suits in connection with the

discharge of their regulatory responsibilities." *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d

112, 115 (2d Cir. 2011) (per curiam); *see also*, *e.g.*, *NYSE Specialists*, 503 F.3d at 96; *DL*

---

[13]   Despite possessing at least two routes to bring their claims before the SEC, Plaintiffs have not attempted to invoke the Exchange Act's review process.  Plaintiffs have not initiated any proceeding before the SEC, nor pursued any adverse decision by the SEC to the federal courts of appeals.  Thus, even if it were argued—incorrectly—that Plaintiffs could have been permitted to pursue their claims in district court after exhausting their remedies under the Exchange Act, dismissal would be warranted here because they have not exhausted those remedies.  *See Swirsky v. NASD*, 124 F.3d 59, 62 (1st Cir. 1997) (applying "'the doctrine of exhaustion of administrative remedies . . . to prevent circumvention of established procedures'" in the SRO context (quoting *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 695 (3d Cir. 1979))); *Citadel*, No. 13-cv-5833, slip op. 3 (dismissing complaint because "plaintiffs have not availed themselves of the administrative process"); *Am. Benefits Grp., Inc. v. NASD*, No. 99-cv-4733, 1999 WL 605246, at *8 (S.D.N.Y. Aug. 10, 1999) (dismissing complaint because the plaintiff "could have challenged the rules at least before the SEC and sought review in an appropriate court of appeals" but failed to do so); *Cook*, 31 F. Supp. 2d at 1249 (dismissing complaint for failure to exhaust because the SEC must "determine whether [SROs are] discharging properly [their] duties and responsibilities").

*Capital*, 409 F.3d at 97; *D'Alessio v. NYSE, Inc.*, 258 F.3d 93, 105–06 (2d Cir. 2001).  Numerous

other courts have reached the same conclusion.  *See*, *e.g.*, *Series 7*, 548 F.3d at 114–15; *Sparta*

*Surgical Corp. v. NASD*, 159 F.3d 1209, 1213–15 (9th Cir. 1998).  SRO immunity is dispositive

here.

Absolute immunity is a "'matter not simply of logic but of intense practicality, since, in

the absence of such immunity, [an SRO's] exercise of its quasi-governmental functions would be

unduly hampered by disruptive and recriminatory lawsuits.'"  *D'Alessio*, 258 F.3d at 105

(quoting *D'Alessio v. NYSE, Inc.*, 125 F. Supp. 2d 656, 658 (S.D.N.Y. 2000)).  The entire

"purpose of immunity" is to provide SROs with "breathing room to exercise their powers"

without having to worry that regulatory decisions might "engender endless litigation."  *NYSE*

*Specialists*, 503 F.3d at 97.  Accordingly, claims against an SRO are barred if they attack

conduct that falls within the scope of the SRO's regulatory role, whether the lawsuits are pleaded

as federal claims, state-law claims, statutory claims, or common-law claims.  *See*, *e.g.*, *Standard*,

637 F.3d at 116–17 (state-law claims); *DL Capital*, 409 F.3d at 96 (federal statutory and state

common-law claims); *D'Alessio*, 258 F.3d at 100 (state common-law claims).[14]

The determinative question in applying SRO immunity is "*whether* [the] specific acts and

forbearances [challenged by the plaintiff] were incident to the exercise of regulatory power," and

thus the "propriety of those actions or inactions" is irrelevant.  *NYSE Specialists*, 503 F.3d at 98;

*see also*, *e.g.*, *id.* at 95–96 (motive and reasonableness are not relevant considerations in

immunity determination); *Sparta*, 159 F.3d at 1215 (absolute immunity applies even if the

allegations of misconduct are true).  As the Second Circuit explained in *Standard*, if the

---

[14] The fact that SROs are immune from private damages suits challenging the exercise of their
regulatory functions does not mean that those actions are exempt from review.  To the contrary,
as noted in Part I.A *supra*, Congress has established a comprehensive review system involving
oversight by the SEC and, on appeal, the federal courts of appeals.

challenged SRO conduct is "intimately intertwined with the regulatory powers delegated to SROs," then absolute immunity applies.  637 F.3d at 116–17.

### B. Because Plaintiffs Seek Damages Allegedly Caused By The Exchanges' Failure To Properly Exercise Their Regulatory Functions, Their Claims Are Barred By Absolute Immunity.

Plaintiffs' allegations are "intimately intertwined" with the Exchanges' regulatory functions, *Standard*, 637 F.3d at 116, and their claims are accordingly barred by absolute immunity.  Under Section 11A of the Exchange Act and Regulation NMS, Congress and the SEC have charged the Exchanges with the regulatory responsibility of developing, implementing, and enforcing SEC-approved data dissemination plans to facilitate the national market system.  *See supra* at 6–8.  Plaintiffs' claims that the Exchanges violated the Exchange Act and Regulation NMS by permitting HFT firms to access market information sooner than other market participants, through both proprietary feeds and co-location services, are allegations that they have failed to implement the national market system consistent with their regulatory responsibilities.  Because early access to market information is the centerpiece of Plaintiffs' case, their claims are barred by absolute immunity.  Yet even considered independently from Plaintiffs' allegations regarding proprietary feeds and co-location services, complex order types and PFOF programs are themselves part of the Exchanges' duty to regulate trading on their markets, and thus are covered by absolute immunity in any event.

### 1. The Exchanges' Implementation Of The National Market System Is A Core Regulatory Function Under The Exchange Act.

The Exchanges' dissemination of market data is a core regulatory function that falls within their statutorily delegated responsibilities under Section 11A of the Exchange Act and Regulation NMS.  *See* 15 U.S.C. § 78k-1(a)(1)(D) (noting that national market system will "foster efficiency, enhance competition, increase the information available to brokers, dealers,

and investors, facilitate the offsetting of investors' orders, and contribute to [the] best execution of such orders").  In particular, the regulatory responsibility for disseminating consolidated market data—the type of information that "ordinary investors" allegedly receive, *see* CAC ¶ 70—is delegated specifically to the Exchanges under Section 11A and Regulation NMS.  *See* H.R. Rep. No. 94-229, 94th Cong., 1st Sess. 93 (1975) (stating that the systems for collecting and distributing consolidated market data would "form the heart of the national market system"); *see also* Exchange Act Release No. 34-49325, 69 Fed. Reg. 11,126, 11,177 (Mar. 9, 2004) ("public availability of market information . . . is [a] fundamental objectiv[e] of the Exchange Act").

Regulation NMS—which is subtitled "*Regulation* of the National Market System," 17 C.F.R. Part 242 (emphasis added)—delegates to the Exchanges the regulatory responsibility of organizing themselves (and others) through NMS Plans to produce consolidated reports of market data.  *See*, *e.g.*, 15 U.S.C. § 78k-1(a)(3)(B) (directing SEC to "authorize or require [SROs] to act jointly with respect to matters as to which they *share authority under this chapter* in planning, developing, operating, or regulating a national market system" (emphasis added)); *see also* 17 C.F.R. § 242.603(b) (requiring the Exchanges and national securities associations that trade NMS stocks to act jointly pursuant to NMS Plans to disseminate consolidated quotation and transaction information); *id.* § 242.608(a)–(b) (setting forth the procedures for filing NMS Plans and amendments with the SEC and the standards governing SEC approval of those plans).  The NMS Plans themselves spell out (in slightly varying language) these regulatory responsibilities, including overseeing the consolidation process; periodically evaluating the Processors; setting the fees to be paid by recipients of consolidated data feeds; determining matters involving the interpretation of the NMS Plans; making policy

determinations pertaining to contracts with recipients of consolidated market data; and prescribing the forms of contracts for providing consolidated data.  *See*, *e.g.*, NASDAQ UTP Plan § IV.B; CTA Plan §§ IV, V.

Thus, in planning and operating the national market system, the Exchanges actively are engaged in a regulatory function required by Congress and the SEC, and governed by the SEC's Regulation NMS.  Because Plaintiffs' claims seek damages arising from the Exchanges' alleged failure to properly exercise this regulatory authority—and in particular their assertions that the Exchanges violated the Exchange Act and Regulation NMS by permitting HFT firms to receive information earlier than other investors, *see*, *e.g.*, CAC ¶ 109—their claims are barred.

The Second Circuit's decision in *NYSE Specialists* is illustrative.  The plaintiffs there alleged "wide-ranging manipulative, self-dealing, deceptive, and misleading conduct" against an SRO for allowing certain market traders to have advanced access to trading information.  *NYSE Specialists*, 503 F.3d at 93 (internal quotation marks omitted).  These preferred traders, in turn, allegedly could avail themselves of trading advantages, including by trading ahead of other investors who lacked advanced access.  The plaintiffs alleged that the SRO had "permitted and encouraged misconduct and fraud on its trading floor" and was not entitled to immunity because such misconduct "abandoned [the SRO's] regulatory role to maintain a fair and orderly market." *Id.* at 91.  But because the obligation to maintain a fair and orderly market is a core regulatory responsibility for exchanges, the plaintiffs' claims challenged the SRO's failure to properly exercise its regulatory functions, and thus those claims were barred by absolute immunity.  *Id.* at 99–101; *see also*, *e.g.*, *The NASDAQ OMX Group, Inc. v. UBS Sec., LLC*, No. 13-2657-cv, slip op. at 24 (2d Cir. Oct. 31, 2014) (discussing the "federally prescribed duty to operate a fair and orderly exchange").

Similarly here, Plaintiffs allege that the Exchanges violated their regulatory duties with respect to market data by providing advance access to others, who used that purported informational advantage to generate trading profits.  Because the alleged misconduct in this case arises from obligations imposed on the Exchanges by the Exchange Act and Regulation NMS to plan and implement the national market system, Plaintiffs' claims are barred by absolute immunity.[15]

> **2.    Plaintiffs' Claims Based On Complex Order Types And PFOF Programs Are Also Barred By The Exchanges' Absolute Immunity.**

Because Plaintiffs cannot pursue claims that the Exchanges illegally provided earlier access to market information to certain investors, this Court need go no further before dismissing their claims.  As noted above, Plaintiffs' allegations that Exchanges allowed HFT firms to receive market information before other investors are central to their claims; although Plaintiffs allege that HFT firms used several methods to *profit* from that advanced information, their claims depend in the first instance on the Exchanges having "provid[ed] HFT firms access to material trading data via preferred access to exchange floors and enriched data feeds," CAC ¶ 4; *see also supra* at 20–21.  Yet even if the Court were to consider Plaintiffs' allegations regarding complex order types and maker/taker PFOF programs in isolation, those allegations are directly related to the Exchanges' regulatory obligation to oversee and maintain their markets, and accordingly are barred by absolute immunity.  *See, e.g.*, *The NASDAQ OMX Group, Inc. v. UBS*

---

[15]   As the Second Circuit recognized in *DL Capital*, "safeguarding the integrity of market information was one of the purposes behind the regulation of the securities markets in the first place."  409 F.3d at 98.  Because Plaintiffs allege that the Exchanges failed in their responsibilities to "safeguar[d] the integrity of market information," *ibid.*, their claims would be barred by absolute immunity even apart from Section 11A and Regulation NMS.

*Sec., LLC*, No. 13-2657-cv, slip op. at 24 (2d Cir. Oct. 31, 2014) (discussing the "federally

prescribed duty to operate a fair and orderly exchange").[16]

     **a.**   <u>Complex Order Types</u>.  As Plaintiffs acknowledge, the order types used by the

Exchanges—whether simple or complex—reflect "preprogrammed commands traders use to tell

the Exchanges how to handle their bids and offers."  CAC ¶ 4.  As the SEC has recognized in

approving rules regarding order types, the adoption and use of particular order types falls

squarely within the Exchanges' regulatory duties under the Exchange Act (i) to "prevent

fraudulent and manipulative acts and practices," (ii) to "promote just and equitable principles of

trade," (iii) to "remove impediments to and perfect the mechanism of a free and open market and

a national market system," and (iv) to "protect investors and the public interest."  15 U.S.C.

§ 78f(b)(5); *see also*, *e.g.*, Exchange Act Release No. 34-63777, 76 Fed. Reg. 5630, 5634 (Feb.

1, 2011) (approving amendments to exchange rule regarding complex orders); Exchange Act

Release No. 34-69419, 78 Fed. Reg. 24,449, 24,453 (Apr. 25, 2013) (same).

     Plaintiffs allege that the Exchanges have permitted complex order types that allow HFT

firms to exploit their alleged informational advantage to the unlawful detriment of other traders,

*see*, *e.g.*, CAC ¶ 120, but that is simply an allegation that the Exchanges have exercised their

regulatory responsibilities *improperly*.  As the Second Circuit emphasized in *NYSE Specialists*,

the key question for absolute immunity is "*whether* [the] specific acts and forbearances

---

[16]   It is irrelevant that the Exchanges might have created different trading or fee options on their markets in order to increase order flow.  The 1975 Amendments to the Exchange Act are a congressional mandate to the SEC to "create a fair field of competition."  S. Rep. No. 94-75, 94th Cong., 1st Sess. 12 (1975).  Regulation NMS contains the standards and structures designed to bring diversity of trading opportunities and platforms to the market, and the Exchanges' efforts to implement those standards and structures, shaped by the SEC, are thus fundamentally regulatory in nature.  The diverse trading opportunities offered by the Exchanges—including innovative data products, other efforts to facilitate price competition on their markets through order types, and efforts to provide access to their execution facilities—are intimately interwoven with their delegated operational and regulatory roles.

[challenged by the plaintiff] were incident to the exercise of regulatory power," which has nothing to do with the "propriety of those actions or inactions."  503 F.3d at 98.  And even Plaintiffs concede that the Exchanges have a regulatory responsibility to "ensur[e] an orderly and fair market."  CAC ¶ 48; *see also*, *e.g.*, *id.* ¶¶ 44, 73, 77, 81, 281.  Because the Exchanges' promulgation of order types, including complex order types, falls well within their regulatory responsibilities to oversee and maintain their markets, Plaintiffs' allegations with respect to complex order types are barred by absolute immunity.

   **b.**   <u>Maker/Taker PFOF Programs</u>.  Plaintiffs' claims with respect to maker/taker PFOF fees also concern conduct that arises from authority delegated to the Exchanges.  The rules imposing the PFOF fees were promulgated pursuant to the same statutory authority as the complex order types, *see supra* at 15–16; *see also* 15 U.S.C. § 78f(b)(4)–(5), and fit squarely within this delegated authority, *see*, *e.g.*, Concept Release, Competitive Developments in the Options Markets, 69 Fed. Reg. 6124, 6129 (Feb. 9, 2004); *Citadel*, No. 13-cv-5833, slip op. at 2 ("Those fees were imposed to attract 'order flow' to a market, thereby increasing market liquidity and benefitting investors.").

   Once again, Plaintiffs' complaint about PFOF fee structures is that the Exchanges *improperly* exercised their regulatory functions and thereby "incentivize[d] HFTs and their predatory practices rather than ensuring an orderly and fair market."  CAC ¶ 48.  But the creation of PFOF fee rules was an exercise of delegated regulatory power by the Exchanges, and implementation of those rules, in tandem with the SEC's approval, was a regulatory obligation of the Exchanges under the Exchange Act.  That is all that is required for absolute immunity to attach.  *See NYSE Specialists*, 503 F.3d at 98 ("propriety of . . . actions or inactions" is irrelevant).

3.      **Plaintiffs Cannot Plead Around Absolute Immunity By Invoking Supposed "Profit" Motivations.**

Plaintiffs attempt to escape the Exchanges' absolute immunity by pleading around it. Plaintiffs allege that the Exchanges' "sale of advanced access to market data has nothing to do with their former roles as market regulators and everything to do with their private business interests, such as efforts to increase trading volume and profits." CAC ¶ 270. "Allowing [the Exchanges] to be immune from activities *designed* to increase order flow and trading volume from HFT firms would allow unrestrained *motives* for profit to go unchecked." *Id.* ¶ 271 (emphases added). But Plaintiffs' invocations of supposed profit motivations do not abrogate immunity. Under settled Second Circuit precedent, such motivations are *categorically* irrelevant to the immunity analysis.[17]

a.      <u>Second Circuit Precedent</u>. The Second Circuit has repeatedly and expressly held that allegations of profit motive *cannot* defeat absolute immunity. *See NYSE Specialists*, 503 F.3d at 98 (granting immunity to SRO even though the plaintiff had alleged that the challenged decisions were made to increase the SRO's profits); *D'Alessio*, 258 F.3d at 98 (same); *see also Dexter v. Depository Trust & Clearing Corp.*, 406 F. Supp. 2d 260, 263–64 (S.D.N.Y. 2005) (allegations of a profit motive are irrelevant to the immunity analysis), *aff'd*, 219 F. App'x 91 (2d Cir. 2007). It does not matter *how* or *why* an SRO is alleged to have acted wrongfully. As

---

[17]   The SEC has approved the for-profit status of each of the Exchanges. *See* Exchange Act Release Nos. 34-58375, 73 Fed. Reg. 49,498 (Aug. 21, 2008) (BZX, reflecting ownership by BATS); Exchange Act Release No. 34-62716, 75 Fed. Reg. 51,295 (Aug. 19, 2010) (BYX, reflecting ownership by BATS); Exchange Act Release No. 34-51149, 70 Fed. Reg. 7531 (Feb. 14, 2005) (CHX); Exchange Act Release No. 34-61698, 75 Fed. Reg. 13,151 (Mar. 18, 2010) (EDGA and EDGX, reflecting ownership by Direct Edge); Exchange Act Release No. 34-53128, 71 Fed. Reg. 3550 (Jan. 23, 2006) (NASDAQ); Exchange Act Release No. 34-53382, 71 Fed. Reg. 11,251 (Mar. 6, 2006) (NYSE).

noted above, all that matters is "*whether* [the challenged] acts and forbearances were incident to the exercise of regulatory power." *NYSE Specialists*, 503 F.3d at 98.[18]

In *NYSE Specialists*, the plaintiffs alleged—as here—that the SRO defendant had "abandoned its regulatory duties and oversight" because it "had a direct financial interest in the successful continuation of th[e] [challenged] scheme." 503 F.3d at 93, 98 n.3 (internal quotation marks omitted). The Second Circuit held that these allegations were irrelevant, however, because the "focus" of the immunity inquiry must remain on the "specific function at issue in the allegations of misconduct." *Id.* at 99. "If such conduct was within the ambit of the SRO's delegated power," the Second Circuit held, "immunity presumptively attaches, even where the SRO wrongly exercises that power." *Ibid.*

Judge Lynch considered a similar issue in *Dexter*. In that case, the company at issue had been subject to a bankruptcy reorganization plan in which shares of the company had been cancelled and former shareholders had received in exchange interests in a litigation trust. The SRO nonetheless continued to allow purchase of the cancelled shares and announced that holders of those shares would, in conflict with the bankruptcy plan, receive interests in the trust. 406 F. Supp. 2d at 261–62. When the trustee distributed funds to these later purchasers, a shareholder at the time of reorganization filed suit, alleging that the SRO had diluted his value in the trust— and, he maintained, had done so because of the SRO's desire to protect its members and to increase its own profits. *Id.* Judge Lynch noted, however, that SROs do not "lose their

---

[18]   Indeed, "absolute immunity applies even where the challenged conduct was motivated by a wrongful motive[,] as such intent is irrelevant." *NYSE Specialists*, 503 F.3d at 98 n.3. The doctrine "'accords protection from . . . any judicial scrutiny of the motive for and reasonableness of official action,' . . . even where the challenged conduct was motivated by a wrongful motive or even malice." *Id.* at 95–96 (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005)). Courts have thus "declined to craft exceptions [to the immunity doctrine] for bad faith (*Desiderio* [*v. NASD*], 191 F.3d [198,] 208 [(2d Cir. 1999)]), fraud (*DL Capital Grp.*, 409 F.3d at 98), negligence, or even gross negligence (*Sparta*, 159 F.3d at 1215)." *Series 7*, 548 F.3d at 115.

immunity because, in addition to their regulatory functions, they also are profit-making and profit-seeking enterprises," and an SRO's "'motivation in performing [its regulatory] functions is irrelevant to the applicability of absolute immunity.'"  *Id.* at 263 (quoting *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004)).  "[H]owever badly motivated, inept, or even unlawful the [SRO's] actions may have been," the court concluded, the SRO is "absolutely immune from suit on both federal and state claims" because it was performing a regulatory function in permitting trading to proceed.  *Id.* at 264.  The Second Circuit summarily affirmed the decision in *Dexter*.  219 F. App'x at 92.

In this case, Plaintiffs' claims directly implicate the Exchanges' implementation of SEC-approved plans for regulating the national market system.  Just as the plaintiffs did in *NYSE Specialists*, Plaintiffs allege that the Exchanges have abandoned their regulatory role and acted based on supposed profit motivations.  *See* CAC ¶¶ 269–271.  But just as in *NYSE Specialists*, *Dexter*, and other cases, the motivations behind the Exchanges' alleged misconduct are "irrelevant."  *Dexter*, 406 F. Supp. 2d at 263 (internal quotation marks omitted).  Absolute immunity applies with full force to Plaintiffs' claims *because* those claims seek damages arising from the Exchange's alleged failure to properly perform their regulatory functions.

**b.**     The *Facebook* Decision.  Plaintiffs also cite Judge Sweet's decision in *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428 (S.D.N.Y. Dec. 12, 2013), which partially granted a motion to dismiss on immunity grounds but also partially denied SRO immunity with respect to claims arising from technical problems in an exchange's electronic trading systems during the course of an initial public offering ("IPO").  *See*, *e.g.*, CAC ¶ 271.  Judge Sweet concluded that the SRO was immune with respect to its refusal to halt trading or cancel trades following the malfunction, but he determined that absolute immunity did not shield

the SRO for claims relating to the pre-IPO design and promotion of its trading platform.  *See Facebook*, 986 F. Supp. 2d at 452 (discussing challenges to "software design before an IPO" and "promotion of that software before trading commence[d]").  Those claims, he believed, related to the SRO's "own interest as a private entity to increase trading on its Exchange," *id.* at 453, rather than its regulatory functions.

Even if Judge Sweet's decision had been correct on the facts in *Facebook*—and it was not[19]—the reasoning in *Facebook* would not apply here.  The facts of this case arise in a different context from those in *Facebook*, which dealt with technical issues during the course of an IPO.  What matters in this case is whether the actions challenged in the CAC *fall with the Exchanges' duties under the Exchange Act and Regulation NMS*.  The answer to that is unquestionably yes.

## III.    The Consolidated Amended Complaint Fails To State A Claim.

For the reasons discussed above, Plaintiffs' claims fail at the outset under settled legal doctrines.  Those claims are additionally flawed because they fail to state a claim for violations of the Exchange Act.

### A.    Plaintiffs Fail To State A Claim Under Section 6(b) Of The Exchange Act.

Plaintiffs' claim under Section 6(b) of the Exchange Act fails because they do not have a private right of action under that provision.  Under the statutory scheme created by Congress, the SEC alone—not a private litigant—has the power to sanction an SRO for any failure to comply

_____

[19] The Exchanges respectfully submit that the portion of Judge Sweet's decision in *Facebook* denying SRO immunity is wrongly decided; the decision is currently on appeal to the Second Circuit.  Although the court in *Facebook* correctly recognized that "[t]he immunity inquiry turns on the nature of the challenged conduct, not its profitability," and that "the SRO's motive [is] not considered," it incorrectly relied on the SRO's alleged profit motive to increase revenue in denying immunity.  986 F. Supp. 2d at 448–52 & n.13.  The court also erred in concluding that the design of a trading platform is not a regulatory act.  *Id.* at 452–55.  The conduct at issue in *Facebook* was immune because (among other reasons) it involved the regulation of trading on the exchange—a function within the SRO's delegated duty to operate and maintain a fair and orderly market.

with the Exchange Act.  *See* 15 U.S.C. §§ 78s(c), (h)(1), (h)(4), 78u(d)(3)(A).  The Second

Circuit has made clear that no private right of action should be implied to challenge SRO actions

because Congress instead relied on the extensive system of administrative remedies and the

plenary scope of the SEC's enforcement authority over SROs (as enhanced by the 1975

amendments to the Exchange Act) to police SRO actions.  *See Feins v. Am. Stock Exch., Inc.*, 81

F.3d 1215, 1217 (2d Cir. 1996); *Desiderio v. NASD*, 191 F.3d 198, 208 (2d Cir. 1999); *see also*

*Walck v. Am. Stock Exch., Inc.*, 687 F.2d 778, 780, 782–86 (3d Cir. 1982) (noting a "clear

congressional intent not to create a private damages remedy in [Section] 6"); *Jablon v. Dean*

*Witter & Co.*, 614 F.2d 677, 681 (9th Cir. 1980) ("We believe the entire statutory scheme makes

it highly improbable that Congress absentmindedly forgot to mention an intended private action"

in Section 6(b) (internal quotation marks omitted)); *Mihalakis v. Pac. Brokerage Servs., Inc.*, No.

91 Civ. 994, 1991 WL 280236, at *4 (S.D.N.Y. Dec. 23, 1991) (noting that "the greater weight

of recent authority is that no private right of action may be implied under [Section] 6 of the 1934

Act"); *Gustafson v. Strangis*, 572 F. Supp. 1154, 1157 (D. Minn. 1983) (listing the "[n]umerous

courts [that] have held that there is no private cause of action [against an SRO] for violations of

[the Exchange Act]").[20]

---

[20] Before the 1975 amendments to the Exchange Act, the Second Circuit had implied a private
right of action for violations of the pre-1975 version of Section 6(b).  *See Baird v. Franklin*, 141
F.2d 238 (2d Cir. 1944).  As the Second Circuit noted in *Feins*, however, the 1975 statutory
changes "do not suggest Congressional intent to use private parties to enforce the statute through
private causes of action."  81 F.3d at 1222.  Indeed, the 1975 changes, along with the Supreme
Court's more restrictive approach to implied rights of action, have caused the Second Circuit to
express strong doubts about "the continued existence of such a private cause of action under
amended [Section] 6," *id.* at 1224 (citing *Brawer v. Options Clearing Corp.*, 807 F.2d 297, 299
n.2 (2d Cir. 1986)), and have caused courts—including this one—to depart from *Baird*'s holding,
*see*, *e.g.*, *Brawer v. Options Clearing Corp.*, 633 F. Supp. 1254, 1257–62 (S.D.N.Y. 1986).

Because Plaintiffs lack any express right of action to bring suit under Section 6(b), and because no such right of action can be implied, this Court should dismiss Plaintiffs' claims under Section 6(b) for this reason as well.

**B.    Plaintiffs Fail To State A Claim Under Section 10(b) Of The Exchange Act And The SEC's Rule 10b-5.**

Plaintiffs' amorphous claim of securities fraud against the Exchanges fails to allege sufficient facts to establish their standing to sue, much less to plead any of the elements of a cause of action under Section 10(b) and Rule 10b-5.  To violate Section 10(b) and Rule 10b-5, conduct must be either manipulative or deceptive.  *See Santa Fe Indus. v. Green*, 430 U.S. 462, 473 (1977).  Plaintiffs here do not allege any conduct by the Exchanges that fits into either category.  At most, their allegations could be read as attempts to allege aiding and abetting, which is not actionable.  Plaintiffs also fail to allege reliance, loss causation, or scienter.  For these many reasons, the CAC fails to state a claim for securities fraud against the Exchanges.

**1.    Plaintiffs Do Not Have Standing To Assert A Claim Under Section 10(b) And Rule 10b-5.**

Only persons who were "themselves purchasers or sellers" of securities have standing to assert a claim under Section 10(b) or Rule 10b-5.  *See*, *e.g.*, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742 (1975); *Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004).  At the pleading stage, the plaintiff "bears the burden of establishing . . . standing." *Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 84 (2d Cir. 2014); *accord*, *e.g.*, *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007).  Plaintiffs here fail to carry that burden because the CAC does not identify any specific purchase or sale of any specific security.

Although Plaintiffs allege vaguely that they "purchased and sold" millions of shares of stock, CAC ¶¶ 19–23, merely purchasing or selling a security does not, standing alone, confer

standing.  The Second Circuit has rejected the contention that there is "universal standing for purchasers of securities, allowing anyone who made use of the markets to sue under Rule 10b-5."  *Ontario Pub.*, 369 F.3d at 32.  Rather, the standing rule "limits the class of plaintiffs to those who have at least dealt in the security *to which the . . . representatio[n] or omission relates*."  *Ibid.* (quoting *Blue Chip Stamps*, 421 U.S. at 747) (emphasis added).  This limitation is reflected in the PSLRA's certification requirements, which requires plaintiffs to list purchase and sale transactions in the security that is "the subject of the complaint."  15 U.S.C. § 78u-4(a)(2)(iv).

Here, the CAC includes no allegations regarding the purchase or sale of any specific security by any of Plaintiffs.  Similarly, the PSLRA certifications Plaintiffs filed generally purport to list all "transaction(s) during the class period in securities that are the subject of the Complaint," but set forth nothing more than gross annual numbers of shares bought and sold, without identifying any particular stock or date of purchase or sale.  *See* D.E. 169-2 Ex. B, at 2, 7, 10, 13, 16; *see also* CAC ¶¶ 19–23.

These submissions not only flout the clear mandate of the PSLRA, they also plainly fail to establish Plaintiffs' standing.  *See, e.g.*, *Tannenbaum v. Walco Nat'l Corp.*, No. 83-cv-6815, 1984 WL 2374, at *2 (S.D.N.Y. Jan. 27, 1984) (holding that a Section 10(b) claim failed to satisfy the *Blue Chip Stamps* purchaser-seller rule because of the "lack of specifics as to the precise dates of purchase, the number of shares acquired, and the price"); *Spears v. Metropolitan Life Ins. Co.*, No. 2:07-cv-88, 2009 WL 2408928, at *6 (N.D. Ind. Aug. 4, 2009) (dismissing complaint where plaintiffs did not "identif[y] with adequate specificity any securities transaction, which is an essential element of a Rule 10b-5 claim and a mandatory part of the sworn certification required from each plaintiff under the PSLRA"); *see also Fraser v. Fiduciary Trust Co.*, No. 04-cv-6958, 2005 WL 6328596, at *4 (S.D.N.Y. June 23, 2005) (holding that the

38

plaintiff "has not sufficiently pled a purchase or sale of securities with the particularity required by Fed. R. Civ. P. 9(b)" where the plaintiff "fail[ed] to allege the date(s) on which he acquired stock, the number of shares acquired, or the consideration given (if any)" as well as whether he "ever sold his stock").

### 2.      Plaintiffs Fail To Plead A Claim For Market Manipulation.

As best can be discerned from the CAC, Plaintiffs' securities-fraud claim appears to be based on a market-manipulation theory.  The elements of a claim for manipulation under Section 10(b) and Rule 10b-5 are "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 22 (2d Cir. 2013) (internal quotation marks omitted).  A plaintiff seeking to state a claim for manipulation "must state what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Fezzani v. Bear, Stearns & Co.,* 384 F. Supp. 2d 618, 642 (S.D.N.Y. 2004) (internal quotation marks omitted).  The CAC does not comport with these requirements.

### a.      The CAC Does Not Plead Any Manipulative Acts By The Exchanges.

Manipulation is a term of art in the securities laws.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976).  It connotes conduct such as "wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe*, 430

U.S. at 476.[21]   Thus, "the courts have recognized the concept of manipulation as a narrow one."

3 Thomas Lee Hazen, *The Law of Securities Regulation* § 12.1[2][A], at 473 (6th ed. 2009).

In particular, a claim of manipulation requires an allegation that the defendant engaged in "market activity"—namely, trading—designed to convey a false impression of supply and demand for a security.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 100–01 (2d Cir. 2007); *see also*, *e.g, In re Charter Commc'ns Inc. Sec. Litig.,* 443 F.3d 987, 992 (8th Cir. 2006) (manipulation claim requires that defendant "directly engage in manipulative securities trading practices"), *aff'd*, 552 U.S. 148 (2008); *Fezzani,* 384 F. Supp. 2d at 641 (market manipulation requires "direct participation" (internal quotation marks omitted)); *Hundahl v. United Benefit Life Ins. Co*., 465 F. Supp. 1349, 1360 (N.D. Tex. 1979) (manipulation requires "transactions in the marketplace"); 3 Hazen, *supra*, at 480 ("The essence of manipulation is proof that the defendant has engaged in artificial transactions").

To establish manipulation, a plaintiff also must show that the defendant acted "for the purpose of artificially depressing or inflating the price of the security."  *ATSI*, 493 F.3d at 101 (internal quotation omitted); *see also* 3 Hazen, *supra*, at 480 (manipulation requires "the express purpose of changing the market price of the stock").  The aim of such conduct typically is to permit the manipulator to realize profits by trading with innocent investors at the manipulated prices.  *See* S. Rep. No. 1455, 73rd Cong., 2d Sess. 30–31 (1934) (describing purpose of manipulation as "rais[ing] the price of [the] security by concerted activity on the part of the pool members, and thereby to enable them to unload their holdings at a profit").

---

[21]   Wash sales are "transactions involving no change in beneficial ownership," and matched orders are "orders for the purchase [or] sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security."  *Ernst & Ernst*, 425 U.S. at 205 n.25.

The CAC here fails to allege that the Exchanges engaged in any conduct that would meet these specific standards.  Plaintiffs do not allege that any Exchange conducted wash sales, submitted matched orders, or engaged in any other type of market transaction, let alone a transaction designed to artificially affect the market price of any security.  Rather, as explained more fully above, the CAC alleges conduct within the core function of exchanges—the dissemination of market information and the regulation of trading by, among other things, specifying order types.

To the extent that the CAC attempts to allege manipulative conduct within the meaning of Section 10(b), its allegations are directed at HFT firms, not the Exchanges.  It is HFT firms that the CAC alleges "manipulate the U.S. securities markets," CAC ¶ 3.  The CAC pleads no facts showing that any Exchange engaged in "electronic front running, latency arbitrage, rebate arbitrage, spoofing, layering [or] insider trading."  CAC ¶ 274.  These are forms of conduct that HFT firms allegedly carry out; and Plaintiffs have chosen not to name any HFT firms in the CAC.

As to the Exchanges, the CAC at most alleges only aiding and abetting manipulation. The central thrust of Plaintiffs' claim here is that the Exchanges *enabled* HFT firms to take advantage of Plaintiffs and the Class.  The language of aiding and abetting is unmistakable throughout the CAC.[22]  But aiding and abetting a violation of Section 10(b) is not actionable in a

---

[22]   The CAC alleges that the Exchanges "facilitated" unlawful conduct by high-frequency trading firms, CAC ¶ 3; designed order types with the knowledge that HFT firms would use those order types to harm investors, *id.* ¶ 4; "encourage[d]" HFT firms to exploit exchange customers, *id.* ¶ 5; "provide[d] victims" to HFT firms, *id.*; "allow[ed] HFT firms to receive enriched trading information at faster delivery," *id.* ¶ 7; "ma[d]e it possible for [HFT] firms to pick off of and manipulate investors' trades," *id.*; "created the conditions for HFT firms to employ predatory trading strategies," *id.* ¶ 8; "paved the way for a plethora of practices that HFT firms use to prey on less sophisticated investors," *id.* ¶ 61; "enable[d] HFT firms to regularly and repeatedly profit," *id.* ¶ 121; "enable[d] predatory HFT strategies," *id.* ¶ 128; and "incentivized

private securities fraud suit. *See, e.g., Cent. Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). Providing "knowing and substantial assistance" to the violation amounts to aiding and abetting, not primary liability. *See Fezzani*, 716 F.3d at 25; *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 176 (2d Cir. 1998) (rejecting "substantial participation" as the standard for primary liability); 15 U.S.C. § 78t(e) (authorizing the SEC, but not private plaintiffs, to bring aiding-and-abetting claims against parties that "provid[e] substantial assistance" to violators). "[A]n allegation of acts facilitating or even indispensable to a fraud is not sufficient" to state a private claim for market manipulation. *Fezzani*, 716 F.3d at 24. Under this clear Supreme Court and Second Circuit precedent, Plaintiffs' allegations could amount to no more than non-actionable aiding and abetting.

**b.     Disclosure Of The Allegedly Manipulative Conduct Bars Any Claim.**

Even if the conduct alleged in the CAC could form the basis of primary liability for manipulation (which it cannot), the market-manipulation claim would still fail as a matter of law. It is hornbook law that conduct that is disclosed to the market cannot give rise to a claim for market manipulation. "The market is not misled when a transaction's terms are fully disclosed." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130, 132, 140 (2d Cir. 2011) (alterations and internal quotation marks omitted); *see also, e.g., Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 8 (1985); *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012); *In re JP Morgan Auction Rate Sec.(ARS) Mktg. Litig.*, No. 10-md-2157, 2014 WL 4953554, at *8–*9

---

high frequency traders," *id.* ¶ 217. The CAC further alleges that that: the "Exchanges' 'hide and light' orders were designed to and did assist HFT firms in employing predatory trading strategies," *id.* ¶ 134; the "Exchanges knew that engaging in such conduct would induce HFT firms to execute trades on the Exchanges to the detriment of plaintiffs" and "incentivized HFT firms to employ trading strategies," *id.* ¶ 209; "[t]he Exchanges are entirely complicit in and create market conditions that encourage this manipulative conduct" by HFT firms, *id.* ¶ 213; and HFT firms' strategies are "made possible and encouraged by the Exchanges' conduct," *id.* ¶ 221.

(S.D.N.Y. Sept. 30, 2014); *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009).  Here, because each of the types of conduct of which Plaintiffs complain was subject to review by the SEC and disclosed in the Exchanges' various rule filings and other disclosures, as described above, no claim for manipulation can be maintained.

### 3.      The Plaintiffs Fail To Plead Any Deceptive Acts By The Exchanges.

It is far from clear from the CAC that Plaintiffs are even attempting to allege a misrepresentation claim.  Count I invokes only the language of Rule 10b-5(a) and (c) and does not include language from Rule 10b-5(b), which addresses material misrepresentations and omissions.  *See* CAC ¶ 274.  But if, despite this omission, Plaintiffs intended to plead a misrepresentation claim, they have clearly failed to do so.

Any claim of misrepresentation is subject to heightened pleading requirements for fraud under Federal Rule of Civil Procedure 9(b), and for securities fraud under the PSLRA.  As relevant here, Rule 9(b) requires a plaintiff alleging fraud to "specify the statements that the plaintiff contends were fraudulent" and "explain why the statements were fraudulent."  *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks omitted).  Under the PSLRA, similarly, a securities-fraud plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  Under both rules, therefore, plaintiffs must do more than allege that certain statements were false and misleading:  "[T]hey must demonstrate with specificity *why* and *how* that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (emphases added).  In addition, "the PSLRA requires plaintiffs to link *each* act or omission of the defendant to the plaintiffs' alleged losses."  *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272, 1998 WL 342050, at *5 (S.D.N.Y. June 25, 1998) (emphasis added) (citing 15 U.S.C. § 78u-4(b)(4)).  The CAC fails to satisfy these heightened pleading requirements.

As an initial matter, the CAC fails to include any particularized allegations that the challenged statements were, in fact, false or misleading.  The overwhelming majority of the CAC is devoted to establishing that HFT firms were able to take advantage of rules adopted by the Exchanges to profit at other investors' expense.  But these allegations are divorced from the handful of paragraphs devoted to the alleged misstatements.  *See* CAC ¶¶ 78, 82, 86, 90, 93.  The challenged statements are generic assertions to the effect that the relevant markets are "fair or orderly," but Plaintiffs never explain why such statements would be false even if their allegations were correct that HFT firms were able to profit from the markets more successfully than other investors.

In addition, "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable" because they are "too general to cause a reasonable investor to rely upon them."  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (internal quotation marks omitted); *accord*, *e.g.*, *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (same).  The CAC runs afoul of these settled principles when it seeks to hold the Exchanges liable for statements concerning "fair and orderly" markets, a "commitment to regulatory integrity," a desire to "work even harder to earn [investors'] trust and confidence," a focus on "restor[ing] investor confidence," and providing "access to a fair, open, and neutral market place with diverse order flow."  CAC ¶¶ 77, 78, 86, 90, 93.[23]

---

[23]   Similarly, the alleged misrepresentations that market participants could trade "anonymously" and that customers would receive market data in "real-time" (CAC ¶ 82) are inactionable.  The CAC contains no allegation that the Exchanges revealed the identity of any investor to anyone.  Nor does the CAC plead any facts that could show that the Exchanges do not disseminate market information in "real time."  In any event, the fact that the Exchanges offered co-location services and proprietary data feeds that resulted in reduced latencies was repeatedly publicly disclosed in SEC filings, in materials provided by the Exchanges to investors, and otherwise.  *See supra* at 9–

The CAC also vaguely suggests that the Exchanges committed insider trading in violation of Section 10(b) and Rule 10b-5 by providing "proprietary non-public information" concerning unnamed investors' "trading intentions" to HFT firms.  *See* CAC ¶¶ 222–26, 274–75.  Even assuming that these allegations are intended to state a claim for insider trading—which is not at all clear—Plaintiffs' insider-trading theory is fatally flawed.  Not only do Plaintiffs' allegations utterly fail to supply the specificity required of insider-trading allegations, *see In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008), but Plaintiffs also could never state an insider-trading claim against the Exchanges because the Exchanges do not owe any duty to them that could be the predicate of an insider-trading claim.  As the Supreme Court settled long ago, when an insider-trading allegation is based on the misappropriation theory (as any such claim here would have to be[24]), the defendant must betray a fiduciary duty owed to the source of the information.  *See United States v. O'Hagan*, 521 U.S. 642, 652 (1997) ("[t]he misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information").  Plaintiffs offer only one conclusory allegation that the Exchanges owe a fiduciary duty to them, *see* CAC ¶ 4, but that legal conclusion merits no deference and is, in any event, legally incorrect.  It is well-established that "[s]ecurities exchanges are not in a fiduciary relationship with individuals who buy and sell shares through their facilities."  *Piemonte v. Chi. Bd. Options Exch., Inc.*, 405 F. Supp. 711, 718 n.4 (S.D.N.Y.

---

11.  These public disclosures render any statements about "real-time" market data entirely non-misleading.  *See*, *e.g.*, *JP Morgan ARS Mktg. Litig.*, 2014 WL 4953554, at *8 (S.D.N.Y. 2014) ("Plaintiff's material misrepresentation . . . claims fail . . . [because] the activity complained of was adequately disclosed to the market.").

[24]  The other theory of insider trading liability, the "classical" theory, applies only when "a corporate insider trades in securities of his corporation on the basis of material, nonpublic information."  *United States v. O'Hagan*, 521 U.S. 642, 651 (1997).  Plaintiffs do not allege any facts that could fit that pattern.

1975); *see also Arneil v. Ramsey*, 414 F. Supp. 334, 343 (S.D.N.Y. 1976) (finding that an

exchange "is not in a fiduciary relationship with the public customers of its member firms"),

*aff'd*, 550 F.2d 774 (2d Cir. 1977).  As a result, Plaintiffs have no insider-trading claim here.

### 4.   Plaintiffs Do Not Plead Reliance.

Reliance is an essential element of a private cause of action under Rule 10b-5.

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  The reliance

requirement "ensures that, for liability to arise, the requisite causal connection exists" between

the defendant's conduct and the plaintiff's injury.  *Ibid.* (internal quotation marks omitted).  A

plaintiff may establish this connection either through direct, "eyeball" reliance, or, in some

instances, by way of a presumption of reliance.  *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988);

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  In this case, Plaintiffs do not

adequately plead reliance in either of these ways.

Plaintiffs' only attempt to plead reliance is the conclusory statement that "Plaintiffs and

members of the Class that traded during the Class Period relied on the integrity of the market in

the securities listed and traded on the public exchanges."  CAC ¶ 277.  That is essentially the

same allegation of reliance that the Second Circuit held insufficient in *Fezzani*, 716 F.3d at 30

(rejecting allegation that "[i]n reliance on the integrity of the market . . . plaintiffs purchased the

Manipulated Securities").[25]

The lack of any allegation of manipulative conduct by any Exchange also rules out the

application of any possible presumption of reliance to their market-manipulation claim.  In any

event, the CAC does not even attempt to allege that either the fraud-on-the-market or the

---

[25] *See* Plaintiffs' First Amended Complaint for Securities Fraud, Market Manipulation, RICO
and Common Law Claims ¶ 332, *Fezzani v. Bear, Stearns & Co.*, No. 99-cv-0793 (S.D.N.Y.
Apr. 7, 2005), *available at* 2005 WL 6251885.

*Affiliated Ute* presumptions of reliance apply.  The former would require Plaintiffs to plead the existence of an efficient market for a specific security, *see Basic*, 485 U.S. at 247, which they do not.  The *Affiliated Ute* presumption applies only in cases of actionable omissions in the face of a fiduciary duty to disclose; it does not apply to market-manipulation claims like the one here.  *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940–41 (9th Cir. 2009) (per curiam).[26] Moreover, even if *Affiliated Ute* could apply, Plaintiffs have not alleged any basis for a duty to disclose on the part of the Exchanges.  *See Piemonte*, 405 F. Supp. at 718 n.4 (exchanges do not owe fiduciary duties to investors who trade on the exchange); *Arneil*, 414 F. Supp. at 343 (same).

### 5.        Plaintiffs Fail To Allege Loss Causation

Loss causation also is an essential element of a private cause of action under Rule 10b-5. *See Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Loss causation is the proximate causal connection between the defendant's conduct and the plaintiff's loss.  *Ibid.*  That connection is required in market-manipulation cases just as it is in misrepresentation cases.  *See*, *e.g.*, *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009); *see also* 15 U.S.C. § 78u-4(b)(4).  The CAC does not adequately plead loss causation.

Plaintiffs allege that they "purchased and/or sold shares at artificially distorted and manipulated prices."  CAC ¶ 276.  That wholly conclusory and non-specific allegation does not suffice.  Plaintiffs do not identify *what loss* they incurred in trading on *what security* on *which Exchange* at *what time*.  Because Plaintiffs fail to set forth these basic facts, *see Fezzani*, 384 F. Supp. 2d at 642, they do not even come close to alleging the "specific economic harm" that is

---

[26]   The Second Circuit has left open the issue whether the *Affiliated Ute* presumption can apply in a manipulation case, *see Levitt v. J.P. Morgan Sec. Inc.*, 710 F.3d 454, 467 n.9 (2d Cir. 2013), and district courts in this circuit have split on the question.  The Exchanges submit that the Ninth Circuit's analysis in *Desai*—that "manipulative conduct has always been distinct from actionable omissions" that could trigger the *Affiliated Ute* presumption, *Desai*, 573 F.3d at 940—is clearly correct.

required to plead loss causation for a market-manipulation claim.  *See In re Citigroup*, 700 F. Supp. 2d at 307.  Nor do Plaintiffs make any effort to satisfy the requirement that loss causation be pleaded on a defendant-by-defendant basis.  *See* 15 U.S.C. § 78u-4(b)(4) (requiring that "[i]n any private action arising under this Chapter, the plaintiff shall have the burden of proving that the act or omission *of the defendant* . . . caused the loss" (emphasis added)).  The CAC utterly fails to plead any proximate causal connection between any specific allegedly manipulative conduct attributed to any Exchange and any specific loss suffered by Plaintiffs.

### 6.    Plaintiffs Fail To Plead Scienter

A claim under Section 10(b) and Rule 10b-5 requires scienter.  *See Ernst & Ernst*, 425 U.S. at 194.  The PSLRA imposes a heightened standard for pleading scienter.  15 U.S.C. § 78u-4(b)(2).  Under that standard, in a market-manipulation case, the CAC "must plead with particular[ity] facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities."  *ATSI*, 493 F.3d at 102. Similarly, in a misstatement case, "the pleaded facts must give 'rise to a strong inference' of fraudulent intent."  *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 324 (2007).  The CAC fails that test.

As described above, the CAC alleges only conduct that is within the core function of the Exchanges to disseminate market data and regulate trading through, among other things, specifying order types.  Plaintiffs plead no facts from which one could infer that any Exchange had any intent to deceive investors or artificially affect the price of any specific security at any time.  Indeed, there is no plausible argument that the Exchanges engaged in deceptive or

manipulative conduct given that the existence of proprietary data feeds, co-location services, order types, and PFOF fees has repeatedly been disclosed publicly. *See supra* at 9–11, 13–16. Instead, the far more "plausible opposing inference" is that the Exchanges were merely acting within the scope of their regulatory responsibilities, especially given that the SEC has continuously held that the Exchanges' actions in this regard are "consistent with the requirements of the [Exchange] Act" and "protect investors and the public interest." *E.g.*, Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293 (Mar. 26, 2009) (proprietary feeds); Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299 (Sept. 27, 2010) (co-location services); Exchange Act Release No. 34-73333, 79 Fed. Reg. 62,223 (Oct. 16, 2014) (order types); Exchange Act Release No. 34-59714, 74 Fed. Reg. 17,264 (Apr. 14, 2009) (PFOF fees).

## <u>CONCLUSION</u>

For the numerous reasons stated above, this Court should dismiss the CAC under Rule 12(b)(1) for lack of subject matter jurisdiction.  In the event that this Court reaches the additional arguments raised by the Exchanges, this Court should dismiss the CAC under Rule 12(b)(6). Plaintiffs already had the opportunity to amend their complaint, and any further attempt at amendment would be futile.  The dismissal should therefore be with prejudice.  *See, e.g., Baiul v. Williams Morris Agency, LLC*, No. 13-cv-8683, 2014 WL 1804526, at *13 (S.D.N.Y. May 6, 2014) (denying leave to amend).

November 3, 2014

Respectfully submitted,

By: /s/ Douglas R. Cox
Douglas R. Cox
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9539
DCox@gibsondunn.com

*Counsel for The NASDAQ Stock Market LLC and NASDAQ OMX BX, Inc.*

By: /s/ George A. Borden (with permission)
George A. Borden
Steve M. Farina (admitted *pro hac vice*)
Jessica L. Pahl (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
GBorden@wc.com
SFarina@wc.com
JLPahl@wc.com

*Counsel for Defendants New York Stock Exchange LLC and NYSE Arca, Inc.*

By: /s/ James A. Murphy (with permission)
James A. Murphy
Joseph C. Lombard (admitted *pro hac vice*)
Theodore R. Snyder
MURPHY & McGONIGLE, PC
1185 Avenue of the Americas, 21st Floor
New York, NY 10036
Telephone: (212) 880-3968
Facsimile: (212) 880-3998
James.Murphy@mmlawus.com
Joseph.Lombard@mmlawus.com
Theodore.Snyder@mmlawus.com

*Counsel for BATS Global Markets, Inc. and Direct Edge ECN, LLC*

By: /s/ Seth L. Levine (with permission)
Seth L. Levine
Christos Papapetrou
LEVINE LEE LLP
666 Fifth Avenue
New York, NY 10103
Telephone: (212) 223-4400
Facsimile: (212) 223-4425
SLevine@levinelee.com
CPapapetrou@levinelee.com

*Counsel for Chicago Stock Exchange, Inc.*