UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

CITY OF PROVIDENCE, RHODE ISLAND, :
PLUMBERS AND PIPEFITTERS               :
NATIONAL PENSION FUND,                 :
EMPLOYEES' RETIREMENT SYSTEM OF :
THE GOVERNMENT OF THE VIRGIN           :
ISLANDS, STATE-BOSTON RETIREMENT :
SYSTEM, AND FÖRSTA AP-FONDEN           :
Individually and on Behalf of All Others :
Similarly Situated,                     :
                                        :
                          Plaintiffs,   :
                                        :
                vs.                     :
                                        :
BATS GLOBAL MARKETS, INC.,             :
CHICAGO STOCK EXCHANGE, INC.,          :
DIRECT EDGE ECN, LLC, THE NASDAQ       :
STOCK MARKET LLC, NASDAQ OMX BX, :
INC., NEW YORK STOCK EXCHANGE,         :
LLC, NYSE ARCA, INC., BARCLAYS PLC,
BARCLAYS CAPITAL, INC.,

                          Defendants.
_____

Civil Action No. 1:14-cv-02811-JMF
**(Consolidated)**

CLASS ACTION

SECOND CONSOLIDATED AMENDED
COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

SUMMARY OF ALLEGATIONS ................................................................................................1

    Defendants' Scheme and Wrongful Course of Business .........................................................4

JURISDICTION AND VENUE ..................................................................................................8

PARTIES .....................................................................................................................................8

    Plaintiffs ..................................................................................................................................8

    The Exchange Defendants ....................................................................................................10

    The Dark Pool Defendants ...................................................................................................13

CLASS ACTION ALLEGATIONS ..........................................................................................14

FACTUAL ALLEGATIONS ....................................................................................................16

    The Recent Evolution of U.S.-Based Public Stock Markets .................................................16

    The Proliferation of Dark Pools ...........................................................................................22

    The Rise of High Frequency Trading ...................................................................................24

    Plaintiffs and the Class Justifiably Relied on the Fairness and Integrity of the
    Exchanges as Markets ...........................................................................................................33

    The Exchanges' Manipulative Scheme to Defraud ...............................................................37

        The Exchanges Mislead Investors to Induce Them to Trade Against HFT ..................37

            NASDAQ ...............................................................................................................37

            NYSE .....................................................................................................................39

            BATS ......................................................................................................................41

            Direct Edge .............................................................................................................43

            CHX .......................................................................................................................45

        The Exchanges Reap Massive Profits by Providing Co-Location and  Low-
        Latency Enhanced Data Feed Services to HFT Firms .................................................48

            Co-Location ............................................................................................................49

**Page**

Direct and Enhanced Feeds ................................................................................57

The Exchanges' Discriminatory Fee Structure ....................................................64

The Exchanges Create Complex Order Types Designed for HFT Firms to
Prey on Investor Orders ......................................................................................67

    "Hide and Light" Orders ................................................................................74

        Direct Edge: Hide Not Slide (+ ALO) ................................................77

        NASDAQ: Price to Comply and Post Only + "Automatic Re-
        Entry" ........................................................................................................80

        BATS: BATS Only Post Only ...............................................................83

        ARCA: Post No Preference ALO Blind ("ALO PNP B") ...................85

        CHX .......................................................................................................86

    Intermarket Sweep Order Types ....................................................................88

    The Day ISO Order Type ...............................................................................88

    The Post-Only ISO Order Type ....................................................................91

        BATS (BYX/BZX) ...............................................................................96

        Direct Edge (EDGX/EDGA)................................................................98

        CHX .......................................................................................................99

        NASDAQ/NASDAQ BX .....................................................................104

    Flash Orders ...............................................................................................105

The Exchanges' Manipulative Scheme Damaged Plaintiffs and the Class .........................108

    Electronic Front-Running ...........................................................................109

    Rebate Arbitrage ........................................................................................111

    Latency Arbitrage ......................................................................................113

    Spoofing and Layering................................................................................113

**Page**

Like the Exchanges, Barclays Also Engaged in a Manipulative Scheme to Defraud Through Its Dark Pool ..................................................................................114

    Barclays's Dark Pool (Barclays LX) ..........................................................116

    Investors Justifiably Relied on the Fairness and Integrity of Barclays's Dark Pool as a Market.........................................................................................118

        The Regulatory Framework Governing Dark Pools Requires Fairness..............118

        Barclays's Public Statements Failed to Dispel – and in Fact Encouraged – Investors' Belief in the Fairness and Integrity of Barclays's Dark Pool.............122

    In Furtherence of Its Manipulative Scheme, Barclays Operated Its Dark Pool for Its Own Benefit and that of HFT Firms at the Expense of Investors ...................125

        Barclays's "Liquidity Profiling" Does Not Protect Investors from Predatory HFT Trading Tactics ................................................................125

        Rather than Protecting Investors from HFT Firms in Its Dark Pool, Barclays Actively Courted HFT Firms ...............................................126

    Defendants' Scheme and Fraudulent Course of Business Have Led to Governmental Investigations and Penalties....................................................................128

    The Exchanges' Conduct Is Not Shielded by SRO Immunity.............................132

COUNT  I Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ......................................................................................135

COUNT  II Violation of §6(b) of the Exchange Act Against the Exchanges............................137

PRAYER FOR RELIEF ......................................................................139

JURY DEMAND ..............................................................................140

## SUMMARY OF ALLEGATIONS

1.      This securities class action is brought on behalf of public investors who purchased and/or sold shares of stock in the United States between April 18, 2009 and the present (the "Class Period") on a registered public stock exchange generated by defendants (collectively, the "Exchanges")[1] or on the alternative trading venue operated by Barclays PLC through its subsidiary Barclays Capital, Inc. (collectively, "Barclays") identified herein (the Exchanges and Barclays, collectively, the "Defendants"), and were injured as a result of the misconduct detailed herein (the "Class").

2.      This case arises out of a scheme and wrongful course of business whereby the Exchanges and Barclays employed devices, contrivances, manipulations and artifices to defraud in a manner that was designed to and did manipulate the U.S. securities markets and the trading of equities on those markets, diverting billions of dollars annually from buyers and sellers of securities and generating billions more in ill-gotten kickback payments for Defendants.[2]

3.      Contrary to the duties imposed upon them by law, U.S. Securities and Exchange Commission ("SEC") rules, the Financial Industry Regulatory Authority ("FINRA") and their own rules and regulations, Defendants participated in the scheme and wrongful course of business complained of herein whereby the Exchanges and Barclays provided certain market participants – i.e., firms engaged in high-frequency trading ("HFT firms"), which generated enormous trading volume on and hence enormous revenues for the Exchanges –  with material,

---

[1]   Defendants are nationally registered securities exchanges on which U.S. equity stocks were traded during the Class Period, and include BATS Global Markets, Inc., Chicago Stock Exchange, Inc., Direct Edge ECN, LLC, The NASDAQ Stock Market LLC, NASDAQ OMX BX, Inc., New York Stock Exchange, LLC and NYSE Arca, Inc.

[2]   In addition to operating its own dark pool, Barclays also ran its own proprietary HFT desk, itself engaging in many of the same predatory practices of HFT as more fully described herein.

non-public information and trading advantages so that those market participants could use the advantage obtained to manipulate the U.S. securities markets to the detriment of Plaintiffs and the Class.  The Exchanges, having evolved from member-owned not-for-profit entities that focused solely on trade-matching to for-profit enterprises with the financial incentive to increase order flow from HFT firms, engaged in a manipulative and deceptive course of conduct by providing those firms with complex order types, proprietary data feeds and co-location services, allowing them to, *inter alia*, access enhanced trading information at faster speeds and position their trades to the detriment of Plaintiffs and the Class.

4.      Notwithstanding their legal obligations and duties to provide for orderly and honest trading and to match the bids and orders placed on behalf of investors at the best available price, and in direct conflict with their own public statements to their own customers and investors – each of which only reinforced the understanding that Plaintiffs and all Class members had as to the integrity of the markets on which they traded --  the Exchanges and Barclays demanded and received substantial kickback payments in exchange for providing HFT firms access to material trading data via preferred access to exchange floors, and enriched data feeds. To satisfy the demands of HFT firms and attract order flow (and thus more fees), the Exchanges also designed and implemented hundreds of new complex "order types" – preprogrammed commands traders use to tell the Exchanges how to handle their bids and offers – with the knowledge that those same HFT firms would use these order types to detect investors' trading patterns and trade in front of them to their detriment.

5.      Selling and creating products designed to cater almost exclusively to the profit motives of the Exchanges and HFT firms falls outside of the traditional, quasi-governmental role of a stock exchange.  These products and services are not offered to regulate the markets and

benefit the public interest.  Instead, these products and services represent a new era of business activities for the Exchanges as they increasingly search for ways – ***in furtherance of their own self-interest and irrespective of the public's interest, and outside the ambit of their delegated governmental function*** – to increase order flow.  Such conduct, by any measure, serves no regulatory function.

6.      Also in an effort to increase their own trading volumes – and therefore revenues – the Exchanges and Barclays encourage HFT firms to exploit their other customers by providing kickback payments to HFT firms for directing their trades to their own trading venues that they and the HFT firms knew were subject to informational asymmetries as a result of Defendants' scheme and wrongful course of business.  Additionally, the Exchanges purchased retail and institutional order flow from various retail brokerages in order to provide victims to HFT firms' predatory practices.

7.      Plaintiffs and the Class – justifiably relying on the fairness and integrity of the U.S. securities markets – traded on Defendants' Exchanges, misled by Defendants' scheme to present their Exchanges as fair and impartial securities markets while in fact rigging the markets in favor of a type of trader whose presence and activities on the Exchanges furthered Defendants' business interests at the expense of the interests of investors like Plaintiffs and the Class.

8.      Defendants utilized devices, contrivances, manipulations and artifices to defraud, which operated as a fraud and deceit on Plaintiffs and the Class in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  Defendants' misconduct rigged the market and manipulated the prices at which shares were traded during the Class Period, in blithe disregard of the fundamental assumption

that all U.S. investors have that they will be treated fairly, as well as the statutory and regulatory requirements designed to achieve that end,[3] causing substantial damage to Plaintiffs and the Class as a result thereof.[4]

**Defendants' Scheme and Wrongful Course of Business**

9.     Throughout the Class Period, the Exchanges engaged in manipulative and deceptive conduct, and participated in such conduct by others by: (i) charging kickback payments to HFT firms in exchange for situating HFT firms' servers in close proximity to the Exchanges' own order matching servers ("co-location") to create informational asymmetries and otherwise rig the market so that HFT firms could profit from access to, and utilization of, material non-public information;[5] (ii) charging kickback payments to HFT firms in exchange for providing enhanced proprietary data feeds that allow HFT firms to receive enriched trading information at faster delivery speeds than the widely available securities information processor ("SIP") feeds; and (iii) designing and implementing new and exceedingly complex order types to

---

[3] Those rules include SEC Regulation National Market System ("Reg NMS"), implemented in 2007, which requires that investors receive the best price executions for their bids and orders.

[4]     As set forth more fully herein, numerous government and regulatory agencies are now investigating this misconduct. The SEC has been investigating the Exchanges' practices of selling co-location and direct data feeds, and providing complex order types to HFT firms, and on multiple occasions has issued fines for misconduct relating to such practices. Since late March, the U.S. Federal Bureau of Investigation ("FBI") and the U.S. Department of Justice ("DOJ") have both announced they are investigating HFT. Likewise, New York Attorney General Eric Schneiderman (the "NY AG"), the Commodity Futures Trading Commission ("CFTC") and the SEC are also probing the unlawfulness of HFT. On June 6, 2014, SEC Chairman Mary Jo White ("White") unveiled a sweeping set of initiatives to address concerns about HFT, including the possible conflicts of interest created by the mass of complex order types. *See* ¶¶ 280-89 *infr*a for further detail on past and pending regulatory actions.

[5]     By one account, as of 2010, Exchanges collected $1.8 billion on an annual basis from HFT firms in co-location fees alone. Peter Cohan, *Rigged Market: How Latency Arbitrage Picks $3 Billion From Your Pockets* (updated June 6, 2010), *available at* http://www.dailyfinance.com/2010/06/05/rigged-market-latency-arbitrage-3-billion/.

attract order flow and fees from HFT firms and make it possible for those firms to pick off of and manipulate investors' trades, to the detriment of Plaintiffs and the Class.

10.     Through these practices, the Exchanges formed a symbiotic relationship with HFT firms whereby both seek to increase their bottom lines at the expense of Plaintiffs and the Class.  To survive in this new competitive market and to satisfy the demands of their own stakeholders, the Exchanges have created and employed exploitative devices and practices that favor their most-valued HFT customers, while Plaintiffs and the Class have unknowingly maintained their confidence in the integrity of the U.S. equities market. As two of the foremost experts on the predation of the new stock market have aptly explained:

> *The primary purpose of the stock exchanges has devolved to catering to a class of highly profitable market participants called high frequency traders, or HFTs, who are interested only in hyper-short term trading, investors be damned*.  The stock exchanges give these HFTs perks and advantages to help them be as profitable as possible, even if doing so adversely affects you, the investors, because HFT firms are the exchanges' biggest customers.[6]

11.     Barclays likewise engaged in similar misconduct in operating its own alternative trading venue for the benefit of HFT and to the detriment of other market participants.  In an effort to grow its dark pool, Barclays also failed to dispel the investing public's justifiable presumption that Barclays ran its dark pool as fair market, instead actively misrepresenting the way it operated its dark pool in order to lure institutional investors and thereby knowingly subject them to HFT abuses described herein and including those engaged in by Barclays itself. As detailed herein, Barclays has been sued by the NY AG for this and related misconduct.

---

[6]     Sal Arnuk & Joseph Saluzzi, *Broken Markets: How High Frequency Trading and Predatory Practices on Wall Street are Destroying Investor Confidence and Your Portfolio* 1 (2012) (emphasis in original).

12.     Defendants' wrongful acts and unlawful practices constitute the manipulative use of devices and contrivances in violation of the Exchange Act and the SEC rules promulgated thereunder and constitute a scheme and wrongful course of business that has operated as a fraud or deceit on investors on U.S.-based exchanges for at least the past five years.

13.     Defendants' manipulative scheme involved various acts designed to favor HFT firms and disfavor ordinary investors.  Indeed, the essence of Defendants' manipulative scheme was to rig the markets so as to serve ordinary investors up to the HFT firms as prey.  Defendants' unlawful practices were designed to and did position HFT firms to identify investors' desire to transact in securities and then enable those firms to front-run those same investors in transactions that generated almost riskless profits for HFT firms and a constant stream of revenue for Defendants in the form of kickback payments for providing HFT firms faster access to material data before it was disclosed to other market participants.  During the Class Period, some HFT firms had average holding periods of just seconds and some did not report a single losing day of trading over periods ranging from several months to half a decade.

14.     For example, leading HFT firm Virtu Financial, Inc. disclosed in March that it had just one day of trading losses in five years.  At one point, Tradebot, an HFT firm headed by the founder of defendant BATS Global Markets, Inc., had not had a losing day of trading in four years and typically held stocks for only 11 seconds.  Likewise, the proprietary HFT trading desks of JP Morgan, Bank of America, Citigroup and Goldman Sachs combined posted 244 winning trading days against zero losses in the first quarter of 2010.

15.     Moreover, in order to attract HFT firms and the tremendous trading volume (and hence fees) they generated, the Exchanges rigged their markets in a way that transferred the obligation to pay fees to the Exchanges on most transactions from the HFT firms to investors

such as Plaintiffs and the Class.  Thus, the Exchanges not only gave the HFT firms unfair trading advantages over investors like Plaintiffs and the Class, but made such investors pay for theprivilege of being fleeced.  As the Exchanges and Barclays intended in taking these steps, their markets were now structured such that the HFT firms were free to engage in the predatory misconduct detailed herein – such as electronic front-running, rebate arbitrage, latency arbitrage, spoofing, layering, and contemporaneous trading – while Plaintiffs' and Class members' bids and orders were not being given time priority nor fulfilled at the best available prices, all for the benefit of Defendants and HFT firms.  In return for the Exchanges and Barclays diverting billions of dollars from Plaintiffs and the Class to  HFT firms, including by means of providing those firms with access to material non-public data, those firms paid the Exchanges and Barclays massive sums of money.

16.    Public investors are entitled to be treated fairly and honestly when they trade equities on registered national securities exchanges.  Defendants' manipulation of the U.S. securities markets for pure corporate benefit, however – and not for any governmental or regulatory purpose – threatens to erode the investor confidence that is so vital to well-functioning capital markets.  In addition to risking the end of trust in the U.S. capital markets, the misconduct alleged herein has siphoned off billions of dollars from private and public pension funds and individual retirement accounts that millions of Americans depend upon.  Defendants' misconduct has deprived these investors of the very "market integrity" the Supreme Court acknowledges all "'buyer[s] [and] seller[s] . . . rely on.'"  *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) (citation omitted).  Instead, Plaintiffs and the Class have been victimized in what can fairly be characterized as "'a crooked crap game.'"  *Id.* (citation omitted).   As such, Plaintiffs request the damages, disgorgement and injunctive relief sought herein.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§6(b) and 10(b) of the Exchange Act, 15 U.S.C. §§78f(b) and 78j(b), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

19.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the Defendants maintain their principal places of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and facilities of the national securities markets.

## PARTIES

**Plaintiffs**

21.     Plaintiff City of Providence, Rhode Island ("City of Providence") is a municipal corporation with a principal address of 444 Westminster Street, Suite 220, Providence, Rhode Island.  As of December 12, 2013, plaintiff City of Providence managed hundreds of millions of dollars in assets on behalf of thousands of beneficiaries associated with the City of Providence, including active and retired public employees and their dependents.  As detailed in its Certification previously filed with the Court, plaintiff City of Providence purchased and sold tens of millions of shares of U.S.-based stock exchange listed stock for investment purposes in trades executed by various brokers during the Class Period, including on exchanges and the dark pool

operated by Defendants herein.  City of Providence suffered substantial damages as a result of Defendants' unlawful conduct.

22.     Plaintiff Plumbers and Pipefitters National Pension Fund ("Plumbers and Pipefitters"), is a national pension fund with a principal address of 103 Oronoco Street, Alexandria, Virginia 22314.  As of June 30, 2013, Plumbers and Pipefitters had over $4.9 billion in assets on behalf of more than 136,000 participants and their families.  Plumbers and Pipefitters provides retirement benefits to plumbers and pipefitters working in the building and maritime construction industries.  As detailed in its Certification previously filed with the Court, Plumbers and Pipefitters purchased and sold tens of millions of shares of U.S.-based stock exchange listed stock for investment purposes in trades executed by various brokers during the Class Period, including on exchanges operated by Defendants herein.  Plumbers and Pipefitters suffered substantial damages as a result of Defendants' unlawful conduct.

23.     Plaintiff Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands") is a defined-benefit pension plan for officials and employees of the Government of the Virgin Islands.  With over $1.3 billion in assets, Virgin Islands is the principal investment organization of the U.S. Virgin Islands' retirement plans.  Virgin Islands provides retirement, health, and other pension benefits to over 8,200 retirees and pensioners and a little more than 11,000 active members.  It is estimated that Virgin Islands has served approximately 22,000 members since operations began in 1959.  As set forth in its Certification previously filed with the Court, plaintiff Virgin Islands purchased and sold millions of shares of U.S.-based stock exchange listed stock for investment purposes in trades executed by various brokers during the Class Period, including on exchanges operated by Defendants herein.  Virgin Islands suffered substantial damages as a result of Defendants' unlawful conduct.

24.     Plaintiff State-Boston Retirement System ("State-Boston") is an institutional investor and a governmental defined benefit plan that provides retirement benefits for the employees of the City of Boston, Boston Redevelopment Authority, Boston Housing Authority, Boston Public Health Commission and Boston Water & Sewer Commission.  State-Boston has approximately 34,000 active and retired participants, representing approximately $5.4 billion in assets.  As detailed in its Certification previously filed with the Court, plaintiff State-Boston purchased and sold tens of millions of shares of U.S.-based stock exchange listed stock for investment purposes in trades executed by various brokers during the Class Period, including on exchanges and the dark pool operated by Defendants herein.  State-Boston suffered substantial damages as a result of Defendants' unlawful conduct.

25.     Plaintiff Första AP-fonden ("AP1") is a national pension fund based in Stockholm, Sweden, whose management contributes to ensuring a high and predictable retirement pension for every person employed in Sweden.  AP1 is one of five buffer funds in the Swedish national income pension system.  The capital reserves in the AP1 funds are used to cover the deficit when disbursements from the pension system exceed contributions to the system.  With net assets of approximately $40 billion, AP1 is one of Sweden's largest pension funds.  As set forth in its Certification previously filed with the Court, plaintiff AP1 purchased and sold millions of shares on U.S.-based stock exchange listed stock for investment purposes in trades executed by various brokers during the Class Period, including on exchanges operated by Defendants herein.   AP1 suffered substantial damages as a result of Defendants' unlawful conduct.

**The Exchange Defendants**

26.     During the Class Period, the following "national securities exchanges" were registered with the SEC under §6 of the Exchange Act and trade equities.

27.     Defendant BATS Global Markets, Inc. ("BATS"), along with its operating subsidiaries BATS BZX Exchange, Inc. and BATS BYX Exchange, Inc., is an electronic stock exchange based in Lenexa, Kansas.   BATS was founded in June 2005 as an Electronic Communication Network ("ECN") and its name stands for Better Alternative Trading System. BATS operates two stock exchanges in the United States, the BZX Exchange and the BYX Exchange.  As of the filing of the initial complaint in this case, BATS averaged daily trading volumes of approximately 630 million and 200 million shares, respectively, which accounted for approximately 8.5% and 2.7%, respectively, of U.S. equity daily trading volume.  In 2014 BATS merged with defendant Direct Edge (defined below).

28.     Defendant Chicago Stock Exchange, Inc. ("CHX") is a stock exchange headquartered in Chicago, Illinois.  The CHX is a national securities exchange and self-regulated organization, which operates under the oversight of the SEC.  Originally founded as a non-profit, non-stock corporation owned by its members, the CHX demutualized in 2004, thereafter becoming a wholly owned subsidiary of a holding company, CHX Holdings, Inc. ("CHX Holdings").  CHX Holdings is a for-profit, stock corporation headquartered in Delaware.  Prior to the merger of BATS and Direct Edge, CHX was the third most active stock exchange by volume, and the largest exchange outside New York City.

29.     Defendant Direct Edge ECN, LLC ("Direct Edge") is a Jersey City, New Jersey-based electronic stock exchange operating through two separate trading exchanges, EDGX Exchange and EDGA Exchange.  As of the filing of the initial complaint in this action, Direct Edge averaged daily trading volumes of approximately more than 500 million and more than 200 million shares, respectively, and accounted for approximately 7% and 3%, respectively, of all U.S. daily equity trading volume.  EDGX utilizes a so-called maker/taker pricing model offering

high rebates for those who place bids and offers and charging those who merely fill orders. EDGA is a low cost exchange with a taker/maker pricing model. According to its website, Direct Edge now is "a BATS Global Markets company," following a merger between the companies in January 2014. Accordingly, the companies are working to combine operations under the BATS technology platform and brand.

30.    Defendant The NASDAQ Stock Market LLC ("NASDAQ"), is a New York City-based electronic stock exchange. In 1971, NASDAQ stood for National Association of Securities Dealers Automated Quotations. NASDAQ was founded in 1971 by the National Association of Securities Dealers ("NASD"), who divested themselves of it in a series of sales in 2000 and 2001. NASDAQ is now owned and operated by the New York City-based NASDAQ OMX Group, which also owns the OMX stock market network. It is regulated by FINRA, the successor to the NASD. The NASDAQ is the second largest stock exchange in the world by market capitalization of the companies listed thereon, after the New York Stock Exchange. The NASDAQ typically trades in excess of 1.3 billion shares daily, and accounts for just less than 20% of all U.S. equity trading on a daily basis.

31.    Defendant NASDAQ OMX BX, Inc. ("BX") (formerly the Boston Stock Exchange) is one of the many stock exchanges owned and operated by the NASDAQ OMX Group. It focuses on nationally listed securities. BX typically trades an average of 220 million shares on an average daily basis, and accounts for approximately 3% of all daily U.S. equity trading volume.

32.    Defendant New York Stock Exchange, LLC ("NYSE") is a stock exchange headquartered in New York City. The NYSE is operated by NYSE Euronext, which was formed by the NYSE's 2007 merger with the fully electronic stock exchange Euronext. In December

2012, it was announced that the NYSE was being sold to Intercontinental Exchange ("ICE"), a futures exchange headquartered in Atlanta, Georgia, for $8 billion.  NYSE and Euronext then became subsidiary divisions of ICE, and in 2014 Euronext became an independent public company through an initial public offering ("IPO").  The NYSE is by far the world's largest stock exchange, with its listed companies accounting for more than $16 trillion as of May 2013.  Average daily trading value was approximately $169 billion in 2013.  The NYSE has been fined twice by the SEC in a little over two years for violations of exchange rules, the Exchange Act and Reg NMS, regarding the manner in which it sent data through its proprietary feeds vis-à-vis the SIP feeds and the method in which it offered co-location services.

33.     Defendant NYSE Arca, Inc. ("ARCA") is headquartered in Chicago, Illinois.  Previously known as ArcaEx, an abbreviation of Archipelago Exchange, it is a securities exchange on which both stocks and options are traded.  It was owned by NYSE Euronext, which merged (as NYSE Group) with Archipelago Holdings in a reverse merger on February 27, 2006.

**The Dark Pool Defendants**

34.     Defendant Barclays PLC is a financial services company headquartered in the United Kingdom with offices in New York City.  Barclays's brokerage division placed bids or offers and/or transacted on behalf of the Class on stock exchanges and alternate trading venues during the Class Period. Barclays PLC, through its subsidiary Barclays Capital Inc., which provides securities brokerage services and is headquartered in New York City, operates the alternate trading venue or "dark pool" called Barclays Liquidity Cross or Barclays LX.  In late 2013, Barclays LX became the leading alternate trading venue according to published trading volumes.  During the Class Period, Barclays PLC also maintained its own proprietary trading divisions or trading desks that engaged in HFT.

35.     Defendant Barclays Capital Inc., which is a subsidiary of Barclays PLC, is a registered broker dealer and investment advisor headquartered in New York City.  Barclays Capital Inc. operates the alternate trading venue or "dark pool" called Barclays Liquidity Cross or Barclays LX.  In late 2013, Barclays LX became the leading alternate trading venue according to published trading volumes.  During the Class Period, Defendant Barclays Capital, Inc. also maintained its own proprietary trading divisions or trading desks that engaged in HFT.

## CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all public investors who purchased and/or sold shares of stock listed on a U.S.-based equity exchange operated by the Exchanges or the dark pool operated by Barclays during the Class Period and were injured thereby.  Excluded from the Class are Defendants, any officer, director, partner or owner of any of the Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs and can only be ascertained through proper discovery, Plaintiffs believe there are millions of members in the proposed Class.

38.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct that is complained of herein.

39.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.

- 14 -

40.     In addition, Defendants have acted and refused to act, as alleged herein, on grounds generally applicable to all members of the Class, thereby making final injunctive relief concerning the Class as a whole appropriate.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the common questions of law and fact are:

a.     whether Defendants implemented the manipulative acts, devices or contrivances or engaged in the alleged fraudulent scheme and course of business alleged herein; whether the Exchange Act and SEC rules were violated by Defendants' conduct alleged herein;

b.     whether Defendants acted knowingly or recklessly in connection with the misconduct alleged herein;

c.     whether the trading prices of shares purchased and sold during the Class Period were distorted by Defendants' conduct;

d.     whether and what equitable relief should be granted to Plaintiffs and the Class; and

e.     the extent of damages sustained by members of the Class, and whether the Class is entitled to disgorgement and injunctive relief, and the appropriate measure of such damages and disgorgement.

42.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Further, as the damages suffered by most individual members of the Class may be relatively small, the expense and burden of individual litigation makes it virtually impossible for most members of the Class to redress the wrongs done to them individually.  The Class is readily

definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation and different treatment of different defendants for the same misconduct and damages. There will be no significant difficulties in managing this action as a class action.

## FACTUAL ALLEGATIONS

**The Recent Evolution of U.S.-Based Public Stock Markets**

43.     In 1972, the U.S. market for securities was quite fragmented.  The same stock often traded at different prices at different trading venues, and the NYSE ticker tape did not report transactions of NYSE-listed stocks that took place on regional exchanges or on other over-the-counter securities markets.  This fragmentation made it difficult for traders to comparison shop.

44.     In 1975, Congress authorized the SEC to facilitate a national market system ("NMS") to ensure that stock listed on registered exchanges traded at the same or similar prices across all public exchanges.  One of the objectives of creating an NMS was the linking of all markets for qualified securities through communication and data processing facilities, facilitating simultaneous quoting from all exchanges and allowing investors to obtain the best price.  Section 11A of the Exchange Act, enacted in 1975, provides for the establishment of the NMS for securities.

45.     An NMS plan is a structured method of transmitting securities transactions in real-time.  In the United States, NMS's are governed by §11A of the Exchange Act and SEC Rule 11(a)(1).  In addition to processing the transactions themselves, these plans also emit the price and volume data for these transactions.  Information on each securities trade is sent to a central network at the Securities Industry Automation Corporation ("SIAC") where it is consolidated with other trades on the same "tape" and then distributed.  There are three major tapes in the United States.  Tape A is for trades in securities listed on NYSE; Tape B is for trades

in securities listed on NYSEMKT (formerly AMEX), NYSEARCA and BATS (together, the "consolidated tape," which contains all NYSE and regional exchange trades); and Tape C which contains all trades in securities listed on NASDAQ.  When Congress mandated an NMS for trading securities in 1975, it emphasized that consolidated data "would form the heart of the national market system."[7]

46.     During the early 2000's, U.S. stock regulators became worried that the U.S. markets were falling behind financial centers such as London, Frankfurt and Hong Kong, which were embracing electronic trading systems.  SEC officials worried that control of U.S. capital markets could begin to shift offshore if the U.S. system did not evolve.  In 2005, the rules promulgating the national market system were consolidated into Reg NMS, which went into effect in 2007.  The purpose of Reg NMS was to ensure that – as required by §11A of the Exchange Act – orders were always carried out at the best price available.  Some of the more notable Reg NMS rules included:

- ***Order Protection (or Trade-Through) Rule*** – providing intermarket price priority for quotations that are immediately and automatically accessible (Rule 611);

- ***Access Rule*** – addressing access to market data such as quotations (Rule 610);

- ***Sub-Penny Rule*** – establishing minimum pricing increments (Rule 612); and

- ***Market Data Rules:***

    a)     Allocation amendment – instituting a new Market Data Revenue Allocation Formula;

    b)     Governance amendment – creating advisory committees; and

    c)     Distribution and Display Rules – governing market data (Rules 600, 601 and 603).

---

[7]     H.R. Rep. No. 94-229, 94th Cong., 1st Sess. 93 (1975).

47.     In explaining the purpose of Reg NMS, the SEC reiterated that "the NMS [was] designed to achieve the objectives of efficient, competitive, *fair*, and orderly *markets that are in the public interest and protect investors*."[8]   The SEC also stated that in connection with enacting the Order Protection Rule, its primary purpose was to provide "strengthened assurance that *orders will be filled at the best prices*," and to provide investors "*greater confidence that they will be treated fairly when they participate in the equity markets*."[9]   The SEC went on to emphasize that "*[m]aintaining investor confidence is an essential element of well-functioning equity markets*."[10]    Noting that the public comment portion of the rulemaking process highlighted the divergent interests of short-term traders and long-term investors, the SEC emphatically stated that Reg NMS was being structured to favor the interests of long-term investors over short-term traders, stating, in pertinent part, as follows:

> Noting that any protection against trade-throughs could interfere to some extent with such short-term trading strategies, the release framed the Commission's policy choice as follows: "Should the overall efficiency of the NMS defer to the needs of professional traders, many of whom rarely intend to hold a position overnight? Or should the NMS serve the needs of longer-term investors, both large and small, that will benefit substantially from intermarket price protection?"  *The Reproposing Release emphasized that the NMS must meet the needs of longer-term investors, noting that any other outcome would be contrary to the Exchange Act and its objectives of promoting fair and efficient markets that serve the public interest*.[11]

---

[8]     Regulation NMS, 17 C.F.R. Parts 200, 201, 230, 240, 242, 249 and 270, Release No. 34-51808, File No. S7-10-04, RIN 3235-AJ18 ("Reg NMS") at 6, *available at* http://www.sec.gov/rules/final/34-51808.pdf.  All emphasis is added unless otherwise noted.

[9]     *Id*. at 11.

[10]     *Id*.

[11]     *Id*. at 16 (citation omitted).

The SEC also emphasized how protecting long-term investors over short-term traders satisfied its regulatory mandate to protect "investors," emphasizing that "it makes little sense to refer to someone as 'investing' in a company for a few seconds, minutes, or hours," so "when the interests of long-term investors and short-term traders conflict . . . , the Commission believes that" it is the SEC's "clear responsibility . . . to uphold the interests of long-term investors."[12]

48.     As enacted, Reg NMS required that exchanges and brokers accept the most competitive bid or offer prices posted at any U.S. trading venue that displayed price quotes, so as to speed up the stock market and ensure that investors got the best prices.  For stock exchanges, Reg NMS at its core required them to display the national best bid and offer ("NBBO") prices. Though Reg NMS required exchanges to display the NBBO, the rule was intended to provide greater information to the investing public – not to increase order flow, a goal, unrelated to any governmental or regulatory function, that the Exchanges have aggressively pursued with the rise of HFT trading.   To generate new and robust order flow from trading firms, including, specifically HFT firms, the Exchanges began to offer financial incentives to lure this new business.  These incentives took the form of rebates paid to traders (including brokers) to offer to sell or buy securities on those exchanges.

49.     Exchanges had begun charging fees to investors who sought to merely accept the prices the market makers quoted, *i.e.,* charging such fees to so-called "takers" of liquidity, while not charging so-called "makers."  This new fee system is called "maker-taker."  It was initiated by newer private exchanges in the early 1990s, and by the late 2000s had spread so that it was used by exchanges including NYSE-Arca, NASDAQ and BATS.[13]   Under the maker-taker

---

[12]   *Id*. at 18-19.

[13]   There is also the reverse of this rebate/fee system, "taker-maker," which has been adopted by at least one exchange.  *See, e.g.*, ¶ 29 *supra* (EDGA exchange imposes a "taker-maker" model.

system, exchanges offer a transaction rebate, (for example $0.002 per share), to parties who are "makers" or providers of liquidity, *i.e.*, traders submitting non-marketable limit orders, while charging a fee (for example $0.003 per share) to parties who accept the makers' bids or offers, *i.e.*, "takers" of liquidity (such as traders submitting market orders or marketable limit orders). In this example the exchanges pocket the $0.001 difference, which given the volume of trading in the U.S. adds up to enormous amounts of money annually.

50.   An example of "maker-taker" pricing model is as follows:

> Imagine a grocery store in which you can haggle over prices.  The grocer is willing to sell you an apple for $1.  You, however, are offering to pay 95 cents for the apple.  If the grocer agrees and takes your lower offer, **he pays the take fee** while **you get the make fee**.  If, however, you decide to give in and pay $1 for the apple, **you** pay the take fee and the grocer gets the make fee. Whoever gives in and crosses the spread between the bid and the offer pays.[14]

51.   The "maker-taker" model runs counter to the traditional "customer priority" design, under which customer accounts are given order priority without having to pay exchange transaction fees.  Under the "customer priority" model, exchanges did not charge transaction fees to investors; rather, they charged transaction fees to market-makers (specialists in particular stocks who held relatively large amounts of shares in those stocks in order to facilitate trading) and paid broker-dealers for order flow.  Because the "maker-taker" model charges fees to those entities who come to the market when they need to, and pays fees to "makers" whose constant trading creates liquidity,   the "maker-taker" pricing model disfavors investors who purchase stocks to hold and sell them when they have an independent reason to, and favors traders who

---

Unless otherwise noted, the Exchanges herein generally impose the "maker-taker" pricing structure.).

[14]  Scott Patterson,  *Dark Pools:  The Rise of the Machine Traders and the Rigging of the U.S. Stock Market* 42 (2012) ("*Dark Pools*").

engage in flipping stocks for short-term profits, such as HFTs.  While the Exchanges continue to pay broker-dealers for order flow, over the last decade, they have instituted the maker-taker pricing structure to incentivize HFT firms to trade on their exchanges and create a market focused on increasing revenues for themselves.

52.     In setting user access fees, the Exchanges do not act as regulators, but rather are entities that are themselves regulated.  Recognizing the exchanges' need to generate revenues, Reg NMS (which became effective in August 2005) imposed a high cap (of 30 cents per 100 shares) on the access fees exchanges could charge, but did not otherwise regulate the type or nature of the fees that exchanges could charge and had been charging.  Rather, Reg NMS left  it to the business judgment of the exchanges to determine the range of fees that could be charged to their respective users.  Notably, the Exchanges themselves stated that Reg NMS "recognized that market-based solutions, not regulatory mandates, would best serve investors."[15]  Reg NMS neither mandated nor permitted exchanges to charge discriminatory fees, and the manner in which the Exchanges did so was outside the ambit of the securities regulatory structure, did not serve any regulatory purpose, and was promulgated solely to serve the private business interests of Defendants..

53.     For the market-making firms, as they constantly placed bids and offers for securities, the stock exchanges' frequently shifting schemes of rebates and discounts created an arbitrage opportunity.  With more than a dozen U.S. stock exchanges and more than 40 private stock-trading venues, the ability of exchanges to charge different types of fees at different levels (subject only to the high cap imposed by Reg NMS) added additional complexity to the financial

---

[15] Exchange Market Data Coalition, *Comments on NetCoalition Petition for Review*, Exchange Act Release No. 34-55011 at 6 (Jan. 26, 2007), *available at* https://www.sec.gov/comments/34-55011/3455011-9.pdf.

markets – leading to rebate arbitrage (where traders decide which exchange to trade on based on the rebate paid to them for doing so).

54.     Following the adoption of Reg NMS, it became more valuable for a trading platform to qualify as a full-fledged stock exchange because if an exchange displayed the best price for a stock, then that was where an order for the stock had to be filled (providing market flow and the related financial incentives).   The same was not true of other types of trading platforms, some of which do not publicly display price quotes.   For instance, in 2008 defendant BATS converted its electronic trading platform to a full-fledged public exchange registered with the SEC in order to capture new trading business precipitated by the new Reg NMS rules. Defendant Direct Edge followed suit in 2010.   In addition, established exchanges such as NASDAQ purchased fading exchanges that once represented regional markets in Philadelphia, Boston and Cincinnati, reestablishing them as electronic platforms geared toward specific niches. From 2007 to 2011, seven new stock exchanges opened for business.

**The Proliferation of Dark Pools**

55.     Reg NMS also spurred the proliferation of alternate trading venues that do not publicly display bid and offer prices and allowed for anonymous trading (commonly referred to as "dark pools").   The fees public stock exchanges charge investors incentivize them to direct stock orders toward these and other private trading platforms, where trading is often cheaper.

56.     Dark pools are alternative trading systems ("ATS"), that evolved from   the "upstairs trading" provided for decades by exchanges, in which the size and price of electronic orders are hidden from other market participants.   Historically, stock exchanges with "upstairs trading" would match large buy and sell orders after the close of trading, at the closing price. Trades matched in this way were only disclosed after the event and, thus, did not change the exchange-quoted price.   To avoid influencing exchange prices with clues about outstanding

demand, unfilled order data was not disclosed. The role of these original dark pools was to provide institutional investors with a venue to make trades they would not otherwise make.

57.    Without "upstairs trading," frequently large institutional orders would be split into smaller orders in an attempt to hide within regular trading activity.  In the 1980s, however, algorithmic trading facilitated by complex computer programs was created specifically to identify these "order splitting" strategies.

58.    In 2007, Reg NMS made it possible for anyone to start a dark pool, in part, by eliminating the protections afforded manual quotations by exchanges and allowing investors to bypass exchanges for a better price.  Large investment banks recognized the growing importance of dark pool trading and quickly created or expanded their own dark pools, matching both buyer and seller from their own client pool to avoid paying transaction fees twice.

59.    Unlike Exchanges' "upstairs trading" which were designed as an added service for institutional investors, broker-dealer dark pools were designed as independent revenue streams requiring significant order flow and execution rates.  This revenue-focused model eliminated daily matching orders and ushered in the advent of continuous crossing in which orders are either immediately matched, re-routed or returned.  Broker-dealer dark pools also allowed "resting" orders and "limit" orders, and most eliminated the minimum order size which defined exchange dark pools.

60.    Broker-dealer dark pools market themselves as alternative trading venues that provide anonymity and information barriers.  When an institutional investor submits a large order to a dark pool, the investor is revealing valuable information.  Protection against short-selling, front-running and other HFT schemes based on that information by the broker-dealer, or

those to whom that information could be passed, is the foundation upon which the broker-dealer markets its dark pool to institutional investors.

61.     In 2008, dark pools accounted for 16% of all stock trading.  By 2013, that figure had risen to over 40% with average daily trading volume of 920 million in January of that year compared with just 900 million on NYSE.  All dark pools are registered with the SEC and FINRA as broker-dealers.

**The Rise of High Frequency Trading**

62.     The new structure Reg NMS attempted to address also ramped up cat-and-mouse games played by sophisticated electronic traders operating in the stock market.  Computerized HFT firms tried to obtain clues about what Class members, in particular big institutional investors, were planning to trade through techniques such as repeatedly placing and instantly canceling thousands of stock orders to detect demand (referred to colloquially as "pinging").  If such an HFT firm's algorithms detected that a Class member was planning to purchase or sell a certain stock, the HFT firm's computers would rush to buy (or sell) it first and then sell it back to that Class member at a higher or lower price, pocketing the difference.  That process made purchases or sales costlier for Class members.

63.     Institutional investors making large stock purchases have long been accustomed to breaking up their orders to avoid tipping off the market.  But because buy and sell orders were being bounced around so widely following the enactment of Reg NMS, it became easier for HFT firms' algorithms to detect what and how much Class members were planning to trade – including their price sensitivity and margin requirements – based on knowing each investor's historical practices.  For instance, as an Illinois appellate court found in February 2010 in a decision involving HFT firm Citadel's claim to intellectual property rights over its proprietary HFT information gathering systems:

High frequency trading . . . requires the development of a vast collection of historical market data.  Citadel has been gathering market data since it began the high frequency business, which was built on the foundation of Citadel's prior quantitative investment work.  ***The data system contains the rough equivalent of approximately 100 times the amount of data included in the Library of Congress***.  In order to use the historical market data, codes and programs must be written to ***translate, organize and replay it***.  This process involves writing code to review and organize the data into a coherent and usable format.  ***Market data replayers allow a particular signal or "alpha" to be tested over historical market data***.  Citadel developed these tools in building its high frequency business.  A combination of signals or "alphas" may be used in a trading strategy.

***Moreover, Citadel built trading engines that read incoming real-time market data and, when the opportunity arises, execute its trading strategies and alphas to buy and sell securities***.  This is a critical piece of the infrastructure and of the entire interrelated network.[16]

64.     With the dramatic change in the stock exchange model following the introduction of Reg NMS, exchanges no longer generated most of their revenue from listing fees.  In addition to listing fees, stock exchanges now make fees in several ways including:

- Exchanges make approximately three-hundredths of a penny for every 100-stock order;

- HFT firms pay exchanges for the right to install their computer servers in the limited space as close as possible to the actual exchange, so that their electronic trade requests will arrive milli- and microseconds earlier than their competitors' requests;

- HFT firms pay exchanges for faster access to direct proprietary data feeds containing enhanced material trading data;

- Financial researchers, news companies and HFT firms pay exchanges for access to trade data – who sold what, when and for how much; and

- Traders purchase special trading software from exchanges.

---

[16]   *Citadel Inv. Grp., LLC v. Teza Techs. LLC*, 924 N.E. 2d 95, 97-98 & n.1 (Ill. 2010) ("Signals or 'alphas' are mathematical price prediction algorithms or models developed and tested by Citadel.").

Rather than relying on listing fees, exchanges "now receive most of their revenue from transactions and the sale of market data and related services based on those transactions."[17]

65.    In exchange for kickbacks, fees and the potential for increased trading volume, the Exchanges provided favored HFT firms with co-location, enhanced data feed and complex order type products, devices that when combined together and implemented by the HFT firms, were ultimately designed to drive HFT order flow back to the Exchanges.   The Exchanges acted to further this goal in furtherance of their own business interests, not for any delegated governmental or regulatory purpose.

66.    HFT is a type of algorithmic trading, specifically the use of sophisticated technological tools and computer algorithms to rapidly trade securities.   HFT uses proprietary trading strategies carried out by computers to move in and out of positions in fractions of a second.   As of 2009, studies suggested HFT trading accounted for 60%-73% of all U.S. equity trading volume.   By value, actual HFT was estimated in 2010 by consultancy Tabb Group to make up just **56%** of equity **trades** in the U.S.   Financial services firms that engage in proprietary HFT on their own firms' accounts sometimes also engage in trading for their customers' accounts.   Indeed, many of the nation's largest financial institutions have in-house HFT divisions under their umbrellas.   HFT is proprietary trading done on the firm's own account though, not trading done on behalf of that firm's customers.   Financial services firms earn profits ***off the market*** when they engage in proprietary, HFT against other market participants, whereas they earn commissions ***for trading*** on the accounts of their customers ***on the market***.

---

[17]   Comment Letter from Sal Arnuk and Joseph Saluzzi, Themis Trading, to Elizabeth Murphy, SEC at 2 (Apr. 21, 2010), *available at* http://www.themistrading.com/article_files/0000/0543/4-21-10_THEMIS_--_SEC_Comment_Letter.pdf.

67.     HFT has grown exponentially since its inception in 1999 following the SEC's authorization of electronic exchanges in 1998.  At the turn of the 21st century, HFT trades had an execution time of several seconds, whereas by 2010 this had decreased to milli- and even microseconds.[18]

68.     In the early 2000s, HFT accounted for fewer than 10% of equity orders, but according to data provided by the NYSE, overall trading volume grew by about 164% between 2005 and 2009, a material portion of which can be attributed to HFT.  Proponents of permitting HFT claim HFT firms are market-makers and provide liquidity to the market which lowers volatility and helps narrow bid-offer spreads, making trading and investing cheaper for other market participants.  In the U.S., dedicated HFT firms represent 2% of the approximately 20,000 firms operating today, ***yet account for 73% of all equity bids and orders volume***.

69.     High frequency traders move in and out of positions very quickly, aiming to capture sometimes just a fraction of a cent in profit on every trade – providing very low margins.  But HFT firms do not employ significant leverage, accumulate positions or hold their portfolios for minutes – much less overnight.  As a result, HFT has a potential Sharpe ratio (a measure of risk and reward) thousands of times higher than traditional buy-and-hold strategies.  HFT firms make up for their low margins with incredibly high volumes of trading, frequently numbering in the millions.

70.     However, HFT firms execute on very few of the bids and orders they place on stock exchanges and alternate trading venues, often placing those bids and orders for only

---

[18]   A millisecond is one thousandth of a second; a microsecond is one millionth of a second.  By way of comparison, one millisecond is to one second as one second is to 16.67 minutes and one microsecond is to one second as one second is to 11.574 days.  Estimates of the time it takes to blink your eye range from 100 millisecond (100,000 microsecond) to 400 millisecond (400,000 microsecond) – just a mere fraction of a second.

seconds and only for the purpose of discovering the intentions of investors. In 1999, there were 1,000 quotes per second, streaming from U.S. stock exchanges and approximately two billion shares traded each day. Today, there are two million quotes per second, but the market trades just over five billion shares per day, which is just over twice the volume of stock traded, but 2,000 times more quotes. These quotes are essentially HFT firms at war with each other, to the detriment of the investing public. "In other words, the HFTs generate a crushing, expensive amount of information (data) that don't need to be sent to millions of computers around the world," and "[t]hey spend a vast majority of their time spoofing, or trying to fake out algorithms of other HFTs."[19]

71.    As set forth more fully herein, some examples of typical trading methods utilized by HFT firms include:

a.    ***Trading Ahead***.   Most retirement savings, such as public and private pension funds or 401(k) and individual retirement accounts in the U.S., are invested in mutual funds, the most popular of which are index funds which periodically "rebalance" or adjust their portfolio to account for current prices and market capitalization of the underlying securities in the stock or other index that they track. This allows trading algorithms to anticipate and trade ahead of stock price movements caused by mutual fund rebalancing, making a profit on advance knowledge of the large institutional block orders. This results in profits being transferred from investors to algorithmic traders, estimated to be at least 21 to 28 basis points annually for S&P 500 index funds, and at least 38 to 77 basis points per year for Russell 2000 funds.

b.    ***Electronic Front-Running***.   Electronic front-running is a practice whereby a market participant seeks to exploit large orders being placed out in the market. For

---

[19]    *See generally* Jon Najarian, *How to 'Unrig' Markets* (Apr. 11, 2014), *available at* http://www.cnbc.com/id/101575733.

example, a large order from a pension fund to buy will be broken into small parts and trading takes place over several hours or even days, and will cause a rise in price due to increased demand. An HFT firm can utilize preferred access to material trade data to try to identify this happening and then trade in front of the fund, buying the relevant security elsewhere and then profiting from selling back to the pension fund at increased prices.

        c.    ***Latency Arbitrage***.  This practice relies on outdated market access technology employed by customers unable or unwilling to spend tens of thousands of dollars per month for special services from the Exchanges. Utilizing HFT strategies, HFT traders use speed to gain minuscule advantages in arbitraging price discrepancies in some particular security trading simultaneously on disparate markets. This practice alone can and has generated virtually riskless profits for Defendants. "Riskless profits" is not a speculative statement but is an industry norm for HFT firms. For example, Rishi Narang, co-founder of HFT firm Tradeworx Inc., explained the process in a documentary film about HFT as follows: "So let's say I can buy the S&P here for 10% down on the day, but I can sort of sell it here at the exact same moment for 8% down on the day, I've made 2% with zero risk. If you have the exact same instrument priced differently in two different places, that's ***free money***."[20] By one account, latency trading advantages have been estimated to account for $21 billion in profit per year.[21]

        72.    High frequency traders have claimed their practices substantially improve market liquidity, narrow bid-offer spreads, lower volatility and make trading and investing cheaper for other market participants. However, in September 2011, Nanex, LLC (an HFT software

---

[20]  Marije Meerman, *Money & Speed: Inside the Black Box* at 26:43-27:00 (Jan. 31, 2011), *available at* https://www.youtube.com/watch?v=aq1Ln1UCoEU.

[21]  Elaine Wah & Michael Wellman, *Latency Arbitrage, Market Fragmentation, and Efficiency: A Two-Market Model* (June 16-20, 2013), *available at* http://web.eecs.umich.edu/srg/wp-content/ uploads/2013/02/ ec38-wah.pdf.

company) published a report stating the contrary, revealing that the amount of quote traffic compared to the value of actual trade transactions over four and half years demonstrated a ten-fold ***decrease*** in efficiency.   Moreover, the liquidity that high frequency traders provide is illusory as it can disappear in an instant, worsening an unstable situation when liquidity matters most, as occurred during the "Flash Crash" of May 6, 2010 when several leading HFT firms such as Tradeworx Inc. stopped trading during severe market turmoil.

73.     With the influx of high frequency traders in the market, more fully automated markets such as NASDAQ, Direct Edge and BATS have gained market share from less automated markets such as the NYSE.   The speeds of computer connections, measured in milliseconds or microseconds, have become important.  For example, in 2009, the London Stock Exchange bought a technology firm called MillenniumIT and announced plans to implement its Millennium Exchange platform, which they claim has an average latency of 126 microseconds. Since then, exchanges have continued to evolve to reduce latency, competing to attract high frequency traders, and today, with turnaround times of three milliseconds available, these very fast exchanges allow high frequency traders to pinpoint the consistent and probable performance ranges of stock prices.

74.     Especially since 2011, there has been a trend to use microwaves to transmit data across key connections, such as the one between New York and Chicago.  This is so because microwaves travelling in air suffer a less than 1% speed reduction compared to light travelling in a vacuum, whereas with conventional fiber optics light travels over 30% slower.   In the microseconds it takes a high frequency trader – depicted below in blue – to reach the various stock exchange servers housed in these New Jersey towns, the conventional trader's order,

theoretically, makes it only as far as the red line.   The time differences can be financially advantageous in a number of ways.



Michael Lewis, *The Wolf Hunters of Wall Street: An Adaptation From "Flash Boys: A Wall Street Revolt*," (Mar. 31, 2014), *available at* http://www.nytimes.com/2014/04/06/magazine/flash-boys-michael-lewis.html.

75.    HFT was initially introduced to allow participants like market-makers the opportunity to meet or improve on the NBBO to ensure incoming orders were matched at the most advantageous prices according to Reg NMS.   However, in practice, these programs have

been manipulated by HFT firms to inspect major orders as they come in and use that information to profit to the detriment of ordinary investors.

76.     The fact that HFT firms are electronically front-running the trades of ordinary investors is demonstrated by the fact that HFT activity is not constant; it occurs in microbursts – showing that it is only triggered by the placing of a bid or order by an ordinary investor, revealing that investor's intention.  The example below is illustrative.  The line at the bottom of this graphic is the stock market activity involving General Electric shares over 100 milliseconds (one-tenth of a second) at 12:44 p.m. on December 19, 2013.  The gray box magnifies a five-millisecond window, during which General Electric experienced very heavy bid and offer activity, but only a total of 44 trades:



Lewis, *The Wolf Hunters of Wall Street, supra*.

77.     The SEC does not regulate HFT.  The brief but dramatic stock market crash in 2010 known as the Flash Crash, when the Dow Jones Industrial Average plunged to its largest

intraday point losses, only to recover much of those losses within minutes, is believed to have been caused by HFT.  After almost five months of investigations, the SEC and the CFTC issued a joint report identifying the cause that set off the sequence of events leading to the Flash Crash and concluding that the actions of HFT firms contributed to volatility during the crash.  To date the SEC has enacted no rules or regulations regarding HFT.

**Plaintiffs and the Class Justifiably Relied on the
Fairness and Integrity of the Exchanges as Markets**

78.     Plaintiffs and the Class relied on the traditional role and function of exchanges as protectors of the investing public, justifiably believing that the Exchanges provided level playing fields on which no class of trader is favored over other investors.  The Exchanges, however, acted in their own profit-driven self-interests in complete disregard of, and wholly outside the ambit of, the regulatory duties set forth below.  Instead, the Exchanges devoted their actions to the non-regulatory activity of attracting profitable HFT trading – often directly sacrificing the interests of investors like Plaintiffs and the Class to do so.  The Plaintiffs and the Class relied upon the purpose and adequacy of the regulatory structure to ensure an honest and fair market, and did not anticipate that the Exchanges' self-interested acts outside that structure would fundamentally subvert those goals..

79.     As registered national stock exchanges under the Exchange Act, the Exchanges are required to ensure that they operate in conformity with the Exchange Act and SEC rules and their own rules, and that its members comply with the Exchange Act, as well as the SEC's and the Exchanges' own rules.  In fact, many of the Defendants hold or have held themselves out as protectors of investors and have stated that they treat all investors equally and fairly.  For example, defendant NASDAQ's own equity rules reference the "protection of investors" 17 times.  ICE, in its most recent annual report, acknowledged that defendants NYSE and ARCA, as

self-regulatory organizations ("SROs") registered with the SEC, are charged with "providing fair and orderly markets and protecting investors."[22]  Moreover, NYSE's Code of Business Conduct and Ethics states that its employees, officers and directors should not "take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice."[23]

80.     Under §6(a)-(b) of the Exchange Act, 15 U.S.C. §78f(a)-(b), entitled "National securities exchanges":

> (a) . . . An exchange may be registered as a national securities exchange under the terms and conditions hereinafter provided in this section . . . by filing with the Commission an application for registration in such form as the Commission, by rule, may prescribe containing the rules of the exchange and such other information and documents as the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors.
>
> (b) . . . An exchange shall not be registered as a national securities exchange unless the Commission determines that –
>
> (1)     Such exchange is so organized and has the capacity to be able to carry out the purposes of this title . . . and to comply, and . . . to enforce compliance by its members and persons associated with its members, with the provisions of this title . . . , the rules and regulations thereunder, and the rules of the exchange.

*     *     *

---

[22]  ICE 2013 Annual Report (Form 10-K) at 25 (Feb. 14, 2014), *available at* http://ir.theice.com/files/doc_financials/10-K/10K2013.pdf.  The NYSE has more explicitly laid out this duty in earlier annual reports. *See* Nan S. Ellis et al., *The NYSE Response to Specialist Misconduct: An Example of the Failure of Self-Regulation* at 104 (June 2010) ("The NYSE acknowledges that '*[b]efore committing their trust and savings to the market, investors must be guaranteed a fair and level playing field along with equal access to information and guidance they can trust*.'") (quoting 2002 NYSE Annual Report), *available at* http://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=1070&context=bblj.

[23]  NYSE Manual, Section 3, Corporate Responsibility, *available at* http://nysemanual.nyse.com/lcm/sections/lcm-sections/chp_1_4/default.asp.

(4)    ***The rules of the exchange provide for the equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons using its facilities***.

(5)    ***The rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade . . . to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest***; ***and are not designed to permit unfair discrimination between customers***, ***issuers, brokers, or dealers*** . . . .

(6)    The rules of the exchange provide that . . . its members and persons associated with its members shall be appropriately disciplined for violation of the provisions of this title . . . , the rules or regulations thereunder, or the rules of the exchange, by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction.

81.    The dissemination of market information is a field in which the Exchanges are regulated, not regulators.  Rule 601 of Reg NMS allows SROs, which by definition include registered national securities exchanges such as Defendants, to distribute their own market data independently for a fee.  By virtue of distributing such data on an exclusive basis, an exchange is deemed an "exclusive processor."  Rule 603(a) establishes uniform standards for distribution of both quotations and trades.  Specifically, "Rule 603(a)(1) requires that any market information distributed by an exclusive processor . . . that is the exclusive source of the information, be made available to securities information processors [also known as "SIPs"] on terms that are fair and reasonable.  Rule 603(a)(2) requires that any SRO . . . that distributes market information must do so on terms that are not unreasonably discriminatory."[24]

---

[24]    Reg NMS at 279.

82.    More specifically, the Exchanges are "prohibited from providing their data directly to customers any sooner than they provide their data to the plan processors."[25]

83.    The standards set forth in Rule 603(a) were designed "to ensure that the independently distributed market data would be made available to all investors and data users,"[26] and to "promote efficiency and competition among market centers by helping to assure that independently reported trade and quotation information is distributed on terms that are fair and reasonable and not unreasonably discriminatory."[27]   Moreover, the SEC has stated that "'[r]obust technology governance is just as important to preventing investor harm as any other compliance or supervisory function.'"[28]   Significantly, the Exchanges view the dissemination of market information as "a significant product of their core business" that funds both regulatory activities and strategic initiatives.[29]   Indeed, as exchanges explained it to the SEC in 2007:

> Market data is critical to competition between the Exchanges, for while Exchanges are in the business of helping business, they are also businesses themselves. . . . .   Like all businesses, Exchanges fight for survival and primacy by offering more desirable products and attracting more buyers than their competitors.[30]

As set forth herein, the Exchanges have allowed their business interests to overshadow any duties to the public.

---

[25]    *See Concept Release on Equity Market* Structure, 17 CFR Part 242 [Release No. 34-61358; File No. 57-02-10] RIN 32 35-AK47 (January 21, 2010).

[26]    Reg NMS at 270.

[27]    *Id*. at 385.

[28]    Press Release, *SEC Charges New York Stock Exchange for Improper Distribution of Market Data* (Sept. 14, 2012), *available at* http://www.sec.gov/News/PressRelease/Detail/PressRelease/1365171484740#.VG-NAZ0o6uE.

[29] *Comments on NetCoalition Petition for Review*, at 5.

[30] *Id*. at 3.

**The Exchanges' Manipulative Scheme to Defraud**

**The Exchanges Mislead Investors to Induce Them to Trade Against HFT**

84.     Aware of their  public image as trusted self-regulatory entities – an image upon which Plaintiffs and the Class relied to their detriment -- the Exchanges further sought to enhance that image and to disguise their actual self-interested conduct that subverted the integrity of their markets.  They did so by continuing to assure investors that their markets are "fair and orderly," and for the benefit of traditional individual and institutional investors.  In this way they further induced individual and institutional investors to trade on their exchanges while simultaneously selling and profiting from services provided to HFT in order to take advantage of those same individuals and institutions.

### NASDAQ

85.     The NASDAQ OMX Group made public statements throughout the Class Period assuring the investing public that it operated fair and orderly exchanges, all the while knowing that through the provision of co-location services, proprietary data feeds, order types and payment for order flow, it had stacked the deck in favor of certain market participants, especially HFT firms.   Such statements trumpeted the NASDAQ OMX Group's "[c]ommitment to regulatory integrity," and its desire "to ensure transparent trading and a fair and orderly market for the benefit of investors."[31]   Moreover, the NASDAQ OMX Group acknowledged that its exchanges as "SROs . . . are an essential component of the regulatory scheme of the Securities Exchange Act of 1934 . . . for providing fair and orderly markets and protecting investors."[32]   As

---

[31]    NASDAQ OMX Group 2011 Annual Report (Form 10-K) at 4 (Feb. 24, 2012), *available at* http://ir.nasdaqomx.com/secfiling.cfm?filingID=1193125-12-77518&CIK=1120193.

[32]    *Id*. at 18.

the NASDAQ OMX Group admitted, transparency was an important part of its efforts to maintain fair and orderly markets.

86.     But this was a subterfuge, as the NASDAQ OMX Group was providing preferred market participants with trading advantages to the substantial detriment of all other investors, and the NASDAQ OMX Group benefitted greatly from these dealings.  Throughout much of the Class Period, NASDAQ's Access Services business, which included co-location services, and Market Data business, which included proprietary data products, provided large, ever-increasing sources of revenue for the exchange.  For example, in the year ending December 31, 2012, Access Services revenues increased $16 million when compared with the same period in 2011, totaling $238 million in 2012, and Market Data revenues increased $15 million to a total of $344 million in 2012, "primarily from U.S. market data products," which include proprietary data feeds.  Even when overall revenues for the Access Services and Market Data businesses decreased from one year to the next, co-location services and proprietary data products continued to thrive.

87.     While the NASDAQ OMX Group benefitted directly from the payments it received for co-location services and proprietary data products, it also catered to preferred market participants, such as HFT firms, because of the high volume of trading they brought to the exchanges.  As NASDAQ stated in regulatory filings throughout the Class Period, volume, and especially volume provided by HFT firms, was a key revenue driver for its exchanges:

> Current initiatives being considered by regulators and governments, such as restrictions on algorithmic (high-frequency) trading, could have a material adverse effect on overall trading and clearing volumes.  ***Because a significant percentage of our revenues is tied directly to the volume of securities traded and cleared on our markets, it is likely that a general decline in trading and clearing volumes would lower revenues and may***

*adversely affect our operating results if we are unable to offset falling volumes through our pricing.*[33]

88.    The potential for conflict between its business-related desire to increase revenues and its obligations to investors was not lost on NASDAQ.   As it noted, "[w]e have self-regulatory obligations and also operate for-profit businesses, **and these two roles may create conflicts of interest**."[34]   In providing certain preferred market participants with co-location services, proprietary data feeds, special order types and payment for order flow, NASDAQ acted in its own interest to increase company profit, with indifference to its statutory duties, which neither required nor supported, and nor were in any way implicated in, its courting the business of HFT firms.

### NYSE

89.    NYSE Euronext similarly represented to investors that it provided fair trading venues which treated customers equitably.   NYSE consistently stated that market participants could trade "anonymously"[35] and that its customers received market data in "real-time."[36]

---

[33]   *Id*. at 24.

[34]   *Id*. at 31.

[35]   "NYSE and NYSE MKT . . . build on our core attributes of liquidity, pricing efficiency, low trading costs and tight spreads by broadening customers' ability to trade quickly and anonymously."  ICE 2013 Annual Report (Form 10-K) at 6 (Feb. 14, 2014).  The same language was used in the NYSE's Forms 10-K for fiscal years 2009 through 2012.  *See* NYSE 2009-2012 Annual Reports (Forms 10-K) (Mar. 1, 2010; Feb. 28, 2011; Feb. 29, 2012; Feb. 26, 2013).

"NYSE Arca's trading platform provides customers with fast electronic execution and open, direct and anonymous market access."  ICE 2013 Annual Report (Form 10-K) at 6 (Feb. 14, 2014).  The same language was used in the NYSE's Forms 10-K for fiscal years 2009 through 2012.  *See* NYSE 2009-2012 Annual Reports (Forms 10-K) (Mar. 1, 2010; Feb. 28, 2011; Feb. 29, 2012; Feb. 26, 2013).

[36]   "Orders can be matched either on a price/time or pro rata basis, configurable by contract, with transacted prices and volumes and the aggregate size of all bids and offers at each price level updated on a real-time basis. Users are continually notified of all active orders in the central

- 39 -

However, NYSE profited by betraying the interests of traditional investors such as Plaintiffs, in favor of HFT customers who were willing to pay tens of thousands of dollars a month for an edge on the market.

90.     Despite its proclamations about "anonymous market access," NYSE profited by providing faster speeds and expensive enhanced data feeds which NYSE's favored customers could use to overcome the purported anonymity. The revenues NYSE generated by selling these technological advantages grew rapidly during the Class Period. The Information Services and Technology Solutions segment's annual revenues increased by roughly $50 million each year. NYSE publicly highlighted this segment and set a target of $1 billion in revenues by 2015. As set forth more fully below, NYSE knew that its statements regarding anonymity were false and misleading because NYSE empowered its favored customers in a way that allowed HFT firms to defeat the purported anonymity. And NYSE profited by doing so.

91.     Contrary to NYSE's representations to shareholders about distributing data in "real-time," NYSE offered co-location for a fee, and provided market data to its customers at two different speeds. In truth, NYSE had two classes of customers, only one of whom received data in "real-time." With this systemic advantage, created and maintained by the NYSE, favored

---

order book, making market depth easy to monitor." ICE 2013 Annual Report (Form 10-K) at 16 (Feb. 14, 2014). The same language was used in the NYSE's Forms 10-K for fiscal years 2009 through 2012. *See* NYSE 2009-2012 Annual Reports (Forms 10-K) (Mar. 1, 2010; Feb. 28, 2011; Feb. 29, 2012; Feb. 26, 2013).

"Our primary market data services include the provision of real-time information relating to price, transaction and order data on all of the instruments traded on the cash and derivatives markets of our exchanges." ICE 2013 Annual Report (Form 10-K) at 7 (Feb. 14, 2014). "NYSE Technologies' Market Data Platform provides real-time market data distribution . . . ." NYSE 2009-2012 Annual Reports (Forms 10-K) (Mar. 1, 2010; Feb. 28, 2011; Feb. 29, 2012; Feb. 26, 2013).

NYSE customers such as HFT firms could skim profits off of average Americans and institutional investors by imposing unknown transaction fees.

92.     In September 2012, NYSE settled an enforcement action by the SEC regarding this speed differential between its proprietary feed and the public quotation system.  NYSE was charged with violating Reg NMS by providing trade data to its direct data feeds faster than it was provided to its SIP.  NYSE and NYSE Euronext paid a $5 million penalty.

### BATS

93.     Like the other exchanges, defendant BATS represented that its trading platform facilitated fair and orderly markets, yet offered a competitive advantage in the form of co-location services, proprietary data feeds and complex order types to a favored group of predatory HFT customers.  For example, in connection with its attempted IPO, BATS stated in an amended Form S-1 filing on March 12, 2012: "Our trading platform is designed to facilitate fair and orderly markets, and we deploy cutting-edge regulatory surveillance technology in the United States and Europe to monitor our customers' trading."[37]  Similarly, in an open letter to BATS customers and the trading community in general, BATS CEO Joe Ratterman ("Ratterman") stated, also in connection with its failed IPO: "Our listing Exchange has an obligation to operate and maintain fair and orderly markets . . . .  [W]e will work even harder to earn your trust and confidence in the months and years ahead."[38]  In practice, however, BATS operates anything but fair and orderly markets.

---

[37]   BATS Amendment No. 4 to Form S-1 Registration Statement at 121 (Mar. 12, 2012) ("BATS Amended Form S-1"), *available at* http://www.sec.gov/Archives/edgar/data/1519917/000119312512107970/d179347ds1a.htm, at 121.

[38]   Steve Schaefer, *BATS Moves Into Damage Control After Scrapped IPO* (Mar. 26, 2012), *available at* http://www.forbes.com/sites/steveschaefer/2012/03/26/bats-moves-into-damage-control-after-scrapped-ipo/.

94.     The founder of BATS, David Cummings ("Cummings"), also founded the pioneering HFT firm Tradebots Systems Inc. ("Tradebots").  In 2007, Cummings stepped down as CEO of BATS to remove "any apparent conflict of interest" based on his ownership of Tradebots, but continued to serve on the BATS board of directors while running Tradebots.  In its March 12, 2012 filing, BATS disclosed that affiliates of its "strategic investors," including Tradebots (run by Cummings) and another powerhouse HFT firm, Getco LLC (now KCG Holdings, Inc.), accounted for "a significant percentage of [BATS's] revenue," including approximately 30% of revenue from 2009 to 2011 (and up to 10% by any one such affiliate for each year).[39]  BATS also provides rebates to favored HFT firms as part of its maker-taker model, and from 2009 to 2011, between 31% and 53% of such rebates (as part of its "total cost of revenues") were generated by these "strategic investors."  Perhaps most astonishingly, in 2009 *51% of BATS rebates were paid to a single affiliate*.

95.     Just weeks after BATS's March 2012 disclosures, it was reported that the SEC was examining the trading activities of BATS investors Getco LLC and Tradebots and whether those firms "used their close links to computerized stock exchanges [with a focus on BATS] to gain an unfair advantage over other investors."[40]  Not surprisingly, BATS noted in its filing that it has "***self-regulatory obligations that may create conflicts of interests***."[41]  But the investigation and conflicts of interest did not preclude BATS from continuing to offer rebates, co-location services, direct and enhanced data feeds and complex order types (discussed in further detail

---

[39]   As of 2012, Tradebot and Getco accounted for roughly 25% of the daily trading on many large U.S. stocks.

[40]   Scott Patterson & Jean Eaglesham, *SEC Probes Rapid Trading* (Mar. 23, 2012), *available at* http://online.wsj.com/news/articles/SB10001424052702304636404577297840134760650.

[41]   BATS Amended Form S-1 at 25.

herein) that allow HFT firms to profit off the backs of Plaintiffs and the Class.  As BATS CEO

Ratterman acknowledged before the U.S. Senate Permanent Subcommittee on Investigations on

June 17, 2014:

> Certain practices surrounding broker agency relationships, such as payment for order flow and soft dollar arrangements, as well as exchange fee structures create the potential for conflicts of interest . . . .

> \*     \*     \*

> Nonetheless, there remain perceptions that differences in content and speed of dissemination confer unwarranted advantages on select market participants. . . . While Rule 603 of Regulation NMS dictates that exchanges do not release market data to private recipients before disseminating that data to the public securities information processor ("SIP"), differences in content and downstream technologies can still create a perception of unfairness.

> \*     \*     \*

> Perceptions of unfairness are also present with respect to the market data exchanges use in their matching engines and routing infrastructure to calculate the national best bid and offer ("NBBO"). Some have suggested that exchanges that use the SIP data to calculate the NBBO provide unfair opportunities to sophisticated traders to engage in risk-free latency arbitrage.[42]

96.   In early August 2014 it was reported that BATS was in advanced talks with the

SEC to settle allegations that it gave unfair advantages to high-speed traders, including creating

and providing order types that gave HFT firms an edge over investors on its exchanges.

**Direct Edge**

97.   Like BATS and the other exchanges, Direct Edge, which completed a merger with

BATS on January 31, 2014, represented during the Class Period that it "maintain[s] a fair and

---

[42]    Testimony of Joe Ratterman at 4, 6, *available at* http://www.google.com/url?sa=t&rct=
j&q=&esrc=s&frm=1&source=web&cd=2&ved=0CCQQFjAB&url=http%3A%2F%2Fcdn.bat
strading.com%2Fresources%2Fpress_releases%2FJoe-Ratterman-Testimony-06-171-14.pdf&ei=
t58CVOHgMYe6iwKqkoH4Aw&usg=AFQjCNEES wkNVXuL3Za_Unv6DP3r7A8gsA.

orderly market"[43] for the benefit of all investors.  For instance, in 2012, Direct Edge released a

"statement of principles" designed to "help restore investor confidence and provide a better

environment for the trading of small and large-company stocks alike."[44]   As part of these

principles, former Direct Edge CEO William O'Brien ("O'Brien") proclaimed:

> To start with the premise that there is an "unlevel playing field" is
> unfairly accusatory and alarmist, and does nothing to restore
> investor confidence. . . .  [T]he focus should be on ensuring that
> exchanges can consistently provide great results for a broad
> spectrum of investors.
>
> *        *        *
>
> Stock exchanges function best when diverse participants all believe
> they are getting a near-optimal outcome.  This gives them the
> confidence to submit their order into a trading venue with
> maximum transparency, price discovery and liquidity.
>
> *        *        *
>
> Thus the increasing automation of the stock market should be
> viewed as something that works to greatly improve investor
> confidence.[45]

98.     But during the Class Period, Direct Edge at times only disclosed its unfair order

types to a select group of predatory HFT firms.  Additionally, Direct Edge often only marketed

its enhanced data feeds and co-location services to those who could afford them.  And even

---

[43] Direct     Edge,     Clearly     Erroneous     Review     Requests,     *available     at*
http://www.directedge.com/Regulation/ClearlyErroneousPolicy.aspx.

[44] Press Release, *Direct Edge Statement of Market Structure Principles*, Prepared remarks of
Direct Edge CEO William O'Brien to be delivered June 20, 2012 before The Committee on
Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises,
United States House of Representatives at a hearing titled "Market Structure: Ensuring Orderly,
Efficient, Innovative and Competitive Markets for Issuers and Investors" (June 19, 2012),
*available                                                                              at*
http://www.directedge.com/About/PressReleases/tabid/363/articleType/ArticleView/articleId/79/
Direct-Edge-Statement-of-Market-Structure-Principles.aspx.

[45] *Id.*

assuming all market participants had access to all of Direct Edge's services, Direct Edge's CEO himself admitted that "[t]he process for acquiring and using this [market] data is currently cumbersome and expensive," and "entails significant fixed costs even before any explicit exchange market data fees are paid, with total costs for retail firms of upwards of $1 million or more per month. This leads to such information being restricted to investors, creating the perception of 'haves' and 'have nots.'"[46]

99.     As a result of its conduct, Direct Edge has come under the microscope of regulators.  In March 2012, it was reported that the SEC was "examining the communications between some rapid-fire trading firms and Direct Edge Holdings LLC."[47]  In early August 2014 it was reported that BATS was in advanced talks with the SEC to settle allegations that it, and Direct Edge, gave unfair advantages to high-speed traders, including creating and providing order types that gave HFT firms an edge over investors in their markets.  Former Direct Edge CEO O'Brien was reportedly ousted from BATS in large part because of the SEC investigation, forthcoming settlement and related public misstatements surrounding the data feeds BATS utilizes to price stock trades on its exchanges.

### CHX

100.     Launched in 2007, the CHX's Matching System claims to offer "access to a fair, open, and neutral market place with diverse order flow" from retail brokers, CHX Institutional Brokers, NASD market makers and CHX market makers.[48]  But having fallen from one of the

---

[46]  *Id*.

[47]  Scott Patterson & Jean Eaglesham, *SEC Probes Rapid Trading* (Mar. 23, 2012), *available at* http://online.wsj.com/news/articles/SB10001424052702304636404577297840134760650.

[48]  Chicago Stock Exchange, Matching System (2008), *available at* http://www.chx.com/trading-information/matching-system/; *see also* The Handbook of World Stock, Derivative & Commodity Exchanges.

premier exchanges following the implementation of Reg NMS, CHX actively courted HFT, encouraging co-location in its Chicago Data Center and constantly seeking to upgrade functionality to reduce turnaround time and enhance processing of market data.[49]  CHX also provides a "maker-taker" fee structure, paying traders for ostensibly providing liquidity.

101.    CHX's desire to decrease latency was discussed in a November 21, 2011, Markets Media article *Chasing Speed*:

> "Speed remains important, it's become the norm," David Herron, chief executive officer of the Chicago Stock Exchange, told Markets Media. "Unfortunately, a couple of thousand miles is an issue."
>
> Because of that, the CHX is looking to open a new data center on the east coast in an effort to lower execution times for its clients that have data centers in the New York and New Jersey area. The new data center will handle its Tape A matching engine, while it[s] Tape B matching engine will remain in Chicago.
>
> "We need to be closer to the bulk of the firms in New York and New Jersey data centers to limit data transmission lag," said Herron. "It will help as far as reducing execution time, turnaround time, and will help with cross connecting."

102.    In the May 2013 issue of *Traders Magazine*, CHX's CEO David Herron ("Herron") discussed the need to cater to HFTs and other purported "liquidity providers" in an article entitled *Fund Fight; Nasdaq, NYSE and BATS are slugging it out with incentives, new order types and a new exchange to resuscitate trading in ETFs*:

> "It's a natural evolution born from the end of the specialist market-making system, where people via rule had an affirmative obligation to lay a tight market and maintain a fair and orderly market and basically provide liquidity when no natural liquidity was available," said Dave Herron, chief executive of the Chicago Stock Exchange.

---

[49]   http://www.wallstreetandtech.com/dir/?id=462.

According to *Traders Magazine*, in Herron's estimation, you need to pay fees to "market makers" that meet specified liquidity and market quality goals to kick-start trading in less-liquid securities.

103.    Then on August 15, 2013, the SEC issued a Cease-and-Desist Order and imposed sanctions – including a penalty of $300,000 – on CHX for:

> fail[ing] to implement policies and procedures reasonably designed to detect and prevent improper trade-throughs, and failed to regularly surveil to ascertain the effectiveness of such policies and procedures and take prompt action to remedy any deficiencies, in violation of Rule 611 [of Reg NMS].  In addition, CHX failed to monitor and enforce compliance by its members with the Exchange's own rules in violation of Section 19(g)(1) of the Exchange Act.[50]

104.    According to the SEC, CHX had been notified of abuses of the validated cross system as early as March 2008 from a broker-dealer customer of the exchange who reported that its traders "repeatedly manipulated the validated cross system to execute trades that advantaged accounts held by hedge funds (which generally paid higher commissions) at the expense of accounts belonging to various employee[s'] stock purchase plans, employees['] stock option plans, and similar plans."[51]  Notwithstanding these "red flags," CHX did nothing to "implement effective surveillance procedures reasonably designed to prevent abuses of the validated cross system."[52]

---

[50]    *In the Matter of Chicago Stock Exchange, Inc.*, SEC Release No. 70214, Order Instituting Administrative and Cease-and-Desist Proceedings, Market Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 19(h)(1) and 21C of the Securities Exchange Act of 1934 at 2 (Aug. 15, 2013), *available at* http://www.sec.gov/litigation/admin/2013/34-70 214.pdf.

[51]    *Id.* at 5.

[52]    *Id.*

**The Exchanges Reap Massive Profits by Providing Co-Location and
Low-Latency Enhanced Data Feed Services to HFT Firms**

105.    In the wake of the implementation of Reg NMS, the national stock exchanges faced increasing competition from new exchanges and alternate trading venues, and consequently competition for order flow, which is essential in generating revenue for the Exchanges.  At the same time, ultra-fast electronic proprietary trading outfits (*i.e.*, HFT firms) were seeking new ways to capitalize on arbitrage opportunities, including exploiting information latencies.

106.    "Latency" is the time between the moment a signal to buy or sell a share is sent from a broker or HFT firm and when it is received by a trading venue.  Several factors determine the latency of a trading system, including the boxes, the logic and the lines the broker uses to transmit the order, and whether the order is first sent to a public stock exchange or to an alternate trading venue.  The boxes are the machinery through which the signals pass on their way from Point A to Point B, *i.e.*, the computer servers and signal amplifiers and switches.  The logic is the software, the code instructions that operate the boxes.  The lines used to be just the glass fiber-optic cables that carry the information from one box to another.  The single biggest determinant of speed used to be the length of the fiber, or the distance the signal needs to travel.  To expedite transmission, some firms now transmit data between Chicago and New Jersey via microwave signals sent from tower to tower as well.

107.    Against this backdrop, the Exchanges capitalized on HFT firms' demands for products and services that increase speed and provide exclusive access to information, most notably the ability to obtain trading data at faster speeds through co-location and low-latency[53]

---

[53]    In this context, low-latency activity can be defined as strategies that respond to market events in the milliseconds environment.

enhanced data feeds, and demands for exceedingly complex order type products that only a select few, namely the Exchanges and HFT firms, can take advantage of or even understand. One well-respected *New York Times* financial reporter aptly explained the dynamics between the Exchanges and HFT firms in this context as follows: "[The] exchanges don't just passively allow certain investors to connect to their systems.  They have created systems and pricing tiers specifically for high-speed trading.  They are charging higher rates for faster speeds and more data for select clients.  The more you pay, the faster you trade."[54]

**Co-Location**

108.    One of the pillars of the Exchanges' new world of generating increased order flow from HFT firms is selling server space  in close proximity to the Exchanges' servers so that the HFT firms can trade at lightning-fast speeds.  This practice is commonly referred to as selling "co-location" services.  When combined with either (or both) of the enriched data feeds or complex order types (as discussed herein), co-location results in a manipulative device under the Exchange Act because it either (1) allows HFT firms to gain access to public information sooner than the investing public (and thereby trade on that information before it is publicly disseminated); or (2) permits HFT firms to front-run the non-HFT investing public by gaining access to pricing and other trading-related information based on what is in the queue versus what is displayed.  In either event, by such conduct, the Exchanges have diverted billions of dollars annually away from non-HFT market participants such as Plaintiffs and the Class and into the hands of the Exchanges and their preferred HFT customers.   The Exchanges knew that HFT

---

[54]    Andrew Ross Sorkin, *Fault Runs Deep in Ultrafast Trading* (Mar. 31, 2014), *available at* http://dealbook.nytimes.com/2014/03/31/fault-runs-deep-in-ultrafast-trading/?_php=true&_-type=blogs&_r=0.

firms seeking an edge over those investors who were not marketed or could not afford such services would pay a premium for the increased speed these services provide.

109.    The SEC has defined co-location as a service whereby a stock exchange "rents . . . space to market participants that enables them to place their servers in close physical proximity to a trading center's matching engine.  Co-location helps minimize . . . [latency times] between the matching engine of trading centers and the servers of market participants."  When trading at the speed of light, close proximity to an exchange matters.  A one millisecond advantage can be worth $100 million a year to a single HFT firm.[55]  Faster access to trading data through co-location allows HFT firms to engage in predatory trading strategies as detailed below.  As a result of such strategies, individual and institutional investors such as Plaintiffs and the Class pay higher prices for stocks.

110.    The Exchanges boast about their ability to offer faster-speed co-location and other connectivity services to those willing to pay the premium, and seek to differentiate their services from those offered by competing trading venues.  For example, NASDAQ OMX Group, the parent of defendants NASDAQ and BX, claims that its new "1G Ultra Client Connectivity" option "is expected to be an average of *8 to 9 microseconds faster* [roundtrip] compared to the existing 1G connectivity!"[56]  It also touts co-location services designed to "reduce latency," offers connectivity between NASDAQ OMX Group's data center and New York metro hubs on "ultra-low latency millimeter wave networks" at speeds "40%-50% faster than the fastest fiber

---

[55]    Ted Oberhaus, *High-Frequency Trading: The Co-Location Advantage* (May 23, 2014), *available at* http://tabbforum.com/opinions/high-frequency-trading-the-co-location-advantage.  There are 1,000 milliseconds in one second.

[56]    NASDAQ OMX Connectivity Options – 1G Ultra, Frequently Asked Question (emphasis in original).  There are one million microseconds in one second.

networks."[57]   These co-location arrangements are cost prohibitive for most investors.   For example, in 2013 defendants NYSE and ARCA charged up to $5,000 upfront and a minimum of $4,800 in monthly co-location rental fees, with fees easily reaching ten times that or more depending on how much space and how many kilowatts customers want.[58]   NASDAQ BX charges $13,000 per month for co-location in its "Super High Density Cabinet,' with an installation fee of $7,000.[59]   These fees generate huge profits for the Exchanges.   By one estimate, exchanges take in $1.8 billion annually as of 2010 for co-location services alone. As these services are not necessary to the operation of a stock exchange, their purpose is purely to generate revenues for the Exchanges.   NASDAQ acknowledged as much in a "Notice of Filing" with the SEC in September 2014:

> [NASDAQ] believes that fees for co-location services . . . . are constrained by the robust competition for order flow among exchanges and non-exchange markets, because co-location exists to advance that competition.   Further, excessive fees for co-location services, including for wireless technology, would serve to impair an exchange's ability to compete for order flow rather than burdening competition.[60]

---

[57]   NASDAQ OMX | Co-Location (CoLo), *available at* http://www.nasdaqtrader.com/Trader-.aspx?id=colo (emphasis in original).   There are one million microseconds in one second.

[58]   Aaron Elstein, *NY AG looks into 'Insider Trading 2.0'* (Mar. 18, 2014), *available at* http://www.crainsnewyork.com/article/20140318/BLOGS02/140319867/ny-ag-looks-into-insider-trading-2-0#document; Exhibit 5, Schedule of Fees and Charges for Exchange Services by NYSE Arca Equities, Inc., *available at* http://www.sec.gov/rules/sro/nysearca/2013/34-71130-ex5.pdf.

[59] Co-location fees at CHX currently run up to $500 per month ($6,000 per  year).

[60] The NASDAQ Stock Market LLC, *Notice of Filling and Immediate Effectiveness of Proposed Rule Change to Amend Fees for Optional Wireless Connectivity for Co-located Clients, Exchange Act Release No.* 34-73132 at 8 (September 17, 2014), *available at* http://www.sec.gov/rules/sro/nasdaq/2014/34-73132.pdf.

111.    By any measure, , "advanc[ing] competition" for "order flow among the exchanges" is an activity that does not fall within any regulatory function that has been delegated to the Exchanges

112.    If there was ever any doubt as to whom the Exchanges marketed their co-location services, defendant NYSE's promotional materials make it unequivocally clear that "[h]igh frequency and proprietary trading firms, hedge funds and others who need high-speed market access for a competitive edge" were the intended targets.[61]  The materials also tout "extremely low latency access to NYSE Euronext's markets, including NYSE . . . and NYSE Arca," and admit that "[c]onnecting to today's electronic markets is complex and expensive, but is critical for firms seeking to remain competitive and satisfy clients' performance demands."[62]  The image below is an excerpt from these materials.

---

[61]    Service Description, Colocation: NYSE Euronext's U.S. Liquidity Center at 1 ("NYSE Promo"), *available at* http://www.nyxdata.com/doc/35072; *see also* Pam Martens, *High Frequency Trading Is Not Like a First Class Airline Ticket – Unless You Have Also Hijacked the Plane and Robbed the Passengers in Coach* (Apr. 29, 2014), *available at* http://wallstreetonparade.com/2014/04/high-frequency-trading-is-not-like-a-first-class-airline-ticket-%E2%80%93-unless-you-have-also-hijacked-the-plane-and-robbed-the-passengers-in-coach/.

[62]    NYSE Promo at 1.

## Lowest Latency Access to NYSE Euronext's Markets in North America

### FAST FACTS

**What is it?**
Fully managed colocation space next to NYSE Euronext's US trading engines in the new state-of-the-art data center.

**Who is it for?**
High frequency and proprietary trading firms, hedge funds and others who need high-speed market access for a competitive edge.

**What does it provide?**
Access to NYSE Euronext's US trading engines at extremely low latency and connectivity to NYSE Euronext's market data through NYSE Euronext's SFTI network.

113.   Although defendants Direct Edge and BATS do not maintain their own co-location data centers themselves, they provide the service through unregulated third parties, which NYSE itself has recognized takes co-location "out of the realm of regulation simply by virtue of the structuring of the offering," which "could result in an extremely tilted playing field based on real estate proximity."[63]   Consequently, Direct Edge and BATS charge fees to clients to

---

[63]   Letter from NYSE Euronext to CFTC Chairman Gary Gensler and SEC Chairman Mary Schapiro, Sept. 21, 2009 ("NYSE letter") at 2, *available at* https://www.sec.gov/comments/4-588/4588-42.pdf.

"cross connect" to the Direct Edge and BATS servers located within the third party facilities, providing HFT firms with the same (or better) latency edge over Plaintiffs and the Class that NYSE, NASDAQ and CHX provide through operating the data centers themselves.   10G "physical" connection port charges alone run up to $5,000 per month per port on the BATS BZX exchange and up to $2,000 per month on Direct Edge's EDGX exchange.   In third party facilities, well-funded HFT firms can pay a premium to sit next to the matching engine, leaving less financially adept firms on the other side of the data center and at a latency disadvantage.  Of course, those traders unable to connect directly to one of these data centers in the first place is at an even greater disadvantage than the HFT firm at the far end of the room.

114.   The ability to cross connect was actually developed as part of larger suites of technology-based services designed to compete with similar services already offered by defendants NYSE and NASDAQ.   For example, in 2013 NASDAQ OMX Group charged $13,000 per month to co-locate in its high-end "Super Cab" co-location cabinet, but customers must also pay for fiber cross-connects, bandwidth, electricity and copper wiring, among other services, to fully realize the benefits of co-location.   Further, the Exchanges sometimes offer discounts on their services, including co-location fees.  In late 2013, for example, NYSE changed its pricing for some co-location services, and offered:

> a one-time Cabinet Upgrade fee of $9,200 when a User requests additional power allocation for its dedicated cabinet such that the Exchange must upgrade the dedicated cabinet's capacity. A Cabinet Upgrade would be required when power allocation demands exceed 11 kWs. However, *in order to incentivize Users to upgrade their dedicated cabinets*, the Exchange proposes that the Cabinet Upgrade fee would be $4,600 for a User that submits a written order for a Cabinet Upgrade by January 31, 2014…[64]

---

[64]   Self-Regulatory Organizations; New York Stock Exchange LLC; Notice of Filing and Immediate   Effectiveness of Proposed Rule Change to Offer Partial Cabinets and Cabinet

It is hard to imagine how charging such exorbitant fees to a limited number of HFT firms with bottomless purses complies with the duty of the national securities exchanges to provide equal access to all investors.

115. Catering to HFT firms' predatory trading strategies and jockeying for HFT firm business at the expense of Plaintiff and the Class through private business operations designed to increase revenues has, since at least the beginning of the Class Period, been the Exchanges' modus operandi. For example, Direct Edge hired  NASDAQ OMX's former head of NASDAQ Access Service (including the co-location business) to spearhead the company's connectivity services, including Connect Edge, which he described as: "Direct Edge's move into other areas into which we can provide value. *We see it as obtaining additional revenue*."[65]  Direct Edge rolled out Connect Edge during a "soft launch" in the summer of 2010 to "specific handpicked customers," including "sell side firms looking to control their infrastructure…"[66]  Likewise, the chief technology officer at NYSE Technologies, the technology division of NYSE Euronext (operator of the exchanges run by defendants NYSE and ARCA), admitted in 2012 that "*[p]eople who trade utilizing co-location tend to use arbitrage strategies*."  Not surprisingly, it is widely acknowledged that exchanges like BATS and Direct Edge, among others, "built trading

---

Upgrades As Part of Its Co-location Services and to Amend its Price List to Reflect the New Services, *available at* http://www.sec.gov/rules/sro/nyse/2013/34-71122.pdf (emphasis added).

[65]  Ivy Schmerken, *Direct Edge Launches Connectivity To Other Equity Markets* (Nov. 15, 2010), *available at* http://v5.wallstreetandtech.com/infrastructure/direct-edge-launches-connectivity-to-oth/228200952.

[66]  *Id.*

platforms that cater to high-speed traders,"[67] with the specific goal of attracting trading volume and increasing revenues.

116.    Significantly, NYSE offered co-location services from 2006 until September 2010 – seventeen months into the Class Period – without an exchange rule in place, presumably because it did not view co-location as part of its regulatory functions.  This practice of charging co-location fees to favored HFT firms well into the Class Period drew a $4.5 million fine from the SEC in 2014.  In its order issuing the penalty, the SEC found that:

> The fees that were charged for co-location…were not transparent or made publicly available. In addition, the fees that NYSE charged for co-location services…were not uniform for all customers, and were the product of discrete negotiations with each customer, such that each customer negotiated its own fees. As a result, not all…customers paid the same fees for the same types of services.[68]

Even after NYSE began standardizing its fees for new co-location customers in mid-2009, it allowed pre-existing customers to continue paying the fees for which they previously had contracted.[69]  Defendants CHX and NASDAQ also charged fees for co-location services without SEC orders approving such fees until March 10, 2010 and June 28, 2010, respectively.

117.    At the same time, NYSE Eurnonext actually misled regulators about the nature of co-location in a letter to the SEC and CFTC Chairmen in 2009, claiming "[i]t is important to note

---

[67]    Ivy Schmerken, *Will the BATS-Direct Edge Merger Raise Stakes for Rival Exchanges?* (Aug. 26, 2013), *available at* http://www.wallstreetandtech.com/exchanges/will-the-bats-direct-edge-merger-raise-stakes-for-rival-exchanges/d/d-id/1268366?.

[68]    SEC Release No. 72065, Order Instituting Administrative And Cease-And-Desist Proceedings Pursuant To Sections 19(H)(1) And 21c Of The Securities Exchange Act Of 1934, Making Findings, And Imposing Remedial Sanctions And A Cease-And desist Order, *available at* http://www.sec.gov/litigation/admin/2014/34-72065.pdf.

[69]    *Id.*

that retail investors are not disadvantaged by co-location."[70]   The NYSE Letter continued: "Co-location provides operational, not informational advantages…With co-location, the information is made available at the same time to all market participants and the difference with respect to receipt of the information lies in the operational capacity of the trading firm's systems."[71] Although NYSE was correct that co-location is an operational function of exchanges, it failed to explain the fact that NYSE, like the other Exchanges, offers co-location services to attract HFT order flow because HFT firms utilize co-location in conjunction with direct and enhanced data feeds to create their own "synthetic" or "constructive" NBBOs and greater depth of order book information substantially earlier than what is publicly available from the SIP, allowing them to achieve virtually risk free arbitrage opportunities, as explained in greater detail below.

### Direct and Enhanced Feeds

118.   The Exchanges also provide HFT firms the ability to receive enhanced trading information at faster speeds through the Exchanges' low-latency direct data feeds.  These feeds are in contrast to the SIP feeds which include trade and best-price order information reported by the Exchanges and which are widely available to the public (also referred to as the consolidated feed or consolidated tape).  As a leading market data provider has explained, "[t]here are over 2.5 million subscribers paying exchanges approximately $500 million a year for SIP data . . . with the expectation of receiving comprehensive, accurate, real-time prices for stocks: unfortunately . . . they aren't getting any of that."[72]   This is because HFT firms receive these direct market data feeds from the Exchanges at speeds faster than the SIP.  Moreover, the

---

[70]   NYSE Letter at 1.

[71]   *Id.* at 2.

[72]   *HFT Front Running, All The Time* (Sept. 30, 2013), *available at* http://www.nanex.net/aqck2/4442.html.

sensitive direct feed trading data allows HFT firms "to track when an investor changes price on his order, how much stock the investor is buying or selling in accumulation, as well as the ascertaining of hidden order flow."[73]  Consequently, "[t]his information assists HFTs in predicting short-term price movements with near certainty."[74]

119.    When combined with either the co-location services referenced above or the complex order types discussed herein, direct and enhanced data feed products constitute manipulative devices under the Exchange Act because, contrary to the fundamental understanding of Plaintiffs and the Class, reinforced by  Defendants, that the Exchanges treat all investors fairly, they either (1) allow HFT firms to gain access to public information sooner than the investing public (and thereby trade on that information before it is publicly disseminated); or (2) permit HFT firms to front-run the non-HFT investing public by gaining access to pricing and other trading-related information based on what is in the queue versus what is displayed.

120.    The SEC has continued to emphasize the importance of the consolidated data feeds on many occasions, including in its January 2010 Market Structure Concept Release where it stated that, "[a]s a result [of consolidated market data], the public has ready access to a comprehensive, accurate, and reliable source of information for the prices and volume of any NMS stock at any time during the trading day.  This information serves an essential linkage function by helping assure that the public is aware of the best displayed prices for a stock, no matter where they may arise in the national market system."

---

[73]    Sal Arnuk & Joseph Saluzzi, *Exchanges and Data Feeds: Data Theft on Wall Street* at 1 (May 11, 2010), *available at* http://www.themistrading.com/article_files/0000/0554/THEMIS_ TRADING-_White_Paper_--_Data_Theft_On_Wall_Street_--_05-11-10.pdf.

[74]    *Id*.

121.     Reg NMS requires that trades be executed on the exchange offering the best price at the time of the order.  In order to make compliance with that requirement possible, Reg NMS established an NBBO, which would be the best price at which any trade would have to be executed.  The NBBO is determined from bid and order data centralized by SIP, which gathers groups of bids and offers on a computer and disseminates them to market participants through their computers.  The SIPs are now maintained by the two primary exchanges, NYSE and NASDAQ, each exchange's SIP collecting all bids and offers on any exchange for all stocks listed on that exchange.

122.     NBBO is the heart of the NMS envisioned and purportedly implemented by Reg NMS.  It assures that, even with a multiplicity of exchanges, each trade will be executed on the best terms available.

123.     Reg NMS did not establish a minimum (or maximum) speed at which data regarding bids and offers must be collected and then transmitted by the SIPs to market participants.  Reg NMS does require, however, that the SIPs transmit such data so as to be received by all market participants at the same time.  In direct contravention of that rule during the Class Period, and therefore outside the ambit of their regulatory function, the Exchanges sold and continue to sell alternative data feeds to market participants, for extremely high fees, that provide either or both of (a) faster transmission of data regarding bids and offers than provided by the SIPs  (*i.e.*, so-called "direct feeds") and (b) a greater depth of data regarding bids and offers than provided by the SIPs (*i.e.*, so-called "enhanced feeds").  These alternative data feeds gives market participants who are able and willing to pay extremely high fees to the exchanges an enormous competitive advantage over other market participants.  Given that only two exchanges are paid to maintain SIPs, and these alternative data feeds yield even those exchanges

substantially higher fees than their SIP yields them, the exchanges have a clear incentive to put their resources into these alternative feeds at the expense of the SIPs.[75]

124.    A hypothetical example of the advantage provided to market participants by a direct feed follows.  An exchange 50 miles away from the NYSE receives a bid for an NYSE-listed stock at 10:00:00.0000 AM.  A market participant co-locating with that exchange, or maintaining a computer adjacent to that exchange, who purchases a direct feed from that exchange will receive data regarding that bid almost immediately.  However, it might take the data regarding this bid .0002 seconds to reach the computer on which the NYSE aggregates and then transmits bid and order data for its SIP.  When such a bid comes into the NYSE's computer, the computer wipes the time-stamp showing the time at which the initial exchange transmitted it, and transmits data via its SIP, at a much slower speed than a direct feed, bearing a time-stamp showing the time of the NYSE's transmission.  Accordingly, market participants receiving the data by means of the SIP – the vast majority of investors – do not know that the data was already .0002 seconds stale when first transmitted to them.  They do not know that other market participants, willing to pay high fees to the initial exchange, had received the trade data  more than .0002 seconds earlier.

125.    While the Exchanges understand Reg NMS permits market participants to construct their own "synthetic" and "constructive" NBBOs and to trade according to them, they also know and intend that the subscribers to direct and enhanced data feeds from several

---

[75]    In January 2014, NASDAQ gave notice to the Unlisted Trading Privileges Committee of the exchanges, the body responsible for overseeing the administration of the SIPs, that it does not intend to renew its contract to maintain its SIP after it expires in 2016, owing to NASDAQ's dissatisfaction with the Committee's failure to cooperate with NASDAQ's attempts to upgrade its SIP.

exchanges are given an unfair advantage in creating and trading on their own NBBOs based on data that are much timelier and more accurate than the NBBO established by the SIP.

126.     Further advantages are provided by "enhanced feeds."  Enhanced feeds provide greater depth of information than the SIPs.  The SIPs provide "the top of the book":  the single best bid and the single best offer for a given stock on any of the exchanges.  At ascending price levels, enhanced feeds provide greater depths of order book information for the particular exchange providing the feed, starting from a feed providing the single best bid and the single best order on *that* exchange (rather than, as with SIP, the single best bid and the single best offer from *any* of the exchanges), to a feed providing each and every bid and each and every order on the exchange.  This greater depth of market information is important, because the greater depth of market information an investor has, the more informed a decision the investor can make concerning market trends:  the state of the market for a given stock or industry, the direction of market movement of that stock or industry, the total market demand for a stock or industry, etc. This greater depth of data is especially useful to HFTs, who feed it into computers with algorithms that analyze and respond to it immediately, enabling them to engage in latency arbitrage and other manipulative conduct described herein.

127.     This information, however, comes at a high price, excluding the vast majority of market participants who are unable or unwilling to pay such high fees.  Indeed, such high fees are not feasible for traditional buy-and-hold investors, but only make sense for entities making mostly speculative short-term investments that they rarely hold for as long as even a day. Moreover, not only are the monthly fees charged by each exchange enormously high, but in order to get maximum benefit from direct and enhanced data feeds, a market participant must purchase the feeds from many or all exchanges – an expense that few market participants can

bear. The only reason HFT firms are willing to pay such exorbitant fees is that the informational and technological advantages sold by the Exchanges give them an unfair advantage over Plaintiffs and the Class.

128. In fact, one leading HFT firm, Virtu Financial, Inc., has itself confirmed that subscribers to direct feeds (primarily HFT firms) regularly receive quote and trade data faster than recipients of consolidated market data. The consolidated data, according to Congress, "serves as the heart of the national market system,"[76] and according to the SEC should provide the public with a "comprehensive, accurate, and reliable source of information for the prices and volume of any NMS stock at any time during the trading day." The Exchanges can charge over $10,000 a month for direct feed fees alone and there are several equity-trading exchanges for which a customer would need a direct feed from each – and that is not including the approximately $10,000 per month in necessary telecommunications fees. Although supporters of the Exchanges' proprietary feeds argue that this information is equally available to all investors, the reality is that not many individual or institutional investors have the resources to pay for this information or invest in the computer and telecommunications systems needed to access this information, assuming they are aware it exists at all.

129. For example, Direct Edge charged enterprises from $50,000 for its most basic feed to $100,000 per month for its most in-depth enhanced feed. Moreover, Direct Edge has described its market data product, BATS One Feed, as "60% less expensive per professional user and more than 85% less expensive for an enterprise license for professional users (50% less for non-professional users) when compared to a similar competitor exchange product."[77] If Direct

---

[76]   H.R. Rep. No. 94-229, 94th Cong., 1st Sess. 93 (1975).

[77]   Direct Edge, BATS One Feed, *available at* http://www.directedge.com/MarketData/BATSOneFeed.aspx.

Edge derived the savings rates based on its cheapest option, BATS One Summary, then, according to Direct Edge, competitive exchanges are charging professional users as much as $333,333 per month for an enterprise license for a budget direct data feed.  NASDAQ charges similar rates to enterprises.  An enterprise license for a direct NASDAQ data feed costs between $25,000 per month plus additional subscriber fees up to $500,000 per month.

130.   In 2012, the SEC issued its first-ever financial penalty against an exchange – the NYSE – for giving market data to its own direct feeds faster than to the SIP.  The SEC wrote of its $5 million fine that:

> "*[I]mproper early access to market data, even measured in milliseconds, can in today's markets be a real and substantial advantage that disproportionately disadvantages retail and long-term investors*," said Robert Khuzami, Director of the SEC's Division of Enforcement.  "That is why SEC rules mandate that exchanges give the public fair access to basic market data. *Compliance with these rules is especially important given exchanges' for-profit business interests*."[78]

131.   In summary, by selling co-location and direct and enhanced information feed services, and in exchange for a premium, the Exchanges provide HFT firms with an enhanced glimpse into what the market is doing before others who do not have similar access.  As a result, the Exchanges create a two-tiered market where individual and institutional investors trade with an informational disadvantage to technology-enhanced insiders such as HFT firms.  These services offered by Defendants are not sanctioned by the regulatory framework provided under the securities laws, serve no governmental or regulatory purpose, have no beneficial effect on market quality, and are designed to benefit to the Exchanges and their most profitable customers, who leverage this non-public information to profit at the expense of Plaintiffs and the Class

---

[78]   Press Release, *SEC Charges New York Stock Exchange for Improper Distribution of Market Data* (Sept. 14, 2012), *available at* http://www.sec.gov/News/PressRelease/Detail/PressRelease/1365171484740#.VATf_6Pn93w.

through predatory trading tactics such as electronic front-running, latency arbitrage, spoofing, layering and contemporaneous trading.

### The Exchanges' Discriminatory Fee Structure

132.   Rule 610 of Reg NMS, also known as the "Access Rule," sought to curb certain abuses but failed to go far enough.  Indeed, both Exchanges and HFT firms took advantage of the revised regulatory structure and engaged in predatory and manipulative conduct beyond the limits of what the new rule covered, including the offering by the Exchanges of new and complex order types that HFT firms could leverage to the Exchanges' and HFT firms' benefit and to the detriment of Plaintiffs and the Class.

133.   Under Rule 610(d), an exchange must adopt, maintain and enforce rules that "prohibit its members from engaging in a pattern or practice of displaying quotations that lock or cross any protected quotation in an NMS stock."[79]  In other words, Rule 610 banned "locked markets" – where the best price buy order at one exchange is marketable against and priced equally to the best priced sell order at another exchange, but the order itself is designated "non-routable" by the broker and therefore cannot be matched with the order on the other exchange.[80] The concern of regulators was that "displaying quotations that lock or cross previously displayed quotations is inconsistent with fair and orderly markets and detracts from market efficiency."[81]

---

[79]   Reg NMS at 206.  NMS stock effectively includes stocks listed on a national securities exchange.

[80]   Non-routable orders are orders sent to an exchange that do not authorize that exchange to route the order to another market for execution when the exchange is not displaying the NBBO. These orders are only executable on the exchange to which they are sent, so as to avoid paying the exchange a routing fee.  By contrast, exchanges typically make routable orders the default order type because of their desire to collect routing fees.

[81]   *Id*. at 194.

134.    In implementing Rule 610, the SEC was also concerned about the economic incentives created by the "maker-taker" model, where the Exchanges paid HFT firms a rebate to "make" liquidity and charged investors a fee to "take" liquidity.  The model "made it economically sensible for parties to lock markets to attempt to execute for rebate, when such parties would otherwise incur a taker fee if they were routed to the venue displaying the best price."[82]  As the SEC acknowledged in Reg NMS: "Often, the locking market participant is not truly willing to trade at the displayed locking price, but instead chooses to lock rather than execute against the already-displayed quotation to receive a liquidity rebate."[83]  Despite these concerns, the rule both failed to take into account the full extent that HFT "is actually inspired by race conditions to get exchange and dark-pool proffered rebates,"[84] and failed to effectively address HFT rebate-subsidized scalping strategies.  In reality, the rebates were crucial to HFT firms' existence, and the drive to capture them drove the Exchanges to develop new mechanisms for HFT firms to collect them.  The extent to which this revised regulatory structure changed the incentives of HFT firms, and the manner in which the Exchanges took advantage of those incentives to engage in self-interested conduct not designed to serve any governmental or regulatory purpose or design, is described in part by the following account:

> The implementation of REG NMS in 2007 changed the mechanisms for achieving queue position in a price-time priority market.  This fundamentally changed trading strategies and exchange matching practices.  By banning locked markets, REG NMS constrained the mechanisms through which a price

---

[82]   Haim Bodek, *The Order Type Controversy, Part I: Price to Comply* (Mar. 10, 2014), *available at* http://tabbforum.com/opinions/the-order-type-controversy-part-i-price-to-comply.

[83]   Reg NMS at 197.

[84]   *Let's Talk Locked and Crossed – Lock Stock and Two Smoking Barrels* (Dec. 9, 2013), *available at* http://blog.themistrading.com/lets-talk-locked-and-crossed-lock-stock-and-two-smoking-barrels/.

movement occurred in the U.S. market.  Thus, Rule 610 defines precisely the conditions in which an HFT can achieve a superior place in the queue (*i.e.*, when an order would not lock an away market).

*     *     *

The ban resulted in HFTs being forced to engage in "spam and cancel" strategies that repeatedly attempted to get to the top of the order queue on a price move.  Such strategies would attempt to "step in the middle" to set a new aggressive price. This invariably locked away markets. Rule 610 demanded that such orders not be accepted at the entered price.

This activity caused immense load on exchanges, but in no way did exchanges want to discourage high-volume HFT order flow.  To court HFTs, exchanges provided a number of specialized features to assist "spam and cancel" strategies, many of which are still operational today.[85]

135.    The Exchanges cultivated the HFT firms' rebate strategy, while simultaneously attracting HFT order flow and volume on their trading venues, through offering "specialized features" such as new and complex orders types and order type combinations, including "hide and light" and Post-Only Day ISO orders, that allow HFT firms to "jump" to the top of an exchange's limit order queue to ensure that the firm captures a rebate and not pay a "taker" fee. While the ban on locked markets interfered with the economic incentives of the Exchanges and sophisticated HFT firms, the mechanisms developed by the Exchanges in response to Reg NMS, along with other manipulative practices designed to benefit the Exchanges and HFT firms described herein, allowed both the Exchanges and favored HFT firms to reap financial benefits at the expense of Plaintiffs and the Class.  While Reg NMS did not expressly prohibit the acts and practices the Exchanges engaged in, it neither mandated nor permitted the Exchanges to further their own business interests by favoring one group of traders (who generated tremendous

---

[85]   Haim Bodek, *The Problem Of HFT: Collected Writings On High Frequency Trading & Stock Market Structure Reform* 30-31 (2013) ("*The Problem of HFT*").

amounts of volume and revenues for the Exchanges) against the investing public as a whole –

acts and practices that are outside any governmental or regulatory function delegated to the

Exchanges.

**The Exchanges Create Complex Order Types
Designed for HFT Firms to Prey on Investor Orders**

136.    To maximize the benefits of high speed trading, and, in turn, to increase order

flow, the Exchanges have designed hundreds of new "order types" – preprogrammed commands

traders use to tell exchanges how to handle their bids and their offers to sell.  In their simplest

form, order types give an exchange's customer different ways to interact with the market.  But,

as part of the fraudulent and deceptive scheme alleged herein, the Exchanges have developed

new and exceedingly complex order types that only benefit the Exchanges and HFT firms at the

expense of Plaintiffs and the Class.

137.    As an initial matter, the Exchanges' attempted disclosure (or complete lack

thereof) of complex order type functionality and order handling practices to the SEC and the

public are wholly insufficient for even the most sophisticated investor to understand and/or

utilize.  The same can be said for the way these complex order types are used by HFT firms in

combination with co-location services and/or enhanced data feeds.

138.    To attract more HFT customers, the Exchanges offer HFT firms the ability to gain

access to the top of their  "order book," or the queue of buy and sell orders that are typically

ranked by price and when they were received, which is crucial for HFT firms to execute their

predatory strategies and in many instances collect "maker" rebates (and avoid paying the "taker"

fee) from the Exchanges.  The complex order types created and provided by the Exchanges, in

combination with the Exchanges' selective disclosure of order type functionality,  are key to

providing HFT firms with superior queue positioning, including the ability to jump ahead of

other investors in an exchange's order book, enabling HFT firms to regularly and repeatedly profit to the detriment of unsuspecting investors.   The complex order types created by the Exchanges that serve to preference HFT firms over ordinary investors include at least the following fraudulent and deceptive practices:

- order handling practices that permit HFT firms to step ahead of investor orders in violation of established rules of priority and precedence;

- rebooking and repositioning of investor orders that permit HFT firms to escape disadvantageous trades;

- conversion of investor orders eligible for maker rebates into unfavorable executions incurring taker fees (under the maker-taker pricing model);

- insertion of HFT intermediaries in between legitimate customer-to-customer matching; and

- discriminatory order handling of investor orders during sudden price movements.[86]

139.   With the addition of dozens of alternate trading venues that offered traders the ability to execute bids and offers, exchanges faced increasing competition for order flow, and developing new order types for their most lucrative customers – HFT firms – helped the Exchanges attract and retain their business.   This dynamic was explained last year by the Executive Vice President of Global Sales for NYSE Euronext (operator of markets run by defendants NYSE and ARCA), who stated that "'*[w]e're always competing for market share, so we try to create products that will attract more volume*.'"[87]   This growth in order types, she said, was designed "'*to ensure a customer achieves certain economics*.'"[88]   As explained by the

---

[86]   *Id.* at 11-12.

[87]   Laurie Carver, *Exchange Order Types Prompt Fears of HFT Conspiracy* (Apr. 23, 2013), http://www.risk.net/risk-magazine/feature/2261626/exchange-order-types-prompt-fears-of-hft-conspiracy.

[88]   *Id.*

- 68 -

founder of leading market data firm Nanex, Eric Hunsader, "'[e]xchanges are losing out to dark pools, so when HFTs ask for a new order type, they get a new order type.'"[89]

140.    In general, the new order types were created by the Exchanges for and at the behest of their preferred HFT customers (through exclusive, backroom communications), were marketed solely or at least largely to HFT firms and other favored traders, and were not adequately disclosed to all market participants.    For example, a well-known trader who approached the SEC about the order type controversy, Haim Bodek ("Bodek"), explained:

> My direct experience was that exchange marketing departments tended to segment their customer base . . . .  If you were an HFT, you were most likely provided entirely different marketing materials than if you were an agency broker responsible for routing institutional orders.  In other words, *you were either marketed unfair advantages like queue-jumping or you weren't*.  It was that simple."[90]

Another high frequency trader hinted at the selective disclosure of order types that allow queue jumping as follows: "'We talk a lot to the exchanges, to optimize the order type for a given trade. Sometimes you'll want to pay the rebate and sometimes want to take it – but *what's really essential is to jump to the head of the queue. You pay for it, but you jump to the head*.'"[91]

141.    Significantly, these sentiments have been substantiated by employees of the stock exchanges themselves, including one who worked for Archipelago (which after a merger with NYSE Group became defendant ARCA) who said of the early creations of the new order types:

> "We created all these different order types to accommodate how [some market participants] wanted to trade . . . .  We tweaked how

---

[89]   *Id.*

[90]   *The Problem of HFT* at 9.

[91]   Laurie Carver, *Exchange Order Types Prompt Fears of HFT Conspiracy* (Apr. 23, 2013), available at http://www.risk.net/risk-magazine/feature/2261626/exchange-order-types-prompt-fears-of-hft-conspiracy.

> the order would interact with our book according to what they wanted. ***A lot of the unique orders were created at the request of a customer, typically a high frequency customer***. You had to be a sophisticated customer to learn how to use it."[92]

Similarly, a technologist who worked at several exchanges clarified that "'[i]t became about meeting the needs of that specific HFT community . . . .  We spent a tremendous amount of money trying to meet their needs. . . .  It's all about what functionality can I offer the HFT that they can take advantage of.  We're going after ***guaranteed economics***."'[93]  In other words, the Exchanges worked with HFT firms to create ways for those firms to make guaranteed profits at the expense of investors and institutions who had no reason to suspect that new order types were being developed and leveraged to their detriment.  According to one NYSE executive, some order types "***are to guarantee economic results***."[94]

142.  The Exchanges offer hundreds of new order-type options, which translate to thousands of variations because they behave differently depending on how an HFT firm's trading programs are coded.  Moreover, defendant BATS has claimed that it has 2,000 different combinations of instructions for placing orders on its exchanges.  Bodek summarized the complexity of this system as follows:

> [N]ot even the most sophisticated user would have been able to determine how top HFT firms employed special order types by scrutinizing exchange [application programming interface] manuals and regulatory filings.  The most important details (*e.g.* intended usage cases, intended order interaction sequences, order

---

[92]  *Dark Pools* at 205.

[93]  *Id*. at 204 (emphasis in the original).

[94]  *Computerized Trading: What Should the Rule of the Road Be? – Part II: Hearing Before the Subcomm. on Sec., Ins., & Inv. of the S. Comm. on Banking, Hous., & Urban Affairs*, 112th Cong. 22 (2013) (remarks of Joseph Mecane, Executive Vice President and Head of U.S. Equities, NYSE Euronext).

precedence rules, etc.) are not documented in any adequate manner.[95]

143.    Further, Bodek stated that often "'the rule descriptions [of the complex order types] did not match what was going on at the exchanges.'"[96]   By failing to include important information about how their order types worked in their regulatory filings, or failing to make the filings altogether, the Exchanges thwarted the SEC rule-making process.   In doing so, they deprived the investing public of adequate notice of order types; they deprived the public of an opportunity to comment; and they deprived the SEC of information essential to performing its statutory regulatory function.   In fact, defendant ARCA was fined by the SEC as recently as May for allowing certain order types to have undocumented features, such as the subpenny functionality.

144.    For example, in the wake of Reg NMS's Rule 610, the exchanges used a common order matching engine feature known as the "price slide" order.   The practice modifies the price of an order that locked the markets, thereby sliding that order back to a lower queue placement where it would sit.   But HFT firms, acting on information about handling mechanisms at the Exchanges not known by the investing public, would "first know that there was an order ahead in a better queue position, and second, cancel the order and retry."[97]  As a result:

> While HFTs canceled their slid orders, traditional investor orders would typically just slide without being canceled.  This causes the institutional orders to move to the back of the queue and away from the trading action.   In this strategy, the HFTs would monopolize the top of the book, interacting with marketable

---

[95]  *The Problem of HFT* at 48.

[96]  Laurie Carver, *Exchange Order Types Prompt Fears of HFT Conspiracy* (Apr. 23, 2013), *available  at*  http://www.risk.net/risk-magazine/feature/2261626/exchange-order-types-prompt-fears-of-hft-conspiracy.

[97]  *The Problem of HFT* at 31.

> orders, while the institutional-side orders would be at the bottom of
> the queue only to be executed when a large buyer or seller cleared
> the book.
>
> *      *      *
>
> To execute these spam-and-cancel strategies even more quickly,
> HFTs utilized specialized order confirmation information to detect
> being slid so they could quickly cancel the price-slid order.
> Exchanges also provided alternative cancel-back or "opt out"
> options that literally rejected orders that might have otherwise been
> placed in a disadvantaged queue position.[98]

By and large, the Exchanges did not adequately inform many of their institutional clients and

their brokers such that these investors had no idea that their orders were sliding away from the

top of the order book.

145.    As the Exchanges realized that they could generate vast profits from attracting

HFT firm orders and fees, they began aligning their interests with those of the HFT firms,

including enabling predatory HFT strategies by creating new order types and selectively

disclosing the existence, function and regulatory pitfalls of these new order types.

146.    The disclosures of order type functionality and order handling practices provided

by the Exchanges to the SEC and the public are insufficient for even the most sophisticated

investor to understand and/or utilize these complex order types without additional information,

which the Exchanges make available  to HFT firms and not to the investing public..

147.    The selective disclosure of complex order type functionality and order handling

practices to HFTs by the Exchanges has caused measurable harm to investors including, *inter*

*alia*, increased opportunity costs from unexecuted fill orders, adverse selection and price

movement bias on executed fill orders, and increased execution costs.

---

[98]    *Id*. at 31-32.

148.   The Exchanges have cooperated with the HFT firms in creating these complex order types, and have selectively disclosed their operation and nature only to favored customers, in furtherance of their business interests, and not as part of any governmental or regulatory function that has been delegated to them.  The order types favor a certain class of traders over the general investing public because those favored traders generate enormous volume and revenues for the Exchanges.

149.   One HFT insider and staunch defender of HFT practices estimated that inferior queue positioning can cost investors 1.7 cents per share, resulting "in **tens of millions of dollars (conservatively) of extra trading costs for investors (and profits for HFTs)**."[99]

150.   The selectively disclosed features of these order types include the following:

a.      precedence rules that advantage HFT order types over others (including conditions where price-time priority corruption occurs, and conditions where certain order type priority is firm, though other order types are "re-posted" with new booking times);

b.      rules for "hiding" and "lighting" (including conditions for maintaining a hidden state and triggers for lighting, and conditions where incoming orders have preference over "hidden" states or are subordinate to such "hidden" states, including but not limited to, the impact of DAY ISOs as "lighting" events);

c.      conditions for adherence to the SIP including the cases where an exchange will use direct feeds in conjunction with the SIP to determine "locking" and "lighting" conditions;

---

[99]   Attached chart to April 21, 2010 letter from Manoj Narang, Tradeworx, Inc. CEO, to Elizabeth Murphy, SEC Secretary, at 17, *available at* http://www.sec.gov/comments/s7-02-10/s70210-129.pdf (noting the profitability difference between being first in line versus last in line).

d.      conditions and mechanisms where information about an exchange's protected quotation state management, which normally would be expected to remain local to the exchange order matching engine, is communicated to HFTs in an advantageous manner (i.e., mechanisms in which price sliding reject messages provide "re-posting" guidance for HFTs);

e.      conditions of eligibility for maker/taker fees and rebates and conditions where fee transference occurs (including the conditions where non-marketable orders are re-posted to execute against special orders to incur taker fees); and

f.      scenarios where the various price-sliding conditions are applied (with detail provided for both HFT order types and the common public customer order types), as well as full detail on conditions where "Post Only" orders in a hidden state may internally lock a market or otherwise gain precedence over other orders (including such properties as would apply to "Post Only" mid-point orders). [100]

151.    Set forth in detail below are a few of the most manipulative order types put in place by the Exchanges that harm those individual and institutional traders not provided the information necessary to utilize their functionality, such as Plaintiffs and the Class.

**"Hide and Light" Orders**

152.    One of the most abusive, selectively disclosed order types developed by the Exchanges for the benefit of favored HFT firms are those that allow HFT firms to post orders that remain hidden at a specific price point at the front of an exchange's trading book when the market is moving, while at the same time pushing other traders to the back of the order book queue.  By contrast, limit orders, which simply specify a price limit at which to buy or sell and are regularly used by individual and institutional investors, lose their priority in the queue when

---

[100]    http://tabbforum.com/opinions/reigniting-the-order-type-debate-haim-bodek-explains-the-real-issues-with-%27undocumented%27-order-type-features

the market shifts. These predatory order types, colloquially referred to as "hide and light" orders, were created by the Exchanges under the guise of complying with Reg NMS's ban on locked markets to assist HFT firms in getting to and preserving their spot at the top of the Exchanges' order queues without relying on their spam and cancel strategies.[101]

153.   The ability to dominate the top of the order book allows HFT firms to rapidly and repeatedly collect "maker" rebates from the Exchanges and cause others who thought they might collect a "maker" rebate to pay the "taker" fee. A hide and light order generally is a non-routable order that would ordinarily lock a market, but does not do so because it is initially "hidden" and does not appear in the order book. When the market unlocks, the hidden order "lights" and is booked at the front of the queue.[102] Thus, the Exchanges rebook HFT firms' "hide and light" orders such that traditional investors affected by such orders are "queue jumped," frequently paying higher prices for their trades than they otherwise would have and being subjected to a taker fee.

154.   The "hide and light" order type is a key weapon in the HFT arsenal that allows HFT firms to generate "guaranteed profits" from interacting with less sophisticated market participants – even when their profit from a trade would otherwise be zero from buying and then selling a stock at the same price. These order types were specifically marketed by the Exchanges to sophisticated traders employing abusive HFT strategies and ***not*** to institutional investors seeking longer terms investment strategies. Each of the Exchanges' offers or offered order types

---

[101] BATS explained that such order types "eliminate[] the need for traders to retry orders multiple times in rapid succession trying to be high in priority at the next NBBO price." BATS Display-Price Sliding: Slide orders that lock or cross the NBBO (2011), *available at* http://www.batstrading.com/resources/features/bats_exchange_pricesliding.pdf

[102] In contrast, a traditional non-routable "lit" limit order at the same price, would because it created a locked market, either be immediately cancelled or "price slid" so as not to lock the market.

that "hide and light" or performed analogous behaviors to the detriment of Class members during the Class Period.

155.    The following is an example of how an HFT firm employing a "hide and light" order can queue jump a non-routable limit order placed on behalf of a traditional or institutional investor:  Suppose the market for General Electric is $30.01 (bid), $30.02 (ask) with 1,000 shares available on exchange X.  An institution sends a non-routable limit order to buy 5,000 shares of General Electric for $30.02, which locks an away market because another exchange's best offer is also $30.02.  The institution is able to purchase the 1,000 shares on exchange X at $30.02, and is willing to pay up to $30.02 for another 4,000 shares.  Upon locking the away market, the institution is price slid to $30.01.  But suppose an HFT firm sees the 1,000 shares trade at $30.02 and sees the new $30.01 bid for the remaining 4,000 shares.  However, there is no longer a matching offer at $30.02 on that exchange.  The HFT firm then steps ahead of the institution by posting a "hide and light" buy order, locking the market at $30.02 ahead of the institutional order.  Then, the away market unlocks as the offers clear at $30.02 and the $30.02 hide and light bid is rebooked and lights up.  The institution's order is then rebooked and displayed at $30.02, but placed after the HFT order.

156.    The effect of these order types, as *Dark Pools* explains, is that "[e]veryday investors . . . were buying stocks for a slightly higher price than they should, and selling for a slightly lower price and paying billions in 'take' fees along the way."[103]  In other words:

> By staying at the front of the queue and hidden as the market shifted, the [HFT] firm could place orders that, time and again, were paid the fee.  Other traders **had no way of knowing** that the orders were there.  Over and over again, their orders stepped on the

---

[103]    *Dark Pools* at 49.

> hidden trades, which acted effectively as an invisible trap that
> made other firms pay the "take" fee.[104]

But as explained above, these order types were not adequately documented and/or disclosed to

anyone other than Defendants' favored HFT customers and as a result, the majority of investors,

even sophisticated investors handling the portfolios of multi-billion dollar pension funds, did not

use them.  If they did, limit orders, which most investors rely on to invest in stock, would

become obsolete, and limit orders are "the food the new order types fed on."[105]

157.    Each of the Exchanges' "hide and light" orders described below were designed to

and did assist HFT firms in employing predatory trading strategies to the detriment of Plaintiffs

and Class members during the Class Period.

### Direct Edge: Hide Not Slide (+ ALO)

158.    In May 2009, Direct Edge added its own hide and light order type called "Hide

Not Slide," specifically to benefit a limited number of powerful HFT firms in efforts to attract

order flow and increase revenue.  Hide Not Slide works as follows:

> Say an order to buy Microsoft Corp. for up to $30.01 a share is
> sent to electronic stock exchange Direct Edge Holdings LLC, with
> instructions to be filled only there and not routed elsewhere.
>
> Meanwhile, though there is no matching sell order on Direct Edge,
> another market, such as Nasdaq, has an order to sell Microsoft at
> $30.01.  It is also an order to be filled only on that exchange.
>
> The SEC considers this a "locked market" and doesn't allow it.
> The fear is it could encourage manipulation such as buying and
> selling a stock merely to generate fees. The ban means an order to

---

[104]  *Id*. at 50 (emphasis in original); *see also* Haim Bodek, *HFT Checkmate – The Alpha in Order Types* (Dec. 31, 2013), *available* at http://tabbforum.com/opinions/hft-checkmate-the-alpha-in-an-order-type?page=2 ("For five long years, the greater investment community was subjected to unnecessary transaction costs as they transferred 'guaranteed economics' to HFT firms and exchanges through mechanisms unbeknownst to them.").

[105]  *Dark Pools* at 51.

buy for $30.01 can't be displayed on Direct Edge. The order will "slide" to a lower price, $30.

Here's where Hide Not Slide orders can take advantage. They are hidden from other investors – not displayed on the exchange's order book.

The locked-markets ban applies only to displayed orders. So if a $30.01 Hide Not Slide order is placed now, it won't slide to a lower price.

When the market "unlocks" – such as if the sell order on Nasdaq is filled or canceled – the Hide Not Slide order is converted back to a displayed order at $30.01 and is eligible to trade against Microsoft shares posted for sale on Direct Edge at that price.

As for the first investor's order – the one that slid to $30 – it converts back to the original $30.01 price, but is placed in line behind the Hide Not Slide order. If a $30.01 sell order for Microsoft enters Direct Edge, the Hide Not Slide order will get it first.

If not many Microsoft shares are offered for sale on Direct Edge at $30.01, the first investor may not get any.[106]

159.    Direct Edge also provides HFT firms the option to combine the Hide Not Slide order with an Adding Liquidity Only ("ALO") order, which executes only when the order makes liquidity, thus allowing it to execute only when it will capture the exchange's rebate and protecting it from ever having to pay the "taker" fee.[107]

160.    In efforts to keep the Hide Not Slide order exclusive and conceal its actual functionality from anyone other than a select group of HFT firms, Direct Edge did not adequately and/or publically disclose the existence of the order type and the full extent of how it

---

[106] Scott Patterson & Jenny Strasburg, *How "Hide Not Slide" Orders Work* (Sept. 19, 2012), *available at* http://online.wsj.com/news/articles/SB10000872396390444812704577605840263150860.

[107] Direct Edge and some other exchanges at times refer to ALO-type orders and other functions as order "modifiers." Semantics aside, an order designated or functioning as an ALO order or modifier clearly functions as an order type, *i.e.*, a set of instructions that traders use to communicate to exchanges how to handle their order, rather than an order "modifier."

operated to either the SEC or the investing public.  For example, over five months after the order

type was released, Direct Edge's portal application programming interface ("API") specifications

failed to refer to the order handling priority function of the order type.  As Direct Edge did not

formally convert from an ECN to a national securities exchange until March 2010, it was not

**required** to file a public order type description with the SEC describing the functioning of the

order type.[108]  However, even after Direct Edge's two trading platforms (EDGX and EDGA)

converted to national exchanges, Direct Edge's regulatory disclosures and technical

documentation as to the "Hide Not Slide" functionality continued to remain inadequate and

failed to mention queue priority and other abuses.[109]  Additionally, Direct Edge never fully

disclosed how the "Hide Not Slide" order combined with ALO functionality could adversely

affect buy-side investors and convert orders otherwise eligible to receive a rebate into orders

subject to paying the "taker" fee.

161.    The disclosures that Direct Edge made to its customers concerning the new order

type were similarly wholly inadequate and often non-existent.  Direct Edge initially marketed the

Hide Not Slide order type specifically to an exclusive group of ultra-high frequency traders at the

expense of traditional long-term investors, and slowly revealed the functionality of the order to

others when it was either pressured to do so or when it thought it was necessary to attract order

flow or generate revenues from certain trading firms.  For example, at a December 2009 holiday

---

[108]  Under Regulation ATS, however, as an ECN Direct Edge was required to file an amendment prior to implementing a "material change" to its operation.  17 C.F.R. §242.301(b)(2)(ii).  As such filings are not public, it is unknown whether Direct Edge actually made such a filing. Moreover, Direct Edge had filed its application to register both the EDGX and EDGA exchanges as national securities exchanges by the time Hide Not Slide was implemented.

[109]  On July 16, 2014, Direct Edge disclosed for the first time in a regulatory filing that its Hide Not Slide order type permits queue jumping.  In the same month, Direct Edge made explicit that EDGX and EDGA have different version of the Hide Not Slide.

party, the Director of Sales for Direct Edge told one investor whose firm had been bleeding profits for several months using standard limit orders that he is "totally screwed" unless he takes advantage of complex order types available at Direct Edge such as Hide Not Slide. This investor, who operated a sophisticated trading operation, had been "complaining . . . for months about the bad executions he'd been getting, and had been told nothing about the hidden properties of the order types until he'd punished the exchange by cutting it off."[110] The Direct Edge representative, Eugene Davidovich, even admitted that the Hide Not Slide order "'probably should be illegal, but if we changed things, the high-frequency traders wouldn't send us their orders.'"[111]

162.   As evident from the above exchange, there was no announcement or marketing materials widely available describing the release of Hide Not Slide and its functionality. Tellingly, there was no way that even many sophisticated Direct Edge customers could independently decipher the order interaction between Hide Not Slide and the exchange's default price sliding mode. Direct Edge implemented these marketing strategies with the specific knowledge of the adverse impact on the majority of investors whom Direct Edge deliberately kept in the dark as to the existence and full functionality of the Hide Not Slide order.

### NASDAQ: Price to Comply and Post Only + "Automatic Re-Entry"

163.   NASDAQ is believed to have developed one of the first "hide and light" orders known as Price to Comply. The stated purpose of the Price to Comply order type is to re-price

---

[110]  *Dark Pools* at 50-51; Scott Patterson & Jenny Strasburg, *For Superfast Stock Traders, a Way to Jump Ahead in Line* (Sept. 19, 2012), *available at* http://online.wsj.com/news/articles/SB/10000872396398920457755999243693561670.

[111]  *Dark Pools* at 51; Scott Patterson & Jenny Strasburg, *For Superfast Stock Traders, a Way to Jump Ahead in Line* (Sept. 19, 2012), *available at* http://online.wsj.com/news/articles/SB/10000872396398920457755999243693561670.

an order to comply with Reg NMS's ban on locked markets.  In reality, the Price to Comply order was designed primarily to, like other "hide and light" orders, assist in effectively locking markets.  It did this by exploiting a regulatory loophole that distinguished between protected quotations and hidden orders when complying with Rule 610(d).  Under the rule, hidden orders are not considered protected quotations and thus can freely lock markets.  In essence, NASDAQ allowed customers using the Price to Comply order to "lock[] a market with an exempt hidden order in the cases where [the user's] displayed order would violate the ban on locked markets."[112]  The order type operated as follows:

> When NASDAQ received a Price to Comply order, it would check if the order price locked an away market. If the order was in fact impermissible according to Rule 610(d)        and the ban on locked markets, NASDAQ would book the Price to Comply order as a hidden order at the locking price. Price to Comply was the "have your cake and eat it too" order, conveniently booked as displayed or hidden – whichever was more preferable when considered in the context of a permissible display price according to Rule 610(d).[113]

164.    NASDAQ also provided HFT firms the ability to repeatedly capture NASDAQ's rebate, and only pay the "taker" fee when obtaining price improvement, by utilizing its Post-Only order.  In short, for HFT firms using this order type it became a guaranteed profit.  NASDAQ's Post-Only order, similar to Direct Edge's ALO order, was designed to allow HFT firms to submit orders at potentially marketable prices and not execute against booked or outstanding orders (so as to protect the user from being charged a "taker" fee). When a Post-Only order would match the best sell order on the NASDAQ OMX market's book and pay the taker fee, the order is price slid and displayed one tick away from the best sell price to avoid the

---

[112]  Haim Bodek, *The Order Type Controversy, Part I: Price to Comply* (Mar. 10, 2014), *available at* http://tabbforum.com/opinions/the-order-type-controversy-part-i-price-to-comply.

[113]  *Id.*

fee.  If a Post-Only order would lock or cross a protected quote at another exchange but not lock the NASDAQ OMX order book, the order will be handled as though it were a Price to Comply order such that it will be booked at the national locking price and displayed one tick away.  On NASDAQ and BX, a Post-Only order that crosses the book will only execute if the amount of price improvement that would be received by trading against that order exceeds the cost to remove liquidity.

165.    Prior to 2012, NASDAQ knowingly implemented a two-tiered system in which HFT firms communicated with NASDAQ through a superior interface filled with advantageous order types while other market participants, including Plaintiffs and the Class, communicated through an inferior interface, without disclosing the elevated risk of abuse associated with that interface.

166.    The first-tier, high-speed interface, called OUCH, was developed for HFT firms and offered order types such as Post-Only orders for those market participants informed, presumably through undisclosed channels such as direct marketing campaigns and personal relationships, regarding the advantageous features utilized by these order types.

167.    The second-tier interface, called FIX, did not offer the HFT-friendly order types and was utilized by large institutional investors unfamiliar and uninformed about the advantageous features of the OUCH order types.  The investors using the FIX interface did not and could not know the disadvantages intrinsic to the order types they were being offered because NASDAQ did not properly disclose the functionality of the OUCH order types, the interplay between combinations of various order types and order modifiers offered on the OUCH interface or the interplay with order types delivered via the inferior FIX interface.

168.    In October 2011, NASDAQ normalized the asymmetry between the OUCH and FIX interfaces by providing Post-Only and other superior order types on FIX.  Therefore, from the start of the Class Period through the time at which NASDAQ ended the two-tiered interface system described herein, Plaintiffs and the Class were systematically disadvantaged and injured as a direct result of the informational asymmetries and undocumented order types offered to HFT firms by NASDAQ.

### BATS: BATS Only Post Only

169.    "Hide and light" functionality on the BATS exchanges operated through "Display-Price Sliding" and the BATS Only and Post Only order types (or combination thereof – *e.g.*, "BATS Only Post Only" or "BOPO").  According to BATS, as of 2011, "Display-Price Sliding allows orders that would normally be cancelled automatically because of locking or crossing the NBBO to temporarily 'slide' (adjust) to the NBBO and reside in the BATS matching engine."[114]  The BATS Post Only order allows "users to make a market and specify not to remove liquidity unless adequate price improvement is accessible. Any incoming post only orders that cross with a resting displayed order that does not offer adequate price improvement will be rejected."[115]  In other words, the Post Only order on the BATS exchanges *guarantees* that the trader employing it will not "take liquidity" as the order will either generate a rebate for the trader, create a profitable trade or be rejected.  BATS Only orders are only executable on the applicable BATS exchange and neither BATS Only nor BATS Post Only orders are routed to other markets.

---

[114] BATS Display-Price Sliding:  Slide orders that lock or cross the NBBO (2011), *available at* http://www.batstrading.com/resources/features/bats_exchange_pricesliding.pdf.

[115] BATS Definitions & Order Types:  Order and Routing Instruction Descriptions (2013*)*, *available at* http://www.batstrading.com/resources/features/bats_exchange_definitions.pdf.

170.   The BOPO order and lighting functionality has been available on the BATS exchanges since at least 2009.   BATS admittedly developed its Display-Price Sliding functionality to "eliminate[] the need for traders to retry orders multiple times in rapid succession trying to be high in priority at the next NBBO price."[116]   In other words, Display-Price Sliding was developed to cater to HFT techniques of capturing rebates and achieving top of the queue status without having to send new orders at the time quotes move.   In fact, a regulatory filing related to BATS's IPO revealed that in 2009 BATS "paid 51% of such rebates to a single firm, which it described as 'an affiliate of one of [BATS's] strategic investors.'"[117]   The firm is widely suspected to be Tradebots, the Chairman and CEO of which is also the founder of BATS.

171.   In 2012, BATS was forced to admit its regulatory filings disclosing the price-sliding features of its order types directly contradicted BATS' actual order handling practices.[118]

172.   Although in 2012 and 2013 BATS amended how price sliding and Post Only interactions were handled on its exchanges, the complexity with which these functions operated at BATS prior to and continuing to the present assisted its efforts in catering to favored HFT customers at the expense of traditional investors.   BATS did not adequately disclose the functionality of these order types to the overwhelming majority of investors, and at a minimum early in the Class Period traders would be required to call the BATS trading desk in order to receive an explanation of the BOPO functionality, assuming the trader even knew to ask about it in the first instance.

---

[116]   BATS Display-Price Sliding:  Slide orders that lock or cross the NBBO (2011), *available at* http://www.batstrading.com/resources/features/bats_exchange_pricesliding.pdf.

[117]   Jean Eaglesham, et al., *Scrutiny of High-Speed Trade – Links to Exchanges Scrutinized, New Types of Trades, Too* (Apr. 5, 2012), *available at* http://online.wsj.com/news/articles/SB30001424052702303816504577321864050711038

[118]   http://www.sec.gov/rules/sro/bats/2012/34-67657.pdf

**ARCA: Post No Preference ALO Blind ("ALO PNP B")**

173.    ARCA released the Post No Preference Blind ("PNP B") order type in December 2007.  This "hide and light" order is an undisplayed limit order priced at or through the NBBO, with a tradable price set at the contra side of the Protected Best Bid and Offer ("PBBO") which is the same as the NBBO).  Where the PBBO moves away from the price of the PNP B, but the prices continue to overlap, the limit price of the PNP B will remain undisplayed and its tradable price will be adjusted to the contra side of the best protected offer or best protected bid.  Where the PBBO moves away from the price of the PNP B and the prices no longer overlap, the PNP B will convert to a displayed PNP limit order.

174.    In other words, PNP ALO B is booked hidden when it locks an away market and ARCA will permit it to track, through continuous rebooking, at the locking price when the NBBO is fluid.  For example, if an order locks the away market by trying to buy at 10.05 when the away market is offered at 10.00, that order will be hidden at 10.00. Then, when the away market changes to 10.03, the order will be booked hidden at 10.03. This will continue indefinitely until the order can be properly displayed or "lit" on ARCA.

175.    In 2008, ARCA released its version of an ALO order, which is a limit order that is posted to the ARCA order book only when the order adds liquidity, and once posted, does not route to other exchanges, in order to allow firms using it to collect rebates and only pay "taker" fees in a small number of scenario relative to other order types.  When these functions are combined, ARCA's ALO PNP B order type provides HFT firms privy to selectively disclosed order type functionality with the ability to jump to and remain at the top of ARCA's order queue and collect rebates from the exchange over and over again while subjecting Class members' orders to lower queue priority and/or increasing the frequency of incurring taker fees for investor

orders.[119]   ARCA never properly disclosed the full extent of the combined order type, and failed to market the PNP B and ALO orders to all market participants on a fair and equal basis in violation of its duties as a national stock exchange.

## CHX

176.    According to the CHX website, CHX Article 1, Rule 2 purports to provide "a complete list of order types, modifiers, and related terms and complete definitions" for market participants.

177.    According to the information and documentation provided in CHX Article 1, Rule 2, combined with the "Order Types and Modifiers" page on its website, CHX non-routable orders function, in part, as follows:

> **CHX Only**: a limit order modifier that requires an order to be ranked and executed on the Exchange without routing away to another trading center and is eligible for the CHX Only Price Sliding Processes. A CHX Only order that is price slid will be assigned a Regulation NMS and Regulation SHO compliant executable price and a Regulation NMS and Regulation SHO compliant display price by the Matching System upon receipt. Thereafter, the Matching System will continue to price slide the order to the extent that it could be executable or displayable at a more aggressive price, but shall under no circumstances price slide the order through its original limit price. CHX Only orders must be fully displayed limit orders. Orders marked Do Not Display or Reserve Size cannot be designated as CHX Only orders.

> *         *         *

> **Do Not Route**: a limit or market order modifier that requires an order to only be executed or displayed within the Exchange's Matching System and not be routed to another market.[120]

---

[119]   According to ARCA's own order type usage statistics, the ALO PNP B combination order is used on average two to three times as much as the PNP B order alone.

[120]   Chicago Stock Exchange, CHX Order Types and Modifiers, *available at* http://www.chx.com/trading-information/order-types/.

178.   The information provided by CHX to market participants fails to disclose or document the circumstances in which post only non-routable orders on CHX can achieve queue priority over other order types.  The lack of disclosure to market participants regarding these features and conditions results in predatory trading strategies employed by HFT firms to the detriment of Plaintiffs and Class.

179.   The concept of queue priority describes the ability of certain orders to be rebooked at the top-of-queue in ways that traditional order types cannot as top-of-book price changes. CHX non-routable orders that achieve queue priority could be an order type which manages maker-taker fees and rebates, while also serving as a powerful tool for "lighting" at top-of-queue at an aggressive price in a manner that is algorithmically managed by CHX.

180.   CHX's non-routable order provides queue-priority features that advantage these orders over traditional orders.  In order to comport with its obligation to "remove impediments to and perfect the mechanism of a free and open market" and prevent "unfair discrimination between customers, issuers, brokers, or dealers" (15 U.S.C. §78f(b)(5)), CHX has a duty to fully and publically disclose material order interactions between particular orders which may reserve top-of-queue positions over other orders.

181.   In addition, the information publically provided by CHX to market participants fails to disclose or document the circumstances and conditions in which CHX Only orders will be financially harmed by paying taker fees in trades with Post Only orders during price-sliding events.  The  selective disclosure by CHX regarding its valued relationship with predatory HFT firms and the resulting interaction of competing orders, including, but not limited to, those described above, damaged Plaintiffs and the Class.

**Intermarket Sweep Order Types**

182.   Reg NMS Rule 611 was originally designed to bind multiple markets into a single, unified NBBO system by prohibiting exchanges from executing trades when a better price was available on another exchange.  Such trades are commonly referred to as "trade-through" violations and (prior to the implementation of Reg NMS Rule 611) were enforced by requiring exchanges to either reject marketable orders or route them to the trading center (*i.e.*, exchange) displaying the best price.

183.   In an attempt to serve institutional investors seeking to execute unusually large trades without signaling to the market their intention to buy or sell a large block of shares (and potentially influencing the market price), and to otherwise avoid the potential for trade-through violations, in 2005 the SEC introduced the Intermarket Sweep Order ("ISO") order type as an exception to Reg NMS Rule 611.  This exception allowed investors to use an ISO order type to "sweep" the various exchanges and execute large trades even where it might otherwise result in a trade-through.

184.   Although the ISO as originally contemplated, as set forth above, by Reg NMS was intended as an accommodation to (primarily) institutional investors, it has since been hijacked by the Exchanges and subverted (without the requisite SRO rule making) into a device that facilitates rather than prevents fraudulent and manipulative acts and practices.  The most egregious examples of these, the Day ISO and Post-Only ISO, are explained below.

**The Day ISO Order Type**

185.   The Day ISO order type was designed to sweep through the best price on all market centers at the NBBO to capture as many shares as possible without being limited by the delayed executions that might otherwise be caused by compliance with Rule 611 as trading centers updated their protected quotations.  For example, if a trader wishes to buy 1000 shares of

ABC, and there are 100 shares of ABC being offered at $5.00 at "Exchange A" and 1,000 shares at $5.10 being offered at "Exchange B," Rule 611 would limit a non-ISO order to buying only the 100 shares at Exchange A at $5.00, after which the trader would need to send additional orders to ascertain the desired 900 shares after waiting for Exchange A to reflect that its offer price of $5.00 had been eliminated.  In contrast, however, the Day ISO order would allow the trader to buy the 100 shares at Exchange A for $5.00 while simultaneously routing a buy order for the remaining 900 shares to Exchange B for $5.10.  In this scenario, there are only 100 shares at $5.00 so by sweeping the market at $5.00 the trader is allowed to simultaneously post a buy order for 900 shares at the more aggressive price of $5.10 on Exchange B because the market on Exchange A has been swept.  Such a use is conceivably legitimate under Rule 611.

186.    This seemingly legitimate use of the Day ISO order type to "sweep" to fill large orders is not in fact the primary reason that Day ISOs are used by HFT firms.  Rather, the Exchanges have permitted HFT firms to ostensibly use these order types to "jump" to the top-of-queue in a manner inconsistent with the original Reg NMS.  Day ISOs can queue-jump price-slid orders and hide-and-light orders when booked at their limit price.  HFTs will typically send Day ISOs the nanosecond after a market change because this change presents a new opportunity to be at the top of the queue.  Unlike traditional market participants, such as Plaintiffs and the Class, the HFT uses fast price feeds to determine that the price of $5.00 on Exchange A (in the example above) has already traded and is no longer available so the HFT firm can now post a Day ISO order to buy on Exchange B at $5.05 which would normally be rejected as a violation of Rule 611.  As previously discussed, the HFT firm knows the $5.00 price is stale based on the faster feed provided by the exchange while other market participants do not have access to that information as a result of the exchange using slower feeds to inform the SIP.  The ISO-specific

abuse is that the HFT firm does not have to sweep away any markets in this case because the exchange's fast price feeds communicates that there are no eligible prices to sweep. Thus, the HFT order is booked on Exchange B at $5.05 and queue-jumps hide-and-light orders as well as every other order type that was not permitted to post at $5.05 on Exchange B.

187.    When combined with the Exchanges' efforts to sell access to unusually fast data feeds to HFT firms while selling access to slow data feeds to other market participants, the exchange corrupted the Day ISO into a device primarily used by HFT firms to queue-jump less advantaged trades to post at normally impermissible prices and to queue-jump less advantaged order types that only a select group of market participants, namely their HFT customers, can use to gain an unfair advantage.  Indeed, such an advantage is virtually inevitable where HFT firms combine the use of a Day ISO order type with high speed data feeds because it allows them to trade at prices that are inaccessible to non-HFT firms and that would otherwise be rejected as impermissible transactions under Rule 611 as trade-through violations.

188.    Exchanges and dark pools often choose to use the slow consolidated data feeds (the SIP) to restrict access to prices, a practice which harms investors by denying them access to liquidity in fast moving markets and which serves to further advantage HFTs that employ Day ISOs for rebate posting and queue priority purposes to get ahead of aggressive customer orders. Thus, the speed advantages created by co-location and fast data feeds, along with complex order types like the Day ISO and the Post-Only ISO (discussed below), resulted in a two-tiered system – created by the Exchanges solely for their own profit – whereby HFT users were the hunter while non-HFT users were the hunted.

189.    HFT firms using Day ISO order types strategies are able to post ahead of those relying on the slow SIP data feeds and execute trades at prices that are systematically denied to

other traders.   Indeed, the ISO has been transformed by the Exchanges from an order type primarily intended to sweep markets to fill large order into an order type that is intended (by HFT firms, at least) to **avoid** sweeps and to post ahead of the slow SIP.   In fact, the Post-Only ISO order type, a particularly advanced version of the Day ISO, serves as a primary example of how the Day ISOs were created by the Exchanges to be exploited by the HFT firms at the expense of the investing public.

### The Post-Only ISO Order Type

190.    Unlike the Day ISO and hide and light, prior to July 2014, the Post-Only ISO order type had never appeared as a proposed rule change in the Exchanges' SEC filings with the exception of CHX from 2009 to 2013.[121]

191.    Notably, the Post-Only ISO eliminates the inconvenience of the Day ISO, which, while able to avoid sweeps, must execute orders.  Instead, **the Post-Only ISO is not accepted at its aggressive price unless it can post passively to capture a rebate**, a constraint exactly the opposite of the intended use of ISOs.

192.    The Post-Only ISO also has the ability to discover pricing and order flow information because HFT firms receive confirmation when it would otherwise take liquidity (and do so without ever executing a trade). This pricing information is even provided in the case of hidden orders (*e.g.*, orders which investors are told by the Exchanges are undetectable unless executed). A Post-Only ISO can also queue-jump less advantaged orders ranked at the same price even though the Post-Only ISO arrived later in time.

---

[121]  CHXwas the first exchange to admit that it approved and permitted the use of the  Post-Only ISO.  However, in May 2013, the exchange submitted to the SEC a proposal to remove this order type as redundant, maintaining that it could be replicated by a limit order with certain modifiers. *See* http://www.sec.gov/rules/sro/chx/2013/34-69538.pdf.

193.   In other words, the Post-Only ISO provides HFT firms with a near risk-free "jump" to the top-of-queue ahead of all other orders in the direction that they know – given the attributes of the Post-Only ISO – the market is likely headed, along with more time to act given the high speed data feeds and protection against paying taker fees instead of capturing rebates. Moreover, all of this occurs without counter parties ever knowing what has transpired.

194.   A Post-Only order is an order type designed to encourage displayed liquidity by allowing users to submit orders at potentially marketable prices without having to execute those orders against booked orders (*i.e.*, limited risk).  By its terms, a Post-Only order is posted on the exchange and does not route away to another exchange and will be immediately cancelled if it would lock or cross a manual or protected quotation.

195.   BATS provides the following explanation of Post-Only orders:

> Post only orders allow users to make a market and specify not to remove liquidity unless adequate price improvement is accessible. Any incoming post only orders that cross with a resting displayed order that does not offer adequate price improvement will be rejected.[122]

196.   Further building on the "Post-Only" prong of the Post-Only ISO, a Post-Only ISO order type will ***either*** be: (1) immediately cancelled without execution if it is marketable against a contra-side order; or (2) posted on the exchange at the entered limit price.

197.   For example, if sell orders exist on Exchange A for ABC at $10.01 and Exchange A receives a directed Post-Only ISO to buy ABC stock at $10.01, it will cancel back the order unfilled because the order would have incurred the taker fee.  If there are no such sell orders, Exchange A will display the $10.01 buy Post-Only ISO, with the understanding that if a sell order for ABC at $10.00 exists on Exchange B, the originator of the Post-Only ISO order will

---

[122]   BATS Definitions & Order Types: Order and Routing Instruction Descriptions (2013), *available at* http://www.batstrading.com/resources/features/bats_exchange_definitions.pdf.

assume Reg NMS responsibility for taking out those offers independently.[123]  Thus, Exchange A will allow the Post-Only ISO to lock away markets because it is relying on the trader who sent the Post-Only ISO to simultaneously sweep away markets at the locking price with additional ISOs pursuant to Reg NMS Rule 611(c).  The inescapable regulatory violation inherent on any exchange allowing a Post-Only order to be combined with an ISO order is that if a trader uses a Post-Only ISO for every market, as Reg NMS requires for all ISOs, nothing will get swept because the Post-Only forbids the taking of liquidity.

198.    Notably, for HFT firms the cancellation or rejection of a Post-Only ISO order *is* the objective in the case where a Post-Only ISO would otherwise have resulted in a sweep or execution consistent with Rule 611.  This aversion to fulfilling the ISO sweep obligation and execution is due to the fact that HFT firms using Post-Only ISO order types are not (primarily) concerned with acquiring stocks at better values (as in the example above, the stock was posted at $10.01 per share but could be purchased at $10.00 per share).  To the contrary, HFT firms seek to avoid interaction with passive liquidity while at the same time positioning themselves for rebates by advancing to the top-of-queue.

199.    Regarding the "ISO" prong of the Post-Only ISO, traditional ISO attributes are virtually nonexistent in the Post-Only ISO.  Indeed, as discussed above the ISO is an order type that was created by Rule 611 to allow large orders to sweep the exchanges to simultaneously access liquidity across multiple venues.

---

[123]  Reg NMS Rule 611:

> (c) Intermarket sweep orders. The trading center, broker, or dealer responsible for the routing of an intermarket sweep order shall take reasonable steps to establish that such order meets the requirements set forth in § 242.600(b)(30).

Reg NMS at 520.

200.    Contrary to a traditional ISO, the Post-Only ISO, however, cannot sweep and cannot take liquidity.  This is because HFT firms employing a Post-Only ISO only seek to be a market maker so that they can receive a rebate from the Exchanges.  Thus, the purpose of the Post-Only ISO is fundamentally inconsistent with Rule 611 and this is perhaps the reason why Post-Only ISO order types, though clearly authorized by the Exchanges (and not the SEC), as set forth herein, never experienced full and transparent SRO rule changes by any exchange.

201.    On June 5, 2014, SEC Chairwoman White announced a sweeping package of recommendations aimed at the "aggressive, destabilizing trading strategies in vulnerable market conditions."[124]   As part of that announcement, White instructed the Exchanges to conduct a thorough review of the types of trading orders being facilitated and to "consider appropriate rule changes to help clarify the nature of their order types and how they interact with each other."[125]

202.    Each of the Exchanges that provides facilities for trading equity securities released a document ("Clarification Document") pursuant to White's instructions and a subsequent request from the SEC's Division of Trading and Markets that memorializes the inner workings of each exchange.

203.    The Clarification Documents supposedly seek to "clarify" various data feeds-related issues, including the implications for order handling and were issued by the Exchanges, offering varied levels of disclosure.  Some of these appear to confirm, however, that certain order types, including the Post-Only ISOs, were previously authorized by the Exchanges for use by HFT firms but never  fully disclosed to the investing public or the SEC.

---

[124] SEC Speech, Enhancing Our Equity Market Structure (June 5, 2014), *available at* http://www.sec.gov/News/Speech/Detail/Speech/1370542004312#.VAT3Z6Pn93w.

[125] *Id*.

204.    On July 7, 2014, the SEC released NYSE's Notice of Filing of Proposed Rule Change Amending Rule 13 – "Equities To Make the Add Liquidity Only Modifier Available for Additional Limit Orders and Make the Day Time-In-Force Condition Available for Intermarket Sweep Orders."  In this SRO filing, NYSE requested from the SEC changes that would allow the use of a Post-Only ISO.

205.    The depth and detail of Post-Only ISO functionality disclosed by NYSE serves to illustrate the insufficiency of any comparable disclosures by the other Exchanges.   In fact, NYSE's own filing alerted the SEC that Day ISOs are not adequately disclosed on other exchanges.  NYSE's proposed rule changes stated as follows:

> The rules of Nasdaq, BATS, BATS-Y, EDGA, and EDGX do not expressly provide that their versions of ISOs can be day, however, nor do their rules prohibit this functionality. In practice, Nasdaq, BATS, BATS-Y EDGA, and EDGX all accept ISOs with a day time in-force condition. In addition, NYSE Arca Equities expressly permits an ISO with a day time-in-force condition, which is entered as a Post No Preference ("PNP") Order. See, e.g., NYSE Arca Equities Rule 7.31(w) (PNP Order designated ISO does not route and may lock and cross and trade through protected quotations). See also Securities Exchange Act Release No. 34-54549 (Sept. 29, 2006), 71 FR 59179 (Oct. 6, 2006) (SRNYSEArca-2006-59) (Order approving NYSE Arca Equities' proposal to adopt ISO PNP Orders, which post to NYSE's Arca book and may lock or cross protected quotations). See also CHX Article 20, Rules 4(b)(1) and (23).[126]

206.    The SEC's order approving NYSE's proposed rule change provides no indication whatsoever that its approval of the NYSE order type was in any way a tacit approval of undisclosed, under-disclosed or selectively disclosed order types on competing exchanges.  The language used by the SEC ("After carefully considering the proposals, the comments submitted, and the Exchanges' responses to the comments, the Commission finds that the proposed rule

---

[126] http://www.sec.gov/rules/sro/nyse/2014/34-72548.pdf

changes are consistent with the requirements of the Act and the rules and regulations thereunder applicable to a national securities exchange.") gives every indication that all Exchanges must engage in a similar process of disclosure and public comment before being deemed compliant with the relevant rules and regulations.

207.    The following Exchanges have engaged in selective disclosure of their ISO order type functionality and order handling practices that caused measurable harm to investors:

**BATS (BYX/BZX)**

1.    Day ISO

208.    BATS July 28, 2014 Clarification Document is conspicuous in its subtlety.  Stuck onto the end of a paragraph about trade-through compliance, in what reads as afterthought, is the following sentence: "The ME [matching engine] will then display and execute non-ISO orders at the same price as the Day ISO."

209.    By way of the above statement, BATS has confirmed for the first time that as a matter of practice its Day ISO can queue-jump regular orders.  BATS also uses the term "execute" in the Clarification Document, indicating that orders might be handled in a way that pays taker fees to the Day ISO.

2.    Post-Only ISO

210.    BATS has not submitted regulatory filings with the SEC acknowledging its authorization of Post-Only ISO order types.  Likewise, there is no explanation concerning these special order types on BATS' website and the exchange has never issued public statements regarding the use of the Post-Only ISO order type.

211.   Nonetheless, the Post-Only ISO order is referenced in the order type statistics section of BATS' website, confirming Post-Only ISO order types are permitted:[127]



[127] BATS        Order        Type        Usage        Summary,   *available    at* http://batstrading.com/market_data/order_types/.

**Direct Edge (EDGX/EDGA)**

1.  <u>Day ISO</u>

212.    Direct Edge is now owned by BATS.  Both BATS and Direct Edge released Clarification Documents on the same day that essentially mirror each other with respect to the language and positions discussed above.

2.  <u>Post-Only ISO</u>

213.    Direct Edge has taken the position that it does not have an obligation to report its use of the Post-Only ISO order type to regulators, because the Post-Only ISO is the result of two "order modifiers" which are disclosed.  However, BATS own order type statistics data indicates that the Post-Only ISO is an ***order type*** (not a "modifier") and identifies it as such on its website.

214.    Direct Edge has never submitted regulatory filings with the SEC acknowledging the use of Post-Only ISO order types, though its most recent Clarification Document states that the Day ISO "is similar to the Post ISO order on [NSX]."[128]  Likewise, there is no explanation concerning these special order types on Direct Edge's website and the exchange has never issued public statements regarding the use of the Post-Only ISO order type.

215.    Despite the lack of any disclosure, regulatory or otherwise, related to the utilization of Post-Only ISO order types on any Direct Edge exchanges, according to its API specifications, Direct Edge authorizes the use of these undocumented complex order types and has done so since at least February 2011.

---

[128] *See* Self-Regulatory Organizations; EDGX Exchange, Inc.; Notice of Filing of Proposed Rule Change Relating to Include Additional Specificity Within Rule 1.5 and Chapter XI Regarding Current System Functionality Including the Operation of Order Types and Order Instructions at 70 n.64 (July 25, 2014), *available at* http://www.sec.gov/rules/sro/edgx/2014/34-72676.pdf.

# CHX

### 1.   Day ISO

216.   According to the CHX website, CHX Article 1, Rule 2 purports to provide "a complete list of order types, modifiers, and related terms and complete definitions" for market participants.   Among other order types and modifiers, CHX Article 1, Rule 2 defines "BBO Intermarket Sweep ('BBO ISO')," "Intermarket Sweep ('ISO')" and "Price-Penetrating ISO."

217.   According to the information and documentation provided in CHX Article 1, Rule 2, combined with the "Order Types and Modifiers" page on the its website, CHX ISOs function as follows:

> **BBO Intermarket Sweep ("BBO ISO")**: a limit order modifier that marks an order as required by SEC Rule 600(b)(30) that is to be executed against any orders at the Exchange's Best Bid and Offer (including any Reserve Size or undisplayed orders at or better than that price) as soon as the order is received by the Matching System, with any unexecuted balance of the order to be immediately cancelled, if marked IOC, or placed in the Matching System.

*      *      *

> **Intermarket Sweep ("ISO")**: a limit or cross order modifier that marks an order as required by SEC Rule 600(b)(30) that is to be executed against any orders at the Exchange's BBO (including any Reserve Size or undisplayed orders at that price) as soon as the order is received by the Matching System, with any unexecuted balance of the order to be immediately cancelled.

*      *      *

> **Price-Penetrating ISO**: a limit order modifier that marks an order as required by SEC Rule 600(b)(30) that is to be executed at or better than its limit price as soon as the order is received by the Matching System, with any unexecuted balance of the order to be immediately cancelled. Orders marked as Price-Penetrating ISO shall be executed against any eligible orders in the Matching

System (including any Reserve Size or undisplayed orders) through multiple price points.[129]

218.    The information provided by CHX to market participants fails to disclose or document the "lighting" or related queue-jumping features in CHX Day ISOs. The information provided by CHX to market participants also fails to disclose or document CHX's Day ISOs interactions and functionality in combination with other order types and order modifiers on CHX, including, but not limited to, the order type formerly identified by CHX as Post-Only ISO.

## 2.    Post-Only ISO

219.    On July 6, 2009, CHX became the first and only exchange to disclose the availability of the Post-Only ISO order type. CHX submitted a proposed rule change to the SEC announcing its intention to add the Post-Only ISO order type ("CHX Proposed Rule Change").[130]

220.    The CHX Proposed Rule Change explained the features and functionality of the Post-Only ISO, in part, as follows:

> The Exchange proposes to amend CHX Article 20, Rule 4 to add the Post Only and Post Only ISO order types.
>
> A Post Only Order is an order designed to encourage displayed liquidity on the Exchange. By its terms, a Post Only Order is posted on the Exchange and does not route away to another trading center. A Post Only Order will be immediately cancelled if it is marketable against a contra-side order in the Matching System when entered, or if it is at a price that would lock or cross a manual or protected quotation.
>
> A Post Only ISO Order is a type of ISO order that will be immediately cancelled without execution if it is marketable against a contra-side order in the Matching System when entered. If a Post

---

[129] Chicago Stock Exchange, CHX Order Types and Modifiers, *available at* http://www.chx.com/trading-information/order-types/.

[130] Self-Regulatory Organizations; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change by the Chicago Stock Exchange, Inc. Adding the Post Only and Post Only ISO Order Types, *available at* http://www.sec.gov/rules/sro/chx/2009/34-60243.pdf.

Only ISO is not immediately cancelled, it will be posted on the Exchange at the entered limit price. By entering a Post Only ISO, a Participant represents that such Participant has simultaneously routed one or more additional limit orders marked "ISO," as necessary, to away markets to execute against the full displayed size of any protected quotation for the security with a price that is superior or equal to the limit price of the Post Only ISO entered in the Matching System. Consequently, a Post Only ISO order will be displayed by the Exchange regardless of whether it will lock or cross another market center's quote.[131]

221.   The CHX Proposed Rule Change explained that the statutory basis and regulatory compliance of the Post-Only ISO as follows:

The Exchange believes that the proposed rule change is consistent with Section 6(b) of the Act in general, and furthers the objectives of Section 6(b)(5) in particular, in that it is designed to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in facilitating transaction in securities, to remove impediments and perfect the mechanisms of a free and open market, and, in general, to protect investors and the public interest by allowing CHX to amend its rules to add the Post Only and Post Only ISO order types based on similar rules already in effect at other exchanges. The addition of these order types will benefit Exchange customers and promote competition among market centers.[132]

222.   The CHX Proposed Rule Change identified the Post-Only ISO as an "order" or "order type" at least 13 times. The terms "modify," "modifier" or "order modifier" were never used and there were no similar terms or parallel language used.

223.   On May 8, 2013, nearly four years after disclosing the Post-Only ISO as an available order type, CHX unilaterally decided it no longer needed to disclose the Post-Only ISO and would "delete the [Post Only ISO] defined order term[] from the CHX rules."

224.   CHX told the SEC:

---

[131]  *Id*. at 2.

[132]  *Id*. at 3.

> [T]he Exchange proposes to delete "Post Only ISO" from the CHX
> rules, because a Post Only ISO is simply a limit order marked Post
> Only and BBO ISO and not a distinct order modifier. As such, the
> Exchange submits that maintaining a separate defined order term
> for "Post Only ISO" is redundant and unnecessary.[133]

225.    CHX did not inform the SEC that it would stop offering HFT firms all the abusive

features and functionality of the order type it previously defined as "Post Only ISO" in its rules.

CHX simply deleted any and all information regarding the Post-Only ISO from all publically

available resources.  CHX's semantic change from calling the Post-Only ISO an "order type" to

"a limit order marked Post Only" left market participants, such as Plaintiffs and the Class,

without any means or ability to obtain information regarding the availability, features or function

of the order type previously defined by CHX as a Post-Only ISO.

226.    Thus, the order type formerly defined by CHX as Post-Only ISO is now a

completely undisclosed and undocumented trading strategy which CHX makes available to only

those market participants who learn about it independently or directly from CHX through non-

public communications.

227.    Market participants trading on CHX not privy to the availability of this trading

mechanism have been and will continue to be disadvantaged and abused in ways consistent with

the victims of Post-Only ISOs on other exchanges discussed herein.

---

[133] Self-Regulatory Organizations; Chicago Stock Exchange, Inc.; Notice of Filing and
Immediate  Effectiveness of a Proposed Rule Change to Consolidate All CHX Order Types,
Modifiers, and  Related Terms Under One Rule and to Clarify the Basic Requirements of All
Orders Sent to the  Matching System, *available at* http://www.sec.gov/rules/sro/chx/2013/34-
69538.pdf.



# NYSE ARCA ORDER TYPE USAGE

| ORDERTYPE | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 |
|---|---|---|---|---|---|
| ISO PNP IOC | 23.68% | 24.60% | 25.38% | 25.24% | 24.90% |
| Limit | 15.29% | 15.27% | 15.58% | 15.00% | 15.12% |
| ALO PNPB | 8.05% | 8.35% | 8.07% | 8.46% | 8.47% |
| Limit Reserve | 8.41% | 8.57% | 8.24% | 7.72% | 7.74% |
| PNP IOC | 7.19% | 6.41% | 5.39% | 5.26% | 5.89% |
| Limit IOC | 4.02% | 4.63% | 5.13% | 5.35% | 4.98% |
| PNP | 4.20% | 4.44% | 4.64% | 4.84% | 4.72% |
| ISO ALO PNP | 5.00% | 4.38% | 4.41% | 5.04% | 4.69% |
| MOC | 3.24% | 2.95% | 3.33% | 3.13% | 3.07% |
| InsideLimit | 2.36% | 2.53% | 2.68% | 2.76% | 2.69% |
| PNPB | 2.91% | 2.84% | 2.56% | 2.31% | 2.36% |
| PL | 1.90% | 2.13% | 2.05% | 2.08% | 2.10% |
| ALO MPL | 1.54% | 1.53% | 1.69% | 1.84% | 1.86% |
| MPL | 1.07% | 1.19% | 1.21% | 1.24% | 1.30% |
| Limit NOW | 1.11% | 1.10% | 1.02% | 1.09% | 1.22% |
| ISO PNP | 1.64% | 1.45% | 1.03% | 1.03% | 1.19% |
| ALO PNP | 1.75% | 1.63% | 1.56% | 1.38% | 1.17% |
| LOC | 0.53% | 0.44% | 0.45% | 0.77% | 0.78% |
| PNP Reserve | 0.28% | 0.15% | 0.14% | 0.12% | 0.72% |
| MPL IOC | 0.53% | 0.50% | 0.58% | 0.67% | 0.67% |
| Other | 4.75% | 4.32% | 4.30% | 4.08% | 4.37% |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

Source: NYSE Arca Trading Data and Analytics

**NASDAQ/NASDAQ BX**

1.   Day ISO

228.     The NASDAQ Clarification Document makes no reference to Day ISO ability to queue-jump regular orders.  However, evidence exists that the NASDAQ Day ISO is capable of queue-jumping in a manner consistent with the BATS Clarification Document.

2.   Post-Only ISO

229.     NASDAQ has not submitted regulatory filings with the SEC acknowledging its authorization of the Post-Only ISO order type.  However, on July 28, 2014, NASDAQ included the following reference in an SRO filing regarding data feeds:

> In general, any order that is sent to NASDAQ with an ISO flag is not re-priced and will be processed at its original price.  ***There are a limited number of circumstances in which an order marked as an ISO will be determined not to be executable at its original price and will be re-priced***.  These include re-pricing under the Plan to Address Extraordinary Market Volatility, re-pricing to comply with Regulation SHO, ***and the re-pricing of an order with a post-only*** condition if NASDAQ has an order at that price at the time the order is accepted.[134]

230.     Despite the lack of regulatory and technical disclosure related to the utilization of Post-Only ISO order types on any NASDAQ exchanges, according to the excerpt above and order type statistics below (statistics which NASDAQ no longer makes public), NASDAQ clearly authorizes the use of Post-Only ISO order types:

---

[134] Self-Regulatory Organizations; The NASDAQ Stock Market LLC; Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Disclose Publicly the Sources of Data Used for Exchange Functions at 6 n.9, *available at* http://www.sec.gov/rules/sro/nasdaq/2014/34-72684.pdf.

## NASDAQ OMX EQUITY ORDER TYPE USAGE

AUGUST 2013

| | % OF ORDER COUNT | | | % OF EXECUTED ORDERS | | |
|---|---|---|---|---|---|---|
| | ISO | NON-ISO | TOTAL | ISO | NON-ISO | TOTAL |
| IMMEDIATE OR CANCEL | 1.8% | 11.6% | 13.40% | 19.7% | 19.3% | 39.00% |
| DISPLAYED LIMIT - PRICE TO COMPLY | 2.5% | 17.4% | 19.90% | 6.7% | 20.5% | 27.20% |
| DISPLAYED LIMIT - POST ONLY | 4.9% | 32.2% | 37.10% | 4.2% | 16.6% | 20.80% |
| NON-DISPLAYED LIMIT (INCL. MIDPOINT) | 0.2% | 24% | 24.20% | 0.3% | 6.1% | 6.40% |
| DISPLAYED LIMIT - ATTRIBUTABLE (FOR MKT MAKER COMPLIANCE) | 0% | 3.1% | 3.10% | 0.1% | 0.4% | 0.50% |
| OTHER (INCL MIDPOINT POST ONLY & SUPPLEMENTAL) | 0.1% | 2.1% | 2.20% | 0.3% | 5.7% | 6.00% |
| TOTAL | 9.50% | 90.40% | 99.90% | 31.30% | 68.60% | 99.90% |

231.    This wide array of complex order types marketed to HFT firms is in stark contrast to the order types known and available to typical retail and institutional investors – namely market orders that are executed immediately at the current available price, and limit orders that specify a price limit at which to buy or sale.   Investors relying on brokers not privy to the Exchanges selective disclosure of order type functionality have no practical way of taking advantage of the complex order types employed by HFT firms.  The Exchanges know this, and specifically designed the complex order types for HFT firms to jump ahead of the basic sitting duck market and limit orders utilized by Plaintiffs and the Class.

### Flash Orders

232.    The Exchanges developed flash orders to give favored HFT firms an advanced look at orders that come in when the NBBO is unavailable on an exchange's market, giving those firms the ability to act on unfilled trades before being routed to another exchange quoting a better price.  As explained by former SEC chairman Mary Schapiro, "[f]lash orders are orders

that flash in milliseconds to only a select group of market participants, which can disadvantage other investors."[135]   Direct Edge was one of the first to start "flashing" orders to favored customers prior to routing those orders to all market participants, giving HFT firms an advanced look at order flow.  The practice at Direct Edge, called the Enhanced Liquidity Provider ("ELP"), accounted at times for 10% of Direct Edge's overall volume but brought in the lion's share of its revenues, helping spark the company's rapid growth, including tripling its market share from 2008 to 2009.  One analyst commented that "[i]t's far and away the most profitable component of their trading volume … and if that were to be eliminated it would have a serious negative financial impact on the firm."[136]

233.   NASDAQ and BATS quickly imitated Direct Edge, offering flash orders in June 2009 before promptly stopping the practice three months later after the SEC and Congress launched investigations into the practice and one senator contended that "flash orders are not being shown to all investors at the same time, creating a two-tier market."[137]   The BATS and NASDAQ services exposed flashes to a far larger group of market participants than the Direct Edge service.   For example, BATS introduced the BATS Optional Liquidity Technology ("BOLT") order type in 2009 which allowed customers up to 500 milliseconds of additional order exposure on BATS proprietary data feeds and the ability to collect a $.0015 per share rebate on a routable order rather than pay the standard routing fee.  BATS typically executed 85

---

[135] Alexandra Zendrian, *Gone In A Flash* (Aug. 28, 2009), *available at* http://www.forbes.com/2009/08/27/flash-trading-bats-intelligent-investing-nasdaq.html.

[136] Jonathan Spicer, *Direct Edge in crosshairs of "flash" orders debate* (July 27, 2009), *available at* http://www.reuters.com/article/2009/07/27/us-exchanges-flashes-analysis-idUSTRE56Q4B320090727.

[137] Michael Mackenzie, *SEC to review 'flash' orders* (July 28, 2009), *available at* http://www.ft.com/cms/s/0/039fc8f6-7a11-11de-b86f-00144feabdc0.html#axzz3JkRvfz8S.

million to 100 million shares a day, or up to 10% of its daily execution volume, via the BOLT order type.  Even flash volume representing just 5% of all trades can yield over 10% of profits for an exchange.

234.    Flash orders harm investors because investor orders are traded ahead of after they are flashed, and because investors' displayed limit orders at the NBBO are not executed because HFT firms at other exchanges step up to match the best price.  Apparently recognizing this, the SEC proposed a rule amendment prohibiting flash orders in September 2009, explaining that:

> the flashing of order information outside of the consolidated quotation data stream could   lead to a two-tiered market in which the public does not have fair access to information   about  the  best available prices for a security that is available to some market participants.   Flash orders also may detract from the incentives for market participants to display their trading interest publicly.[138]

235.    NASDAQ actually supported the ban, agreeing with the SEC that flash orders created a two-tiered market, and effectively admitting that NASDAQ had to offer flash orders because it was losing market share.  One comment letter to the SEC's proposed rule amendment characterized investor harm at the hand of flash orders as follows:

> We believe flash mechanisms impose costs on customers because a customer can "miss the market" when its marketable order is converted to a flash order, rather than being routed to the displayed best price. In addition, a customer is harmed when its displayed order at the national best bid or offer is not executed because market makers on another exchange step up to match that best price through a flash mechanism. The supposed cost savings to customers that has been noted by other commenters does not take into account the customers on other exchanges who did not trade because of market maker step ups in flash mechanisms.[139]

---

[138]  http://www.sec.gov/news/press/2009/2009-201-factsheet.htm.

[139]  Letter from John McCarthy to SEC Secretary Elizabeth Murphy (Sept. 29, 2010), *available at* http://www.sec.gov/comments/s7-21-09/s72109.shtml.

236.    Despite the backlash to flash orders from the SEC, Congress, several exchanges and other market participants, in November 2010 Direct Edge revamped its flash strategy by adding an auction feature in a bid to make its use more attractive to customers.  Several months later, the SEC told Direct Edge that it would institute proceedings on whether or not to disapprove the change, and Direct Edge thereafter finally announced it would stop offering flash orders.  In the end, Direct Edge defiantly refused to stop "flashing" orders until February 28, 2011, almost two years into the Class Period.

**The Exchanges' Manipulative Scheme Damaged Plaintiffs and the Class**

237.    By employing the aforementioned devices, contrivances, artifices and manipulations, the Exchanges pursued a fraudulent scheme and wrongful course of business that operated as a fraud or deceit on public investors trading stocks on the U.S. stock exchanges.

238.    During the Class Period, the Exchanges engaged in wrongful and discriminatory practices, including providing co-location and enhanced low-latency direct data feed services, and creating and implementing hundreds of complex order types for HFT firms, for the purpose of, and knowing that such acts would result in further fraudulent activity such as electronic front-running, latency arbitrage, spoofing, and layering by HFT firms.  The Exchanges knew that engaging in such conduct would induce HFT firms to execute trades on the Exchanges to the detriment of Plaintiffs and the Class.  The Exchanges also implemented a fee structure that they knew incentivized HFT firms to employ trading strategies, including rebate arbitrage, that caused Plaintiffs and the Class to transact on the Exchanges' venues at worse prices.  Defendants' fraudulent scheme and wrongful course of business played a central and essential role in at least the following activities, which operated as a fraud or deceit on Plaintiffs and the Class.

**Electronic Front-Running**

239.   NYSE former Rule 92, FINRA Rule 5320 Information Memo No. 80-38 ("Memo"), expressly prohibits electronic front-running or "trading ahead."  The Memo provides, in part, that members and member organizations "should not trade in options or in underlying securities by taking advantage of their possession of material, non-public information concerning block transactions in these securities."  This type of conduct is inconsistent with "just and equitable principles of trade" and a member who violates this rule may face disciplinary proceedings under NYSE Rule 476.[140]  However, the conduct by the Exchanges alleged herein resulted in the manipulation of the market by means of these wrongful practices and violated the prohibition against trading ahead.

240.   The Exchanges sold HFT firms access to information concerning the proprietary non-public intent of Plaintiffs and members of the Class, including their intention to purchase or sell securities, their price sensitivity, margin requirements and/or the amount of shares they intended to transact in.  The Exchanges did this, first, by collecting payments from HFT firms in exchange for permitting them to install their own computers directly within or in close proximity to the Exchanges' own order matching boxes.  Defendants knew these co-location arrangements were intended to and would in fact provide HFT firms with nearly instantaneous access to investor orders and bids placed on the Exchanges by brokerage firms, and did so knowing HFT firms could and would use the data to trade in front of Class members.  The Exchanges also provided a low-latency edge to HFT firms by offering direct data feeds that were faster than the widely used SIP, and by allowing HFT firms to utilize complex new order types that allowed them to jump the queue and trade in front of Class members.  These feeds also provide enhanced

---

[140]  *See* NYSE Exchange Rule 105(h), "Prohibition Against Front-Running of Blocks."

trading information to HFT firms that allows them to at a minimum track when an investor changes price on his order and how much stock the investor is buying or selling in accumulation, as well as ascertain hidden order flow.

241.    The market data revenue earned by the Exchanges is used to further develop their business products and increase their market share.  NASDAQ has said that while historically exchanges used market data revenue to support their regulatory function, today, "some of the revenue is instead used simply to buy market share and gain additional market data revenue."[141] Similarly, NYSE has stated that "market data revenues [are] not . . . considered regulatory fees."[142]

242.    The Exchanges collected billions of dollars from HFT firms for co-location rights and data feed services so that the firms could reduce their own latency *vis-a-vis* other traders. For example, when a broker placed an order to purchase 100 shares of Proctor & Gamble on the NYSE or an alternate trading venue, HFT firms got access to it within milli- or even microseconds and were able to actively look at all the other exchanges and alternate trading venues – using their high speed cable and/or radio wave signal technology – and discover where the shares to be purchased could be purchased most cheaply, or where the shares to be sold could be sold for the highest price.  They then raced the investor's order to that exchange, transacted and then fulfilled the investor's order.

243.    To do so however, HFT firms put out "pings" (or small orders or bids) on all of the other exchanges to locate the best price.  In so doing, HFT firms necessarily increased the

---

[141] Nasdaq Stock Market, Inc., *Comments on Proposed Reg NMS*, File No. S7-10-04 at 30 (July 2, 2004), *available at* http://www.sec.gov/rules/proposed/s71004/knight070504.pdf.

[142] New York Stock Exchange, Inc., *Comments on SEC Release No.34-50699*, File No. S7-39-04 Proposed Rules on Fair Administration and Governance of SROs, Appendix B  at 4 (Mar. 8,2005), *available at* http://www.sec.gov/rules/proposed/s73904/myeager030805a.pdf.

perceived demand for the relevant stock, often resulting in artificial price increases/decreases. HFT firms, however (through the operation of complex orders the Exchanges agreed to create just for these purposes), just as instantaneously cancel all unwanted orders and bids.  Through this "pinging," HFT firms appear to increase demand for the stock (at a certain price point) and thus manipulate its price.  As a result though, while the HFT firm may transact at the best quote available on a particular exchange when it eventually transacts, it has to often run up/down those prices before trading due to its own efforts to electronically front-run the investors' orders – and so it transacts for the investor at a price that damages the investor.  The Exchanges take steps to rig their markets such that this manipulative conduct occurs on their trading platforms, in order to  increase trading volume and ultimately, their bottom line.  The steps taken by the Exchanges create the structure by which the harm caused to Plaintiffs and the Class is certain and inevitable.

**Rebate Arbitrage**

244.    Purportedly to increase and improve liquidity on their exchanges – which draws more business into their exchanges and allows the exchanges to collect greater fees from the increased trading – the Exchanges historically began paying brokers and HFT firms to transact on their exchange to the extent they were placing a new bid or offer there.  Such activity is characterized in the industry as "making" liquidity.  Conversely, those who merely pay the bid or offer price quoted on an exchange are characterized in the industry as merely "taking" liquidity.

245.    Early on, many of the Exchanges adopted maker/taker pricing plans.[143]  Makers were paid rebates to place their orders and bids on the exchange whereas takers had to pay to

---

[143]  The maker/taker model is in contrast to the "customer priority" model, whereby any account identified as a "customer" goes to the head of the queue for priority of fill, without paying a transaction fee to the exchange.  The exchange charges market-makers fees for transactions. Payment for order flow is also paid to brokerage firms as an inducement to send their orders to a given exchange.

fulfill their orders on the same exchange.  Investors pay their brokers a commission to conduct their trades, but these maker/taker fees paid to – or not charged by – the exchanges were separate and apart from that.  As such, they often incentivized brokers to be market-makers rather than takers.

246.    However, with the advent of so many new stock exchanges, competition grew and strategies varied, and soon certain exchanges became incentivized to pay takers and charge makers.  BATS did this on its BYX trading system to entice brokers to send their orders to BATS – where BATS knew high frequency traders were waiting – even though it did not increase liquidity in the process.

247.    The different pricing models being employed across the various public exchanges and alternate trading venues soon created a new arbitrage opportunity for high frequency traders. In addition to the need for speed that electronic front-running required, high frequency traders were incentivized by the Exchanges to trade on more electronic trading venues and to trade where they were paid to do so.  ***This incentivized high frequency traders to hold off on fulfilling an order at the best price available on a particular exchange if the exchange offering the best price demanded payment from them to complete the order***.  Instead, the HFT firms, which were way out ahead of the rest of the market by micro- if not milliseconds, were incentivized to create more interest in the stock by pinging more exchanges – even if doing so increased the market price for the stock suddenly – in order to close the trade on an exchange that would pay them the largest rebate rather than charging them a fee to transact.  Again, the price increase such delays precipitated were ultimately borne by Plaintiffs and members of the Class.

### Latency Arbitrage

248.    Latency arbitrage occurs when different people and firms receive market data at different times.  These time differences, known as latencies, may be as small as a billionth of a nanosecond, but in the world of HFT, such differences can be crucial.  So crucial, in fact, that HFT firms pay the Exchanges substantial sums to be located closer to the Exchanges' servers – each foot closer saving one nanosecond – and to access material trading data via enhanced low-latency data feeds.  Latency arbitrage occurs when HFT algorithms make trades a split second before a competing trader, and then resell the stock seconds later for a small profit.

249.    As an example, an institutional investor seeks to buy a substantial position, for example 100,000 shares of a given stock.   Often brokers will try to execute the trade intermittently in small 100 share block orders, trying to get the then best price available, say $4.50 per share.  This is where the "latency arbitrage" takes place.  HFT firms use their internal compilations of knowledge of historical trading practices to divine who the investor is, how much it wants, what it is willing to pay and/or what its margin requirements are, and essentially buys up all the available shares at $4.50 per share an instant before the institutional investor gets them.  Now the institutional investor's algorithm moves on, and looks for shares at $4.51 per share.  The HFT firm then sells all the stock it just bought at $4.50 per share, earning – in a period of a second or less – a completely risk free penny a share, or $5,000.  Practices like this add up to many millions of dollars each trading day, transferring annual sums of more than $1 billion to the coffers of HFT firms.

### Spoofing and Layering

250.    So-called "spoofing" and "layering" (collectively, "layering") are HFT strategies that use non-bona fide orders, or orders that a trader does not intend to have executed, that are designed to induce others to buy or sell the security at a price not representative of actual supply

and demand.  Such practices are designed to and do manipulate the market, and the Exchanges cause and profit from such manipulations.

251.   More specifically, HFT firms place bona fide buy (or sell) orders on the Exchanges' trading venues they intend to have executed, and then immediately enter numerous non-bona fide sell (or buy) orders for the sole purpose of attracting interest to their bona fide orders.   The placement of these non-bona fide orders is to induce, or trick, other market participants to execute against their initial bona fide orders.   Immediately after the execution against the bona fide orders, the HFT firms cancel the open non-bona fide orders.  They typically then repeat this strategy on the opposite side of the market to close out the position.   Using this strategy, the HFT firms induce other market participants to trade in a particular security by placing and then cancelling layers of orders in that security, creating fluctuations in the NBBO of those securities, increasing order book depth and using the non-bona fide orders to send false signals regarding the actual demand for such securities, which the other market participants misinterpret as reflecting true demand and in this way manipulate the market.  The Exchanges consciously design their markets knowing they will lead to the specific HFT firms' orders that deceive other market participants into buying (or selling) stocks from (or to) the HFT firms at prices that have been artificially raised (or lowered) by HFT firms.

**Like the Exchanges, Barclays Also Engaged in a Manipulative Scheme to Defraud Through Its Dark Pool**

252.   The fragmentation of financial trading venues and electronic trading that Reg NMS sought to remedy allowed for the creation of alternate trading venues (also known as "dark pools"), which are normally accessed through crossing networks or directly between market participants.   A dark pool is a trading venue that is not openly available to the public. Historically, dark pools were created so that financial institutions could execute large block

trades anonymously and away from public exchanges.  In theory, such anonymity prevented adverse price movement that might otherwise occur if the broader market knew that a large investor was seeking to execute a large trade.  Most of the nation's largest financial services firms now all have divisions within them that operate alternate trading venues.

253.   Given the supposed "dark" nature of alternative venue trading, theoretically neither the size of the trade nor the identity of the market participant is revealed until the trade is filled.  This allows, for example, institutional investors wishing to buy or sell large blocks of securities to do so without showing their hand and thus avoid any negative price impact.  It also means, however, that institutional investors making large trades in these alternative venues must place an even greater reliance upon the honesty and integrity of their brokers who operate these venues to act in the institutional investors' best interest.

254.   Alternative trading venues are of various types and can execute trades in multiple ways, including throughout the day or at scheduled times.  Traders affiliated with the financial institution operating a particular dark pool can also trade in that venue and many of these dark pool operators permit outsiders to gain entry into their venue by selling access or charging commissions to HFT firms.

255.   The rise of dark pools has added pressure on the Exchanges to come up with ways to try to minimize lost market share and incentivized them to create products and services for HFT firms that attract order flow and fees.  These include (as discussed at length herein) products and services such as co-location, enhanced data feeds and the use of complex order types.

256.   Significantly, the use of these products and services by HFT firms is not limited to trading activity on the Exchanges.  Indeed, as dark pools increasingly gained market share –

there are now as many as 45 different dark pools, and as much as 40% of all equity trades now take place in dark pools[144] – HFT activity has proliferated in these venues.[145]

**Barclays's Dark Pool (Barclays LX)**

257.    Most all of the major Wall Street banks either run their own dark pool or do so jointly with other market participants.  Barclays is no exception.

258.    Barclays is a broker/dealer as defined by FINRA and operates a dark pool.  It also owns and operates its own algorithmic or HFT desk, which effectively operates like the HFT firms, thereby providing it with the knowledge, motive and opportunity to engage in the manipulative acts and practices as described herein, in both lit markets and dark pools, including its own dark pool.  Barclays also permitted HFT firms to gain information and dark pool access to "anonymous" orders placed in its dark pool – but it did so knowing that the HFT firms would engage in many of the same manipulative practices described herein, including "front running," "latency arbitrage" and "trading ahead" among others.

259.    Barclays operates its own dark pool called Barclays Liquidity Cross, or "Barclays LX."  Barclays planned and intended to establish its Barclays LX dark pool as the largest private trading venue in the world.  In order to do so, it exploited investors' belief in Barclays LX as a safe haven to investors – particularly institutional investors such as State-Boston and the other Plaintiffs – while enticing predatory traders with monetary and informational incentives and the presence of investors for them to prey on.

---

[144]  *See, e.g.*, Sam Mamudi, *Dark Pools Take Larger Share of Trades Amid SEC Scrutiny* (June 12, 2014), *available at* http://www.bloomberg.com/news/2014-06-12/off-exchange-stock-trading-reaches-two-year-high-in-u-s-.html.

[145]  Bradley Hope & Scott Patterson, *Dark Pools Shed Light on Their Operations* (June 4, 2014), *available at* http://online.wsj.com/articles/big-banks-top-share-data-in-new-finra-dark-pool-data-disclosures-1401715882 (noting that "[s]ome have also questioned the role played by high-frequency firms . . . in dark pools").

260.    Eric Schneiderman, NY AG, has conducted an investigation of Barclays and its dark pool, and as a result of his investigation has initiated an action against Barclays in the Supreme Court of the State of New York in the County of New York, *The People of the State of New York v. Barclays Capital, Inc.*, Index No. 451391/2014.  This investigation was conducted by means of subpoena powers and other investigative tools unavailable to private litigants, pre-suit.

261.    As recounted in his complaint against Barclays, among the matters uncovered by Attorney General Schneiderman's investigation was evidence of Barclays's intention to expand its dark pool into the largest in the world.   The evidence uncovered by Attorney General Schneiderman can be summarized as follows:

a.      In the years following the creation of Barclays LX, Barclays's own marketing materials reflect that, as of late 2011, Barclays LX was essentially in the middle of the pack of the several dark pools operating in the U.S., measured by average daily volume of share traded.

b.      Growing its dark pool to become the largest one in the United States was a principal goal of Barclays's Equities Electronic Trading division (the division that houses the dark pool), and was central to driving profits for the division.  Speaking in 2013, the Head of Barclays's Equities Electronic Trading division recalled that "[w]e laid out a plan two years ago to overhaul our offering end to end, gain market share and provide clients with the best electronic trading tools in the market."

c.      In an internal document found by Attorney General Schneiderman, Barclays instructed its employees that "[a]ggregating [order] flow into Barclays LX has strategic and economic value for the entire Equities business," including the savings Barclays would

realize by not having to pay commissions to execute trades on other venues; fees gained from firms paying to trade in the dark pool; and the "internal trading P&L [profit and loss] opportunities" available to internal Barclays trading desks that trade in the dark pool against brokerage client order flow.   According to Attorney General Schneiderman, Barclays also referred in that documetn to the "market share value of attracting more [order] flow" into its dark pool.   Internal Barclays documents valued this growth opportunity at between $37 and $50 million per year.

        d.    A former senior Director in Barclays's Equities Electronic Trading recalled to Attorney General Schneiderman's investigators that, "[a]t every sales meeting or product meeting, the main goal they were talking about was to grow the size of [Barclays's dark pool] to become the largest pool.   All the product team's goals, which would also include their compensation[,] were tied to making the pool bigger.   [Barclays had] great incentive at all costs to make the pool bigger."

262.   In order for Barclays's dark pool to expand in accordance with Barclays's plan, Barclays would have to increase the number of trades it executed in the dark pool acting as a broker.   This would require Barclays to direct a larger number of its brokerage customers' orders into the dark pool.   In order to create liquidity in the dark pool sufficient to insure that these orders could be filled, Barclays also sought to attract HFT firms into its dark pool.

**Investors Justifiably Relied on the Fairness and Integrity of Barclays's Dark Pool as a Market**

**The Regulatory Framework Governing Dark Pools Requires Fairness**

263.   Investors justifiably relied on Barclays's compliance with the regul;atory framework that governs dark pools, which requires fairness and integrity.   Introduced in 1998,

Regulation ATS ("Reg ATS") was established to allow ATS, including dark pools,[146] ECNs and broker-dealers, to register as either national securities exchanges, or as broker-dealers and comply with certain additional requirements under Reg ATS.  Because trading venues subject to Reg ATS are not required to meet the specifications of an exchange, they are not bound by the market surveillance and other self-regulatory responsibilities of securities exchanges.  However, under Reg ATS alternative trading venues such as dark pools must register with the SEC as broker-dealers and must adhere to the business conduct rules applicable to broker-dealers established by FINRA.  These obligations are in addition to the requirement that all dark pools "must comply with the antifraud, antimanipulation, and other applicable provisions of the federal securities laws."[147]

264.    Most notably, Rule 301(b)(10) of Reg ATS requires ATS operators to implement safeguards and procedures for protecting their users' confidential trading information, including "limiting access to the confidential trading information of subscribers" to certain employees of the ATS.  Reg ATS also requires, under Rule 301(b)(2), trading venues such as dark pools to disclose certain information about the nature of their operations on Form ATS, and to amend its Form ATS before implementing material changes to its operation or when the Form ATS becomes inaccurate.  Two recent SEC enforcement actions under Rule 301(b)(10) and (2) highlight the importance of the requirement that dark pool operators maintain the confidentiality of their customers' trading information.

---

[146] FINRA has defined a dark pool as "an ATS that does not display quotations or subscribers' orders to any person or entity, either internally within an ATS dark pool or externally beyond an ATS dark pool (other than to employees of the ATS)." Order Approving Proposed Rule Change Relating to Publication of Certain Aggregate Daily Trading Volume Data (Mar. 5, 2010), SEC Release No. 34-61658 (Fed. Reg. Vol. 75, No. 48).

[147] Reg ATS, Preliminary Notes.

265.    In *In the Matter of Pipeline Trading Systems*, the SEC fined Pipeline Trading

Systems ("Pipeline") $1 million and two of its top executives $100,000 each in October 2011 for

willful violations of §17(a)(2) of the Securities Act of 1933 and Rules 301(b)(2) and 301(b)(10)

of Reg ATS for describing its dark pool to investors as a crossing network that protected

institutional investors from predatory trading when in reality the majority of the orders placed on

Pipeline's dark pool were filled by Pipeline's parent company.  In doing so, ***the SEC stressed***

***that regardless of where a trade takes place, "'one principle remains fundamental – investors***

***are entitled to accurate information as to how their trades are executed***."[148]  It also

emphasized "'***the importance of full disclosure by those who operate alternative trading***

***systems about their operations and the execution services they provide***.'"[149]

266.    A year later, in *In the Matter of eBX*, the SEC fined eBX, LLC (a joint venture

formed by Credit Suisse, Citi, Merrill Lynch, Lehman Brothers and Fidelity), which operates the

alternative trading venue LeveL ATS, $800,000 to resolve findings that it willfully violated Reg

ATS Rules 301(b)(10) and (2) by failing to protect customers' confidential trading information

and failing to disclose that it allowed an outside entity that built the LeveL ATS dark pool – Lava

Trading (a unit of Citigroup) – to make use of that confidential trading information.

267.    Dark pools must also comply with the rules applicable to broker-dealers

established by FINRA, including Rule 5270, which prohibits front running of block transactions.

Subsections (a) and (b) of Rule 5270 of FINRA provide:

> (a) No member or person associated with a member shall
> cause to be executed an order to buy or sell a security or a related

---

[148]  Press Release, *Alternative Trading System Agrees to Settle Chargers That It Failed to Disclose Trading by an Affiliate* (Oct. 24, 2011), *available at* http://www.sec.gov/news/press/2011/2011-220.htm.

[149]  *Id*.

financial instrument when such member or person associated with a member causing such order to be executed has material, non-public market information concerning an imminent block transaction in that security, a related financial instrument or a security underlying the related financial instrument prior to the time information concerning the block transaction has been made publicly available or has otherwise become stale or obsolete.

(b) This Rule applies to orders caused to be executed for any account in which such member or person associated with the member has an interest, any account with respect to which such member or person associated with a member exercises investment discretion, or for accounts of customers or affiliates of the member when the customer or affiliate has been provided such material, non-public market information by the member or any person associated with the member.

Similarly, Rule 5320 of FINRA, adopted September 12, 2011, consolidated previous customer order protection rules and replaced the then-existing FINRA customer limit and market order protection rules, NYSE Rule 92, and other similar exchange rules.  Rule 5320 generally prohibits a member firm that accepts and holds a customer order from trading a security on the same side of the market for its own account at a price that would satisfy the customer order, unless it immediately executes the customer order up to the size of and at an equal or better price than it traded for its own account.

268.    Based in part on the regulatory structure described above, Plaintiffs and the Class presumed, as they did with respect to the Exchanges, the integrity of the trading platforms operated by the dark pools, and that they would be treated fairly.  The institutions that operate dark pools such as Barclays did nothing to dispel that presumption on behalf of Plaintiffs, the Class, and the investing public.  Rather they built on that presumption and buttressed it by marketing the the dark pools to investors as trading venues where investors can trade securities safe from the predations of HFT firms and other predatory investors.  Similar to the Exchanges, however, in order to receive the benefit of the enormous trading volume HFT firms generate,

Barclays invited HFT firms to trade in its dark pool and gave them incentives to do so – one of those incentives being the presence of investors who would serve as the victims of the HFT firms' predatory trading activities. In other words, while assuring investors that its dark pool had special safeguards to protect them from predatory trading practices, Barclays in fact offered the investors up to the predators as prey, for the operators' own financial benefit.

### Barclays's Public Statements Failed to Dispel – and in Fact Encouraged – Investors' Belief in the Fairness and Integrity of Barclays's Dark Pool

269.    Far from dispelling investors' belief in the fairness and integrity of its dark pool, Barclays made public statements that encouraged such belief. Investors had no reason to believe other than that they were being treated fairly and not subjected to predatory practices. But even if investors investigated the matter, they would have found public statements by Barclays encouraging them to believe in the fairness and integrity of Barclays's dark pool. In particular, Barclays encouraged investors to believe that the dark pool was a safe place for them to trade, insulated from aggressive or predatory HFT practices.

270.    Barclays's efforts to encourage clients, potential clients and other market participants to belive in the safety of trading in its dark pool relied, in large part, on a service Barclays calls "Liquidity Profiling." This Liquidity Profiling service purportedly allowed Barclays to monitor the "toxicity" of the trading behavior taking place in its dark pool and, as Barclays claimed, "hold [traders] accountable" if their trading was "aggressive," "predatory" or "toxic." First marketed in 2011, Liquidity Profiling has been represented by Barclays to work by grouping the traders in its dark pool into six categories based on their trading behavior, ranked 0 to 5. In the "0" and "1" categories are those traders conducting the most aggressive, predatory trading activity; in the "4" and "5" categories are those traders conducting the safest, most passive, long-term investor-like trading activity. Participants in Barclays's dark pool were told

that they could disable their orders from interacting with traders falling into any of the various categories – in particular, clients could opt-out of trading with traders that were identified by the Liquidity Profiling service as engaging in potentially harmful HFT strategies.   According to Attorney General Schneiderman, "Barclays represented Liquidity Profiling as a 'sophisticated surveillance framework, helping to protect you from predatory trading . . . our team proactively monitors the behavior of individual participants and quickly responds with corrective action when adverse behavior is detected.'  Liquidity Profiling, according to Barclays, 'improve[s] the overall quality of [Barclays's dark pool because] High-alpha takers [*i.e.*, high frequency traders] can be held accountable . . . transparency means that aggressive flows will be quickly identified by the Barclays ATS team.'"

271.    According to Attorney General Schneiderman, Barclays has represented in various industry publications, including, among others, *Traders Magazine, Markets Media*, and *Hedge Week*, that "'Liquidity Profiling analyzes each interaction in the dark pool, allowing us to monitor the behavior of individual participants . . . providing clients with transparency about the nature of counterparties in the dark pool and how the control framework works.

272.    Attorney General Schneiderman's investigation disclosed that, as one part of its marketing effort, Barclays created and disseminated analyses of the landscape of trading in its dark pool, purporting to show how clients were protected from aggressive HFT activity and underscoring Barclays's commitment to transparency.   One such analysis was contained in a widely-disseminated document intended for institutional clients titled *Liquidity Profiling – Protecting You in the Dark*.   That document included an analysis purporting to represent the "liquidity landscape" of Barclays's dark pool. The analysis showed that very little of the trading in Barclays's dark pool is "aggressive."   As represented by the analysis, most of the trading in

the dark pool is "passive" – even most of the trading activity of HFT firms (denominated "electronic liquidity providers" in Barclays's analysis).  In its entirety, the analysis represented that Barclays's dark pool is a safe venue with few aggressive traders.

273.  As part of its effort to convince clients that it protected them from aggressive HFT, Barclays issued marketing material that included representations purporting to show the amount of aggressive trading activity in its dark pool.  Attorney General Schneiderman's investigation disclosed that, in marketing materials released in early 2013, Barclays claimed that the trading in its dark pool was "48% passive," "43% neutral" and "9% aggressive."  Attorney General Schneiderman's investigation further disclosed that, in March 2014, Barclays issued revised marketing materials that were even more favorable for Barclays, asserting that its dark pool was comprised of 36% passive activity, 58% neutral activity and 6% aggressive activity.  According to Attorney General Schneiderman, this marketing material was in use until at least April 2014.

274.  In February 2014, Barclays's dark pool was named the "Best Dark Pool" by *Markets Media*, an industry publication.  Attorney General Schneiderman's investigation disclosed that, in commenting on the award in marketing material labeled 'for institutional investors only,' Barclays's Head of Equities Electronic Trading attributed Barclays LX's growth to Barclays's commitment to being transparent with its institutional investor clients regarding how Barclays operates, how Barclays routes client orders, and the kinds of counterparties traders can expect to deal with when trading in the dark pool.  Transparency was "the one issue that we really took a stance on . . . .  We always come back to transparency as the key driver – letting [clients] know how we're interacting with their flow and what type of flow they're interacting

with."  He further stated that "[t]ransparency on multiple levels is a selling point for our entire equities franchise."'

**In Furtherence of Its Manipulative Scheme, Barclays Operated Its Dark Pool for Its Own Benefit and that of HFT Firms at the Expense of Investors**

275.    Having failed to dispel, but rather encouraged investors in their reasonable belief in the fairness and integrity of its dark pool with special safeguards in place to protect investors against predatory trading practices rife on public exchanges, Barclays in fact operated its dark pool for the benefit of HFT firms, in order to enjoy the benefits of the enormous volume of trading their participation in the dark pool would generate.

276.    Whereas Barclays, as described above, induced investors to trade in its dark pool by telling them there was very little (about 6%) "aggressive" trading activity there, Attorney General Schneiderman's investigation disclosed that in March 2014, Barclays was engaged in discussions with a prominent HFT firm wherein Barclays itself categorized approximately 25% percent of the orders taking liquidity in its dark pool as aggressive.  In an internal document collecting the information received from Barclays, that firm summarized the data provided to it by Barclays, and concluded that the trading activity in Barclays's dark pool was "50% good, 50% aggressive."

**Barclays's "Liquidity Profiling" Does Not Protect Investors from Predatory HFT Trading Tactics**

277.    Attorney General Schneiderman's investigation disclosed that Barclays does not perform its highly touted "Liquidity Profiling," described above, in a manner that protects investors from predatory trading tactics employed by HFT:

        a.    Despite Barclays's assertion that it uses Liquidity Profiling to police its dark pool, and will "refuse a client access" if that trader's activity becomes toxic, Barclays has in fact never prohibited a single firm from participating in its dark pool, no matter how toxic or

- 125 -

predatory its activity was determined to be.  Indeed, Barclays has known about the high levels of

toxic activity occurring in its dark pool – including latency arbitrage – and has been aware of

which firms are responsible, yet Barclays has refused to stop it.

       b.    Barclays has not regularly updated the ratings of traders monitored by the

Liquidity Profiling service, so that traders have often been categorized in ways that did not

reflect their aggressive trading activity in Barclays's dark pool.  Failing to properly rate traders

gives Barclays's clients a false understanding of their exposure to predatory HFT activity.

       c.    Barclays has applied "overrides" to a number of traders in the dark pool,

assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic.

Even worse, these overrides are often provided to Barclays's own internal trading desks

(including HFT-like high-speed high-order desks) and to HFT firms for whom Barclays acts as

broker.

       d.    Although not disclosed in Barclays's marketing materials, Barclays's

Liquidity Profiling service is not applied to a significant portion of the trading activity in

Barclays's dark pool.  It is not applied to client orders that are routed to the dark pool via

Barclays's proprietary algorithms (*see* below).  Worse, Liquidity Profiling only protects traders

when they ***provide*** liquidity (*i.e.*, post an order to the dark pool), but not when they ***take*** liquidity

(*i.e.*, accept a posted order).  As described in detail above, HFT tactics tend to put HFT firms on

the "make" rather than the "take" side of transactions – such that "Liquidity Profiling" was

frequently not applied for the benefit of the side of the transaction it was purporting to protect.

### Rather than Protecting Investors from HFT Firms in Its Dark Pool, Barclays Actively Courted HFT Firms

278.    While, as described above, Barclays told investors it excluded predatory

"aggressive" traders such as HFT firms from its dark pool, Attorney General Schneiderman's

investigation disclosed that Barclays in actuality actively courted HFT firms for the dark pool, in order to increase trading activity therein:

(a)      On numerous occasions since 2011, Barclays disclosed detailed, sensitive information to major HFT firms in order to encourage those firms to increase their activity in Barclays's dark pool.  That information, which was not generally supplied to other clients, included data that helped those firms maximize the effectiveness of their aggressive trading strategies in the dark pool, such as:

(i)      The routing logic of Barclays's order router, including the percentage of Barclays's internal order flow that was first directed into its own dark pool;

(ii)      A breakdown of trades executed in the dark pool by participant type (*e.g.*, percentage of orders from institutional investors, high frequency traders, etc.); and

(iii)      A breakdown of trades executed in the dark pool by "toxicity" level.

(b)      Barclays has taken a number of additional actions to invite high frequency traders to trade, and trade aggressively, in its dark pool:

(i)      Barclays charges HFT firms little or nothing to trade in its dark pool.  For example, since at least 2011, the two largest participants in Barclays's dark pool – both of which are HFT firms – were charged nothing per share when posting orders, and between $0.0002 and $0.0005 per share when taking available orders;

(ii)      Barclays allows high frequency traders to "cross-connect" to its servers.  Several dozen of the most well-known and sophisticated high HFT firms in the world are or recently have been cross-connected with Barclays, allowing them to take advantage of

Barclays's non-HFT clients, by getting a speed advantage over those slower-moving counterparties; and

(iii)   While Barclays has represented that it used ultra-fast "direct data feeds" to process market price and trade data in order to deter latency arbitrage by high frequency traders in its dark pool, Barclays in fact processed that market data so slowly as to **allow** latency arbitrage.  Internal analyses conducted by Barclays confirmed that Barclays's slow processing of market data allowed high frequency traders to engage in such predatory activity.

279.   Just as the Exchanges, Barclays caused damage to investors who traded on its dark pool by rigging the market to favor HFT firms at their expense, such that investors received less favorable prices on their trades on the dark pool than they would have if the market operated fairly.

**Defendants' Scheme and Fraudulent Course of Business Have Led to Governmental Investigations and Penalties**

280.   On March 31, 2014 the *Wall Street Journal* reported that the FBI is investigating HFT-related practices, including whether HFT firms are using non-public information to front run orders placed by other investors or are placing groups of orders and then cancelling them to create the false appearance of market activity.  A few days later, on April 4, 2014, U.S. Attorney General Eric Holder confirmed that the DOJ was investigating whether HFT practices violate insider trading laws.  SEC Enforcement Director Andrew Ceresney further stated that "'the Enforcement Division [of the SEC] has a number of ongoing investigations into HFT and automated trading to ferret out possible abuses such as market manipulation, spoofing and related issues.'"[150]   The acting chairman of the CFTC similarly indicated that the agency is

---

[150]  Joseph De Simone, et al., *Expect Increasing Scrutiny Of High-Frequency Trading* (June 4, 2014),   *available   at*   http://www.law360.com/securities/articles/544458/expect-increasing-scrutiny-of-high-frequency-trading.

reviewing HFT practices to see if they constitute "spoofing" or other manipulative conduct that could violate the Commodities Exchange Act or CFTC rules.

281.    Prior to the regulators' recent focus on HFT practices, they had been investigating the Exchanges' related practices of providing co-location, data feeds and complex order types to HFT firms for years.  In many instances, regulators instituted enforcement actions and/or issued significant fines and penalties in connection with their investigations.

282.    For example, following an investigation by the SEC Enforcement Division's Market Abuse Unit, in September 2012, the SEC found that defendant NYSE and its parent NYSE Euronext violated Reg NMS over an extended period of time beginning in 2008 by sending data through two of its proprietary feeds before sending data to the consolidated feeds. NYSE and NYSE Euronext agreed to a $5 million penalty and significant undertakings to settle the charges.  This marked the first-ever financial penalty by the SEC against an exchange.

283.    Less than two years later, there would be a total of six.  One such subsequent penalty came on May 1, 2014, when the SEC imposed penalties on NYSE for numerous violations, including the manner in which it offered co-location services.  Specifically, according to the SEC, NYSE provided co-location services "'without an exchange rule in effect that permitted and governed the provision of such services on a fair and equitable basis.'"[151] Defendant ARCA, NYSE MKT and defendant NYSE's affiliated routing broker Archipelago Securities agreed to pay a $4.5 million penalty.

284.    In August 2013, defendant CHX agreed to pay $300,000 to settle regulatory claims that it failed to comply with rules designed to ensure that brokers secure the best possible

---

[151] Sam Mamudi, *SEC Fires First Shots Since 'Flash Boys' With NYSE Fine* (May 2, 2014), *available at* http://www.bloomberg.com/news/2014-05-01/sec-says-nyse-rules-were-shoddy-as-exchange-fined-4-5-million.html.

prices when trading securities on its exchange on behalf of investors.   The commonwealth of Massachusetts also sent a survey to over 1,000 investment specialists about HFT practices, including the use of co-location and direct data feed services provided by exchanges.

285.   Additionally, revelations regarding the Exchanges' complex order types have spawned a "sweeping SEC inquiry into the activities of the sophisticated trading firms and stock-exchange operators – including Nasdaq OMX Group Inc. [the parent company of defendants NASDAQ and BX], NYSE Euronext [which operates defendant NYSE], Direct Edge Holdings LLC and BATS Global Markets."[152]   The SEC announced in 2013 that it is investigating "how order types are proposed, implemented, and monitored post-implementation."[153]   Most recently, in conjunction with its proposal to address certain aspects of HFT, the SEC revealed that it was working with the exchanges to revamp their complex order types.   In related comments, Chair of the SEC White stated:

> Another source of broker conflicts is the large number of complex order types offered by the exchanges, which have been a recent focus of the SEC's examination program. The majority of these order types are designed to deal with the maker-taker fee model and the SEC's rule against locking quotations.
>
> I am asking the exchanges to conduct a comprehensive review of their order types and how they operate in practice. As part of this review, I expect that the exchanges will consider appropriate rule changes to help clarify the nature of their order types and how they

---

[152] Scott Patterson & Jenny Strasburg, *For Superfast Stock Traders, a Way To Jump Ahead in Line* (Sept. 19, 2012), *available at* http://online.wsj.com/news/articles/SB10000872396390443989 20457-7599243693561670.

[153] National Exam Program, SEC, Examination Priorities for 2013 at 9 (Feb. 21, 2013), *available at* http://www.sec.gov/about/offices/ocie/national-examination-program-priorities-2013.pdf.

interact with each other, and how they support fair, orderly, and efficient markets.[154]

286.    Chair White's comments were made in connection with the SEC's announcement of a set of initiatives to address HFT, exchange practices and dark pools.  As part of the initiatives, the agency "will look into concerns about the resiliency and fairness of market data feeds . . . will work with stock exchanges to minimize speed differences between the public data feed and high-speed direct feeds typically used by high-frequency firms . . . [and] will examine whether exchanges can de-emphasize speed as a key to successful trading."[155]

287.    Also in early August 2014, it was reported that BATS was in advanced talks with the SEC to settle allegations that it and Direct Edge gave unfair advantages to high-speed traders, including offering order types that gave HFT firms an edge over investors in their markets.  The expected settlement is reportedly the major reason BATS recently forced out its former president O'Brien, who joined BATS from Direct Edge as part of the companies' merger earlier this year.

288.    On June 17, 2014, the Senate's Permanent Subcommittee on Investigations held a hearing to investigate HFT, including the possible conflicts between rebates paid by exchanges to brokers and brokers' obligations to honor their clients' trades.  At the hearing, representatives of defendants NYSE and BATS admitted that "rebate fees and payments to brokers for orders should face greater regulatory scrutiny."[156]  Thomas Farley, president of NYSE Group, stated

---

[154] SEC Speech, Enhancing Our Equity Market Structure (June 5, 2014), *available at* http://www.sec.gov/News/Speech/Detail/Speech/1370542004312#.VAXwmaPn93w.

[155] Scott Patterson, *SEC Chairman Targets Dark Pools, High-Speed Trading* (June 6, 2014), *available at* http://online.wsj.com/articles/sec-chairman-unveils-sweeping-proposals-to-improve-markets-1401986097.

[156] Silla Brush & Cheyenne Hopkins, *High-Frequency Trading Rebates Under Scrutiny in Senate* (June 17, 2014), *available at* http://www.bloomberg.com/news/2014-06-17/high-speed-trading-fees-under-scrutiny-by-u-s-senators.html.

that "'[w]e are seeking support for the elimination of maker-taker pricing and the use of rebates . . . . Broad adoption of this policy would reduce the conflicts inherent in such pricing.'"[157] Similarly, ICE CEO Jeffrey Sprecher agreed that the maker-taker model creates conflicts of interests for brokers seeking rebates instead of putting their clients' needs first.

289.    Dark pools have also come under regulatory scrutiny recently.  On May 2, 2014 it was reported that the NY AG was expected to issue subpoenas to exchanges and alternative trading platforms to gather data on the manner in which high frequency proprietary trading firms obtain information.  And on June 9, 2014, the SEC announced that it is investigating a number of large dark pools, for, among other things, whether the trading systems are properly disclosing to clients how they operate, treating all investors fairly and protecting confidential client information.  Then on June 25, 2014, as alleged above, NY AG Eric Schneiderman announced a lawsuit against the international bank Barclays, arising from the operation of Barclays's dark pool, Barclays LX, and other aspects of its electronic trading division.

**The Exchanges' Conduct Is Not Shielded by SRO Immunity**

290.    Historically, national securities exchanges operated as not-for-profit entities. Defendants have more recently converted to or, in the case of the newer exchanges, have always been for-profit entities.   The incentives and functions of the member-owned cooperative exchange of 1934 bear little resemblance to those of the for-profit exchanges of today.  With the shift in status to for-profit companies that answer to shareholder desires for profits, the Exchanges developed a business model to capitalize on their control over market data and trading information.  This shift in focus has resulted in quarterly earnings targets and revenues earned from co-location and direct data feed services, and from increased trading volume

---

[157]  *Id.*

generated by catering to the needs of HFT and brokerage firms, including offering hundreds of new complex order types and rebates for order flow.  These activities do not function to protect investors.  They cater to a select group of traders who utilize sensitive trading information at faster speeds to prey on investors.  As such, they create asymmetrics and operate for Defendants' corporate benefit.

291.  The Exchanges traditionally marketed and sold access to their markets to customers on a non-discriminatory basis.  With the rise of co-location and direct data feeds, the Exchanges have sold access to their data to sophisticated HFT firms who pay significant sums of money for an advanced look at trading data.  The Exchanges' sale of advanced access to market data has nothing to do with their former roles as market regulators and everything to do with their private business interests, such as efforts to increase trading volume and profits.  These "access services" have been described as "core" products in the Exchanges' business models.[158] Moreover, the Exchanges' offering of complex order types to HFT firms amounts to selective disclosure of information that creates trading advantages for a select group.  As the Securities Industry and Financial Markets Association recently acknowledged, exchanges have focused their efforts on the "part of their business that earns profits to maximize the returns for their shareholders, and, in some cases, minimized their actual performance of regulatory functions."[159]

292.  The SEC has distinguished between exchanges' regulatory functions, which are shielded by immunity, and their market operations businesses, which are not.  As described by

---

[158] Direct Edge Holdings, LLC, *Comments on Concept Release on Equity Market Structure, Exchange Act Release No.* 34-61358 at 19 (April 28, 2010), *available at* http://www.sec.gov/comments/s7-02-10/s70210-159.pdf.

[159] Comment Letter from the Securities Industry and Financial Markets Association to SEC Chair Mary Jo White at 4 (July 31, 2013), *available at* http://www.sifma.org/comment-letters/2013/sifma-submits-comments-to-the-sec-requesting-a-review-of-the-self-regulatory-structure-of-securities-markets/.

the SEC, an SRO's regulatory functions include promulgating and enforcing rules governing their members and markets, investigating and, where necessary, disciplining their members and users of their markets, and examining their members.  *See* Exchange Act Release No. 34-50700, 69 Fed. Reg. 71,256, 71,259 (Dec. 8, 2004).  An exchanges market operations business does not fall into any of those categories.   The SEC has recognized that the exchanges roles as SROs is functionally separate from their business of operating markets.  The SEC has stressed that this dichotomy "can create a strong conflict of interest" when SRO regulatory responsibilities give way to business "pressure to attract order flow.  *Id.* at 71,261-62.

293.   The manipulative devices referenced herein are not, individually or collectively, within the ambit of the Exchanges' delegated governmental or regulatory functions.  Rather, they relate to the Exchanges' private business operations.   .   Several of the Defendants' own statements confirm as much:

> Because the law does not  mandate a particular funding stream for exchanges, how exchanges are funded is a matter of business strategy for each exchange to determine and a basis on which exchanges can and should compete.   This includes, therefore, determining how to best promote and utilize market data within the applicable legal and regulatory framework.   It is in each Exchange's best interest to provide proprietary information to investors to further their business objectives, and each Exchange chooses how best to do that.[160]

294.   As recognized by United States District Judge Robert W. Sweet in a recent opinion in *In re Facebook, Inc., IPO & Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 453 (S.D.N.Y. 2013), "[a]s exchanges have evolved into for-profit enterprises, an irreconcilable conflict has arisen, rendering independence unattainable in the context of an exchange regulating

---

[160] *Comments on NetCoalition Petition for Review*, at 4.

its own, for-profit business conduct."[161]   Allowing Defendants to be immune from activities designed to increase order flow and trading volume from HFT firms would allow unrestrained motives for profit to go unchecked.

## COUNT  I

### Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

295.   Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if fully set forth herein.

296.   During the Class Period, Defendants engaged in illegal acts and practices, including contrivances and manipulations, and participated in a fraudulent scheme and wrongful course of business, which was intended to and did operate as a fraud or deceit on the investing public, including Plaintiffs and other members of the Class.   Defendants' unlawful conduct caused Plaintiffs and Class members to purchase and sell shares at distorted and manipulated prices, and in doing so damaged Plaintiffs and the Class.

297.   Defendants: (i) employed devices, schemes and artifices to defraud; and (ii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers and sellers of shares on the Exchanges and in Barclays's dark pool, including Plaintiffs and Class members.   In an effort to enrich themselves through these manipulative tactics and illicit kickback payments, Defendants wrongfully engaged in various fraudulent conduct and/or participated in such conduct by others as detailed herein, including electronic front running, latency arbitrage, rebate arbitrage, spoofing, and layering; and otherwise distorted and manipulated the pricing of Plaintiffs' and the Class's securities in violation of §10(b) of the Exchange Act and Rule 10b-5.   All Defendants are sued as primary participants in the wrongful

---

[161]   And NASDAQ has admitted as much in its own public filings.   *See* ¶ 87 *supra*.

and illegal conduct and scheme charged herein, as each engaged in the manipulative acts and deceptive practices detailed herein.

298.    Defendants had actual knowledge of the illegal practices set forth herein. Defendants' scheme was designed to and did defraud Plaintiffs and the Class by distorting the prices they paid for shares of stock in the markets.

299.    As a result of Defendants' misconduct, the trading prices of the securities purchased or sold on the Exchanges and in Barclays's dark pool by public investors were artificially manipulated and distorted during the Class Period.  In ignorance of the true facts and the illegal practices of Defendants during the Class Period, Plaintiffs and other Class members purchased and/or sold shares at artificially distorted and manipulated prices and were damaged thereby.

300.    Plaintiffs and the Class justifiably relied on the fairness and integrity of the Exchanges and Barclays's dark pool in trading on those markets.  Defendants know of the investing public's belief in the fairness and integrity of the markets they maintained, and did nothing to dispel it.  To contrary, Defendants by their public statements actively encouraged this belief on the part investors such as Plaintiffs and the Class.

301.    Had Plaintiffs and other Class members known of the truth concerning Defendants' illegal practices, they would not have purchased or sold stock on these exchanges and in Barclays's dark pool at the artificially distorted and manipulated prices which they paid. Plaintiffs and members of the Class that traded during the Class Period relied on the integrity of the market in the securities listed and traded on the public exchanges.

302.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5.  As a direct and proximate result of the wrongful conduct by Defendants,

Plaintiffs and members of the Class suffered damages in connection with their purchases and/or sales of stock during the Class Period.

## COUNT II

### Violation of §6(b) of the Exchange Act
### Against the Exchanges

303.   Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if fully set forth herein.

304.   Section 6(a) and (b) of the Exchange Act, 15 U.S.C. §78f(a)-(b), entitled "National securities exchanges," states:

> (a) . . . An exchange may be registered as a national securities exchange under the terms and conditions hereinafter provided in this section . . . by filing with the Commission an application for registration in such form as the Commission, by rule, may prescribe containing the rules of the exchange and such other information and documents as the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors.

> (b) . . . An exchange shall not be registered as a national securities exchange unless the Commission determines that –

> (1)   Such exchange is so organized and has the capacity to be able to carry out the purposes of this title . . . and to comply, and . . . to enforce compliance by its members and persons associated with its members, with the provisions of this title . . . , the rules and regulations thereunder, and the rules of the exchange.

> *   *   *

> (4)   The rules of the exchange provide for the equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons using its facilities.

> (5)   The rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of

- 137 -

a free and open market and a national market system, and, in general, to protect investors and the public interest . . . .

(6)    The rules of the exchange provide that . . . its members and persons associated with its members shall be appropriately disciplined for violation of the provisions of this title . . . , the rules or regulations thereunder, or the rules of the exchange, by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction.

305.    The Exchanges are national securities exchanges registered with the SEC under Section 6 of the Exchange Act.  The Exchanges are obligated to operate their securities exchanges in the public interest and for the protection of investors, assuring that the exchange is operated in a fair and equitable manner.  Acting deliberately, fraudulently and in bad faith, the Exchanges, both before and during the Class Period, failed to discharge these obligations (and violated them) as set forth in this Complaint.

306.    The conduct of the Exchanges complained of results not from ordinary or even gross negligence but rather from their knowing and active furtherance and participation in the scheme and wrongful course of business alleged herein, which conduct was undertaken for the Exchanges' own economic gain.

307.    Section 6 of the Exchange Act was specifically enacted to protect public investors who trade on these public exchanges.  Such individuals and institutions – the members of the Class – are the direct intended beneficiaries of the prohibitory and protective rules embodied in §6 of the Exchange Act and the rules and regulations promulgated thereunder by the SEC and various stock exchanges.  The volume of trading on these public exchanges reflects the collective reliance of the members of the Class on the existence of the Exchange Act, its prohibitory and protective provisions and the rules and regulations of the Exchanges pursuant thereto.  The trading volume on these exchanges reflects the misplaced reliance of public investors on the

integrity of trading in the markets maintained by the Exchanges and their false assurances that their markets were fair and un-manipulated by HFT firms.

308.    As a direct and proximate result of the Exchanges' deliberate and bad faith violations of §6 of the Exchange Act, the members of the Class have been damaged, while the Defendants have improperly profited and been enriched.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, appointing Lead Plaintiffs as Class Representatives and approving Plaintiffs' selection of Robbins Geller Rudman & Dowd LLP, Motley Rice LLC and Labaton Sucharow LLP as class counsel, under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages, including interest, in favor of Plaintiffs and the other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding equitable restitution of investors' monies of which they were defrauded and disgorgement and/or the imposition of a constructive trust on Defendants' ill-gotten gains;

D.    Awarding forfeiture in favor of the Class against Defendants for all illicit fees, commissions and any other compensation paid by Plaintiffs and Class members;

E.    Awarding equitable and/or injunctive relief in favor of the Class against Defendants and their counsel, agents and all persons acting under, in concert with, or for them, including: (i) an accounting of and the imposition of a constructive trust and/or an asset freeze on Defendants' illicit profits from the conduct detailed herein; (ii) prohibiting Defendants from structuring their venues to encourage, and permitting high frequency traders to engage in

electronic front-running, rebate arbitrage, latency arbitrage, spamming, spoofing, quote spamming and/or contemporaneous trading; (iii) directing Defendants to ensure that customer bid and offer prices are provided to all investors and trading entities at the same time; (iv) prohibiting Defendants from providing a financial incentive in the form of rebates or otherwise to HFT and brokerage firms for placing orders and bids on those exchanges; and/or (v) prohibiting Defendants from providing an informational advantage to any HFT firm via paid-for reduced latency services.

       F.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

       G.     Such other and further relief as the Court may deem just and proper.

<b>JURY DEMAND</b>

     Plaintiffs hereby demand a trial by jury.

DATED:  November 24, 2014         LABATON SUCHAROW LLP
                                   JOEL H. BERNSTEIN
                                   IRA A. SCHOCHET
                                   BARRY MICHAEL OKUN
                                   FELICIA Y. MANN

                                   /s/ JOEL H. BERNSTEIN
                                   JOEL H. BERNSTEIN
          140 Broadway
          New York, NY  10005
          Telephone: 212/907-0700
          212/818-0477 (fax)
          jbernstein@labaton.com
          ischochet@labaton.com
          bokun@labaton.com
          fmann@labaton.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Andrew J. Brown
David W. Mitchell
Brian O. O'Mara
Lonnie A. Browne
600 West Broadway
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)
andrewb@rgrdlaw.com
davidm@rgrdalw.com
bomara@rgrdlaw.com
lbrowne@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
VINCENT M. SERRA
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
vserra@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
RANDI BANDMAN
30 Vesey Street, Suite 200
New York, NY 10007
Telephone:  212/693-1058
patc@rgrdlaw.com
randib@rgrdlaw.com

MOTLEY RICE LLC
JOSEPH F. RICE
WILLIAM H. NARWOLD
ANN K. RITTER
JOSHUA L. LITTLEJOHN
DAVID P. ABEL
CHRISTOPHER F. MORIARTY
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
jrice@motleyrice.com
bnarwold@motleyrice.com
aritter@motleyrice.com
jlittlejohn@motleyrice.com
dabel@motleyrice.com
cmoriarty@motleyrice.com

MOTLEY RICE LLC
DONALD A. MIGLIORI
ALEX R. STRAUS
600 Third Avenue, Suite 2101
New York, NY  10016
Telephone:  212/577-0040
212/577-0054 (fax)
dmigliori@motleyrice.com
astraus@motleyrice.com

Co-Lead Counsel for Plaintiffs