UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                                    :
IN RE:                                                              :
                                                                    :
BARCLAYS LIQUIDITY CROSS AND HIGH                                   :
FREQUENCY TRADING LITIGATION                                        :
                                                                    :
*This Document Relates To All Actions*                              :
-------------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  08/26/2015

14-MD-2589 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

In 2014, author Michael Lewis published a bestselling book titled *Flash Boys: A Wall Street Revolt,* in which he argued that "high-frequency traders" have been able to gain an unfair advantage in the stock market, in part because stock exchanges and "dark pools" — alternative venues for trading stocks — have enabled those traders to obtain and trade on market data faster than other investors.  A litany of lawsuits followed in short succession, asserting various theories of liability.  *See*, *e.g.*, *Lanier v. BATS Exchange, Inc.*, — F. Supp. 3d —, No. 14-CV-3745 (KBF), 2015 WL 1914446 (S.D.N.Y. Apr. 28, 2015) (state-law claims against various stock exchanges); *Strougo v. Barclays PLC*, — F. Supp. 3d —, No. 14-CV-5797 (SAS), 2015 WL 1883201 (S.D.N.Y. Apr. 24, 2015) (investor suit against the operator of a major dark pool); *People ex rel. Schneiderman v. Barclays Capital Inc.*, 1 N.Y.S.3d 910 (N.Y. Sup. Ct. 2015) (state-law claims against the operator of a major dark pool).  This multidistrict litigation ("MDL") proceeding involves a group of cases in that litany.  In four cases, originally filed in this District, various investors (collectively, the "SDNY Plaintiffs") bring claims under the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78a *et seq.*, against seven stock exchanges — BATS Global Markets, Inc., Chicago Stock Exchange, Inc., Direct Edge ECN, LLC, the NASDAQ Stock Market LLC, NASDAQ OMX BX, Inc., New York Stock

Exchange, LLC, and NYSE Arca, Inc. (collectively, "the Exchanges") — as well as Barclays

PLC and Barclays Capital Inc. (collectively, "Barclays"), a major financial institution and the

subsidiary that operates its "dark pool."  In a fifth action, Docket Number 15-CV-168, filed in

the United States District Court for the Central District of California and later consolidated here

by the Judicial Panel on Multidistrict Litigation (the "JPML"), Plaintiff Great Pacific Securities

("Great Pacific") sues Barclays alleging violations of California state law.

Now pending are three motions by Defendants, largely pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, to dismiss the claims of Plaintiffs in all five cases (collectively,

"Plaintiffs").  Significantly, the motions do not call upon the Court to wade into the larger public

debates regarding high-frequency trading or the fairness of the U.S. stock markets more

generally.  That is, Lewis's book may well highlight inequities in the structure of the Nation's

financial system and the desirability for, or necessity of, reform.  For the most part, however,

those questions are not for the courts, but for commentators, private and semi-public entities

(including the stock exchanges), and the political branches of government, which — as Plaintiffs

themselves observe — have already taken up the issue.  (*See* Second Consol. Am. Compl.

Violation Federal Securities Laws (14-CV-2811, Docket No. 252 ("SAC") ¶¶ 280-89 (describing

investigations related to high-frequency trading by the United States Congress, the Federal

Bureau of Investigation, the Department of Justice, the Commodity Futures Trading

Commission, and the Securities and Exchange Commission); Am. Class Action Compl. (15-CV-

168, Docket No. 30) ("Am. Compl.") ¶ 5 (describing actions taken by the New York Attorney

General)).  More to the point, the only question for this Court on these motions is whether the

Complaints in these cases are legally sufficient to survive Defendants' motions.  Applying well-

established precedent from the United States Supreme Court, the United States Court of Appeals

for the Second Circuit, and the California Supreme Court, the Court is compelled to conclude

that they are not.  Accordingly, and for the reasons stated below, Defendants' motions to dismiss

are granted, although Great Pacific is granted leave to amend its complaint in 15-CV-168.

## BACKGROUND

Generally, in considering a Rule 12(b)(6) motion, a court is limited to the facts alleged in

the complaint and is required to accept those facts as true.  *See, e.g.*, *LaFaro v. N.Y.*

*Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).  A court may, however, consider

documents attached to the complaint, statements or documents incorporated into the complaint

by reference, matters of which judicial notice may be taken, public records, and documents that

the plaintiff either possessed or knew about, and relied upon, in bringing suit.  *See, e.g.*,

*Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282

F.3d 147, 153 (2d Cir. 2002).  Thus, the following facts are taken from the relevant Complaints,

exhibits attached thereto, and documents of which the Court may take judicial notice.

## A.  The Creation of the National Market System

Prior to 1975, the U.S. stock market was fragmented among several stock exchanges.

(SAC ¶ 43-44).  In general, investors seeking to purchase a stock on a particular exchange

interacted only with investors also trading on that exchange, and stocks were often traded at

different prices on different exchanges.  (*See id.* ¶ 43).  In 1975, Congress amended the

Exchange Act to, among other things, give the Securities and Exchange Commission ("SEC")

authority to issue rules that would stitch the disparate exchanges into a single national market.

*See* Pub. L. No. 94-29, § 7, 89 Stat. 111, *codified at* 15 U.S.C. § 78k-1.  (SAC ¶ 44).  Since those

amendments, the SEC has enacted a host of regulations to fulfill Congress's vision of a unified

national stock market.  In 2005, those measures were consolidated into a rule known as

"Regulation NMS" ("NMS" being short for "national market system"), which, among other things, requires exchanges to produce national market system plans ("NMS Plans") to facilitate the development and operation of a national market for securities.  *See* Exchange Act Release No. 34-51808, 70 Fed. Reg. 37,496 (June 29, 2005) ("Regulation NMS"); 17 C.F.R. § 242.603(b).  (SAC ¶ 46; Mem. Law Supp. Exchanges' Mot. To Dismiss Second Consol. Am. Compl. Pursuant Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (14-MD-2589, Docket No. 8) ("Exchanges' Mem.") 8-9).  Pursuant to its NMS Plan, an exchange must transmit real-time information regarding transactions on that exchange to a centralized entity (the "Processor") that then consolidates the information into a single, unified data feed (or "consolidated feed").  *See* 17 C.F.R. §§ 242.601-602.

A consolidated feed includes information on (1) the price at which the latest sale of each stock traded on the exchanges occurred, the size of that sale, and the exchange on which it took place; (2) the current highest bid and lowest offer for each stock traded on the exchanges, along with the number of shares available at those prices; and (3) the "national best bid and offer," or "NBBO," which are the highest bid and lowest offer currently available across all the exchanges and the exchange or exchanges on which those prices are available.  *See NetCoalition v. SEC*, 615 F.3d 525, 529 (D.C. Cir. 2010), *superseded by statute on other grounds*, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), *as recognized in NetCoaltion v. SEC*, 715 F.3d 342 (D.C. Cir. 2013); *see also* 17 C.F.R. § 242.600(b)(13).  Regulation NMS also requires that exchanges and brokers immediately accept the most competitive offer for a particular stock when matching a buyer to a seller — meaning that, in theory, the NBBO for a particular stock is the price at which that stock should trade.  *See* Regulation NMS, 70 Fed. Reg. at 37,501-02.  (SAC ¶ 48).  The consolidated feed effectively

transforms the disparate exchanges into a single national market.  After all, at any given point, an entity seeking to trade a stock should be able to identify the best available price on any of the registered exchanges and send its order to that exchange for execution.  In theory, it no longer matters if that entity is located on Wall Street, while the best available offer is from a party in Chicago.

## B.  The Rise of High-Frequency Trading

In 1998, in response to the growth of trading over electronic platforms and other emerging technologies, the SEC authorized electronic platforms to register as national exchanges.  *See* Regulation of Exchanges and Alternative Trading Systems, SEC Release No. 34-40760, 63 Fed. Reg. 70844 (Dec. 22, 1998) ("Regulation ATS").  In the nearly two decades since then, and especially since the SEC enacted Regulation NMS, the stock markets have witnessed a dramatic rise in high-frequency trading ("HFT").  (SAC ¶¶ 66-69).  Although there is no definitive definition of what constitutes HFT, the term generally refers to the practice of using computer-driven algorithms to rapidly move in and out of stock positions, making money by arbitraging small differences in stock prices — often across different exchanges — rather than by holding the stocks for an appreciable period of time.  *See, e.g.*, *Strougo v. Barclays PLC*, — F. Supp. 3d —, No. 14-CV-5797 (SAS), 2015 WL 1883201, at *2 (S.D.N.Y. Apr. 24, 2015).  (*Accord* SAC ¶¶ 66, 69).  To enable them to engage in that arbitrage, high-frequency traders put a premium on the ability to react rapidly to information regarding the U.S. stock market.  *See Strougo*, 2015 WL 1883201, at *2.  They employ a number of strategies (the specifics of which are not relevant here), all of which depend on the ability to process and respond to market information more quickly than other users on the Exchanges.  (*See, e.g.*, SAC ¶¶ 237-56).  In the early 2000s, firms employing HFT strategies ("HFT firms") were responsible for only about 10%

of the orders placed on the Exchanges.  (*Id.* ¶ 68).  Today, by contrast, they make up nearly three

quarters of the Exchanges' trading volume.  (*Id.* ¶ 66).

The effects of HFT on the stock market are the subject of some controversy.  Some

commentators and, at points, the SEC, have stated that HFT firms have a positive effect on the

market by creating significant amounts of liquidity, thereby permitting the national stock market

to operate more efficiently and benefitting ordinary investors (including Plaintiffs).  *See, e.g.*,

Regulation NMS, 70 Fed. Reg. at 37,500 ("Short-term traders clearly provide valuable liquidity

to the market.").  Others have sharply criticized the HFT firms' trading practices.  Chief among

their criticisms — and one that Plaintiffs forcefully adopt in their filings before the Court — is

that the HFT firms use the speed at which they are capable of trading to identify the trading

strategies being pursued by ordinary investors and react in a manner that forces ordinary

investors to trade at a less advantageous price, with the HFT firm taking as profit a portion of the

"delta" — that is, the difference between the price at which the ordinary investor would have

traded and the price at which it actually traded as a result of the HFT firm's actions.  For that

reason, opponents of HFT, including Plaintiffs, often describe them as "predatory" or "toxic"

trading strategies.  More specifically, and as discussed further below, Plaintiffs allege that

Defendants have provided the ingredients necessary for HFT firms to execute their predatory

trading strategies and thereby enabled the HFT firms to exploit ordinary — that is, non-HFT —

investors.  (SAC ¶¶ 71-72).  It is to those Defendants that the Court now turns.

## C.  The Exchanges

The primary Defendants in this case — the Exchanges — are all self-regulatory

organizations ("SROs") within the meaning of the Exchange Act.  *See* 15 U.S.C. § 78c(a)(26)

(defining SRO).  (SAC ¶¶ 26-33).  They are registered with the SEC pursuant to Section 6(a) of

the Exchange Act, and they have developed and operate platforms on which an entity seeking to purchase a stock can be matched with an entity seeking to sell that same stock. *See* 15 U.S.C. § 78f; *id.* § 78c(a)(1). SROs are private entities that exercise regulatory authority delegated to them by the SEC, subject to "extensive" SEC regulation. *See Lanier*, 2015 WL 1914446, at *8; *see also DL Capital Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 95 (2d Cir. 2005) (explaining an SRO's regulatory authority). The Exchanges remain SROs even though they are now for-profit corporations, a status that the SEC authorized in 1998. *See* Regulation ATS, 63 Fed. Reg. at 70882-84; *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 243 (D.C. Cir. 2003) (discussing Regulation ATS). (SAC ¶ 290).

The Exchanges make commissions off the trades placed on their platforms, meaning that the number of orders that are executed on an Exchange has a significant bearing on that Exchange's revenue. (*See id.* ¶ 49). Accordingly, the SDNY Plaintiffs allege (and it is hard to dispute) that each Exchange has an incentive to attract as much trading activity as possible. (*See, e.g.*, *id.* ¶¶ 4, 139). The SDNY Plaintiffs argue that this incentive has led the Exchanges astray and that, in their zeal to attract trading activity, the Exchanges have rigged their markets in favor of the HFT firms, which, as noted, now make up the majority of trading in the U.S. stock market. (*Id.* ¶ 66). Three features of the Exchanges' operations are relevant here.[1]

The first feature involves the Exchanges' provision of "enhanced" or "proprietary" data feeds. These data feeds contain much of the same information that the Exchanges transmit to the

---

[1]     In their papers, the SDNY Plaintiffs discuss a fourth feature: the Exchanges' alleged use of the "maker/taker model" — through which an Exchange charges a fee to an entity that "takes" liquidity (*i.e.*, that buys a stock) and pays a rebate to an entity that "makes" liquidity (*i.e.*, that sells the stock). (SAC ¶¶ 49-51, 134-35). At oral argument, however, the SDNY Plaintiffs clarified that their claims are not based on the alleged use of the maker/taker model. (June 18, 2015 Tr. (Docket No. 46) 30). Accordingly, the Court deems the SDNY Plaintiffs to have abandoned any claims based on the maker/taker model and need not discuss the model further.

Processor for inclusion in the consolidated feed, although in some instances they also provide additional or more detailed information regarding trading activity on the exchanges. (*Id.* ¶ 126). In addition, the data in the proprietary feeds are transmitted directly from an Exchange to the proprietary feed's subscribers. (*Id.* ¶ 118). *See* Exchange Act Release No. 34-67857, 2012 WL 4044880, at *2 (Sept. 14, 2012). By regulation, the Exchanges are not permitted to transmit the information in the proprietary feed any earlier than they transmit the information to the Processor for integration into the consolidated feed. *See* Exchange Act Release No. 34-67857, 2012 WL 4044880, at *8 (requiring the Exchanges to take "reasonable steps to ensure . . . that . . . data relating to current best-priced quotations and trades through proprietary feeds [are released] no sooner than . . . data [sent] to the . . . Processor" for integration into the consolidated feed). But because the proprietary feed is transmitted directly from an exchange to a subscriber, and does not have to be integrated with information from other exchanges, it is typically delivered to subscribers before the same information is transmitted via the consolidated feed. (*Cf.* SAC ¶ 118). Applications to establish proprietary feeds are reviewed by the SEC, and the SEC has approved various such applications. *See, e.g.*, Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293 (Mar. 26, 2009). In fact, Plaintiffs do not appear to dispute that the proprietary feeds at issue in this case were approved by the SEC.

The second practice or feature at issue involves allowing high-frequency traders the option of installing their servers at, or extremely close to, the servers used to operate the Exchanges. (SAC ¶ 108). This practice, known as "co-location," has the effect of shaving fractions of a second off the time it takes for a trader's server to interact with the Exchange's servers. (*Id.* ¶ 108-10). As with the proprietary feeds, applications are reviewed by the SEC, and the SEC has found such applications consistent with the Exchange Act. *See* Exchange Act

Release No. 34-62961, 75 Fed. Reg. 59,299 (Sept. 27, 2010).  Again, Plaintiffs do not appear to dispute that the co-locations at issue in this case were approved by the SEC.

The third and final feature at issue in this case is the Exchanges' creation of "hundreds" of complex order types.  (SAC ¶ 142).  An order type is a "preprogrammed command[]" that "traders use to tell exchanges how to handle their bids and their offers to sell" stocks.  (*Id.* ¶ 136).  An example of a simple order type might be a command that tells an exchange to buy a stock at the prevailing market price, whatever it may be.  More complex order types require an exchange to do things to the order based on different scenarios.  (*See id.* ¶¶ 152-206 (discussing examples of complex order types)).  For example, the SDNY Plaintiffs describe "hide[-]and[-]light" orders, which allow traders to place orders that remain hidden — *i.e.*, they do not appear as bids or offers on the individual exchange — until a stock reaches a particular price, at which point the orders "light" and jump the queue of investors waiting to trade.  (*Id.* ¶¶ 152-56).  Unlike more traditional "limit" orders generally used by ordinary investors, which permit traders to buy or sell a stock below or above a particular price, but can lose their place in the order queue when the market shifts, the hide-and-light orders appear only when a stock reaches a particular price, thereby ensuring that the trader that places a hide-and-light order is always at the front of the order queue, enabling the trader to trade ahead of ordinary investors.  Plaintiffs contend that the Exchanges designed these complex order types, including the hide-and-light order types, in "backroom" negotiations with their best HFT clients and that they did so, not to promote the efficient operation of Exchanges, but rather to attract more orders.  (*Id.* ¶¶ 140, 148).

**D.  Barclays and the Barclays's Dark Pool**

Regulation NMS also contributed to the development of a series of alternative trading venues known as "dark pools."  In contrast to the "lit" Exchanges — *i.e.*, those that are required

by to SEC to publish the best bid and offer available via the consolidated feed — dark pools are not required to publish transaction information until after the transaction closes, hence the reason they are called "dark" pools.  (*Id.* ¶¶ 55-56).  In theory, dark pools make it easier for a trader to purchase or sell large quantities of stock without moving the market or otherwise alerting other traders to its plans.  (*Id.* ¶¶ 57, 60; Am. Compl. ¶ 19).  Regulation NMS permitted investors to bypass the Exchanges and execute trades in a dark pool when the dark pool offered a more favorable price.  (*Id.* ¶ 20).  The ability to compete with the Exchanges on price evidently created a significant opportunity for dark pools to increase trading volume and, as a result, revenue.

Barclays, like most major financial institutions, operates a dark pool, known as "Barclays LX."  (*Id.* ¶¶ 257, 259).  As with the Exchanges, Barclays's dark pool generates revenue based in large part on the volume of trading.  (SDNY Pls.' Mem. 13).  And as with the Exchanges, HFT firms provide a significant source of potential trading volume and, therefore, revenue for Barclays LX.  (Lead Pls.' Omnibus Mem. Law Opp'n Defs.' Mots. To Dismiss (14-MD-2589, Docket No. 26) ("SDNY Pls.' Mem.") 13; SAC ¶ 59).  Plaintiffs contend that, by providing proprietary feeds and co-location services at prices that only HFT firms could afford, Barclays set out to capture this trading volume by rigging its dark pool in favor of the HFT firms.  (*See, e.g.*, *id.* ¶ 275; SDNY Pls.' Mem. 14).  Apparently recognizing that ordinary investors might refuse to trade in a dark pool rigged in favor of "predatory" HFT firms, however, Barclays also marketed its dark pool to ordinary investors as a "safe" place for them to trade, with very little aggressive HFT trading.  (SAC ¶¶ 268-74; Am. Compl. ¶¶ 4, 32, 34-35).  Additionally, Barclays introduced a service called Liquidity Profiling, through which Barclays categorized firms using the dark pool as either aggressive, neutral, or passive, and gave each user the option to prevent entities with certain ratings from trading against it.  (SAC ¶ 270; Am. Compl., Ex. A at 8-10).

Thus, in theory, Liquidity Profiling allowed investors to avoid interacting with the most aggressive HFT firms in the dark pool.  (SAC ¶¶ 269-70; Am. Compl. ¶ 37).  The combined effect of these actions, according to Plaintiffs, was that Barclays misrepresented its dark pool as a safe place to trade, even as it operated the dark pool in a manner that permitted HFT firms to exploit Plaintiffs.

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  Significantly, however, the Supreme Court has made clear that a court should not accept *non*-factual matter or "conclusory statements" set forth in a complaint as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009).  Instead, a court must follow a two-step approach in assessing the sufficiency of a complaint in the face of a Rule 12(b)(6) motion.  *See id.* at 680-81.  First, the court must distinguish between facts, on the one hand, and "mere conclusory statements" or legal conclusions on the other hand; whereas the former are entitled to the presumption of truth, the latter are not and must be disregarded.  *See id.* at 678-79.  Second, the court must "consider the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief."  *Id.* at 681.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  A plaintiff must show "more than a sheer possibility that a defendant acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's

pleadings "have not nudged [his or her] claims across the line from conceivable to plausible,

[the] complaint must be dismissed." *Id.* at 570.

## THE SDNY PLAINTIFFS' CLAIMS AGAINST THE EXCHANGES

The SDNY Plaintiffs contend that the Exchanges violated the Exchange Act by engaging

in a manipulative scheme in which they enabled HFT firms to exploit ordinary investors trading

on the Exchanges in return for which the HFT firms directed their considerable trading activity

to the Exchanges.  (SDNY Pls.' Mem. 7-8).  The essence of the alleged scheme is as follows.

Motivated by the need to increase trading volume, and therefore revenue, and recognizing that

the HFT firms represented a large — and growing — share of total trading volume, the

Exchanges began "catering" their business operations to the needs of the HFT firms.  (*Id.* at 6-7).

Specifically, they began offering products, such as proprietary feeds and co-location, whose

primary value was to shave minute fractions of a second off the time it takes to receive and

respond to information from the Exchanges.  (*Id.* at 8-10).  Such services are valuable only to

HFT firms, as only they stand to profit from very small decreases in the time it takes to respond

to information regarding activity on the Exchanges; in any case, the Exchanges priced the

services at such "exorbitantly high" rates that they were worthwhile only for HFT firms and thus

"*de facto*" limited to those firms.  (*Id.* at 8-10, 34).  In addition, Plaintiffs contend that the

Exchanges worked with HFT firms to design order types that would allow the traders to further

exploit their speed advantage over ordinary investors.  (*Id.* at 10-11).  Making matters worse, the

Exchanges either did not disclose many of these order types to ordinary investors or marketed

them exclusively to HFT firms, so that the ordinary investors were unaware of their existence.

(*See id.* at 11-12).

Through these actions, the Exchanges enabled the HFT firms to amass a significant speed advantage over ordinary investors and to employ trading strategies that exploited that speed advantage to the detriment of ordinary investors.  The SAC details the various strategies that HFT firms used to exploit Plaintiffs as a result of this scheme.  The specifics of those strategies are not relevant here.  Instead, it suffices to say that each of the strategies depended on the HFT firms' ability to recognize Plaintiffs' trading behavior and, in a fraction of a second, react to that behavior in a manner that permitted the HFT firms to trade ahead of Plaintiffs, thereby making a small profit and causing Plaintiffs to trade at less favorable prices than they would have otherwise.  (SAC ¶¶ 237-251).  In enabling the HFT firms to execute those strategies, the SDNY Plaintiffs allege, the Exchanges' actions "rigged the[] markets in favor of HFT firms."  (SDNY Pls.' Mem. 7).

## A.  Subject-Matter Jurisdiction

As a threshold matter, the Court must briefly address the Exchanges' argument that the Court lacks subject-matter jurisdiction over the SDNY Plaintiff's claims.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998) (holding that the Court may not assume subject-matter jurisdiction and resolve a case on the merits).  The Exchanges contend that the Court lacks subject-matter jurisdiction because the Exchange Act creates a comprehensive regulatory scheme pursuant to which claims based on actions by the Exchanges must be presented first to the SEC, with any appeal of the SEC's decision going directly to the Court of Appeals.  (Exchanges' Mem. 17-24).  That argument, however, is unpersuasive.  The SDNY Plaintiffs allege that the Exchanges operated their business in a manner that ran afoul of the federal securities laws, violations of which are typically redressable in federal district court.  Put simply, the question of whether Section 10(b) reaches the Exchanges' conduct goes to the merits

of the SDNY Plaintiffs' claims and does not implicate the Court's authority to hear the case.  *Cf.*

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) (holding that the question of

"what conduct § 10(b) reaches" is a "merits question," not one that goes to subject-matter

jurisdiction).

The cases upon which the Exchanges rely do not call for a contrary conclusion.  First, the

Exchanges rely on cases involving questions of preemption.  (Reply Mem. Law Supp.

Exchanges' Mot. To Dismiss Second Consol. Am. Compl. Pursuant Fed. R. Civ. P.. 12(b)(1) and

12(b)(6) (14-MD-2589, Docket No. 28) ("Exchanges' Reply Mem.") 3 (citing, *e.g.*, *Lanier*, 2015

WL 1914446, at *10)).  The question of whether the "structure of the Exchange Act" displaces

claims under Section 10(b), however, is an issue of *preclusion*, not preemption, as it involves the

interaction of different provisions of federal law.  *See POM Wonderful LLC v. Coca-Cola Co.*,

134 S. Ct. 2228, 2236 (2014).  Second, the Exchanges cite cases in which a party was appealing

from a decision by the SEC.  (*See* Exchanges' Mem. 21-23).  In those cases, however, Congress

expressly vested subject-matter jurisdiction in the federal courts of appeals, thereby depriving the

district courts of authority to act.  (*See id.* (citing, *e.g.*, *Altman v. SEC*, 687 F.3d 44, 45-46 (2d

Cir. 2012) (per curiam))).  Here, there is no comparable provision.  Thus, in the final analysis,

whether or not the Exchanges' arguments have merit, they are better understood as arguments

about administrative exhaustion or primary jurisdiction insofar as they are premised on the

theory that the executive branch is more competent to address the claims at issue.  *See, e.g.*,

*Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (explaining that the

administrative exhaustion requirement "give[s] the administrative agency the opportunity to

investigate, mediate, and take remedial action" (internal quotation marks omitted) before court

intervention); *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (describing the

doctrine of primary jurisdiction and its role in "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties" (quoting *United States v. W. Pac. R.R.*, 352 U.S. 59, 63 (1956)). In either case, they do not implicate the Court's subject-matter jurisdiction, *see, e.g.*, *Fowlkes*, 790 F.3d at 385 ("[W]hether [the plaintiff] properly exhausted his claims . . . has no bearing on the subject matter jurisdiction of the District Court."); *S. New England Tel. Co.*, 624 F.3d at 136 ("[P]rimary jurisdiction, despite its name, is not related to the *subject matter jurisdiction* of the district court over the underlying action . . . ."), so the Court may proceed to consideration of the SDNY Plaintiffs' claims on the merits.[2]

## B. Absolute Immunity

Next, the Exchanges argue that, even if the Court has jurisdiction, Plaintiffs' claims are barred by the doctrine of absolute immunity. (*See* Exchanges' Mem. 24-36). It is well established "that an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011) (quoting *DL Capital Grp.*, 409 F.3d at 96). That is because the Exchanges "perform[] a variety of regulatory functions that would, in other circumstances, be performed by the SEC — an agency [that] is accorded sovereign immunity from all suits for money damages." *DL Capital Grp.*, 409 F.3d at 97. Thus, "in light of [the Exchanges'] special status and connection to the SEC," they

---

[2] The Second Circuit's decision in *DL Capital Group* reinforces the Court's conclusion that the Exchanges' argument does not implicate the Court's subject-matter jurisdiction. In that case, the defendant exchange moved to dismiss the complaint on the ground that the plaintiff had not exhausted its remedies before the SEC. *See* 409 F.3d at 96. Both the district court and the Court of Appeals, however, decided the case on other grounds — which they would not have had the luxury to do if the question of exhaustion implicated subject-matter jurisdiction.

are, "out of fairness[,] . . . accorded full immunity from suits for money damages" when taking action pursuant to this special status.  *Id.* (internal quotation marks omitted).

As in other contexts, absolute immunity provides an SRO with "protection not only from liability, but also from the burdens of litigation, including discovery, and should be 'resolved at the earliest possible stage in litigation.'"  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 448, 452 (S.D.N.Y. 2013) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), and citing other cases).  The party seeking that protection bears the burden of establishing its entitlement to absolute immunity.  *See, e.g.*, *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 104 (2d Cir. 2001).  Such immunity "is of a rare and exceptional character," *Standard Inv. Chartered*, 637 F.3d at 115 (internal quotation marks omitted), and must therefore be evaluated on a case-by-case basis, *see, e.g.*, *DL Capital Grp.*, 409 F.3d at 97, using a functional test that examines the "nature of the function performed," *Forrester v. White*, 484 U.S. 219, 229 (1988).  Specifically, an SRO "'is entitled to immunity from suit when it engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder.'"  *DL Capital Grp.*, 409 F.3d at 97 (quoting *D'Alessio*, 258 F.3d at 106).  Or put another way, "so long as the 'alleged misconduct falls within the scope of the quasi-governmental powers delegated to the [exchange],' absolute immunity attaches."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007) (quoting *D'Alessio*, 258 F.3d at 106).

Significantly, the motive or reasonableness of the actions in question is irrelevant to the analysis.  *See, e.g.*, *id.* at 95-96; *accord Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (holding that whether a government official is absolutely immune "turns on the nature of the act, rather than on the [official's] motive or intent").  Instead, "the decision to extend absolute immunity

16

depends 'upon the nature of the governmental function being performed.'"  *DL Capital Grp.*,
409 F.3d at 99 n.4 (quoting *D'Alessio*, 258 F.3d at 104-05).  Thus, the fact that the Exchanges in
this case are now for-profit corporations does not, by itself, deprive them of absolute immunity.
*See, e.g.*, *id.*; *cf. NYSE Specialists*, 503 F.3d at 91 & n.1 (holding that the defendant exchange
was entitled to absolute immunity even though it was "no longer a nonprofit corporation,
following a merger which commenced after the filing of [the] lawsuit").  For similar reasons, and
as the SDNY Plaintiffs conceded at oral argument (Tr. 33-34), it does not matter if an Exchange,
in performing a regulatory function, is *also* motivated by the desire for profit or some other
business purpose.  *Cf. Weissman v. Nat'l Ass'n of Sec. Dealers*, 500 F.3d 1293, 1298-99 (11th
Cir. 2007) (holding that an SRO is not protected by absolute immunity for actions that have no
regulatory dimension and relate solely to the SRO's business interests).  Instead, the sole
question is whether the alleged misconduct falls within the scope of the quasi-governmental
powers delegated to the Exchanges — in which case absolute immunity applies — or outside the
scope of those powers — in which case it does not.  (*See* Exchanges' Reply Mem. 7 ("[A]bsolute
immunity applies to SRO activities that are incident to their regulatory functions, but not to
*exclusively* non-regulatory functions.")).

     With those standards in mind, the Court turns to the three practices of the Exchanges that
the SDNY Plaintiffs challenge in this case: co-location services, the proprietary data feeds, and
complex order types.  (*See* SDNY Pls.' Mem. 7-11).  Whether absolute immunity applies to the
provision of co-location services is easily answered.  It does not.  Notably, although the
Exchanges frame absolute immunity as a dispositive defense with respect to all of the SDNY
Plaintiffs' claims (*see* Exchanges' Mem. 29 (stating that "the Exchanges' immunity for
proprietary feeds and co-location is dispositive"), their memorandum of law does not actually

seek to justify the application of immunity to the provision of co-location services, let alone support such a result.  (*See id.* at 26-29).  The Exchanges have thus abandoned any argument for absolute immunity based on their provision of co-location services.  And, even if they had not, it is hard to see how the provision of co-location services serves a regulatory function or differs from the provision of commercial products and services that courts have held not to be protected by absolute immunity in other cases.  *See, e.g.*, *Weissman*, 500 F.3d at 1298 (holding that an exchange was not absolutely immune for "tout[ing], market[ing], advertis[ing] and promot[ing]" a particular equity because doing so did not involve the "performance of regulatory, adjudicatory, or prosecutorial duties" for which the SRO stood "in the stead of the SEC"); *Facebook*, 986 F. Supp. 2d at 452 (denying absolute immunity with respect to an exchange's design of software and promotion of its ability to facilitate an initial public offering).  The Exchanges, therefore, are not immune from suit based on the provision of co-location services.

By contrast, the Exchanges are absolutely immune for their creation of complex order types.  As noted, the order types permitted by an Exchange define the ways in which traders can interact with that Exchange.  *See* Exchange Act Release No. 34-74032, 2015 WL 137640, at *2 ("Order types are the primary means by which market participants communicate their instructions for the handling of their orders to the exchange.").  By establishing a defined set of order types, the Exchanges police the ways in which users of an exchange are able to interact with each other.  *See id.*  In so doing, the order types establish a framework by which buyers of stocks are matched with sellers.  The creation of new order types — including complex ones — thus plainly "relates to the proper functioning of the regulatory system," for which the Exchanges enjoy absolute immunity.  *NYSE Specialists*, 503 F.3d at 96 (quoting *D'Alessio*, 258 F.3d at 106); *see also DL Capital Grp.*, 409 F.3d at 95 (stating that the "regulatory powers and

responsibilities" that Congress delegated to stock exchanges include the duty "to develop,

operate, and maintain" their markets, "to formulate regulatory policies and listing criteria" for

the markets, "and to enforce those policies and rules, subject to the approval of . . . the SEC").  It

is thus unsurprising that new or modified order types are among the Exchanges' rules that the

SEC reviews under Exchange Act Section 6(b), 15 U.S.C. § 78f(b), to ensure that they, among

other things, prevent "fraudulent and manipulative acts and practices."  *See, e.g.*, Exchange Act

Release No. 34-69419, 78 Fed. Reg. 24,449, 24,453 (Apr. 25, 2013); Exchange Act Release No.

34-63777, 76 Fed. Reg. 5630, 5634 (Feb. 1, 2011).

In arguing to the contrary, the SDNY Plaintiffs contend that the complex order types at

issue are "outside of [the Exchanges'] capacity as SROs" because they were created for business

purposes and at the request of the HFT firms.  (SDNY Pls.' Mem. 37-38).  Relatedly, they assert

that the complex order types are "products" and that the Exchanges do not have immunity for the

development of a product.  (Tr. 32).  These contentions, however, amount to little more than an

argument that the Exchanges should be denied absolute immunity because they acted with an

improper motive — whether it be to profit or to satisfy the HFT firms (and thereby, presumably,

profit).  But, as noted, motive is irrelevant to the absolute immunity question.  *See DL Capital

Grp.*, 409 F.3d at 98 ("[A]bsolute immunity spares the official any scrutiny of his [or her]

motives . . . ." (internal quotation marks omitted)).  Where — as is the case with the complex

order types at issue here — the act of creating a product has a regulatory dimension, an exchange

is immune from suit based on that product.

The final challenged feature of the Exchanges — their provision of proprietary data feeds

— is a closer call, but also falls within the scope of the quasi-governmental powers delegated to

the Exchanges.[3]  Significantly, the SDNY Plaintiffs effectively concede that the dissemination of

market data regarding transactions on the Exchanges through the *consolidated* feed is regulatory

in nature.  (SDNY Pls.' Mem. 33-34; *see also In re NYSE LLC*, Exchange Act Release No. 34-

67857, at *1 (Sept. 14, 2012) (describing the consolidated data as "form[ing] the heart of the

national market system" (internal quotation marks omitted))).  After all, disseminating data in

that manner was an integral part of Congress's and the SEC's efforts to create a national market

system.  Thus, the question is whether the "nature of the function performed" is materially

different when the Exchanges disseminate data through a proprietary data feed rather than the

consolidated feed.  *Forrester*, 484 U.S. at 229.  In the Court's view, the answer to that question is

no.  At bottom, Congress and the SEC have delegated to the Exchanges the task of disseminating

market data as part of a national market system.  In doing so through proprietary data feeds, the

Exchanges are performing that task no less than when they do so through the consolidated feed.

That is, the dissemination of market data through the propriety data feeds is "consistent with" the

quasi-governmental powers delegated to the Exchanges pursuant to the Exchange Act and SEC

regulations.  *DL Capital Grp.*, 409 F.3d at 97 (internal quotation marks omitted).  It follows that

the Exchanges are entitled to absolute immunity for the proprietary data feeds.

---

[3]     At points in their memorandum of law, the SDNY Plaintiffs appear to assert that they
were aggrieved by the Exchanges' marketing of the proprietary data feeds as opposed to the
feeds themselves.  (*See, e.g.*, SDNY Pls.' Mem. 33).  Nevertheless, the substance of their
memorandum makes clear that it is the proprietary feeds themselves, not the manner in which
those feeds are marketed, that form the basis of Plaintiffs' claims.  (*See, e.g.*, SAC ¶ 119
(contending that the proprietary "data feed products constitute manipulative devices under the
Exchange Act because . . . they either (1) allow HFT firms to gain access to public information
sooner than the investing public (and thereby trade on that information before it is publicly
disseminated); or (2) permit HFT firms to front-run the non-HFT investing public by gaining
access to pricing and other trading-related information based on what is in the queue versus what
is displayed").

In arguing otherwise, the SDNY Plaintiffs rely again on the alleged profit motives of the

Exchanges. (SDNY Pls.' Mem. 33). As discussed above, however, the immunity analysis turns

solely on the nature of the conduct at issue; motive is irrelevant. *See NYSE Specialists*, 503 F.3d

at 98 n.3; *DL Capital Grp.*, 409 F.3d at 98. The SDNY Plaintiffs also emphasize that the

proprietary data feeds are not mandated by the SEC and that their information is determined by

the market rather than the SEC. (SDNY Pls.' Mem. 33-34). But that does not render them

entirely non-regulatory in nature. The SEC has concluded that, although it could regulate the

content of proprietary data feeds, Congress wanted as much of the regulatory regime as possible

dictated by the market rather than regulatory fiat. *See* Exchange Act Release No. 34-59039, 73

Fed. Reg. 74,770, 74,771 (Dec. 9, 2008); *see also* Regulation NMS, 70 Fed. Reg. at 37,566-68.

There is no reason to conclude that the SEC's choice of regulatory paradigm — market-based

regulation rather than rulemaking — renders the dissemination of data by propriety data feed

exclusively non-regulatory. And it is not the case that an action must be *mandated* by the SEC in

order for it to be regulatory; otherwise, the absolute-immunity inquiry would turn, first and

foremost, on whether an action was pursuant to an SEC directive and not, as it does, simply on

the nature of the action in question. *See DL Capital Grp.*, 409 F.3d at 98; *Opulent Fund v.

Nasdaq Stock Mkt., Inc.*, No. C-07-3683 (RMW), 2007 WL 3010573, at *5 (N.D. Cal. Oct. 12,

2007) ("SEC approval of a rule imposing a duty on an SRO is not the *sine qua non* of SRO

immunity; engaging in regulatory conduct is.").[4] Finally, the fact that the high cost of the

---

[4]   The SDNY Plaintiffs also allege that the proprietary data feeds are different because they
contain information that is not in the consolidated feed. (SDNY Pls.' Mem. 34). Conclusory
assertions aside, however, the SDNY Plaintiffs' Complaints do not include any allegations with
respect to how the data provided through the proprietary data feeds are enhanced relative to the
consolidated feed data. (*See* SAC ¶¶ 118-31; SDNY Pls.' Mem. 33-35). And even if they did,
that the market influences the content of an individual proprietary data feed does not change the

proprietary data feeds renders them *de facto* exclusive to HFT firms is irrelevant.  That complaint goes to the manner in which the Exchanges' exercise their authority, not to the character of that authority itself, and the Second Circuit has made clear that the "manner" in which an SRO exercises its authority is not relevant to whether that exercise of authority is regulatory.  *DL Capital Grp.*, 409 F.3d at 98; *see NYSE Specialists*, 503 F.3d at 98 (observing that the "propriety of [an SRO's] actions or inactions" has nothing to do whether those actions are protected from suit by absolute immunity).

The cases cited by the SDNY Plaintiffs do not require a contrary conclusion.  In each of those cases, the Court concluded that the relevant exchange's conduct was entirely non-regulatory; that is, the action in question had *only* a business purposes and was not taken pursuant to any delegated or quasi-governmental authority.  *See Weissman*, 500 F.3d at 1299 (concluding that there was "no quasi-governmental function served by . . . advertisements" promoting a particular equity traded on an exchange); *Facebook*, 986 F. Supp. 2d at 452 (concluding that NASDAQ was not immune for a negligence claim based on the malfunction of its software because "[t]here are no immunized or statutorily delegated government powers to design, . . . to . . . test . . . or to fix computer software when it is malfunctioning"); *Opulent Fund*, 2007 WL 3010573, at *5 (holding that NASDAQ is not immune for creating an index of stocks and promoting the index in order facilitate the development of derivative trading on its exchange).  By contrast, the dissemination of data regarding trades — whether through the proprietary data feeds or the consolidated feed — is not exclusively non-regulatory in nature.

---

fact that the feed constitutes the dissemination of market data and, like the consolidated feed, is therefore consistent with the quasi-governmental powers delegated to the Exchanges.

In sum, the Court concludes that the Exchanges are absolutely immune from suit based on their creation of complex order types and provision of proprietary data feeds, both of which fall within the scope of the quasi-governmental powers delegated to the Exchanges.  That conclusion is reinforced by the fact that the SEC has ample authority and ability to regulate those activities and address any improprieties by the Exchanges; the Second Circuit has instructed that a court evaluating a claim of absolute immunity should "consider 'whether there exist alternatives to damage suits against the [the potentially immune entity] as a means of redressing wrongful conduct' if absolute immunity applies."  *NYSE Specialists*, 503 F.3d at 101 (quoting *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir. 1986)).  Here, as in *NYSE Specialists*, "[t]he alternatives [to a suit for damages] are manifold," with the principal alternative seeking to invoke the SEC's "formidable oversight power to supervise, investigate, and discipline the [Exchanges] for any possible wrongdoing or regulatory missteps.'"  *Id.*  The upshot — that the SDNY Plaintiffs may not proceed with their claims with respect to the complex order types and proprietary data feeds — "'may be harsh,' but Congress nevertheless saw fit to delegate to SROs certain regulatory powers for which they 'enjoy freedom from civil liability when they act[] in their regulatory capacity,' even where the SROs 'act in a capricious, even tartuffian manner which causes enormous damage.'"  *Facebook*, 986 F. Supp. 2d at 459 (quoting *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1215 (9th Cir. 1998)) (internal alterations omitted).[5]

---

[5]     In their memorandum, the SDNY Plaintiffs argue that the Court should authorize limited discovery before granting the Exchanges absolute immunity.  (SDNY Pls.' Mem. 44-45).  As noted, however, "SRO immunity provides protection not only from liability, but also from the burdens of litigation, *including discovery*, and should be 'resolved at the earliest possible stage in litigation.'"  *Facebook*, 986 F. Supp. 2d at 448 (emphasis added) (quoting *Hunter*, 502 U.S. at 227 and citing cases); *see also, e.g.*, *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (noting that

**C.  The Sufficiency of the SDNY Plaintiffs' Complaints**

Even if the Exchanges were not absolutely immune from suit for much of the conduct at issue in these cases, the SDNY Plaintiffs' Complaints would be subject to dismissal for failure to state a claim.  As noted, the Complaints plead two sets of claims: one set of claims under Section 10(b) of the Exchange Act and Rule 10b-5, which make it unlawful "[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of . . . rules and regulations" promulgated by the SEC, 15 U.S.C. § 78j(b); and a second set of claims under Section 6(b) of the Exchange Act, which requires the Exchanges to adopt rules and regulations that, among other things, "prevent fraudulent and manipulative acts and practices" and to abide by those rules and regulations, 15 U.S.C. § 78f(b). The Court will address each set of claims in turn.

**1.  Section 10(b) and Rule 10b-5**

First, the SNDY Plaintiffs bring a manipulative-scheme claim under Section 10(b) and Rule 10b-5(a) and (c).  (SDNY Pls.' Mem. 48-61).  As noted, Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, — F.3d —, No. 14-CV-199, 2015 WL 4491319, at *6 (2d Cir. July 24, 2015) (quoting 15 U.S.C. § 78j(b)).  To state a manipulative-scheme claim, a plaintiff must allege "(1) manipulative acts; (2) damage

---

absolute immunity "give[s] government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such *pretrial* matters as discovery" (internal quotation marks omitted)).  In any case, the SDNY Plaintiffs fail to identify any discovery that would be material to the question of whether the conduct at issue is regulatory in nature.

(3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007); *see also Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 22 (2d Cir. 2013) (same).   Because they sound in fraud, manipulative-scheme claims are subject to the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure, which require a complaint to "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Loreley Fin. No. 3 Ltd. v. Wells Fargo Sec., LLC*, — F.3d —, No. 13-1476-CV, 2015 WL 4492258, at *8 (2d Cir. July 24, 2015).   Additionally — and significantly for purposes of this case — manipulative-scheme claims can be based only on primary violations of the Exchange Act; there is no liability under the Exchange Act for aiding and abetting a manipulative scheme.  *See Fezzani*, 716 F.3d at 25; *see also Cent. Bank of Denver N.A. v. First Interstate Bank of Denver N.A.*, 511 U.S. 164, 191 (1994).

In light of those requirements, the SDNY Plaintiffs' Section 10(b) claims fail as a matter of law for at least two reasons.[6]  First, at least to the extent that the SDNY Plaintiffs premise their claims on the provision of co-location services and proprietary data feeds, they fail to allege any manipulative acts on the part of the Exchanges.  As the Supreme Court has explained, manipulation is "virtually a term of art when used in connection with securities markets." *Santa*

---

[6]      The Exchanges advance several other colorable arguments for dismissal of the SDNY Plaintiffs' claims, including that they fail to adequately allege statutory standing, loss causation, and scienter.  (Exchanges' Mem. 38-39, 47-49).  The Court need not, and does not, reach those issues.

*Fe Indus. v. Green*, 430 U.S. 462, 476 (1977) (internal quotation marks omitted).  It "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  *Id.*  Manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."  *ATSI*, 493 F.3d at 100 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)); *see also, e.g.*, *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure.").  A manipulative act is, therefore, any act — as opposed to a statement — that has such an "artificial" effect on the price of a security.  *See ATSI*, 493 F.3d at 100.  In determining what constitutes an "artificial[]" effect on the price of a security, courts generally ask whether the price is the result of the "natural interplay of supply and demand," or instead represents a "false pricing signal to the market."  *Id.* (internal quotation marks omitted).

The provision of co-location services and proprietary data feeds does not qualify as manipulative under these definitions.  In particular, the SDNY Plaintiffs fail to allege that the Exchanges misrepresented or failed to disclose material information regarding either the proprietary data feeds or co-location services.  To the contrary, as another Court within this District recently observed, the Exchanges did not conceal the availability of proprietary data feeds and co-location services, and both were publicly approved by the SEC.  *See Lanier*, 2015 WL 1914446, at *9 ("The SEC has also approved the SROs' use of proprietary feeds . . . ." (citing Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293, 13,294 (Mar. 26, 2009)); *id.* ("[T]he SEC regulates co-location services, which it views as a 'material aspect of the operation of the facilities of an exchange.'" (quoting Exchange Act Release No. 34-61358, 75 Fed. Reg.

3594, 3610 & n. 76 (Jan. 21, 2010))); *see also* Exchange Act Release No. 34-62961, 75 Fed. Reg. 59,299, 59,299-300 (finding an exchange's provision of co-location services "consistent with the requirements of the Act and the rules and regulations thereunder applicable to a national securities exchange"). (Exchanges' Mem. 11 (collecting instances in which the SEC has approved co-location services)). At bottom, the SDNY Plaintiffs' theory of manipulation is that the proprietary data fees and co-location services gave traders who paid a premium the ability to access (and act on) data more quickly than other traders. The SDNY Plaintiffs, however, fail to explain how merely enabling a party to react more quickly to information can constitute a manipulative act, at least where the services at issue are publicly known and available to any customer willing to pay. *See Santa Fe Indus.*, 430 U.S. at 477 ("[N]ondisclosure is usually essential to the success of a manipulative scheme.").

Second, and more broadly, the SDNY Plaintiffs fail to allege primary violations by the Exchanges themselves. Instead, the most that the Complaints can be said to allege is that the Exchanges aided and abetted the HFT firms' manipulation of the market price. It is well established, however, that Section 10(b)'s "proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Cent. Bank of Denver*, 511 U.S. at 177. The SDNY Plaintiffs do point to an extensive list of actions by the Exchanges that they contend constitute manipulative acts on which primary liability may be premised. (SDNY Pls.' Mem. 52-54). In each instance, however, the Exchange's actions merely enabled an HFT firm to execute a transaction, and it was the transaction itself that caused the allegedly artificial effect on the market. That is, to the extent that the SDNY Plaintiffs allege an artificial effect on the market, that effect was caused by the HFT firms' trades themselves, not by the Exchanges' provision of co-location services, proprietary data feeds, and complex order types to the HFT

27

firms.  Put simply, without the trades, there would be no effect on the market at all.  It follows

that the SDNY Plaintiffs' manipulative-scheme claim against the Exchanges fails as a matter of

law and must be dismissed.  *See, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552

U.S. 148, 161 (2008) (finding that Plaintiff had alleged only that the defendant aided and abetted

a securities violation where it was a third party that effected the fraudulent transactions and

"nothing [the defendant] did made it necessary or inevitable for [the third party] to record the

transactions as it did"); *Fezzani*, 716 F.3d at 25 ("[K]nowing and substantial assistance in . . .

facilitating the [securities] fraud . . . do[es] not meet the standards for private damage actions

under Section 10(b).").

## 2.  Section 6(b)

The SDNY Plaintiffs' claims under Section 6(b) of the Exchange Act fail as a matter of

law for a different reason: In 1975, Congress comprehensively amended Section 6(b).  *See* 15

U.S.C. § 78k-1; Pub. L. No. 94-29, § 7, 89 Stat. 111 (1975).  Since then, every Court to have

applied the amended provision has concluded that it does not provide a private right of action.

*See, e.g.*, *Spicer v. Chi. Bd. of Options Exch., Inc.*, 977 F.2d 255, 258-66 & n.2 (7th Cir. 1992)

(citing cases); *see also Mkt. St. Ltd. Partners v. Englander Capital Corp.*, No. 92-CV-7434

(LMM), 1993 WL 212817, at *12 (S.D.N.Y. June 14, 1993); *Kakar v. Chicago Bd. Options

Exch., Inc.*, 681 F. Supp. 1039, 1043 (S.D.N.Y. 1988); *Brawer v. Options Clearing Corp.*, 633 F.

Supp. 1254, 1258-62 (S.D.N.Y. 1986).  *But see Rich v. N.Y. Stock Exch., Inc.*, 509 F. Supp. 87,

89 (S.D.N.Y. 1981) (holding that there was a private right of action under the pre-1975 version

of the statute and stating, in dictum, that Congress's silence in enacting the amendments "must

be viewed as at least an approving expectation" that the implied right recognized in earlier cases

persists).  It is true, as the SDNY Plaintiffs note (SDNY Pls.' Mem. 62-64), that in *Baird v.*

*Franklin*, 141 F.2d 238 (2d Cir. 1944), the Second Circuit held that there is a private right of

action under Section 6(b) of the Exchange Act.  Substantially for the reasons stated in Judge

Stanton's thorough and well-reasoned analysis of the issue in *Brawer*, however, the Court agrees

with the post-1975 consensus and concludes that *Baird* does not apply to the current version of

the statute.  Put simply, the 1975 Amendments changed Section 6(b) and other provisions of the

Exchange Act beyond recognition, establishing a comprehensive scheme of "remedial measures

with enforcement vested in the SEC."  *Brawer*, 633 F. Supp. at 1260; *see also Feins v. Am. Stock

Exch., Inc.*, 81 F.3d 1215, 1222 (2d Cir. 1996) (observing that the 1975 Amendments, "and the

reasoning behind them, do not suggest Congressional intent to use private parties to enforce the

statute through private causes of action.  Rather, to effectuate its purpose, Congress sought to

rely on the expanded oversight and enforcement powers of administrative agencies such as the

SEC.").  Accordingly, the SDNY Plaintiffs' claims under Section 6(b) must be dismissed.

### PLAINTFFS' CLAIMS AGAINST BARCLAYS

The Court turns then to Plaintiffs' claims against Barclays.  The SDNY Plaintiffs bring

claims against Barclays, as they did against the Exchanges, under Section 10(b) of the Exchange

Act and SEC Rule 10b-5; Great Pacific brings claims under California State law.  Although the

statutory regimes are distinct, and for that reason must be considered separately, the claims are

based largely on the same actions by Barclays and, ultimately, fail for much the same reason:

Plaintiffs fail to identify any manipulative acts on which they reasonably relied.

### A.  The SDNY Plaintiffs' Claims Against Barclays

The SDNY Plaintiffs contend that Barclays perpetrated a manipulative or fraudulent

scheme to exploit ordinary investors trading in its dark pool.  (SDNY Pls.' Mem. 68-69).  The

alleged scheme consisted of two broad components.  First, Barclays allegedly disclosed to HFT

firms important, otherwise non-public information regarding transactions in the dark pool.  For example, it provided at least some HFT firms with the "logic" of the servers operating the dark pool, which enabled those firms to refine their aggressive trading strategies.  (SAC ¶ 278; *see also* Am. Compl. ¶ 62).  Second, Barclays either failed to establish or actively undermined various protections for ordinary investors using its dark pool.  For example, Barclays allegedly overrode its Liquidity Profiling product — so that certain HFT firms would appear less aggressive and, therefore, would not be blocked by investors that sought to block aggressive firms from trading against them in the dark pool.  (SDNY Pls.' Mem. 14; SAC ¶ 277).  Similarly, the SDNY Plaintiffs allege that Barclays provided services — including co-location[7] — that could be used effectively only by HFT firms.  (SDNY Pls.' Mem. 71; SAC ¶ 278).  Despite taking those actions to benefit the HFT firms — thereby enabling them to exploit ordinary investors — Barclays nevertheless represented that its dark pool was safe and that the SDNY Plaintiffs were not at risk of being exploited by HFT firms.  (*Id.* ¶¶ 269-74).  As a result of these actions, the SDNY Plaintiffs allegedly traded on worse terms in the dark pool than they would have in a "fair and unmanipulated market."  (SDNY Pls.' Mem. 14; SAC ¶ 279).

These allegations fail to state a claim for at least two independent reasons.  First, as they did with respect to the Exchanges, the SNDY Plaintiffs fail to adequately plead that Barclays committed any manipulative acts.  As noted, a manipulative act is one that sends "a false pricing signal to the market" and therefore does not reflect the "natural interplay of supply and demand." *ATSI*, 493 F.3d at 100; *see Ernst & Ernst*, 425 U.S. at 199 (observing that the term

---

[7]      In the SAC and their memorandum, the SDNY Plaintiffs refer to this service as "cross-connection" rather than co-location (*see* SAC ¶ 113), apparently prompted by the New York Attorney General's use of that term.  *See People ex rel. Schneiderman* v. *Barclays Capital*, *Inc.*, Index No. 451391/2014, Compl. ¶ 13 (N.Y. Sup. Ct. June 25, 2014).  For consistency, the Court will use the term co-location, as that is the term used above in reference to the Exchanges.

"'manipulative' . . . connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities"). The SDNY Plaintiffs' do not allege any actions by Barclays that meet that definition. For example, one of the SDNY Plaintiffs' principal allegations is that Barclays overrode the Liquidity Profiling assessments of certain HFT firms. (SDNY Pls.' Mem. 14; SAC ¶ 277). But the SDNY Plaintiffs do not explain how such overrides *themselves* could have affected the price at which securities traded in the dark pool. The same goes for the allegations regarding co-location and information regarding the logic of the servers operating the dark pools. Although these actions may have made it easier for HFT firms to trade ahead of ordinary investors, the SDNY Plaintiffs do not explain how the actions themselves could have affected, much less *artificially* affected, the prices at which securities traded in the dark pool. *See Stoneridge*, 552 U.S. at 161.

Once again, at most, the SDNY Plaintiffs' allegations amount to the contention that Barclays aided and abetted the HFT firms by creating the conditions through which the HFT firms affected the prices of securities in the dark pool. (*See, e.g.*, SDNY Pls.' Mem. 14 ("Barclays provided HFT firms with certain benefits and information . . . thereby *allowing* the HFT firms to effectively engage in predatory trading." (emphasis added)). But, as noted in the Court's discussion of the SDNY Plaintiffs' claims against the Exchanges, Section 10(b) and Rule 10b-5 create liability only for primary violations of those provisions; there is no liability for aiding and abetting another's violation. *See Fezzani*, 716 F.3d at 24-25. Simply creating the background market conditions is therefore insufficient to state a claim under Section 10(b) or Rule 10b-5. *See Stoneridge*, 552 U.S. at 160-62; *Fezzani*, 716 F.3d at 23-24.

Second, and in any event, the SDNY Plaintiffs' claims against Barclays fail because they do not allege reasonable reliance. As an initial matter, the SDNY Plaintiffs cannot invoke either

of the presumptions of reliance that have been recognized by the Supreme Court.[8]  The first

presumption, the fraud-on-the-market presumption, allows courts to presume reliance on public

statements because, it is assumed, the information in those statements is reflected in the price at

which a stock affected by those statements trades, and investors are presumed to rely on the

integrity of that price when deciding to trade.  *See Halliburton Co. v. Erica P. John Fund, Inc.*,

134 S. Ct. 2398, 2408 (2014); *Stoneridge*, 552 U.S. at 159.  The SDNY Plaintiffs, however, do

not point to any statements by Barclays that could have affected the price at which they *decided*

to trade.  After all, as discussed, they allege that the prices in the dark pools were affected by the

HFT firms' acts between the time the SDNY Plaintiffs decided to place trades and when those

trades were completed.  (SAC ¶¶ 248-56).  As they do not allege that any misinformation was

reflected in the price at which they decided to trade, much less that such misinformation came

from Barclays, the SDNY Plaintiffs cannot rely on the fraud-on-the-market presumption.

Nor can the SDNY Plaintiffs rely on *Affiliated Ute Citizens of Utah v. United States*, 406

U.S. 128 (1972), which held that "if there is an omission of a material fact by one with a duty to

disclose, the investor to whom the duty was owed need not provide specific proof of reliance,"

*Stoneridge*, 552 U.S. at 159 (citing *Affiliated Ute*, 406 U.S. at 153-54).  For one thing, it is not

even clear that the *Affiliated Ute* presumption applies in a manipulation case.  *See Levitt v. J.P.*

*Morgan Sec. Inc.*, 710 F.3d 454, 468 n.9 (2d Cir. 2013).  Assuming it does, however, the

presumption is not available where a plaintiff's theory is based entirely, or even primarily, on

misrepresentations as opposed to omissions.  *See, e.g.*, *Starr ex rel. Estate of Sampson v.*

*Georgeson Shareholder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005); *see also, e.g.*, *Joseph v.*

---

[8]     Indeed, the SDNY Plaintiffs all but conceded as much at oral argument.  (*See* Tr. 61 ("I
think this presumption is something different [than the presumptions recognized by the Supreme
Court] . . . .  [I]t is more a presumption of reliance on the integrity of markets operated fairly.")).

*Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) ("*Affiliated Ute*'s holding is limited to omissions as opposed to affirmative misrepresentations."); *Burke v. Jacoby*, 981 F.2d 1372, 1378-79 (2d Cir. 1992) (noting the distinction between a misrepresentation theory, which requires that the plaintiff "demonstrate that he or she relied on the misrepresentation" and an omission theory, for which "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of th[e] decision" (internal quotation marks omitted)).   Thus, to rely on the *Affiliated Ute* presumption, the SDNY Plaintiffs must, at a minimum, show that their claims are based primarily on Barclays's omissions of material information rather than misrepresentations.

They fail to do so, as their theory of liability is based primarily, if not entirely, on Barclays's alleged misrepresentations, with any omissions playing only a minor role in exacerbating the misrepresentations' effect.   After all, the gravamen of the SDNY Plaintiffs' claims is that Barclays promoted its dark pool as a safe place to trade when, in fact, it was not. To that end, the SAC contains many allegations about how Barclays misrepresented this fact through false or inaccurate statements made to assuage investors regarding the threat of predatory HFT trading.   (*See, e.g.*, SAC ¶¶ 269-71, 276-78).   Notably, even the SDNY Plaintiffs' memorandum of law asserts that the *Affiliated Ute* presumption is available because "Barclays did nothing to dispel the known public perception (which it falsely *promoted*) that its dark pool was fair and even."   (SDNY Pls.' Mem. 72 n.58 (emphasis added); *see also* SDNY Pls.' Mem. 73 (stating that the SAC's "allegations . . . are premised on [Barclays's] fraudulent scheme as well as fraudulent misrepresentations.   The misrepresentations demonstrate that there was no disclosure of Barclays' scheme"); *id.* at 76 (describing how Barclays's "conduct was contrary to the natural and justified expectations of the public — expectations that Barclays itself

fostered")).  If a misrepresentation claim could be reframed as an omission claim merely by

alleging that a defendant "did nothing to dispel" its own misrepresentation, then the limitation of

the *Affiliated Ute* presumption to omissions alone would be meaningless indeed.

Perhaps recognizing the weakness of their claims about the applicability of the fraud-on-

the-market and *Affiliated Ute* presumptions, the SDNY Plaintiffs indicated at oral argument that

they were really inviting the Court to apply a novel presumption of reliance based on the fairness

and integrity of the market.  (Tr. 57-58, 61).  In support of doing so, the SDNY Plaintiffs point to

a footnote in the Second Circuit's decision in *Fezzani*, which observes — in plain *dictum* — that

"[t]here may . . . be some merit to a modified presumption of reliance in market manipulation

cases" where the plaintiff alleges that it relied on the price as "being set by an active, arms-length

market."  *Fezzani*, 716 F.3d at 21 n.2.  The Court declines the SDNY Plaintiffs' invitation.  For

one thing, it was not until oral argument that the SDNY Plaintiffs clarified that they were

invoking this novel presumption of reliance, rather than the two presumptions discussed in their

papers.  *See United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) ("Normally, we will not

consider arguments raised for the first time in a reply brief, let alone at or after oral argument."

(internal quotation marks omitted)).  In addition, an integrity-of-the-market presumption, as the

SDNY Plaintiffs appear to conceive of it, would effectively excuse a plaintiff from pleading or

proving reliance for *any* market-manipulation claim simply by asserting that the actions at issue

somehow affected the fairness of the market or the extent to which the transaction price was the

product of an "arms-length market."  In doing so, it would all but eliminate the reliance

requirement for a market manipulation claim against any entity involved in the operation of a

market for securities, a result that would be inconsistent with the Second Circuit's repeated

reiteration of the reliance requirement in market-manipulation cases.  *See, e.g.*, *Wilson*, 671 F.3d

at 129; *ATSI*, 493 F.3d at 101; *see also In re UBS Auction Rate Sec. Litig.*, No. 08-CV-2967

(LMM), 2010 WL 2541166, at *28 n.19 (S.D.N.Y. June 10, 2010) (declining to recognize a

"novel 'integrity of the market' presumption" and noting that that plaintiffs had "not pointed to

any support in existing case law or statute which suggests it is a valid theory upon which

Plaintiffs can obtain a presumption of reliance"). In short, the SDNY Plaintiffs are not entitled to

any presumption of reliance. Given that, and given that they do not allege actual reliance, their

claims against Barclays must be dismissed for failure to state a claim.

**B. Great Pacific's Claims Against Barclays**

That leaves Great Pacific's claims under California state law for (1) the common law tort

of concealment, (2) violation of California's False Advertising Law, Cal. Bus. & Prof. Code

§ 17500 ("FAL"), and (3) violation of California's Unfair Competition Law, Cal. Bus. & Prof.

Code § 17200 ("UCL"). (Pl.'s Mem. Law Opp'n Barclays' Mot. To Dismiss Am. Compl. (14-

MD-2589, Docket No. 27) ("Great Pacific Mem.") 8-25)). Great Pacific alleges that Barclays

committed the tort of concealment and violated the FAL and UCL by failing to disclose: (1) the

amount of aggressive trading in its dark pool; (2) that it was actively recruiting HFT firms to

trade in its dark pool; and (3) the significant limitations of Liquidity Profiling. (*Id.* at 10-15).

The Court will address those allegations in connection with Great Pacific's concealment claim

and then turn to its claims under the FAL and UCL.

**1. The Tort of Concealment**

A concealment claim under California law requires that

(1) the defendant must have concealed or suppressed a material fact, (2) the
defendant must have been under a duty to disclose the fact to the plaintiff, (3) the
defendant must have intentionally concealed or suppressed the fact with the intent
to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and
would not have acted as he did if he had known of the concealed or suppressed

fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 96 (2001); *accord In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1177 (S.D. Cal. 2010).  Even where the parties do not otherwise have a fiduciary relationship, a commercial transaction between them can create a duty to disclose material facts related to representations made in conjunction with that transaction.  *See Warner Constr. Corp. v. City of L.A.*, 466 P.2d 996, 1001 (Cal. 1970); *Hoffman v. 162 N. Wolfe LLC*, 175 Cal. Rptr. 3d 820, 828 n.11 (Cal. Ct. App. 6th Dist. 2014) (similar).  Thus, "where a party [to a transaction] volunteers information, . . . the telling of a half-truth calculated to deceive is fraud," even if the statement is not literally false.  *See Barnes & Noble, Inc. v. LSI Corp.*, 849 F. Supp. 2d 925, 936 (N.D. Cal. 2012) (internal quotation marks omitted); *Hoffman*, 175 Cal. Rptr. 3d at 831.

Significantly, the requirement that a plaintiff prove that he "would not have acted as he did if he had known of the concealed or suppressed fact," *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th at 96, requires a plaintiff to plead and prove reliance.  *See, e.g.*, *Murphy v. BDO Seidman, LLP*, 6 Cal. Rptr. 3d 770, 781 (Cal. Ct. App. 2d Dist. 2003) (dismissing common law fraud claims as to the plaintiffs who had failed to allege reliance); *see also Rozay's Transfer v. Local Freight Drivers, Local 208*, 850 F.2d 1321, 1328-1331 (9th Cir. 1988) (discussing reasonable reliance as an element of a claim for fraudulent concealment); *In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 190 (S.D.N.Y. 2012) ("[U]nder California law, a plaintiff must plead that he or she actually relied on the alleged misrepresentation." (internal quotation marks and

alteration omitted)).[9]  Additionally, because concealment claims sound in fraud, they are subject

to the heightened pleading requirements of Rule 9(b).  *See, e.g.*, *Grant v. Aurora Loan Servs.,*

*Inc.*, 736 F. Supp. 2d 1257, 1273 (C.D. Cal. 2010); *cf., e.g.*, *Ellington Credit Fund, Ltd. v. Select*

*Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 201 (S.D.N.Y. 2011) (applying Rule 9(b) to a

claim of fraudulent concealment under New York law).  Where "a claim rests on allegations of

fraudulent omission, however, the Rule 9(b) standard is somewhat relaxed because a plaintiff

cannot plead either the specific time of [an] omission or the place, as he is not alleging an act,

but a failure to act."  *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D.

Cal. 2013) (internal quotation marks omitted).

     As noted, Great Pacific's concealment claim is premised the alleged failure of Barclays to

disclose: (1) the amount of aggressive trading in its dark pool; (2) that it was actively recruiting

HFT firms to trade in its dark pool; and (3) the significant limitations of Liquidity Profiling.

(Great Pacific Mem. 10-15).  The Court will address each allegation in turn.

        **a.**      **The Amount of Aggressive Trading in the Dark Pool**

     Great Pacific points to two ways in which Barclays allegedly concealed the amount of

aggressive trading in its dark pool.  First, it contends that Barclays distributed misleading

promotional materials, including a chart that depicted the largest traders in the dark pool and,

according to Great Pacific, insinuated that aggressive trading represented only a small percentage

of total activity in the dark pool; Great Pacific also asserts that a similar chart was provided to

members of the putative class and that some versions of the chart omitted "Tradebot" — "a

---

[9]     Great Pacific cites one case from more than fifty years ago for the proposition that
reliance is not an element of a concealment claim.  (Great Pacific Mem. 17 (citing *Sanfran Co. v.*
*Rees Blow Pipe Mfg. Co.*, 335 P.2d 995, 1002 (Cal Dist. Ct. App. 1st Dist. 1959)).  That case,
however, appears to be an outlier and, as noted, reliance is always listed as an element of a claim
for concealment.  *See, e.g.*, *Lovejoy*, 92 Cal. App. 4th at 96.

particularly 'toxic' HFT" firm.  (Great Pacific Mem. 10; Am. Compl. ¶¶ 44-49).  Great Pacific's theory of concealment with respect to these charts, however, is not entirely clear.  To the extent it argues that the omission of Tradebot constituted concealment, the claim must fail because Great Pacific fails to allege that it ever received — much less relied upon — that version of the chart. (*See* Great Pacific Mem. 11 ("[A]ll the references to the misleading chart from which Barclays concealed the presence of Tradebot are to the chart included in the 'Liquidity Profiling – Protecting You in the Dark' pitchbook that, according to the NYAG, was disseminated by Barclays during the Class Period to *other* members of the Class." (emphasis added))).  Great Pacific alleges that even the chart including Tradebot "le[ft] the clear message that very little trading in the pool was 'aggressive.'"  (Am. Compl. ¶ 40).  But while Great Pacific describes the chart in some detail — *e.g.*, explaining how it used colors and shapes to illustrate the difference between passive and aggressive trading — it does not provide *any* explanation of how the chart was misleading or why it did not accurately illustrate the actual nature of trading in Barclays's dark pool.  (*Id.*; *see* Great Pacific Mem. 9-12 (failing to explain why the chart containing Tradebot was misleading or contain a material omission)).  Absent any explanation of why the chart was misleading, it plainly cannot serve as the basis for a concealment claim.

Second, Great Pacific argues that Barclays failed to disclose the true level of aggressive trading in the dark pool, stating — in the same promotional materials (Am. Compl. ¶ 50) — that "aggressive" trading was only 14% of total trading in 2012.  (*Id.*; Great Pacific Mem. 10-12).  Great Pacific also contends that Barclays stated elsewhere — although it does say when or where or in what context — that only 9% and 6% of trading in its dark pool was aggressive in 2013 and 2014, respectively.  (Am. Compl. ¶ 50; Great Pacific Mem. 10-11).  Great Pacific contends that these numbers were inaccurate, relying in part on a metric of aggressive trading called

"Execution Aggressiveness," which was used by the New York Attorney General in a complaint against Barclays and allegedly showed that roughly 25 to 30% of trading in the dark pool was aggressive. (Am. Compl. ¶ 51). The problem with that argument, however, is that the term "aggressive" is, to a large degree, subjective; that is, Great Pacific makes no claim that there is a commonly accepted, let alone inherent or definitive, definition of the term. Thus, the mere fact that the New York Attorney General uses, and Great Pacific favors, a different metric of aggressive trading does not in itself render Barclays's statements about the composition of its dark pool false or misleading. Nor did Barclays, when it represented how much trading in its dark pool was aggressive, have an obligation to disclose that others might have a different opinion of what the term aggressive means. *See, e.g.*, *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (holding that a defendant "who sets out his own opinion . . . does not omit a material fact by failing to note that others may have different opinions").

Additionally, Great Pacific contends that Barclays's representations were false by alleging that Barclays itself disclosed to an HFT firm that aggressive trading constituted 25% of trading in its dark pool. (Am. Compl. ¶ 52). That argument, however, relies on a comparison of apples to oranges. The 14% figure provided by Barclays and supposedly relied upon by Great Pacific encompassed all trading in the dark pool. (*Id.* ¶¶ 41, 50). The 25% figure, by contrast, corresponded only to the orders *taking* liquidity. (*Id.* ¶ 52). That is, the 25% figure described only a subset of the orders in the dark pool. Great Pacific does not point to any information suggesting that the subset is representative of all trades in the dark pool or that the subset is *more* aggressive than the other trades in the dark pool. It follows that the difference between these numbers does not support the conclusion that Barclays concealed material information. *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 496-97

(S.D.N.Y. 2013) (rejecting a claim under Section 10(b) in part because the plaintiffs "compare[d] apples to oranges" in comparing "two determinations requir[ing] wholly different accounting judgments and calculations"); *see also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (holding where an alleged fraudulent or material misstatement could not be judged against an "objective standard," to state a viable claim, the "plaintiff must allege that [the] defendant's opinions were both false and not honestly believed when they were made").  Finally, and in any event, Great Pacific's claims regarding the 2013 and 2014 measures of aggressive trading fail both for the foregoing reasons and because Great Pacific does not provide any details regarding where or in what context Barclays made those statements.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." (internal quotation marks omitted)).  Accordingly, Great Pacific fails to plead a claim for concealment based on Barclays's representations regarding the amount of trading in the dark pool.

> **b.    Barclays Recruitment of HFTs**

Next, Great Pacific contends that Barclays's efforts to court HFT firms, especially aggressive HFT firms, constituted concealment because Barclays knew that ordinary investors were using the dark pool for the purpose of avoiding such firms.  (Great Pacific Mem. 12-14).  Great Pacific thus appears to contend that Barclays's suggestion that its dark pool was safe and that it was taking steps to limit aggressive trading obligated it to disclose to Great Pacific that it was also taking steps to court HFT firms and provide those firms with information that could be used to further their exploitative trading strategies.  (*Id.* at 13).  In other words, Barclays's statements regarding the safety of the dark pool were, Great Pacific alleges, the sort of "half-truth calculated to deceive" from which a duty to disclose material information can arise.

*Hoffman*, 175 Cal. Rptr. 3d at 831.  Great Pacific identifies three principal actions that were allegedly inconsistent with Barclays's statements regarding the safety of its dark pool and that it was therefore obligated to disclose.  (Great Pacific Mem. 13).  These are (1) "disclos[ing] information to the HFTs to encourage them to increase their activity" in the dark pool, including the "logic" of the servers operating the dark pool; (2) working with the HFT firm Tradebot to change its rating so as to appear less aggressive; and (3) providing HFT firms with transaction information, including volume by participant type and toxicity level.  (*Id.* at 12-13 (internal quotation marks omitted); *see* Am. Compl. ¶ 62).

Whether or not Barclays's failure to disclose this information in promoting its dark pool constituted a material omission, Great Pacific nevertheless fails to state a concealment claim on these allegations because it fails to adequately plead reasonable reliance.  In discussing reliance, Great Pacific asserts that it "would have acted differently" had it known about Barclays's recruitment of HFT firms and that Barclays's omissions were material to its decision-making. (Am. Compl. ¶¶ 7, 68, 85; Great Pacific Mem. 17).  But Great Pacific fails to provide any non-conclusory allegations explaining the connection between the alleged omissions and its decision to trade (or not to trade) in Barclays's dark pool.  That is, Great Pacific has not provided any plausible basis for the conclusion that it would have acted differently had it known about Barclays's alleged interaction with HFT firms.  *See, e.g.*, *Herskowitz v. Apple Inc.*, 940 F. Supp. 2d 1131, 1148 (N.D. Cal. 2013) (holding that simply alleging that a plaintiff reasonably relied on the defendant's statement is insufficient to adequately plead reliance under Rule 9(b)); *In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 190 (S.D.N.Y. 2012) (applying *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993), to conclude that the plaintiffs had not sufficiently pleaded reliance where they alleged only that "it is probable, if not certain, that it would not have

purchased the subject . . . [s]ecurities absent the misrepresentations and concealment of information" contained in certain documents when they never alleged that they had actually read the documents); *Dotson v. Metrociti Mortgage*, No. S-10-CV-3484 (KJM) (DAD), 2011 WL 3875997, at *4 (E.D. Cal. Aug. 31, 2011) (holding that a plaintiff does not adequately plead reliance by suggesting that it continued performing an action without "mak[ing] clear the connection, if any, between the fraud and the[] continued [action]").

    The closest Great Pacific comes to alleging such a connection is its statement that it wanted to "avoid venues" in which HFT firms traded.  (Am. Compl. 68).  But the Amended Complaint does not include any non-conclusory allegations from which the Court could conclude that it is plausible that Great Pacific would have acted differently had it known the truth about Barclays's relationship with these HFT firms.  For example, Great Pacific does not provide any detail suggesting that it avoided venues in which HFT firms were known to exist or that it ever decided to trade on a venue *because* that venue did not have HFT firms.  Similarly, it does not point to any internal memoranda or discussions with clients suggesting that the presence or absence of HFT firms was an important consideration in deciding where to place its trades. Indeed, Great Pacific does not even allege that it stopped trading in Barclays's dark pool after discovering Barclays's relationship with HFT firms.[10]  To be clear, the Court is not suggesting

---

[10]     In fact, Barclays contends — and Great Pacific does not appear to dispute — that Great Pacific continues trading in the dark pool, casting great doubt on Great Pacific's assertion that it would have acted differently had it known about Barclays's contact with the HFT Firms.  (*See* Barclays' Mem. Law Supp. Mot. To Dismiss Am. Compl. (14-MD-2589, Docket No. 24) ("Barclays Mem.") 3; *see* Great Pacific Mem. 19 n.18; Barclays Reply Mem. Further Supp. Its Mot. To Dismiss Am. Compl. (14-MD-2589, Docket No. 33) ("Barclays's Reply Mem.") 7). Although that fact alone might seem sufficient to negate reliance, it does not appear to be in the Amended Complaint or any other document that the Court may consider on a motion to dismiss. *See Thomas v. Calero*, 824 F. Supp. 2d 488, 497 (S.D.N.Y. 2011) ("When addressing a 12(b)(6) motion, the court may not consider evidence proffered by the moving party . . . .").  Accordingly, the Court does not rely on it here.

that any of these examples would be necessary to adequately plead reliance.  But Plaintiff must

provide something more than the bare-bones allegations of reliance in the Amended Complaint.

Moreover, to the extent that Great Pacific suggests that it avoided venues in which any

HFT firms traded and that, based on Barclays omissions, it mistakenly believed that the

Barclays's dark pool did not contain HFTs (Am. Compl. ¶¶ 60, 68), any such reliance was

plainly unreasonable.  After all, in the same presentation discussed above — that is, the

presentation on which Great Pacific alleges it relied as the basis for claims in this lawsuit —

Barclays stated that 30% of its dark pool was composed of electronic liquidity providers,

"Barclays' term for high[-]frequency traders."  (Am. Compl. ¶ 39; *id.*, Ex. A, at 8; *id.*, Ex. A, at

9).  As such, no juror could conclude that it was reasonable for Great Pacific to have believed

that Barclays's dark pool did not contain a significant number, much less any, HFT firms.  *See,*

*e.g.*, *Manderville v. PCG & S Grp.*, 55 Cal. Rptr. 3d 59, 69 (Cal. Ct. App. 4th Dist. 2007)

("[W]hether a party's reliance was justified may be decided as a matter of law if reasonable

minds can come to only one conclusion based on the facts." (internal quotation marks omitted).

Accordingly, Great Pacific fails to plead a claim for concealment based on Barclays's

recruitment of HFT firms.

### c.    Limitations of Liquidity Profiling

Great Pacific's final theory of concealment is that Barclays represented that its Liquidity

Profiling service could monitor and protect against "aggressive" HFT firms when, in reality, it

"offered little or no benefit to [Great Pacific] and Barclays' other clients."  (Great Pacific Mem.

14 (internal quotation marks omitted); Am. Compl. ¶¶ 54, 56).  As noted, Liquidity Profiling

involved two steps.  First, Barclays categorized firms trading in the dark pool as either

aggressive, neutral, or passive.  (*Id.*, Ex. A at 8-9).  Second, it gave traders using the dark pool

the option to block entities with certain ratings from trading against it.  (Am. Compl., Ex. A at 8-9).  Great Pacific identifies several alleged shortcomings with Liquidity Profiling and contends that Barclays was obligated to reveal those shortcomings when promoting the service.  The principal shortcomings included the fact that Barclays did not update the profiles of individual traders, that Barclays altered the profiles of certain traders to suit Barclays's interests, and that Barclays overrode certain profiles to make aggressive traders appear safer and avoid being blocked as potential counterparties.  (Great Pacific Mem. 14; Am. Compl. 56).

Once again, Great Pacific's claim founders on the reliance requirement.  Notably, Great Pacific concedes that it never used, or sought to use, the counterparty blocking service of Liquidity Profiling.  (Great Pacific Mem. 15).  Instead, Great Pacific claims that it relied on the effectiveness of Liquidity Profiling when deciding to trade in the dark pool because it "wanted to avoid trading in venues where proprietary or predatory traders existed."  (Am. Compl. ¶ 68; Great Pacific Mem. 15 n. 13).  As the Barclays presentation attached to the Amended Complaint makes clear, however, Liquidity Profiling was never intended, or advertised, as a way to remove predatory or toxic HFT firms from the dark pool.  (*See* Am. Compl., Ex. A).  To the contrary, the counterparty blocking feature (the one that Great Pacific alleges was ineffective) was premised on the fact that HFT firms *were* trading in the dark pool.  Put simply, to the extent that Great Pacific alleges it relied on the Liquidity Profiling service, that reliance was unreasonable as a matter of law.  *See, e.g.*, *Manderville v. PCG & S Grp.*, 55 Cal. Rptr. 3d 59, 69 (Cal. Ct. App. 4th Dist. 2007) ("[W]hether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts." (internal quotation marks omitted)); *see also, e.g.*, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1163 (9th Cir. 2012) (dismissing the plaintiffs' fraudulent concealment claim under California law after concluding

that the plaintiff "cannot demonstrate justifiable reliance on the purported failure to disclose");

*Hoffman*, 175 Cal. Rptr. 820 at 833 ("After establishing actual reliance, the plaintiff must show

that the reliance was reasonable by showing that (1) the matter was material in the sense that a

reasonable person would find it important in determining how he or she would act; and (2) it was

reasonable for the plaintiff to have relied on the misrepresentation."  (internal citations omitted)).

### 2.  The FAL and UCL

Finally, the Court turns to Great Pacific's claims under the FAL and UCL.  Claims under

the FAL and UCL involve similar elements and, for that reason, courts frequently analyze them

together.  *See, e.g.*, *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F.

Supp. 2d 942, 969 (S.D. Cal. 2012) (treating the reliance requirement under the UCL and FAL as

identical); *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 883-84 (Cal. 2011).  The scope of the

UCL is comprehensive: It "prohibits, and provides civil remedies for, unfair competition, which

it defines as any unlawful, unfair or fraudulent business act or practice."  *Id.* at 883 (internal

quotation marks omitted).  "Unlawful" practices under the UCL include "anything that can

properly be called a business practice and that at the same time is forbidden by law be it civil,

criminal, federal, state, or municipal, statutory, regulatory, or court-made."  *Sybersound Records,*

*Inc. v. UAV Corp.*, 517 F.3d 1137, 1151-52 (9th Cir. 2008) (internal quotation marks and

alterations omitted).  Fraudulent practices include anything that is likely to deceive members of

the general public.  *See Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002).[11]  The FAL is "equally

comprehensive within the narrower field of false and misleading advertising."  *Kwikset*, 246 P.3d

at 884.  The FAL makes it unlawful "to induce the public to enter into any obligation" by means

---

[11]     As Great Pacific does not allege any "unfair" practices within the meaning in the UCL,
that definition is not relevant here.

of a statement "which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. Prof. Code § 17500. Like the UCL, the FAL requires only "that members of the public are likely to be deceived" by a particular statement; the statement need not be actually false. *Kasky*, 45 P.3d at 250 (internal quotation marks omitted).

To possess standing under the UCL or FAL, "a plaintiff's economic injury [must] come 'as a result of' the unfair competition or a violation of the false advertising law." *Kwikset*, 246 P.3d 877 at 887. The California Supreme Court has determined that the phrase "'as a result of' requires a showing of a causal connection or reliance on the alleged misrepresentation." *Id.* (internal quotation marks omitted). Where a plaintiff's claims sound in fraud, as Great Pacific's claims do here, the plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *Id.* at 888 (quoting *In re Tobacco II Cases*, 207 P.3d 20, 26 (Cal. 2009)). Further, in a putative class action, the UCL and the FAL require that the named class representative establish reliance; the other members of the class are not required to do so. *See*, *In re Sony Gaming Networks*, 903 F. Supp. 2d at 969 & n.24; *Kwikset*, 51 Cal. 4th at 326-27 & n.9. Finally, fraud-based claims under the UCL or FAL must meet Rule 9(b)'s heightened pleading standards. *See In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 54 (E.D.N.Y. 2014); *In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1114 (S.D. Cal. 2011) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-06 (9th Cir. 2003)).

Applying those standards here, Great Pacific's UCL and FAL claims fail as a matter of law. First, Great Pacific's claims premised on Barclays's alleged failure to adequately disclose the level of aggressive trading in its dark pool are deficient for the same reason its related concealment claim was: The Amended Complaint does not identify any materially false or

misleading statement by Barclays.  *See Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 467 (E.D.N.Y. 2013) (observing that a claim under the FAL requires "statements in the advertising [that] are untrue or misleading" (internal quotation marks omitted)); *VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*, 673 F.Supp.2d 1073, 1088 (E.D. Cal. 2009) (same).  Second, Great Pacific's UCL and FAL claims premised on Barclays's courtship of HFT firms and its Liquidity Profiling service fail because, as with its concealment claims, Great Pacific fails to allege reasonable reliance on any of Barclays's statements or omissions.  As noted, fraud-based claims under the UCL and FAL require that "the named Class members . . . allege actual reliance to have standing."  *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. at 970;  *Kwikset Corp. v. Superior Court*, 246 P.3d at 888 (describing actual reliance as an element of statutory standing under the FAL); *In re Tobacco II Cases*, 207 P.3d at 26 (stating that a plaintiff "proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-stated principles regarding the element of reliance in ordinary fraud actions").  But, as discussed above in reference to Great Pacific's concealment claims, Great Pacific fails to allege reasonable actual reliance on any statements or omissions by Barclays.

Perhaps recognizing its failure to adequately allege actual reliance, Great Pacific urges the Court to adopt a presumption of reliance based on the California Supreme Court's decision in *In re Tobacco II Cases*, which involved a UCL claim against various tobacco companies.  (Great Pacific Mem. 21).  With respect to the reliance requirement of the UCL, the Court adopted the holdings of two lower courts that a showing of actual reliance on a particular statement was unnecessary because the defendant tobacco companies had engaged in a "decades-long campaign . . . to conceal the health risks of [their] product while minimizing the growing consensus

regarding the link between cigarette smoking and lung cancer and, simultaneously, engaging in saturation advertising targeting adolescents, the age group from which new smokers must come." *Tobacco II Cases*, 207 P.3d at 40 (internal quotation marks omitted)).  The Court reasoned that, in light of that campaign, it would be impossible to demonstrate actual reliance on any particular statement, and thus held that the plaintiffs could instead presume reliance on the defendants' ubiquitous, "saturation" advertising campaign.  *Id.*  The Court, however, limited the presumption to cases "where . . . a plaintiff alleges exposure to a long-term advertising campaign," *id.*, and courts have declined to apply it to UCL and FAL claims in the absence of such a substantial campaign, *see, e.g.*, *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 596 (9th Cir. 2012) ("Honda's product brochures and TV commercials fall short of the "extensive and long-term [fraudulent] advertising campaign" at issue in the *Tobacco II Cases* (alteration in original)); *Marchante v. Sony Corp. of Am.*, 801 F. Supp. 2d 1013, 1019 (S.D. Cal. 2011) (finding the parallel with the *Tobacco II Cases* "unconvincing" where the plaintiff alleged only a "minute fraction of what was alleged in the tobacco cases" and therefore declining to presume reliance); *Pfizer Inc. v. Superior Court*, 105 Cal.Rptr.3d 795, 805 (Cal. Ct. App. 2d Dist. 2010) (declining to apply the *Tobacco II Cases* presumption to Listerine's "effective as floss campaign," which was limited in scope and lasted for only about six months).

In light of that limitation, there is no basis to apply the *Tobacco II Cases* presumption here.  The Amended Complaint identifies only one purported advertisement to which Great Pacific was exposed during the class period — a presentation containing a discussion of Liquidity Profiling.  (Am. Compl. ¶¶ 39-42).[12]  And while Great Pacific makes a passing

---

[12]     The Court assumes, without deciding, that this presentation constituted advertising within the meaning of the FAL.  (*Compare* Barclays Mem. 21-22, *with* Great Pacific Mem. 20 n.19).

reference to other marketing materials, it does not allege any facts regarding those additional materials.  (*Id.* at ¶ 42; Great Pacific Mem. 20 n.19).  For that reason, Great Pacific has not come anywhere near pleading that it was exposed to the sort of sustained, "saturation advertising" campaign that persuaded the Court to presume reliance in the *Tobacco II Cases*.  207 P.3d at 40. To the contrary, applying the *Tobacco II Cases* presumption here would all but eliminate the actual reliance requirement for UCL and FAL claims — a requirement that the California Supreme Court explicitly reaffirmed in the *Tobacco II Cases* themselves, *see* 207 P.3d at 26; *see also Kwikset*, 51 Cal. 4th at 326 (examining the discussion of the reliance requirement in the *Tobacco II Cases* in analyzing claims under the UCL and FAL) — by allowing a plaintiff to simply assert in conclusory fashion that it was exposed to advertising.  Accordingly, Great Pacific's UCL and FAL claims must also be dismissed.[13]

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the Complaints in these cases are GRANTED, and the Complaints are dismissed in their entirety.  That leaves only the question of whether Great Pacific and the SDNY Plaintiffs should be granted leave to amend their complaints for a second and third time, respectively.  The SDNY Plaintiffs do not ask for leave to amend, and the Court will not grant them leave *sua sponte*, both because amendment would likely be futile and because, in granting leave to file a second amended complaint, the Court expressly warned the SDNY Plaintiffs that they would not be given another opportunity to

---

[13]    In light of the Court's conclusion that Plaintiffs fail to state a claim against Barclays, the Court need not, and does not, address Barclays's argument that the Court should strike allegations allegedly lifted from a complaint filed by the New York Attorney General.  (*See* Barclays' Mem. Law Supp. Mot. To Dismiss Second Consol. Am. Compl. (14-MD-2589, Docket No. 16) 11-12; Barclays Mem. 10-12).  Nor does the Court address Barclays's other arguments for dismissal.

address the issues raised in Defendants' motions to dismiss.  *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) (holding that the plaintiff's failure to remedy the complaint's deficiencies identified by an earlier motion to dismiss "is alone sufficient ground to deny leave to amend"); *see also, e.g.*, *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (affirming the district court's denial of leave to amend in part because of the previous opportunities that the plaintiff had received to amend the complaint).  (*See* 14-CV-2811, Docket No. 246).

Great Pacific, however, does seek leave to amend (Great Pacific Mem. 25), and its request is on firm ground given "the liberal standard set forth in Rule 15" of the Federal Rules of Civil Procedure."  *Loreley Fin. No. 3 Ltd.*, 2015 WL 4492258, at *24.  As discussed, many of the deficiencies in the Amended Complaint turn on Great Pacific's failure to plead sufficient facts to establish a plausible claim rather than an inherently flawed legal theory.  And while Great Pacific was also granted leave to amend its complaint after Barclays's initial motion to dismiss and warned that it would not be given another opportunity to address the deficiencies alleged by Barclays (*see* Barclays's Reply Mem. 10), the initial motion and the present motion are not identical and the earlier amendment was made "in the critical absence of a definitive ruling." *Loreley Fin. No. 3 Ltd.*, 2015 WL 4492258, at *25.  Put simply, the Court cannot say that Great Pacific is unable to plead facts sufficient to survive a motion to dismiss and, therefore, that amendment would necessarily be futile.  *See Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).  ("[A]mendment . . . is futile if the proposed claim could not withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).").  Accordingly, Great Pacific is granted leave to file a second amended complaint no later than **four weeks** from the date of this Opinion and Order.  That said, because Great Pacific's case (15-CV-168) will be the

only matter still pending in the MDL, the parties are ordered to show cause in writing no later than **two weeks** from the date of this Opinion and Order why the Court should not suggest to the JPML that 15-CV-168 be remanded to the Central District of California and the MDL closed.

As discussed at the outset of this Opinion and Order, the Court's task in deciding the present motions was not to wade into the larger public debate about HFT that was sparked by Michael Lewis's book *Flash Boys*.  Lewis and the critics of HFT may be right in arguing that it serves no productive purpose and merely allows certain traders to exploit technological inefficiencies in the markets at the expense of other traders.  They may also be right that there is a need for regulatory or other action from the SEC or entities such as the Exchanges and Barclays.  Those, however, are debates and tasks for others.  The Court's narrow task was, instead, to decide whether the Complaints in these cases were legally sufficient to survive Defendants' motions to dismiss.  Having concluded that they are not, the Complaints must be and are dismissed.  The Clerk of Court is directed to terminate 14-MD-2589, Docket Nos. 7, 15, and 23, and to close all member cases except for 15-CV-168.

SO ORDERED.

Date:  August 26, 2015
       New York, New York

JESSE M. FURMAN
United States District Judge