UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF PROVIDENCE, RHODE ISLAND, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 1:14-cv-02811-JMF **(Consolidated)** |
| Plaintiffs, | |
| vs. | |
| BATS GLOBAL MARKETS, INC., et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT ON GROUNDS OF PRECLUSION BY DEFENDANTS
NEW YORK STOCK EXCHANGE, LLC, NYSE ARCA, INC., CHICAGO
STOCK EXCHANGE, INC. (N/K/A NYSE CHICAGO, INC.), BATS
GLOBAL MARKETS, INC. (N/K/A CBOE BATS, LLC), AND DIRECT EDGE ECN, LLC**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ................................................................... 4

    I.    Order Execution and Market Data Form the Basic Structure of the Equity Markets
................................................................................................................................ 4

    II.    The SEC Regulates the Products at Issue ....................................................... 5

    III.    The SEC Has Authorized the Products at Issue .............................................. 8

        A.    New York Stock Exchange, LLC ("NYSE") ............................................ 8

        B.    NYSE Arca, Inc. ("Arca") ....................................................................... 9

        C.    Chicago Stock Exchange, Inc. ("CHX") .................................................. 9

        D.    BATS's BZX and BZY Exchanges ("BATS") ......................................... 9

        E.    Direct Edge's EDGA and EDGX Exchanges ("Direct Edge") ................ 10

    IV.    The SEC Has Taken Action Against Defendants when They Have Not Complied
with SEC Regulations in Connection with the Challenged Products .................. 10

SUMMARY JUDGMENT STANDARD .................................................................... 11

ARGUMENT ............................................................................................................... 11

    I.    The Challenged Products' Centrality to the Equity Markets Satisfies *Credit Suisse*
................................................................................................................................ 13

    II.    The SEC's Broad Authority to Regulate the Products at Issue Satisfies *Credit
Suisse* ................................................................................................................... 15

    III.    The SEC's Active Regulation of the Products at Issue Satisfies *Credit Suisse* .... 17

    IV.    Plaintiffs' Claim Creates a Direct Conflict with SEC Regulation that Satisfies
*Credit Suisse* ...................................................................................................... 20

        A.    Plaintiffs' claim creates actual conflict with current SEC regulation ....... 20

        B.    Plaintiffs' claim creates potential conflict with future SEC regulation .... 24

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................................11

*Bouboulis v. Transp. Workers Union of Am.*,
442 F.3d 55 (2d Cir. 2006)................................................................................................11

*In re Chicago Board Options Exchange Volatility Index Manipulation Antitrust Litigation*,
390 F. Supp. 3d 916 (N.D. Ill. 2019) ..........................................................................12, 13

*City of Providence, R.I. v. BATS Global. Mkts, Inc.*,
878 F.3d 36, 43 (2d Cir. 2017).........................................................................................24

*Credit Suisse First Bos. Corp. v. Grunwald*,
400 F.3d 1119 (9th Cir. 2005) .....................................................................................15, 21

*Credit Suisse Secs. (USA) LLC v. Billing*,
551 U.S. 264 (2007)................................................................................................. *passim*

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
588 F.3d 133 (2d Cir. 2009), 588 F.3d .................................................................... *passim*

*Giordano v. Market Am., Inc.*,
599 F.3d 87 (2d Cir. 2010)...............................................................................................11

*Hayden v. New York Stock Exchange, Inc.*,
4 F.Supp.2d 335 (S.D.N.Y. 1998) ..................................................................................17

*In re Initial Public Offering Secs. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001)...................................................................................1

*Lanier v. Bats Exch., Inc.*,
838 F.3d 139 (2d Cir. 2016)...................................................................................8, 12, 23

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014)...................................................................................................13, 24

*SCR Joint Venture L.P. v. Warshawsky*,
559 F.3d 133 (2d Cir. 2009)..............................................................................................11

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
548 F.3d 110 (D.C. Cir. 2008) ....................................................................................13, 17

*In re Stock Exchs. Options Trading Antitrust Litig.*,
317 F.3d 134 (2d Cir. 2003)......................................................................................................24

**Statutes**

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ..................................................... *passim*

Economic Growth, Regulatory Relief and Consumer Protection Act, Pub. L. No.
115-174, § 502 (2018).............................................................................................................16

**Rules and Regulations**

Regulation NMS, 17 C.F.R. § 242.600 *et seq.*......................................................................... *passim*

Defendants New York Stock Exchange, LLC, NYSE Arca, Inc., Chicago Stock Exchange, Inc. (n/k/a NYSE Chicago, Inc.), BATS Global Markets, Inc. (n/k/a Cboe Bats, LLC), and Direct Edge ECN, LLC (collectively, "Defendants"),[1] by and through their undersigned counsel, hereby move this Court for summary judgment dismissing the remaining claim asserted by Plaintiffs City of Providence, Rhode Island, Plumbers and Pipefitters National Pension Fund, Boston Retirement System, and Virgin Islands Government Employees Retirement System (collectively, "Plaintiffs") as precluded by the Securities Exchange Act of 1934 (the "'34 Act").

## PRELIMINARY STATEMENT

Plaintiffs brought this putative class action against Defendants under Sections 6(b) and 10(b) of the '34 Act.  Defendants moved to dismiss the Second Consolidated and Amended Complaint ("SCAC"), and the Court granted that motion (ECF 282).  Plaintiffs appealed only the dismissal of their Section 10(b) claim, and the Court of Appeals reversed and remanded. Defendants filed a renewed motion to dismiss arguing, *inter alia*, that the Section 10(b) claim was precluded.  The Court held that "[a]ssuming without deciding that [] a preclusion analysis applies ... its resolution would be premature … ."  ECF 104 at 24.

In light of the importance of preclusion, the Court directed that the parties' initial discovery be directed towards issues relating to preclusion and class certification, and the parties

---

[1]     Defendants move separately from The Nasdaq Stock Market LLC and Nasdaq BX, LLC (collectively, "Nasdaq") because they believe that expert testimony is not necessary for the Court to find the claims here precluded—there are no disputed issues of material fact with respect to preclusion and the issue is strictly a matter of law.  *See In re Initial Public Offering Secs. Litig.*, 174 F. Supp. 2d 61, 68-69 (S.D.N.Y. 2001).  Indeed, Defendants are aware of no preclusion or preemption case that was decided on the basis of expert testimony.  In addition, Nasdaq's proposed expert is counsel for certain NYSE affiliates and NYSE was unaware of his engagement by Nasdaq until very recently.  Defendants respectfully submit that the Court can grant summary judgment on preclusion based on this joint motion of NYSE and CBOE, without having to rule on Nasdaq's separate motion or address any of the collateral matters issues that might arise related to Nasdaq's proposed expert.

did so over nearly 18 months.  On the basis of the undisputed material facts and applicable law, summary judgment should be granted to Defendants.

Plaintiffs allege that unidentified "high frequency traders" ("HFTs") used products Defendants offer on their cash equity securities markets to engage in manipulative trading that caused Plaintiffs unspecified losses.  Plaintiffs do not contend that Defendants actually traded at all—Defendants *operate* securities markets, they do not trade on them—but instead seek to impose liability on Defendants for offering products allegedly used improperly by other entities. The products in question are order types, proprietary data feeds, and co-location:

- *Order types* are preprogrammed commands that enable market participants to communicate instructions to a market for executing their buy and sell orders.[2]
- *Proprietary data feeds* are market data products that include, *inter alia*, a specific market's depth-of-book data.
- *Co-location* allows market participants to rent space within an exchange's data center to locate trading software and hardware closer to the exchange's matching engine.

Critically, *every* complained-of product has been approved by the Securities & Exchange Commission ("SEC") as required by the '34 Act.  Indeed, there is no dispute that the SEC actively regulates the products at issue and has approved every order type, proprietary data feed, and co-location service about which Plaintiffs complain as consistent with the '34 Act and regulations thereunder.  And those products are used by a broad range of market participants,

---

[2]     Although Plaintiffs initially challenged an undefined group of order types they labeled "complex," they now purport to challenge *all* order types as manipulative when used in combination with co-location and proprietary data feeds.  *See* Plaintiffs' Supplemental Responses and Objections to Nasdaq's Fourth Set of Interrogatories at 23 ("High Frequency Trading firms could potentially have an advantage over other investors with *any* order type.") (emphasis added) (SUMF ¶ 243).  Plaintiffs also do not properly distinguish between order types and order type modifiers.  But this does not change the analysis because, whether viewed by each defendant as an order type or a modifier, each product Plaintiffs challenge was approved by the SEC and is subject to the SEC's ongoing regulatory jurisdiction.

*including Plaintiffs' own investment advisors and broker-dealers*, who employ them in any number of different trading strategies.

When a private plaintiff brings a claim under one provision of federal law that conflicts with another provision of federal law, that claim is precluded. For claims involving matters that are subject to SEC regulation, the Supreme Court has instructed courts to consider four factors in deciding whether the claim is precluded: (i) whether the activities at issue are central to the functioning of the capital markets, so-called "heartland securities activity," (ii) whether the SEC has statutory authority to regulate the market activities, (iii) whether the SEC actively regulates the market activities, and (iv) whether allowing the claim would create conflict with SEC regulation. *Credit Suisse Secs. (USA) LLC v. Billing*, 551 U.S. 264, 275-76 (2007). All four *Credit Suisse* factors compel a finding of preclusion here:

- Order execution and order types, market data distribution, and co-location form the basic fabric of the market itself. Order execution is how exchanges match buyers and sellers, and order types communicate execution instructions to exchanges. Market data, whether proprietary feeds or consolidated feeds, facilitates informed, competitive, and efficient trading. And co-location is the modern equivalent of human brokers standing on non-electronic trading floors.

- The SEC has broad regulatory authority over order execution and order types, market data distribution, and co-location, as well as authority to approve or prohibit Defendants from offering any particular product. When Defendants fail to act in compliance with applicable law, the SEC's civil enforcement authority enables it to take corrective action, and it uses that authority—including on occasion against these specific Defendants.

- The SEC actively and continuously regulates all three product categories at issue:

  - To create a single, interconnected national market system, the SEC adopted comprehensive rules for order execution and market data distribution known as Regulation National Market System ("NMS"); proprietary data feeds, co-location services, and order types are all permissible under Regulation NMS. Some order types, such as Intermarket Sweep Orders, are *expressly required* by Regulation NMS; Defendants implemented them to facilitate compliance with Regulation NMS. And the SEC continues to exercise its own authority over these products, publishing its own new proposed rules in the Federal Register relating to market data as recently as April 2021.

- o As required by the '34 Act, the SEC reviewed a statutorily-required rule filing for every product at issue in this case and expressly authorized each one that did not become immediately effective, which the SEC could not have done if any product was not consistent with the requirements of the '34 Act. With respect to those that became immediately effective, the SEC exercised its regulatory judgment and chose not to exercise its authority to suspend the filing and institute proceedings to disapprove or approve.

  - o The SEC has exercised its investigative and enforcement authority against Defendants when they have not complied with the '34 Act.

- Plaintiffs' claim necessarily conflicts with the SEC's regulation of the products at issue. Plaintiffs seek damages penalizing Defendants for past conduct the SEC not only permitted, but has continued to permit even over the seven-plus years this case has been pending. Worse, Plaintiffs seek injunctions broadly prohibiting Defendants from offering products going forward that the SEC has expressly permitted pursuant to its statutory authority. Granting such extraordinary relief would fundamentally alter the structure of the U.S. equity markets in ways Congress did not intend—it gave the SEC sole power to establish the rules for and to regulate equity market structure.

The SEC has studied the products at issue in great detail—indeed, the SEC created some of them and the market structure itself. The SEC has solicited public comments and heard from interested parties about the products, including the same arguments made by Plaintiffs concerning whether the particular products should have been approved and how they affect the markets. In exercising its regulatory authority, the SEC approved all the complained-of products pursuant to the '34 Act. Because that is an even stronger basis for preclusion than was presented in *Credit Suisse* and this motion is based on a full evidentiary record that was not before the Court when it reserved the issue for later decision at the motion to dismiss stage, Defendants' summary judgement motion should be granted.

## STATEMENT OF UNDISPUTED FACTS

**I.    Order Execution and Market Data Form the Basic Structure of the Equity Markets**

1.    The market for U.S.-listed equity securities is now predominantly electronic and almost entirely automated; order entry, message acknowledgement, matching algorithms, trade

confirmations, and market data systems form unified platforms.  Defendants' Statement of

Undisputed Material Facts ("SUMF") ¶¶ 1-2.

2.     The matching of orders to buy and sell securities, and the subsequent execution of

securities transactions, is now performed largely by an exchange's computer systems ("matching

engines") rather than by direct negotiation between human participants on an exchange's trading

floor.  SUMF ¶ 3.  Order types are the primary means by which market participants give

exchanges instructions for matching and executing their orders.  SUMF ¶ 4.

3.     The systems for distributing market data are at the heart of the national market

system.   SUMF ¶¶ 6, 13, 34-35.  Securities Information Processors ("SIPs") consolidate the best

quotes for individual stocks across market centers into a national best bid and offer ("NBBO")[3]

for each stock and distribute the information through feeds available for sale ("consolidated

data").  SUMF ¶¶ 7-9.  Other data feeds distributed by exchanges ("proprietary data feeds")

provide a broader range of market data.[4]  SUMF ¶ 15.

4.     Market data facilitates informed, competitive, and efficient trading decisions.

SUMF ¶¶ 16-17.

5.     Co-location facilitates market participants' activity by allowing them to rent space

in the same data center as the exchanges on which they choose to trade.  SUMF ¶ 18.

## II.     The SEC Regulates the Products at Issue

6.     Each Defendant is registered as a national securities exchange under Section 6 of

the '34 Act.  SUMF ¶ 19.  Section 6 requires each Defendant to adopt and maintain rules

---

[3]     The NBBO is the highest bid and lowest offer currently available on any displayed
market.  SUMF ¶ 11.

[4]     Quotation data can include information about both the best available prices in a security
at a given market ("top of book" data) and quotes resting in the order book at prices
higher (for sell orders) or lower (for buy orders) ("depth of book" data).  SUMF ¶ 10.

designed to prevent fraudulent and manipulative acts and practices, promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest.  SUMF ¶ 20.  The SEC has approved Defendants' adoption of exchange rules that prohibit fraudulent and manipulative acts and practices.  SUMF ¶¶ 109-15, 139-42, 157-59, 201-09, 234-42.

7.      Section 19(b) of the '34 Act and regulations promulgated thereunder require an exchange, before altering any material aspect of its market operations (including all of the products at issue in this case), to file a proposed change to its rules with the SEC for approval. SUMF ¶ 21.  A proposed rule change must be filed before offering a new trading product or service.  SUMF ¶ 22.  The SEC reviews exchange rule filings and engages in extensive discussions with exchanges about revisions that it requests on its own, and engages in extensive discussions with exchanges about comment letters submitted in connection with proposed rule filings.  SUMF ¶ 23.

8.      The SEC can approve a rule change only if the rule change is consistent with the requirements of the '34 Act and the rules and regulations thereunder, including Section 6's requirements to protect investors and the public interest and be designed to prevent fraud and manipulation.  SUMF ¶ 24.

9.      Section 19(b) provides that some rule changes take effect upon issuance of an approval order, whereas others take effect immediately upon filing.  SUMF ¶¶ 25-26.  The SEC may suspend any rule change that has become immediately effective and institute proceedings to approve or disapprove it.  *Id.* ¶ 27.  The SEC also requires exchanges to submit many immediately effective rule changes for advance review by the SEC staff, and it has the authority

to reject a filing that would otherwise become immediately effective.  SUMF ¶ 28.  All exchange rules are therefore subject to SEC review.

10.     Section 19(c) empowers the SEC to abrogate, add to, or delete from an exchange's existing rules to conform them to requirements of the '34 Act and the SEC's rules and regulations applicable to registered exchanges.  SUMF ¶ 31.

11.     Section 19(g) requires each exchange to comply with the provisions of the '34 Act, the rules and regulations thereunder, and its own rules.  SUMF ¶ 32.  Section 19(h) authorizes the SEC to enforce all such rules against exchanges.  SUMF ¶ 33.

12.     Section 11A authorizes the SEC to adopt (i) rules to assure that all broker-dealers transmit and direct orders for stocks, and that exchanges execute such orders, in a manner consistent with the establishment and operation of a national market system and (ii) rules to assure that all market participants may obtain information with respect to quotations for and transactions in securities on terms which are not unreasonably discriminatory.  SUMF ¶¶ 36-37.

13.     Rule 611 of Regulation NMS, which generally requires trading centers to establish, maintain, and enforce policies and procedures reasonably designed to prevent it from executing an order at a price that is inferior to the best priced and displayed quotation for the same stock (known as a trade-through), specifically authorizes the use of, and exempts from its application, Intermarket Sweep Orders ("ISOs").[5]  SUMF ¶¶ 39-40.

14.     Rule 603(a) of Regulation NMS authorizes exchanges to distribute proprietary market data and directs exchanges to do so on terms that are fair and reasonable and not unreasonably discriminatory.  SUMF ¶¶ 42-43.

---

[5]     ISOs enable an order router to sweep one or more price levels simultaneously at multiple trading centers by exempting the trading center from the requirements of Rule 611 when

15.     Rule 603(b) of Regulation NMS requires exchanges, pursuant to plans overseen by the SEC, to transmit certain market data to the SIPs for consolidation.  SUMF ¶ 47.

16.     Rule 603 of Regulation NMS requires exchanges to transmit data to proprietary feeds no sooner than they transmit the data to the SIPs for consolidation.  SUMF ¶ 48.  But the rule does *not* require that delivery of data to consolidated feed users be synchronized with delivery of data to proprietary feed users.  *Id.* ¶ 49; *see also Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 145 (2d Cir. 2016).

17.     The SEC continues its active role with respect to the products at issue.  For example, in April 2021 the SEC published amendments to Regulation NMS that would expand the content exchanges must make available for consolidation to include certain depth-of-book data (SUMF ¶¶ 50-51) and eliminate the requirement that consolidated data be distributed exclusively by SIPs by authorizing new "competing consolidators" to distribute such feeds (*id.* ¶¶ 52-53).  Importantly, the SEC's most recent rule-making does not attempt to eliminate proprietary data feeds or make any other at-issue product illegal.

## III.    The SEC Has Authorized the Products at Issue

### A.    New York Stock Exchange, LLC ("NYSE")

18.     Since 2006, the SEC has approved NYSE's exchange rules establishing its Add Liquidity Only, Intermarket Sweep Order, and Day Intermarket Sweep Order order types and modifiers.  SUMF ¶¶ 96-108.

19.     Since 2001, the SEC has approved NYSE's exchange rules establishing each of its proprietary data feeds.  SUMF ¶¶ 70-95.

---

executing such orders.  SUMF ¶ 41.  In other words, ISOs were specifically created to facilitate trading centers' compliance with Regulation NMS.

20.     In 2010, the SEC approved NYSE's exchange rule establishing its co-location services at its then-new data center in Mahwah, NJ.  SUMF ¶¶ 67-69.

**B.     NYSE Arca, Inc. ("Arca")**

21.     Since 2006, the SEC has approved Arca's exchange rules establishing its Add Liquidity Only, Post No Preference, Intermarket Sweep Order, Day Intermarket Sweep Order, and Post No Preference Blind order types and modifiers.  SUMF ¶¶ 131-38.

22.     Since 2006, the SEC has approved Arca's exchange rules establishing its proprietary data feeds.  SUMF ¶¶ 118-130.

23.     In 2010, the SEC approved Arca's exchange rule establishing its co-location services at its then-new data center in Mahwah, NJ.  SUMF ¶¶ 116-17.

**C.     Chicago Stock Exchange, Inc. ("CHX")**

24.     Since 2006, the SEC has approved CHX's exchange rules establishing its Intermarket Sweep Order, CHX Only, and Post Only order types.  SUMF ¶¶ 150-56.

25.     Since 2007, the SEC has approved CHX's exchange rules establishing each of its proprietary data feeds.  SUMF ¶¶ 146-49.

26.     In 2019, the SEC approved CHX's exchange rule establishing its co-location services.  SUMF ¶¶ 143-45.

**D.     BATS's BZX and BZY Exchanges ("BATS")**

27.     The SEC has approved BATS's exchange rules establishing its order types and modifiers, including Displayed Price Sliding, BATS Only, and Post Only order types.  SUMF ¶¶ 187-200.

28.     The SEC has approved BATS' exchange rules establishing each of its proprietary data feeds.  SUMF ¶¶ 162-86.

29.     BATS has never offered co-location services.  SUMF ¶ 161.

9

E.    **Direct Edge's EDGA and EDGX Exchanges ("Direct Edge")**

30.    The SEC has approved Direct Edge's exchange rules establishing its order types
and modifiers, including Hide Not Slide.  SUMF ¶¶ 230-233.  During this litigation, Plaintiffs
also have referred to an "Add Liquidity Only" order type, but neither of the Direct Edge
exchanges has an order type with that name.

31.    The SEC has approved Direct Edge's exchange rules establishing each of its
proprietary data feeds.  SUMF ¶¶ 211-29.

32.    Direct Edge has never offered co-location services.  SUMF ¶ 210.[6]

IV.    **The SEC Has Taken Action Against Defendants When They Have Not Complied
with SEC Regulations in Connection with the Challenged Products**

33.    In 2012, following an investigation by the SEC's Division of Enforcement, NYSE
settled SEC claims that NYSE had, in isolated instances, inadvertently sent market data to its
proprietary feeds milliseconds before sending it to the SIPs for consolidation, in violation of
Rule 603 of Regulation NMS.  The SEC did not find that the offering of proprietary data feeds
was unlawful.  (SUMF ¶ 63).

34.    In 2014, following an investigation by the SEC's Division of Enforcement, NYSE
settled SEC claims that NYSE did not have an SEC-approved exchange rule in effect when it
initially offered co-location services.  The SEC did not find that the offering of co-location
services was unlawful.  (SUMF ¶ 64).

35.    In 2015, following an investigation by the SEC's Division of Enforcement, the
EDGA and EDGX exchanges settled SEC claims that EDGA and EDGX had offered two order

---

[6]    The SEC has likewise approved all relevant rule filings for Nasdaq, *see* The Nasdaq
Stock Market LLC And Nasdaq BX, Inc.'s Local Rule 56.1 Statement Of Material Facts
As To Which There Is No Genuine Issue To Be Tried ¶¶ 23-49, which are subject to the
same analysis set forth herein.

types (Price Adjust and Single Re-Price) before having SEC-approved exchange rules in effect for them and for failing to fully disclose the functionality of the Hide not Slide order type.  The SEC did not find the order types were unlawful and the SEC ultimately approved the order types at issue.  (SUMF ¶¶ 66, 231, 233).

36.     In 2018, following an investigation by the SEC's Division of Enforcement, NYSE settled SEC claims that NYSE had failed to describe in its SEC-approved exchange rules how the two particular order types at issue in that investigation could interact.  The SEC did not find the order types unlawful.  (SUMF ¶ 65).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Factual disputes that are irrelevant or unnecessary" are not material.  *Anderson*, 477 U.S. at 248.  A dispute of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).  "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense."  *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

## ARGUMENT

*Credit Suisse* established a four-factor framework for determining whether the regulatory structure of the securities laws precludes claims made in federal court by a private plaintiff: (i) whether the conduct at issue "lie[s] squarely within an area of financial market activity that the

securities law seeks to regulate," (ii) "the existence of regulatory authority under the securities law to supervise the activities in question," (iii) "evidence that the responsible regulatory entities exercise that authority," and (iv) the "risk" that allowing the claims to proceed "would produce conflicting guidance, requirements, duties, privileges, or standards of conduct."  551 U.S. at 275-76 (SEC regulation of securities underwriting precluded plaintiffs' federal claims that certain underwriting practices were anticompetitive); *see also Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 133 (2d Cir. 2009) (SEC regulation of short-selling precluded plaintiffs' federal claims that fees prime brokers charged relating to short-selling were anticompetitive).

Although *Credit Suisse* involved preclusion of antitrust claims, the general test it set forth applies equally to Section 10(b) claims that conflict with SEC regulation.[7]  As the Second Circuit has held, a private claim that would create new rules for market activities in direct conflict with those the SEC has established "would defeat Congress's intent that the SEC, with its expertise in the operation of the securities markets, make the rules regulating those markets."  *Lanier*, 838 F.3d at 155.  Claims that "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting and amending the '34 Act must be foreclosed.[8]

---

[7]     As the SEC stated earlier in this case, "[w]here a plaintiff's claims conflict with, or otherwise obstruct, the Commission's regulation of the exchanges, the Commission expects that such claims will—and should—be foreclosed."  Brief of SEC as Amicus Curiae, 2016 WL 7030327, at *33.  The SEC made clear its belief that Defendants' "activities in this case should be subject to a preclusion analysis."  *Id.* at *34.

[8]     Only one district court has suggested that a '34 Act claim conflicting with SEC regulation might not be subject to preclusion (*In re Chicago Board Options Exchange Volatility Index Manipulation Antitrust Litigation*, 390 F. Supp. 3d 916 (N.D. Ill. 2019) ("*VIX*")).  *VIX* stated that it seemed "odd" to apply preclusion within a single statutory scheme and that no court had done so yet.  *Id.* at 930-31.  But the *Credit Suisse* test makes even more sense when the question is how one part of the '34 Act interacts with another part of the '34 Act than when the conflict involves a separate statute.  The '34 Act should be viewed holistically and any claims that interfere with the comprehensive structure Congress created for the SEC to regulate registered exchanges should be foreclosed.  *See Lanier*, 838 F.3d at 155.

*In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008).

When the claims are asserted under federal law, *Credit Suisse* provides the test for determining

whether the claims are precluded.[9]

Although a movant need not show that all of the *Credit Suisse* factors favor preclusion to

prevail (551 U.S. at 276), here they do.  Indeed, the case for preclusion here is even stronger than

in *Credit Suisse* and *Electronic Trading Group*.

## I.     The Challenged Products' Centrality to the Equity Markets Satisfies *Credit Suisse*

The first *Credit Suisse* factor favors preclusion because the products at issue "lie squarely

within an area of financial market activity" that is "central to the proper functioning of well-

regulated capital markets."  551 U.S. at 276-77.  Order execution and order types, market data

distribution, and co-location epitomize such heartland securities activities because they form the

basic structure of the equity securities market as it has continued to evolve under Regulation

NMS, which the SEC adopted in response to and to facilitate the automation of the securities

markets.

Order execution is the process by which exchanges match and execute buy and sell

orders, a process that is automated today, *on all registered exchanges*, by the exchanges' trading

---

[9]     The *VIX* court erred in not applying *Credit Suisse* instead relying on a case involving the
Federal Food, Drug, and Cosmetic Act (FDCA) and the Lanham Act to conclude that
plaintiffs' securities claim was not precluded.  *See VIX*, 390 F.Supp.3d at 931 (citing
*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014)).  *POM Wonderful* held
that Congress did not intend for the FDCA to preclude claims under the Lanham Act
because it included in the FDCA a provision preempting state law claims but none
expressly precluding federal claims, and because the two statutes "complement each
other."  573 U.S. at 113-15.  But the absence of an express preemption provision in the
'34 Act is immaterial, because the Supreme Court has already recognized *implied
preclusion* under the securities laws.  *Credit Suisse*, 551 U.S. at 271.  And when a private
plaintiff seeks to impose liability under the '34 Act for conduct that the SEC has held is
consistent with the '34 Act, the claim undermines rather than complements SEC
regulation.

systems.  SUMF ¶¶ 1-3.[10]  Order types facilitate this trading by enabling exchange members to instruct an exchange how to treat the orders that they send to an exchange.  SUMF ¶¶ 4-5.  The preprogrammed commands, for example, allow a market participant to have its buy order for 1,000 shares of IBM stock automatically executed at the best price currently available (a market order), or to have its sell order for 1,000 shares automatically executed at a price no lower than a specified limit (a limit order).  The range of order types exchanges offer, which have all been approved by (and in some cases mandated by) the SEC, are available to any market participant that chooses to use them and provide market participants with a multitude of options for interacting with one another.  *Id.*

Market data plays an equally central role in equity markets, facilitating informed, competitive, and efficient trading decisions.  SUMF ¶¶ 16-17.  Indeed, the systems for distributing market data are at the heart of the national market system.  SUMF ¶¶ 6, 34-35.  The longstanding consolidated feeds, which display information that some market participants use for trading, have proven to be an important element in the success of the U.S. securities markets.  SUMF ¶¶ 12-13.  Rule 603(a) of Regulation NMS authorizes exchanges to sell proprietary data feeds, which provide access to a more diverse set of market data options and have given market participants greater choice in meeting their market data needs.  SUMF ¶¶ 15, 38, 42, 44-46.  And co-location facilitates market participants' activities by allowing them to rent space in the same data center as the exchanges on which they choose to trade, providing a venue for the routing of orders to market centers, the expansion of liquidity, and narrower spreads.  SUMF ¶ 18.

---

[10]     As the market has existed since before the start of the proposed class period, all orders are routed to exchanges' matching engines electronically no matter where they originate.  SUMF ¶ 3.  There are no orders executed on Defendants' markets that do not arrive via an electronic connection using a Defendant's SEC-approved order types.

The challenged products thus "lie at the very heart of the securities [trading] enterprise." *Credit Suisse*, 551 U.S. at 276. If short-selling and joint underwriting qualify as heartland securities activities, then order execution and order types (which govern how all orders interact, including short sales), market data distribution (which is the basis for decisions on what orders to submit, including short sale and covering orders), and co-location (which the SEC has described "as being a material aspect of the operation of the facilities of an exchange," 75 Fed. Reg. 3,594, n.76 (Jan. 21, 2010) (Release No. 34-6135)), must qualify as well. *See Credit Suisse*, 551 U.S. at 276; *Elec. Trading Grp.*, 588 F.3d at 134. Rules regarding order types and order execution, how market data is transmitted, and whether co-location is permissible therefore fall within the core of the issues subject to SEC regulation.

## II.   The SEC's Broad Authority to Regulate the Products at Issue Satisfies *Credit Suisse*

The second *Credit Suisse* factor favors preclusion because the '34 Act grants the SEC "power to forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate" the products at issue. *Credit Suisse*, 551 U.S. at 276-77 (Securities Act Section 10 and related provisions were sufficient authority to supervise defendants' underwriting activities). Sections 6, 10, 11A, and 19 of the '34 Act give the SEC authority to regulate the products at issue here.

The SEC approval process for Defendants' rules "provides for vastly expanded [SEC] oversight and requires that SRO rules promote the federal objectives of the ['34] Act." *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1131 (9th Cir. 2005). Under this authority, the SEC can prohibit or permit the offering of the products at issue here, halt, or change an at-issue product after it has been introduced, and bring an enforcement action in the event of non-compliance with applicable law. *Supra* at 6-7. That neither Sections 6 nor 19 "explicitly reference[] the regulation" of order types, proprietary feeds, or co-location is immaterial, because

the power they together confer over exchanges' markets entails the power to regulate these products and services.  *Elec. Trading Grp.*, 588 F.3d at 136.

In addition to regulating Defendants' individual offerings of the products at issue, the SEC can also establish under Section 11A general rules for market data distribution and order execution applicable across all markets.  SUMF ¶¶ 36-37.  This is precisely the kind of broad rulemaking authority over the market activities in question that supported preclusion in *Electronic Trading Group*.  *See* 588 F.3d at 134.

Finally, under Section 10(b) and the other antifraud provisions of the '34 Act, the SEC can "define and prevent through rules and regulations acts and practices that are fraudulent, deceptive, or manipulative."  *Credit Suisse*, 551 U.S. at 277; *Elec. Trading Grp.*, 588 F.3d at 135.  The SEC has been aware of this lawsuit, and the claims made in it, for years.  If the SEC believes that some particular conduct constitutes market manipulation, it is fully empowered to define, prohibit, and punish such activity, *and it does*.  *Report on Algorithmic Trading* at 55 n. 292 (SUMF ¶ 62).  The Defendants have also adopted SEC-approved trading rules for their individual markets to protect against market manipulation.  *Supra* at 6.  The SEC staff's August 2020 report to Congress, which the SEC staff was required to prepare and submit by a statute enacted in 2018 (years after this case was filed), is notable for (i) concluding that no statutory or regulatory changes were needed to address potential market manipulation, (ii) noting that when the SEC has found manipulation it has pursued the manipulators, and (iii) the absence of any suggestion that any products at issue should be withdrawn from use by market participants. *Report on Algorithmic Trading* at 55 n. 292 (SUMF ¶ 62); Economic Growth, Regulatory Relief and Consumer Protection Act, Pub. L. No. 115-174, §502 (2018).

Indeed, the '34 Act contains a specific system for judicial review of complaints regarding products subject to SEC approval, but that system does not include district courts.  Anyone who believes that an SRO's rules should be amended, including because it thinks they permit manipulative conduct, can petition the SEC under Section 19(c) to amend an SRO's rules, and any rejection of such a petition could be reviewed by a circuit court under Section 25.  SUMF ¶¶ 29-30.  But that statutory system omits district courts from the review process created by Congress.  *In re Series 7*, 548 F.3d at 113; *Hayden v. New York Stock Exchange, Inc.*, 4 F.Supp.2d 335, 339 (S.D.N.Y. 1998).  The existence of this statutory procedure provides a stronger basis for preclusion than existed in *Credit Suisse*.

In sum, "the law grants the SEC authority to supervise all of the activities here in question," and thus *Credit Suisse* factor 2 favors preclusion.  *Credit Suisse*, 551 U.S. at 276.

**III.    The SEC's Active Regulation of the Products at Issue Satisfies *Credit Suisse***

The third *Credit Suisse* factor favors preclusion because the SEC heavily regulates "conduct of the general kind now at issue."  *Elec. Trading Grp.*, 588 F.3d at 135 (quoting *Credit Suisse*, 551 U.S. at 277).  The SEC has adopted regulations regarding the products at issue (and continues to do so even now), approved the products at issue, and brought enforcement actions against Defendants relating to some of those products.

The SEC's adoption of a regulation governing the market activity in question strongly supports preclusion.  *Credit Suisse* highlighted Regulation M, which details what underwriters may and may not do and say during roadshows, as evidencing the SEC's exercise of authority over underwriters in the IPO process.  551 U.S. at 277 (citing 17 CFR §§ 242.100–242.105 (2006), and 70 Fed.Reg. 19672 (2005)).  Similarly, *Electronic Trading Group* highlighted Regulation SHO, which defines the conditions under which brokers may accept short sale orders and requires them to close out short positions when customers fail to deliver borrowed securities

when due, as evidencing the SEC's exercise of authority over prime brokers in short selling.  588 F.3d at 135–36 (citing 17 C.F.R. § 242.203(b)(1), (b)(3)).

Just as Regulation M and Regulation SHO supported preclusion in those cases, the SEC's more recent regulatory activities support preclusion here.  Decades before enacting Regulation NMS, the SEC directed all exchanges to consolidate certain components of their data for distribution by the SIPs,[11] and Regulation NMS expressly authorized exchanges to distribute data independently of the SIPs and prescribed when data may be sent to both kinds of feeds.  SUMF ¶¶ 42, 48-49.  It also required all exchanges to limit trade-throughs in the execution of orders while permitting exceptions for certain order types that the SEC defined in Regulation NMS itself (the ISO order type).  SUMF ¶¶ 39-40.  And the SEC has continued its regulatory activities in, *inter alia*, the August 2020 report to Congress and its April 2021 proposed modification of Regulation NMS.[12]

The SEC's ongoing review of equity market structure since 2009, which has assessed, *inter alia*, the impact of advances in technology on the efficiency of markets and the effects of high-frequency trading strategies, further supports preclusion.  SUMF ¶¶ 54-62.  Requesting in its concept release public comment on market structure issues, forming its advisory committee on equity market structure, hosting its roundtable on market data and market access, preparing its report on academic studies of high-frequency trading and staff report to Congress on algorithmic and high-frequency trading all show "active SEC monitoring" of the issues in this case.  *Elec.*

[11]     Prior to Regulation NMS, the framework for NMS plans was governed by Rule 11Aa3-2.  *See* National Market System Plans; Procedures and Requirements, Release No. 34-17580, 46 Fed. Reg. 15,866 (Mar. 10, 1981).  Rule 11Aa3-2 was repealed in 2005 and replaced by a substantively identical provision in Regulation NMS.

[12]     As SEC Commissioners themselves have acknowledged, Regulation NMS created the current market structure (with its multitude of exchanges and other markets) and

*Trading Grp.*, 588, F.3d at 136 (SEC roundtable evidenced "active SEC monitoring of the role of the prime brokers in short selling").

The SEC has thus exercised its regulatory authority over the products at issue to an even greater extent than in *Credit Suisse* or *Electronic Trading Group* by (i) mandating certain activities relating to the products at issue, (ii) specifically approving the products at issue, and (iii) allowing the products at issue to remain in use despite both Plaintiffs' complaints and complaints by others. *Compare* SUMF ¶¶ 103-04, 106 (Bodek and Bloomberg comment letters) *with Elec. Trading Grp.*, 588 F.3d at 136 ("Regulation SHO and the recent roundtable do not focus on the regulation of borrowing fees (the particular conduct alleged to be anticompetitive); but it is enough for this purpose that the SEC's ongoing regulation is focused on the role of the prime brokers in short selling.").

The SEC also has exercised its authority in these areas through enforcement proceedings. The SEC has initiated several enforcement cases against Defendants and ultimately fined them for transmitting data to their proprietary feeds too quickly, failing to fully disclose order type functionality, and failing to have exchange rules in place for their co-location services. *Supra* at 10-11. Such enforcement activity weighs in favor of preclusion, as it "confirms active regulation." *Credit Suisse*, 551 U.S. at 277 (citing evidence that the "SEC has brought actions against underwriters who have violated these SEC regulations" as favoring preclusion); *Elec. Trading Grp.*, 588 F.3d at 136 (plaintiff's "complaint implicitly confirms active regulation" by alleging that certain prime brokers have been fined for violating regulations regarding short selling).

---

effectively created "HFT" trading. *See, e.g.,* https://www.cnbc.com/2014/10/01/secs-gallagher-time-for-an-overhaul-of-stock-and-bond-market-regulations.html.

The SEC's oversight of the products at issue shows "active and ongoing agency regulation" favoring preclusion.  *Credit Suisse*, 551 U.S. at 285.

## IV.    Plaintiffs' Claim Creates a Direct Conflict with SEC Regulation that Satisfies *Credit Suisse*

The fourth *Credit Suisse* factor favors preclusion because Plaintiffs' claim creates actual conflict with current SEC regulation and potential conflict with future SEC regulation.

### A.    Plaintiffs' claim creates actual conflict with current SEC regulation

Actual conflict exists when claims under another provision of federal law would "inhibit conduct that the SEC permits."  *Elec. Trading Grp.*, 588 F.3d at 137.  This is precisely what would happen if the Court imposed Section 10(b) liability on Defendants for offering SEC-approved data feeds, co-location services, and order types.  *E.g.*, SCAC ¶¶ 295-302.

All the products at issue have been authorized by the SEC.  Rule 603, in authorizing the independent distribution of market data, specifically allows for proprietary data feeds separate from the SIPs.  Co-location services have been expressly approved by the SEC.  And Rule 611, in exempting intermarket sweep orders from the order protection rule, clearly permits ISOs and Day ISOs.  Neither Rule 611 nor any other provision of Regulation NMS prohibits any of the order types Plaintiffs challenge, or else the SEC could not have approved them (or in the case of ISOs, created them) in the first instance.  All the products at issue are therefore expressly or "implicitly permitted by the SEC's Regulation [NMS]."  *Elec. Trading Grp.*, 588 F.3d at 137.  But the conflict Plaintiffs' claim creates runs deeper, because in addition to adopting Regulation NMS (and proposing amendments to it), the SEC specifically approved exchange rules establishing each product at issue.  *Supra* at 8-10.

In fact, the SEC approved the products at issue over the very objections Plaintiffs raise.  *See* SCAC ¶¶ 9, 109, 118, 123, 128.  The SEC understood when it authorized the independent

distribution of market data that proprietary feeds would offer more diverse data choices than the consolidated feeds—creating more choice was precisely the point.  SUMF ¶¶ 44-46.  The SEC also understood that co-location offers reduced latency, and approved co-location services knowing that "[m]any proprietary firm strategies are highly dependent upon speed" and that "[c]o-location is one means to save micro-seconds of latency," allowing certain traders to be "faster than competitors."[13]  *Concept Release on Equity Mkt. Structure*, Release No. 61358, 2010 WL 148783, *28 (Jan. 14, 2010) (SUMF ¶ 57).[14]  When approving order types like Day ISO, the SEC heard from vocal critics who claimed the offerings "catered to high-frequency traders" and subverted the purpose of Regulation NMS.[15]  *See, e.g.*, SCAC ¶ 186.  Having heard those concerns, the SEC disagreed,[16] concluding that "the proposed Day ISO and Day ISO ALO order

---

[13]  The SEC has continued to approve services that facilitate lower latency to this day.  *See* Release No. 34-90209, 2020 WL 6117712, *2 (Oct. 15, 2020) (approving NYSE services for transmitting market data wirelessly).

[14]  In 2009, even before the *Concept Release* was released, the SEC Chairman stated that the SEC had been "engaged in a thoughtful, deliberate and comprehensive review of market structure" that would "seek input on *high frequency trading* and the wide range of strategies that may fall within this vaguely defined category."  Mary L. Schapiro, *Speech at SIFMA Annual Conference: The Road to Investor Confidence* (Oct. 27, 2009) (emphasis added) (SUMF ¶ 54); *see also* Mary Jo White, Chair, SEC, *Enhancing Our Equity Market Structure*¸ Speech at Sandler O'Neill & Partners, L.P. Global Exchange and Brokerage Conference, New York, N.Y. (June 5, 2014) ("many brokers use [co-location and proprietary data feeds] on behalf of their customers.") (SUMF ¶ 55).  The SEC did not seek additional regulatory tools or authority in the intervening years, and confirmed, in August 2020, that no such additions are necessary.  *See SEC Report on Algorithmic Trading in U.S. Capital Markets* (Aug. 5, 2020) (SUMF ¶ 62).

[15]  *See* Haim Bodek, SEC Comment Letter, at 3 (Sept. 15, 2014) (criticizing Day ISO as an order type with "features that cater to high-frequency traders at the expense of the investing public") (SUMF ¶ 103); Bloomberg Tradebook LLC, SEC Comment Letter, at 2 (Oct. 6, 2014) (asserting that "Day ISO ... violates provisions of Regulation NMS") (SUMF ¶ 106).

[16]  *See* Release No. 34-73333, 2014 WL 5088096, *4-6 (Oct. 9, 2014) ("After carefully considering the proposals, the comments submitted, and the Exchanges' responses to the comments, the Commission finds that the proposed rule changes are consistent with the

types are consistent with Rule 610(d) of Regulation NMS."  *See* Release No. 34-73333, 2014 WL 5088096, *4, 6 (Oct. 9, 2014) (SUMF ¶ 108).  Knowing the substance of Plaintiffs' complaints, the SEC nevertheless expressly found the products at issue consistent with the '34 Act and the SEC's own regulations.  *See Grunwald*, 400 F.3d at 1130 (approval of proposed SRO rule reflects SEC's determination that it is consistent with the purposes of the '34 Act).

The SEC also approved the products at issue knowing that market participants use them in combination.  *See* SCAC ¶ 108 (alleging that "[w]hen combined with either (or both) of the enriched data feeds or complex order types ... co-location results in a manipulative device under the Exchange Act").  Defendants disclosed that "[u]sers that receive co-location services normally would expect reduced latencies in sending orders to the Exchange *and* receiving market data from the Exchange."  Release No. 34-62960, 2010 WL 3672902, *2 (Sept. 21, 2010) (SUMF ¶ 69).[17]  They also disclosed that subscribers to proprietary data feeds often use them in conjunction with order types like ISOs.[18]  Plaintiffs have no evidence to argue that in approving the individual products at issue the SEC was not aware of their combined use.

Plaintiffs' claim challenging Defendants' propriety data feeds, co-location services, and order types is thus in direct conflict with the SEC's regulation of those products.  By approving all of the challenged products—in the face of the same arguments Plaintiffs make here—the SEC

---

requirements of the Act and the rules and regulations thereunder applicable to a national securities exchange.") (SUMF ¶ 108).

[17]   Indeed, the SEC recently observed that "the most competitive executing broker-dealers, market makers, and traders using highly latency sensitive strategies ... typically purchase[] co-location services at all major data centers, along with the highest capacity connectivity services and the most raw and unprocessed exchange proprietary data feeds."  *Market Data Infrastructure Release*, 86 Fed. Reg. 18596, 18733 (April 9, 2021).

[18]   Release No. 34-63291, 2010 WL 4597735, *7 (Nov. 9, 2010) ("One important category of users of depth-of-book data are those who use ISOs.") ("[T]he top 20 firms that used ISOs on NYSE Arca and did subscribe to ArcaBook accounted for 54.72% of NYSE Arca's Tape A and Tape B volume for June 2010.") (SUMF ¶ 119)

has exercised its expertise and regulatory authority under the '34 Act and concluded that the products at issue are consistent with the SEC's mandate to ensure fair and orderly markets. That conclusion also necessarily covers the '34 Act's requirement that an exchange's rules be "designed to prevent fraudulent and manipulative acts and practices." 15 U.S.C. § 78f(b)(5). To allow Plaintiffs to assert that the same products are manipulative under Section 10(b) would create a direct conflict: Products the SEC has expressly found to be "fair," "reasonable," "equitable," "just," in "the public interest," and "designed to prevent fraudulent and manipulative acts and practices" under the '34 Act cannot also be *per se* manipulative under the '34 Act.

Actual conflict is thus more than a "risk" here—it is a certainty. Permitting suits like Plaintiffs' to proceed, "with different nonexpert judges and different nonexpert juries, will produce inconsistent results" on issues of market structure overseen and regulated by the SEC. *Credit Suisse*, 551 U.S. at 265. There is no "practical way to confine" Plaintiffs' Section 10(b) claim so that it challenges "only activity of the kind [they] seek to target without inhibiting other conduct that is permitted or encouraged under the securities law," because the conduct is the same. *Elec. Trading Grp.*, 588 F.3d at 137. Plaintiffs seek damages for Defendants' provision of the same products the SEC has approved, and an injunction barring their provision in the future. *See* SCAC, Prayer for Relief. "This inhibiting effect weighs in favor of implied preclusion." *Elec. Trading Grp.*, 588 F.3d at 138.

The Second Circuit's preemption of state law claims regarding the same trading services confirms that preclusion is warranted. In *Lanier* the court held that because "the SEC has approved the Exchanges' use of proprietary feeds and co-location services" while "expressly acknowledg[ing] that proprietary feeds and co-location reduce latency," a state law claim based on potential timing advantages they offer necessarily "conflicts with the SEC's interpretation [of

Regulation NMS] and would undermine Congress's intent to create uniform rules for governing the national market system." 838 F.3d at 154-55. The same reasoning requires preclusion here. *See POM Wonderful*, 134 S. Ct. at 2236 (preemption principles are "instructive" with regard to preclusion).

### B. Plaintiffs' claim creates potential conflict with future SEC regulation

Even if there were some factual dispute over the extent of the SEC's authorization (there is not), the potential for conflict would suffice to preclude Plaintiffs' claim. Preclusion is warranted when there exists a "conflict with an overall regulatory scheme that empowers the agency to allow conduct" that the asserted claims would prohibit. *In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 149 (2d Cir. 2003). So long as there exists "a potential conflict ... based on the possibility that the SEC will act upon its authority," preclusion is necessary to preserve the agency's regulatory authority. *Elec. Trading Grp.*, 588 F.3d at 138. Plaintiffs' claim creates potential conflict in two respects.

*First*, even if the SEC has not approved a particular aspect of a product at issue, it could do so. For example, even if at the motion to dismiss stage the Plaintiffs' allegations that Defendants did not "disclos[e] the full functionality" of their order types had to be accepted as true, *City of Providence*, 878 F.3d at 43, the record demonstrates that the SEC is and would remain free to conclude that Defendants' disclosures were sufficient. When the SEC has in the past deemed disclosures of order type functionality insufficient, it has initiated enforcement proceedings against Defendants (*supra* at 10-11), but it has never found that any of the order types in question itself were unlawfully manipulative in violation of the '34 Act. Permitting Plaintiffs' claim alleging inadequate disclosure of order type functionality (SCAC ¶¶ 137, 143, 146) would deprive the SEC of its regulatory authority to decide that Defendants' disclosures on which it has taken no enforcement action are indeed adequate.

*Second*, even if the SEC had not approved the combined use of the products at issue, it could do so.  The SEC has examined allegations that unidentified HFT firms could be using the products at issue in combination to manipulate equity markets, including in the exact manner alleged by Plaintiffs.  *Compare* SCAC ¶¶ 238-243, 248-251 *with Report on Algorithmic Trading* at 73-75 (SUMF ¶ 62).  But the SEC has reached a different conclusion.

The SEC has found that high-frequency trading, rather than causing widespread market manipulation, benefits equity markets.  The SEC has found that proprietary firms employing high-frequency trading strategies are "the primary liquidity suppliers in equity markets," which both "improve liquidity and reduce spreads."  *Report on Algorithmic Trading* at 71-72.  It has also found that high-frequency trading strategies tend to "improve price efficiency and decrease the time it takes for prices to incorporate new information," and even "reduce short term volatility."  *Id.* at 77-78.  Permitting Plaintiffs' claim would interfere with the SEC's regulatory authority to decide, consistent with the findings in its recent report to Congress, that the products at issue may be used in combination in a manner that is consistent with the securities laws and regulations and should *not* be prohibited.

On both issues, therefore, "[t]here is a potential conflict because the SEC in the future may decide to regulate" these matters, and all the evidence indicates such regulation would not conform to Plaintiffs' speculative theories of market manipulation.  *Elec. Trading Grp.*, 588 F.3d at 137.  "This potential conflict weighs in favor of implied preclusion."  *Id.* at 138.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in their favor and against Plaintiffs on Plaintiffs' Section 10(b) claim and dismiss that claim with prejudice.

Dated:  May 28, 2021

By: /s/ Douglas W. Henkin
Douglas W. Henkin
Justine N. Margolis
Kiran Patel
Nicholas Petts (*pro hac vice* forthcoming)
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6832
Facsimile: (212) 768-6800

Stephen J. Senderowitz
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
(312) 876-8000
stephen.senderowitz@dentons.com

*Counsel for New York Stock Exchange LL*
*NYSE Arca Inc.,*
*and Chicago Stock Exchange, Inc.*

By: /s/ Paul E. Greenwalt III
Paul E. Greenwalt III
Michael Molzberger
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606
Telephone: (312) 258-5702
Facsimile: (312) 258-5600

*Counsel for BATS Global Markets, Inc.*
*(n/k/a Cboe Bats, LLC) and Direct Edge*
*ECN, LLC*