**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *City of Providence, Rhode Island, et al.*,<br><br>                      Plaintiffs,<br><br>     v.<br><br>*BATS Global Markets, Inc., et al.*,<br><br>                    Defendants. | Civil Action No. 1:14-cv-02811-JMF<br>(consolidated)<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**OF THE NASDAQ STOCK MARKET LLC AND NASDAQ BX, INC.**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................3

    A.    National Securities Exchanges and The Exchange Act ...........................................3

    B.    The Exchanges' Challenged Products and Services ................................................5

        1.    Proprietary Data Feeds................................................................................6

        2.    Co-Location Services...................................................................................7

        3.    Order Types .................................................................................................8

    C.    The SEC and So-Called "HFT" .............................................................................10

    D.    Relevant Procedural History ..................................................................................11

ARGUMENT ..................................................................................................................12

PLAINTIFFS' SECTION 10(B) CLAIM IS PRECLUDED BECAUSE IT CONFLICTS WITH AND
OBSTRUCTS THE SEC'S REGULATION OF THE SECURITIES MARKET. .............................13

    A.    Plaintiffs' Claim Conflicts With The Exchange Act's Text And Structure..........14

        1.    Plaintiffs Cannot Challenge The Exchanges' SEC-Approved
            Products And Services As Manipulative Devices. ....................................15

        2.    Plaintiffs Cannot Use Civil Litigation To Modify SRO Rules Or
            Supplant The SEC's Authority To Enforce The Exchange Act. ..............18

    B.    Preemption Decisions Confirm That Plaintiffs' Suit Is Precluded. .......................21

    C.    The *Billing* Test Confirms That Plaintiffs' Suit Is Precluded...............................23

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexander v. Sandoval,*
   532 U.S. 275 (2001)................................................................................................25

*In re Barclays Liquidity Cross & High Frequency Trading Litig.,*
   390 F. Supp. 3d 432 (S.D.N.Y. 2019)...............................................................1, 12

*In re Barclays Liquidity Cross & High Frequency Trading Litig.,*
   126 F. Supp. 3d 342 (S.D.N.Y. 2015)......................................................................11

*Chadbourne & Parke LLP v. Troice,*
   571 U.S. 377 (2014)................................................................................................21

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics,*
   843 F.3d 48 (2d Cir. 2016)...............................................................................14, 22

*City of Providence v. Bats Glob. Mkts., Inc.,*
   878 F.3d 36 (2d Cir. 2017).................................................................2, 5, 6, 12, 16, 17

*Credit Suisse First Boston Corp. v. Grunwald,*
   400 F.3d 1119 (9th Cir. 2005) .............................................................................2, 22

*Credit Suisse Securities (USA) LLC v. Billing,*
   551 U.S. 264 (2007)............................................................................3, 14, 23, 24, 25

*Drayer v. Krasner,*
   572 F.2d 348 (2d Cir. 1978).....................................................................................22

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC,*
   588 F.3d 128 (2d Cir. 2009).....................................................................................24

*Epic Sys. Corp. v. Lewis,*
   138 S. Ct. 1612 (2018)..............................................................................................25

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000)..................................................................................................13

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,*
   873 F.3d 85 (2d Cir. 2017).......................................................................................13

*Lanier v. BATS Exch., Inc.,*
   838 F.3d 139 (2d Cir. 2016).............................................2, 6, 7, 12, 13, 14, 21, 22

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*,
    414 U.S. 117 (1973) ................................................................................... 22

*Nasdaq Stock Mkt., LLC v. SEC*,
    961 F.3d 421 (D.C. Cir. 2020) ............................................................... 5, 19

*NetCoalition v. SEC*,
    615 F.3d 525 (D.C. Cir. 2010) .................................................................... 5

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
    559 F.3d 772 (8th Cir. 2009) ..................................................................... 22

*POM Wonderful LLC v. Coca-Cola Co.*,
    573 U.S. 102 (2014) ................................................................................... 13

*Press v. Quick & Reilly, Inc.*,
    218 F.3d 121 (2d Cir. 2000) ...................................................................... 18

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) ................................................................................... 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ................................................................................ 2, 21

**STATUTES**

15 U.S.C. § 78c ................................................................................................. 3

15 U.S.C. § 78f .......................................................................... 1, 3, 4, 15, 23

15 U.S.C. § 78j ......................................................................... 1, 14, 15, 25

15 U.S.C. § 78s ........................................... 1, 2, 3, 4, 5, 12, 15, 17, 19, 20, 23, 24

15 U.S.C. § 78y .................................................................................. 5, 16, 17

**REGULATIONS**

17 C.F.R. § 240.19b-4 ................................................................................ 3, 4, 8

17 C.F.R. § 240.10b-5 .................................................................................... 14

17 C.F.R. § 242.603 ........................................................................................ 7

**EXCHANGE ACT RELEASES**

*In re Application of The Nasdaq Stock Mkt. LLC*,
    Release No. 34-53128, 71 Fed. Reg. 3,550 (Jan. 23, 2006) ................................ 6, 16

*Concept Release on Equity Market Structure*,
  Release No. 34-61358, 75 Fed. Reg. 3,594 (Jan. 21, 2010) ...............................................7, 10

*In re New York Stock Exchange LLC*,
  Release No. 34-72065, 2014 WL 1712113 (May 1, 2014)....................................................5, 20

*NMS Adopting Release*,
  Release No. 34-51808, 70 Fed. Reg. 37,496 (June 29, 2005) ...................................................6

*Notice of Filing and Immediate Effectiveness of Nasdaq BX's Proposed Rule*
  *Change to Establish a Flash and Cancel Order*,
  Release No. 34-60165, 74 Fed. Reg. 31,334 (June 30, 2009) .................................................17

*Notice of Filing and Immediate Effectiveness of Nasdaq's Proposed Rule Change*
  *to Establish a New Voluntary Flash and Cancel Order*,
  Release No. 34-60037, 74 Fed. Reg. 27,367 (June 9, 2009) ...................................................17

*NYSE Arca Order*,
  Release No. 34-59039, 73 Fed. Reg. 74,770 (Dec. 9, 2008) .....................................................7

*Order Approving Nasdaq BX's Proposed Rule Change to Codify Prices for Co-*
  *Location Servs.*,
  Release No. 34-62396, 75 Fed. Reg. 38,585 (July 2, 2010) ......................................................8

*Order Approving Nasdaq's Proposed Rule Change to Codify Prices for Co-*
  *Location Servs.*,
  Release No. 34-62397, 75 Fed. Reg. 38,860 (July 6, 2010)..................................................8, 16

*Order Approving Nasdaq's Proposed Rule Changes & Amendments*,
  Release No. 34-54155, 71 Fed. Reg. 41,291 (July 20, 2006) ....................................................9

*Order Approving Proposed Rule Change to Establish New Fees for Servs.*
  *Available to Members & Non-Members*,
  Release No. 34-59615, 74 Fed. Reg. 14,604 (Mar. 31, 2009) ...............................................6, 7

*Order Disapproving Proposed Rule Changes to Amend the Fee Schedule on the*
  *BOX Market LLC Options Facility*,
  Release No. 34-85459, 84 Fed. Reg. 13,363 (Apr. 4, 2019)......................................................4

*Order Granting Approval to Amend and Restate Certain Nasdaq BX Rules*,
  Release No. 34-75291, 80 Fed. Reg. 37,698 (July 1, 2015) ......................................................9

*Order Granting Approval to Amend and Restate Certain Nasdaq Rules*,
  Release No. 34-75252, 80 Fed. Reg. 36,865 (June 26, 2015) .......................................9, 15, 18

**NASDAQ RULES**

Nasdaq Equity Rule 7, Section 123 ...............................................................................................7

iv

Nasdaq Equity Rule 7, Section 147 ..................................................................................7

**OTHER AUTHORITIES**

Mary Jo White, SEC Chair, *Enhancing Our Equity Market Structure*
    (June 5, 2014)....................................................................................................9, 10

SEC Staff, *Staff Report on Algorithmic Trading in U.S. Capital Markets*
    (Aug. 5, 2020)..................................................................................................10, 11

## INTRODUCTION

Plaintiffs' claim is precluded by the comprehensive regulatory framework Congress established in the Securities Exchange Act of 1934 ("Exchange Act").  Accordingly, defendants The Nasdaq Stock Market LLC ("Nasdaq") and Nasdaq BX, Inc. ("Nasdaq BX" and, together with Nasdaq, the "Exchanges") are entitled to summary judgment.

Plaintiffs claim that the Exchanges violated Section 10(b) of the Exchange Act and Rule 10b-5 by offering proprietary data feeds, co-location services, and order types that Plaintiffs allege were used by so-called high-frequency trading ("HFT") firms to gain an undisclosed advantage over other investors, including Plaintiffs.  But Congress intended the Securities and Exchange Commission ("SEC") to supervise "the operation of the securities markets" and to "make the rules regulating those markets." *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 452 (S.D.N.Y. 2019) (internal quotation marks omitted).  Allowing Plaintiffs' claim to proceed would conflict with the text and structure of the Exchange Act and undermine Congress's intent by permitting private plaintiffs and civil juries to abrogate the SEC's decisions about how the securities markets should function.

To bring a claim under Section 10(b), a plaintiff must show that a defendant has used a "manipulative or deceptive device or contrivance in *contravention* of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b) (emphasis added).  Plaintiffs cannot do so here because all of the Exchanges' challenged products and services were *approved* by the SEC pursuant to its authority under Section 19(b) of the Exchange Act. *Id.* § 78s(b).  The SEC's approval necessarily included a finding that the Exchanges' rules governing the challenged products and services complied with Section 10(b) and Rule 10b-5 and were "designed to *prevent* fraudulent and manipulative acts and practices." *Id.* § 78f(b)(5) (emphasis added).  Products and services governed by rules that the SEC has found were designed to prevent manipulative acts

cannot possibly constitute manipulative devices under Section 10(b).

Nor can Plaintiffs collaterally attack the SEC's approvals of the Exchanges' rules by asserting that they failed to disclose the full functionality of their challenged products and services to the SEC or that the SEC failed to understand how those products and services could be used by so-called HFT firms. Objections to the SEC's rulemaking process must be raised within "the exclusive review scheme Congress devised for such challenges and not in an action in district court." *City of Providence v. Bats Glob. Mkts., Inc.*, 878 F.3d 36, 44 (2d Cir. 2017). Any such attack would fail, in any event. The Exchanges disclosed how their products and services operate, including that their order types could be combined. And the SEC has known how HFT firms could use those products and services since the beginning of the Class Period.

Moreover, Congress gave the SEC, not private plaintiffs, authority to alter or amend the rules of national securities exchanges and other self-regulatory organizations ("SROs"), 15 U.S.C. § 78s(c), and to bring enforcement actions against SROs when they violate the Exchange Act, the SEC's rules, or their own rules, *id.* § 78s(h). Allowing private plaintiffs to challenge SRO rules under Section 10(b)'s general antifraud provision would circumvent Congress's reticulated regulatory framework and undermine the SEC's authority to regulate SROs. Section 10(b)'s private right of action is intended to "supplement" the SEC's enforcement authority, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007), not to supplant that authority or restrict products and services that the SEC has approved.

Unsurprisingly, numerous courts have concluded that the Exchange Act preempts state-law claims challenging SRO rules that have been approved by the SEC. *See*, *e.g.*, *Lanier v. BATS Exch., Inc.*, 838 F.3d 139, 154 (2d Cir. 2016); *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1128 (9th Cir. 2005). The same principles governing preemption counsel in favor of

preclusion here and confirm that Plaintiffs' claim cannot proceed.

So, too, does the Supreme Court's test governing preclusion under the Exchange Act, as articulated in *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007).  Here, all four of the *Billing* factors point in favor of preclusion:  The SEC has undisputed authority to regulate the Exchanges' challenged products and services; it has exercised that authority by approving the products and services at issue; Plaintiffs' claim directly conflicts (or at least potentially conflicts) with the SEC's authority; and this case falls within the heartland of conduct regulated by the securities laws.  *See id.* at 275-76.

For all of these reasons, this Court should hold that Plaintiffs' Section 10(b) claim is precluded and grant summary judgment to the Exchanges.

## BACKGROUND

### A.    National Securities Exchanges and The Exchange Act

The Exchanges are national securities exchanges registered with the SEC under Section 6(a) of the Exchange Act.  15 U.S.C. § 78f(a); SOF ¶¶ 1, 3.  Registered securities exchanges are SROs under the Exchange Act.  15 U.S.C. § 78c(a)(26).  Congress established a comprehensive system in the Exchange Act granting the SEC authority to regulate the conduct of national securities exchanges that operate as SROs and to ensure that SROs' rules further the purposes of the Act.

Under Section 6(b)(5) of the Act, SROs must promulgate rules that are "designed" to advance the Exchange Act's statutory objectives, including "prevent[ing] fraudulent and manipulative acts," "promot[ing] just and equitable principles of trade," and "protect[ing] investors and the public interest."  15 U.S.C. § 78f(b)(5).  To ensure that SRO rules meet these requirements, SROs must submit all of their proposed rules—as well as "stated polic[ies], practice[s], and interpretation[s]"—for approval by the SEC.  *Id.* § 78s(b); 17 C.F.R. § 240.19b-

4(a)(6).  Some categories of proposed rule changes will not take effect until the SEC affirmatively approves them.   15 U.S.C. § 78s(b)(1)-(2).   Other proposed rule changes—such as those "establishing or changing a due, fee, or other charge"—can be designated to take immediate effect upon filing with the SEC.  *Id.* § 78s(b)(3).  The SEC nevertheless retains authority to suspend those changes and institute proceedings to approve or disapprove them, if necessary to protect investors and further the purposes of the Exchange Act.  *Id.* § 78s(b)(3)(C).[1]  SROs can also designate rule changes to take effect 30 days after filing—or a shorter time approved by the SEC as "consistent with the protection of investors and the public interest"—if they do "not significantly affect the protection of investors or the public interest" or "impose any significant burden on competition." 17 C.F.R. § 240.19b-4(f)(6).  Rules that take effect on an accelerated basis are still subject to suspension and subsequent disapproval by the SEC.  *See* 15 U.S.C. § 78s(b)(3)(C).

SRO rules can be approved by the SEC only if they are "consistent with the requirements of" the Exchange Act "and the rules and regulations issued" thereunder.   15 U.S.C. § 78s(b)(2)(C)(*i*).  Thus, the SEC cannot approve a proposed rule change unless it determines that the rule is consistent, for example, with the requirements of Section 6(b)(5)—including that the rule is "designed to prevent fraudulent and manipulative acts," *id.* § 78f(b)(5)—as well as with Section 10(b) and Rule 10b-5.  *See id.* § 78s(b)(2)(C)(*ii*).[2]

---

[1]  SEC staff are empowered to review immediately effective rule changes to determine whether the Commission should exercise its authority to suspend the rule and institute proceedings under Section 19(b).  Expert Report of James R. Burns, Esq. (Ex. 60 to Robert F. Serio Declaration) 15-18; *see, e.g.*, *Order Disapproving Proposed Rule Changes to Amend the Fee Schedule on the BOX Market LLC Options Facility*, Release No. 34-85459, 84 Fed. Reg. 13,363 (Apr. 4, 2019).

[2]  "The Commission's process in reviewing SRO proposed rule changes is thorough and methodical."  Burns Report 13.  SEC approval of a proposed rule typically "is based on an analysis of how the rule will operate in the market and in the context of other existing SRO and SEC rules." *Id.*  In determining whether to approve a proposed SRO rule (or suspend an immediately effective rule), SEC staff often may coordinate with the staff of the SRO, discussing and reviewing drafts

The SEC also has authority to "abrogate, add to, and delete from" the SRO's rules "to conform its rules to requirements of [the Exchange Act] and the rules and regulations thereunder applicable" to SROs.  15 U.S.C. § 78s(c).  In addition, interested persons "may petition the Commission under Section 19(c) to amend an SRO's . . . rule[s] through notice-and-comment rulemaking."  *Nasdaq Stock Mkt., LLC v. SEC*, 961 F.3d 421, 430 (D.C. Cir. 2020).  Persons aggrieved by the SEC's action may seek review in the courts of appeals if they disagree with the SEC's decision to approve an SRO's rules or to deny a petition for rulemaking under Section 19(c).  *See id.*; *NetCoalition v. SEC*, 615 F.3d 525, 527 (D.C. Cir. 2010); 15 U.S.C. § 78y(a)(1).

An SRO must "comply with the provisions of [the Exchange Act], the rules and regulations thereunder, and its own rules."  15 U.S.C. § 78s(g)(1).  If an SRO violates any of those legal requirements, the SEC may take disciplinary action "if in its opinion such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Act]."  *Id.* § 78s(h)(1).  This disciplinary authority is available to the SEC if an SRO offers products or services that have not been properly submitted to the SEC in the form of a proposed rule or that diverge from the terms approved by the SEC.  *See*, *e.g.*, *In re New York Stock Exchange LLC*, Release No. 34-72065, 2014 WL 1712113 (May 1, 2014) (settled action).

## B.    The Exchanges' Challenged Products and Services

The premise of Plaintiffs' Section 10(b) claim is that the Exchanges' provision of proprietary data feeds and co-location services gave so-called HFT firms earlier access to market information than other investors, and that those firms used that early access, in combination with specialized order types, to gain an undisclosed advantage over ordinary investors.  *See City of Providence*, 878 F.3d at 40.  According to Plaintiffs, the Exchanges did not disclose the full impact

of proposed rules even before they are filed.  *See id.* at 15-17.  The SEC generally also considers any public comments and input from subject-matter experts on its staff.  *See id.* at 16-19.

of their products and services, and non-HFT investors were therefore forced to purchase and sell shares at distorted and manipulated prices.  *Id.* at 49.  Each of the Exchanges' challenged products and services, however, was approved by the SEC.

### 1.    Proprietary Data Feeds

The SEC authorizes national security exchanges to disseminate market data through "proprietary" data feeds, which must be established pursuant to SEC-approved exchange rules.  As the Second Circuit has explained, "the SEC has approved the Exchanges' use of proprietary feeds" and "expressly acknowledged" that those feeds "reduce latency."  *Lanier*, 838 F.3d at 154; *see also NMS Adopting Release*, Release No. 34-51808, 70 Fed. Reg. 37,496, 37,566 (June 29, 2005).

The Exchanges offer proprietary data feeds pursuant to rules submitted to the SEC under Section 19(b) of the Exchange Act.  SOF ¶¶ 19-20.  As part of Nasdaq's application to register as a national securities exchange, it submitted to the SEC in 2005 its proposed rules governing Nasdaq TotalView, its most comprehensive data feed.  SOF ¶ 22(a)-(b).  The SEC approved Nasdaq's application and specifically found that its proposed rules were "designed to . . . prevent fraudulent and manipulative acts and practices."  *In re Application of The Nasdaq Stock Mkt. LLC*, Release No. 34-53128, 71 Fed. Reg. 3,550, 3,551 (Jan. 23, 2006).

Similarly, Nasdaq BX submitted its rules governing its version of TotalView in 2009.  SOF ¶ 24(a).  The SEC approved Nasdaq BX TotalView in March 2009, finding that "the proposed rule change is consistent with the requirements of the [Exchange] Act and the rules and regulations thereunder applicable to national securities exchanges."  *Order Approving Proposed Rule Change to Establish New Fees for Servs. Available to Members & Non-Members* ("*Order Approving BX TotalView*"), Release No. 34-59615, 74 Fed. Reg. 14,604, 14,605 (Mar. 31, 2009).  Among other findings, the SEC concluded that the proposed rule complied with "Rule 603(a) of Regulation NMS," which requires distribution of market data "on terms that are fair and reasonable and that

are not unreasonably discriminatory." *Id.* (citing 17 C.F.R. § 242.603(a)).[3]

During the Class Period, the Exchanges have amended their rules governing proprietary data feeds pursuant to the procedures specified in Section 19(b) of the Exchange Act. *See* SOF ¶¶ 25-26. Plaintiffs have not identified any equities market proprietary data feed that Nasdaq or Nasdaq BX offered without submitting a rule filing under Section 19(b). *See* SOF ¶¶ 21-24.[4]

## 2. Co-Location Services

The Exchanges also offer co-location services that allow customers to place their computer servers in close physical proximity to the Exchanges' computer systems, which reduces the time it takes to send and receive market information. SOF ¶¶ 27-28. The SEC has approved exchanges' use of co-location services and has acknowledged that they reduce latency. *See Lanier*, 838 F.3d at 154; *Concept Release on Equity Market Structure* ("*EMS Concept Release*"), Release No. 34-61358, 75 Fed. Reg. 3,594, 3,610 (Jan. 21, 2010).

The Exchanges' co-location services are governed by rules that each submitted to the SEC under Section 19(b) of the Exchange Act. SOF ¶¶ 27-29. Each Exchange first proposed a rule codifying its fees for existing co-location services in January 2010. SOF ¶¶ 30, 32. "After careful

---

[3] In so doing, the SEC "incorporate[d] by reference the data and analysis from" its order approving NYSE Arca's similar proprietary data feed. *See Order Approving BX TotalView*, 74 Fed. Reg. at 14,606 n.22. In the *NYSE Arca Order*, the Commission acknowledged that "single-market depth-of-book data products have significant advantages over consolidated top-of-book products in terms of both speed and the depth of interest displayed"—the heart of Plaintiffs' claim here. Release No. 34-59039, 73 Fed. Reg. 74,770, 74,774 (Dec. 9, 2008), *vacated on other grounds by NetCoalition*, 615 F.3d 525.

[4] Nasdaq TotalView and Nasdaq BX TotalView are the most comprehensive proprietary data feeds offered by each Exchange; each provides "all orders and quotes from all" of the Exchange's members "as well as the aggregate size of such orders and quotes at each price level." *E.g.*, Nasdaq Equity Rule 7, Section 123. Both Exchanges offer additional equities market proprietary data feeds that do not appear to be relevant to Plaintiffs' claims. For example, Nasdaq offers Nasdaq Basic, which provides only best bid and offer and last sale data. *See* Nasdaq Equity Rule 7, Section 147. Those feeds were also submitted to and approved by the SEC. *See* SOF ¶¶ 22, 24.

review," the SEC approved each Exchange's rule as "consistent with the requirements of the [Exchange] Act and the rules and regulations thereunder applicable to a national securities exchange" and specifically found that each Exchange's rule complied "with Section 6(b)(5) of the Act." *Order Approving Nasdaq's Proposed Rule Change to Codify Prices for Co-Location Servs.*, Release No. 34-62397, 75 Fed. Reg. 38,860, 38,861 (July 6, 2010); *accord Order Approving Nasdaq BX's Proposed Rule Change to Codify Prices for Co-Location Servs.*, Release No. 34-62396, 75 Fed. Reg. 38,585, 38,586 (July 2, 2010).

During the Class Period, the Exchanges have amended their rules governing co-location services pursuant to Section 19(b) of the Exchange Act. *See* SOF ¶ 39. Plaintiffs have not identified any equities market co-location service that Nasdaq or Nasdaq BX offered without submitting a rule filing under Section 19(b), since the original 2010 filings. *See* SOF ¶¶ 34-38.

### 3.   Order Types

The Exchanges offer a range of order types governing the manner in which they will process orders in their trading system, route orders to other exchanges, and execute trades. SOF ¶¶ 40-41. Like proprietary data feeds and co-location services, order types are a "material aspect of the operation of the facilities of the [exchange]," and rules governing order types therefore must be filed with the SEC as proposed rule changes. 17 C.F.R. § 240.19b-4(a)(6).

The Exchanges' rules describe the order types available on each Exchange's trading system, as well as various "attributes" that can be added to each order type. SOF ¶¶ 42. For each order type, the Exchanges have submitted a proposed rule change under Section 19(b), and the SEC has approved each order type they offer. For example, Nasdaq's initial proposed rules encompassed order types that included an "Intermarket Sweep Order" ("ISO"), a "Price to Comply Order," and an "Immediate or Cancel" designation. SOF ¶ 44(a). The SEC "carefully reviewed" the proposed rules and found that they were "consistent with the requirements of the [Exchange]

Act and the rules and regulations thereunder applicable to a national securities exchange and, in particular, the requirements of Section 6(b) of the Act." *Order Approving Nasdaq's Proposed Rule Changes & Amendments*, Release No. 34-54155, 71 Fed. Reg. 41,291, 41,298 (July 20, 2006).[5]

In June 2014, in an effort to increase transparency in this area, SEC Chair Mary Jo White asked the Exchanges and other national securities exchanges to conduct a comprehensive review of their order types to determine how they operate in practice. *See Enhancing Our Equity Market Structure* (June 5, 2014), https://bit.ly/3sWqUdC. Responding to that speech, the Exchanges proposed rule changes "in order to provide additional . . . clarity regarding its order type functionality."[6] Among other things, the 2015 Rule Clarifications distinguished between "Order Types" and "Order Attributes," which could be attached to various Order Types. SOF ¶¶ 45(r)-(u), 48(n)-(q). The SEC again concluded that each Exchange's rule change was "consistent with the requirements of the Act and the rules and regulations thereunder." 80 Fed. Reg. at 36,866; *accord* 80 Fed. Reg. at 37,699.

During the Class Period, the Exchanges have further amended their rules governing order types—and established rules governing new order types—pursuant to Section 19(b) of the

---

[5] Nasdaq thereafter proposed rule changes establishing a Midpoint Peg Order and a Post-Only Order in 2006 and 2009, respectively. SOF ¶ 44(c), (e). Each time, the SEC waived the applicable 30-day waiting period and designated the rule change as operative upon filing, concluding that such action was consistent with the protection of investors and the public interest. SOF ¶ 44(d), (f). In 2011, Nasdaq proposed a rule establishing a Midpoint Peg Post-Only Order. SOF ¶ 44(g). The SEC permitted the rule change to go into effect 30 days after filing and did not exercise its authority to suspend the rule. SOF ¶ 44(h). Other than a Midpoint Peg Post-Only Order, Nasdaq BX established the same order types, which were approved by the SEC in substantially similar ways. *See* SOF ¶¶ 47-48.

[6] *Order Granting Approval to Amend and Restate Certain Nasdaq Rules*, Release No. 34-75252, 80 Fed. Reg. 36,865, 36,865 (June 26, 2015) (approving Nasdaq 2015 Rule Clarification); *accord Order Granting Approval to Amend and Restate Certain Nasdaq BX Rules*, Release No. 34-75291, 80 Fed. Reg. 37,698 (July 1, 2015) (approving Nasdaq BX 2015 Rule Clarification).

Exchange Act. *See* SOF ¶¶ 45, 48. Plaintiffs have not identified any order type that Nasdaq or Nasdaq BX offered without submitting a rule filing under Section 19(b). *See* SOF ¶¶ 43-48.

### C.     The SEC and So-Called "HFT"

Chair White's 2014 speech focused on, among other issues, the "lively debate" that had "centered on high frequency trading, speed, and fairness." *Enhancing Our Equity Market Structure*. She specifically noted that high-frequency "traders use a variety of low-latency tools, including co-located servers in trading data facilities and direct data feeds from trading venues"— tools that "many brokers use . . . on behalf of their customers." *Id.* And she outlined a variety of regulatory approaches to "advance th[e] interests" of non-HFT investors and public companies "without creating unintended adverse consequences." *Id.* At the same time, Chair White emphasized that "[e]mpirical evidence shows that investors are doing better in today's algorithmic marketplace than they did in the old manual markets." *Id.*

Over the preceding years, the SEC had been evaluating the rise of HFTs and their use of exchange products and services. *See* Burns Report 19-30.[7] In 2010, for example, the SEC issued a concept release on equity market structure that devoted considerable attention to HFTs; their use of co-location services, proprietary data feeds, and specific order types; and their trading strategies, including so-called latency arbitrage. *See EMS Concept Release*, 75 Fed. Reg. at 3,606-12. The SEC noted that "some of these strategies may benefit market quality and long-term investors and others could be harmful." *Id.* at 3,607. The purpose of the concept release was to "focus on particular strategies and tools that may be used by proprietary firms and inquire whether these strategies and tools raise concerns that the Commission should address." *Id.*

---

[7]  Although the SEC has used the term "HFT," it has consistently explained that there is no "clear definition" of that term. *EMS Concept Release*, 75 Fed. Reg. at 3,606; *see also* SEC Staff, *Staff Report on Algorithmic Trading in U.S. Capital Markets*, at 38 (Aug. 5, 2020), https://bit.ly/3dXP0jY (noting that "there is no statutory or regulatory definition" of HFT).

In 2020, the SEC staff submitted a report to Congress on *Algorithmic Trading in U.S. Capital Markets*, which summarized the SEC's approach to HFT over the previous decade. The staff explained that "[h]igh frequency trading is not a singular, monolithic type of activity," but "includes a range of strategies"—such as "passive market-making" and various forms of "arbitrage"—that "may have different effects on market quality, particularly under different types of market conditions." *Id.* at 39. "Overall," the staff reported, "most academic studies find that algorithmic trading and HFTs have improved market quality and helped reduce transaction costs." *Id.* at 70. And "[t]here is ample evidence suggesting that, under normal market conditions, algorithmic trading and HFTs improve liquidity and price efficiency and reduce short term volatility." *Id.* The SEC's regulatory approach, the staff noted, has been to take numerous actions "focused on improving transparency, mitigating volatility and enhancing the stability and security of our trading infrastructure," while "on an ongoing basis, [the] staff monitors and assesses market integrity, efficiency, and resiliency." *Id.* at 67.

## D.     Relevant Procedural History

This Court initially dismissed Plaintiffs' Second Consolidated Amended Complaint. *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 355-60, 376 (S.D.N.Y. 2015). On appeal, the Second Circuit sought the views of the SEC. In its *amicus curiae* brief, the SEC argued that Defendants were not immune with respect to allegations about their non-regulatory activities, but also recognized that "principles of preemption and preclusion may nevertheless bar private suits challenging the exchanges' operation of their markets." SEC Amicus Br. 32-33. In particular, when "a plaintiff's claims conflict with, or otherwise obstruct, the Commission's regulation of the exchanges, the Commission expect[ed] that such claims w[ould]— and should—be foreclosed." *Id.* at 33. Thus, "where a plaintiff challenges actions of an exchange that are in accordance with exchange rules approved by the Commission under Section 19(b) of

11

the Exchange Act[, 15 U.S.C. § 78s(b)], preclusion or preemption would bar the challenge because it would conflict with 'Congress's intent that the SEC, with its expertise in the operation of the securities markets, make the rules regulating those markets.'"  SEC Amicus Br. 33 (quoting *Lanier*, 838 F.3d at 155).  Nonetheless, the SEC declined to take a position on whether preclusion bars Plaintiffs' claim because the parties apparently disagreed "about whether each of the challenged practices was approved by the Commission."  *Id.* at 34.

Thereafter, the Second Circuit vacated and remanded this Court's dismissal.  *See City of Providence*, 878 F.3d at 40.  The court recognized that "when a plaintiff challenges actions of an SRO that are in accordance with rules approved by the SEC, the challenge may be precluded."  *Id.* at 50 n.5.  Yet it declined to decide preclusion "based on the pleadings" because the parties had "not briefed this issue."  *Id.*

On remand, this Court similarly acknowledged, in response to Defendants' renewed motion to dismiss, that "allowing Plaintiffs' claims to proceed in this context" might "'defeat Congress's intent that the SEC, with its expertise in the operation of the securities markets, make the rules regulating those markets.'"  *In re Barclays*, 390 F. Supp. 3d at 452 (citation omitted).  But the Court determined that at the pleadings stage it could not decide whether Plaintiffs' Section 10(b) claim is precluded and that the inquiry would be "better left to a later stage of the litigation."  *Id.*

## ARGUMENT

Summary judgment is warranted because Plaintiffs' Section 10(b) claim conflicts with and is precluded as a matter of law by the Exchange Act's comprehensive regulatory structure. Preclusion is crucial for the operation of the national market system established by Congress under the Act.  Private lawsuits challenging the operation of that system under the Act's general antifraud provisions "would conflict with 'Congress's intent that *the SEC*, with its expertise in the operation of the securities markets, make the rules regulating those markets.'"  *City of Providence*, 878 F.3d

at 50 n.5 (emphasis added) (quoting *Lanier*, 838 F.3d at 155).

In accordance with these settled principles, the SEC has explained that Defendants, including the Exchanges, "are highly regulated by the Commission" and that preclusion "protect[s] an SRO's conduct when acting in accordance with rules that were subject to Commission oversight." SEC Amicus Br. 4, 33. Because Plaintiffs' Section 10(b) claim directly challenges conduct that the Exchanges are authorized to undertake pursuant to their SEC-approved rules, the claim is precluded by the Exchange Act.

### PLAINTIFFS' SECTION 10(B) CLAIM IS PRECLUDED BECAUSE IT CONFLICTS WITH AND OBSTRUCTS THE SEC'S REGULATION OF THE SECURITIES MARKET.

The key question with respect to preclusion is whether "the text, history, or structure of" the statute—in this case, the Exchange Act—"shows the congressional purpose or design to forbid" suits under particular provisions of federal law challenging particular types of conduct. *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 106 (2014). Ultimately, "this is a statutory interpretation case," and this Court should "rel[y] on traditional rules of statutory interpretation." *Id.* at 112. Preclusion doctrine furthers the bedrock principle that courts should "interpret [a] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

In analyzing preclusion, courts also draw on the established body of doctrine governing preemption cases. Although the two are different doctrines, the Supreme Court has explained that preemption "principles are instructive insofar as they are designed to assess the interaction of laws that bear on the same subject." *POM Wonderful*, 573 U.S. at 112. For that reason, the Second Circuit has repeatedly emphasized that preemption principles are relevant in assessing preclusion questions, and vice versa. *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 112 (2d Cir. 2017) ("[S]ome aspects of our earlier preclusion analysis aid in deciding the

pre-emption issue on this appeal."); *Church & Dwight Co. v. SPD Swiss Precision Diagnostic*s, 843 F.3d 48, 64 (2d Cir. 2016) ("federal law-state law preemption principles can be 'instructive' in the federal law-federal law preclusion context").

In both preemption and preclusion cases, the Supreme Court and the Second Circuit have explained that one of Congress's core purposes in the Exchange Act was to ensure that "the SEC, with its expertise in the operation of the securities markets, [would] make the rules regulating those markets." *Lanier*, 838 F.3d at 155; *see also, e.g.*, *Billing*, 551 U.S. at 275-76.  As a result, any state- or federal-law claims that "conflict with, or otherwise obstruct, the Commission's regulation of the exchanges" are "foreclosed."  SEC Amicus Br. 33 (collecting cases).  The Exchange Act's comprehensive regulatory framework precludes conflicting federal-law claims even in the absence of a direct textual conflict—and even when the SEC has not yet exercised its regulatory authority. *See Billing*, 551 U.S. at 275-76 (establishing four-factor preclusion test under the Exchange Act).

Here, all of these principles point in the same direction.  Because Plaintiffs' Section 10(b) claim conflicts with the SEC's comprehensive regulatory authority and, in particular, with its decisions reviewing and approving the Exchanges' rules governing proprietary data feeds, co-location services, and order types, their claim is precluded by the Exchange Act.

### A.    Plaintiffs' Claim Conflicts With The Exchange Act's Text And Structure.

To prevail under Section 10(b), Plaintiffs must prove that the Exchanges' challenged products and services constituted "manipulative or deceptive device[s] or contrivance[s] in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5.  That claim is precluded.  Congress intended the SEC, not civil juries, to supervise whether SRO rules are "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . and, in general, to protect investors

14

and the public interest."   15 U.S.C. § 78f(b)(5).   Permitting a civil jury to decide that the Exchanges' challenged products and services—all of which are the subject of SEC-approved rules—constitute manipulative devices would contradict the SEC's conclusion that those products and services comply with the Exchange Act and the SEC's rules and regulations issued thereunder.

### 1. Plaintiffs Cannot Challenge The Exchanges' SEC-Approved Products And Services As Manipulative Devices.

SEC approval of SRO rules under Section 19(b), 15 U.S.C. § 78s(b), necessarily forecloses any claim that products and services authorized by those rules violate Section 10(b), *id.* § 78j(b). To prevail under Section 10(b), Plaintiffs must prove that the Exchanges' challenged products and services *contravene* "such rules and regulations as the Commission may prescribe." *Id.*  Plaintiffs cannot possibly do so because the SEC has *approved* the Exchanges' rules specifying the features, terms, and conditions of the challenged products and services.

SEC approval of an SRO's products and services requires a finding that the SRO's rules are *consistent* with the rules that the SEC has promulgated under the Exchange Act, which means that the SRO's rules cannot contravene those regulatory requirements—including Rule 10b-5.  15 U.S.C. § 78s(b)(2)(C)(*i*).   In addition, SEC approval necessarily entails a finding that the SRO rules are not fraudulent and manipulative acts or practices because the SEC can approve those rules only if it determines that they satisfy Section 6(b)(5)'s requirement that they be designed "to *prevent* fraudulent and manipulative acts or practices." *Id.* § 78f(b)(5) (emphasis added).

The SEC's orders approving the Exchanges' challenged products and services are explicit on these points.  For example, when it approved the Exchanges' 2015 Rule Clarifications, the SEC expressly found that each "proposed rule change is consistent with section 6(b)(5) of the Act, which requires, among other things, that the rules of a national securities exchange be *designed to prevent fraudulent and manipulative acts and practices*." *E.g.*, 80 Fed. Reg. at 36,866 (emphasis

added).   The same order types and attributes described in those clarifications cannot be manipulative devices in contravention of the SEC's rules.  Similarly, when the SEC approved the Exchanges' co-location services rules, the SEC found that each "proposed rule change is consistent with the requirements of the Act and the rules and regulations thereunder applicable to a national securities exchange."  *E.g.*, 75 Fed. Reg. at 38,861.[8]  And when the SEC approved the rules governing Nasdaq and Nasdaq BX TotalView, it likewise concluded that each was "designed to . . . prevent fraudulent and manipulative acts and practices" and to "protect investors and the public interest."  *E.g.*, 71 Fed. Reg. at 3,551.  Permitting a civil jury to reach the opposite conclusion under Section 10(b) would directly conflict with the SEC's judgment and regulatory authority.

The Exchange Act's comprehensive regulatory structure also forecloses any argument that the Exchanges "thwarted the SEC rule-making process" by "failing to include important information about how their order types worked in their regulatory filings."   SCAC ¶ 143. Congress gave the SEC authority to oversee the SRO rule-filing process and did not create private rights of action under Section 6 or 19 of the Exchange Act (which is why Plaintiffs declined to pursue their Section 6 claim).  For that reason, "a party who objects to an SRO's disciplinary action *or rule* must raise its objection under the exclusive review scheme Congress devised for such challenges and not in an action in district court."  *City of Providence*, 878 F.3d at 44 (emphasis added) (citing 15 U.S.C. § 78y).  The SEC's conclusion that the Exchanges' regulatory filings sufficiently described "the basis and purpose of [each] proposed rule change" cannot be challenged

---

[8]  It makes no difference that the Exchanges' co-location services rules approved by the SEC were to "codify fees for [the Exchanges'] existing co-location services."  *E.g.*, 75 Fed. Reg. at 38,860.  The SEC's approval of those services as designed to prevent manipulative acts and practices in July 2010 necessarily means that they were not a manipulative device before July 2010.

here.  15 U.S.C. § 78s(b)(1).[9]

For the same reason, Plaintiffs cannot launch a collateral attack on the SEC's approvals of the Exchanges' rules on the theory that the SEC somehow failed to grasp how the products and services could be used by HFTs.  The "exclusive" avenue to challenge the SEC's decision to approve the Exchanges' rules was through participation in the notice-and-comment process and seeking appellate review.  *City of Providence*, 878 F.3d at 44; *see also* 15 U.S.C. § 78y.  In any event, the SEC has known since before the beginning of the Class Period how proprietary data feeds, co-location services, and order types work—separately and in combination—and how they could be used by HFTs.  *See supra* 5-10; Burns Report 19-31.[10]  And it has made a balanced judgment and approved them as consistent with its mandate to ensure fair and orderly markets and to foster competition.  *See supra* 5-11; Burns Report 31-43.

Moreover, the SEC approved the Exchanges' 2015 Rule Clarifications *after* Plaintiffs filed this suit and expressly found that each "proposed rule change is consistent with section 6(b)(5) of the Act, which requires, among other things, that the rules of a national securities exchange be

---

[9]  Notably, when the Exchanges clarified their order types rules in 2015—after Plaintiffs filed this suit—Plaintiffs had every opportunity to comment on the rule filings to complain that they did not sufficiently explain how the Exchanges' order types work or that the rules were not designed to prevent manipulative acts.  Yet Plaintiffs made no attempt to do so.

[10]  Plaintiffs have at times suggested that it was not clear from the Exchanges' regulatory filings that certain order types could be used in combination.  Both of the Exchanges specifically informed the SEC, however, that what their rules then described as order types could be combined (to the extent they were not mutually exclusive).  *See Notice of Filing and Immediate Effectiveness of Nasdaq's Proposed Rule Change to Establish a New Voluntary Flash and Cancel Order*, Release No. 34-60037, 74 Fed. Reg. 27,367, 27,368 (June 9, 2009) ("As with other Nasdaq order types, the attributes of the Flash and Cancel Order may be combined with all Nasdaq non-routable order types."); *accord Notice of Filing and Immediate Effectiveness of Nasdaq BX's Proposed Rule Change to Establish a Flash and Cancel Order*, Release No. 34-60165, 74 Fed. Reg. 31,334, 31,335 (June 30, 2009) (same with respect to Nasdaq BX order types).  And the SEC was certainly aware, given the staff's expertise in market structure and holistic review, *see* Burns Report 13-19, that order types could be combined, not least because some order types—for example, ISOs—cannot be used in isolation.

designed to prevent fraudulent and manipulative acts and practices." *E.g.*, 80 Fed. Reg. at 36,866. That post-suit timing dooms any argument that the SEC was unaware of how order types would work in combination with proprietary data feeds and co-location services or of Plaintiffs' allegations that HFTs could use these products and services to the detriment of other investors.

It makes no difference that Plaintiffs have brought this suit under Section 10(b) and Rule 10b-5. The Second Circuit has made clear that such claims are barred when they would undermine the SEC's authority to approve regulated activity under other sections of the Exchange Act. In *Press v. Quick & Reilly, Inc.*, 218 F.3d 121 (2d Cir. 2000) (Sotomayor, J.), the court held that the plaintiffs could not proceed with a claim under Rule 10b-5 alleging that the defendant's disclosures were deficient, because the SEC had endorsed those disclosures as consistent with Rule 10b-10. *Id.* at 130-32. Even though the SEC itself declined to take a position on whether the disclosures could (or did) violate Rule 10b-5, *id.* at 132, the court refused to undermine the SEC's regulatory authority by allowing the plaintiffs' claims to proceed. "[B]ecause the SEC has decided precisely what type of disclosure is necessary . . . in the context of Rule 10b-10," the Second Circuit explained that it would "not undermine the SEC's interpretation of its regulation by requiring even greater disclosure . . . under the general antifraud provisions of Rule 10b-5." *Id.* at 131.

Similarly, permitting a jury to decide that the Exchanges' products and services are manipulative devices under one provision of the Exchange Act would undermine the SEC's authoritative determination under a different section of the Act that the rules under which those products and services are offered are designed to *prevent* manipulative acts and practices.

### 2. Plaintiffs Cannot Use Civil Litigation To Modify SRO Rules Or Supplant The SEC's Authority To Enforce The Exchange Act.

There are additional incongruities between Plaintiffs' allegations and the text and structure of the Exchange Act. For example, the Exchange Act reserves to the SEC authority to decide

whether SRO rules must be altered or abrogated, and it directs the SEC to do so through a specified rulemaking process.  Under Section 19(c), the SEC is empowered to "abrogate, add to, and delete from" an SRO's rules "as *the Commission* deems necessary or appropriate . . . to conform its rules to requirements of" the Exchange Act and the SEC's rules.  15 U.S.C. § 78s(c) (emphasis added).

Permitting this suit to proceed would conflict with that provision in two different ways.  First, it would allow a civil jury, rather than "the Commission," to decide whether the Exchanges' existing rules governing the challenged products and services comply with Section 10(b) and Rule 10b-5 and whether it is "necessary or appropriate" to modify or eliminate the rules.  Second, it would replace the detailed notice-and-comment rulemaking process that Congress established under Section 19(c) with civil litigation.  *See* 15 U.S.C. § 78s(c)(1).  Congress's creation of a specific mechanism for altering or abrogating SRO rules forecloses reading an alternative method of doing so into Section 10(b).  Plaintiffs may petition the SEC under Section 19(c) to modify the Exchanges' rules on the ground that they authorize manipulative or deceptive acts, *see Nasdaq*, 961 F.3d at 430; they may not attempt to achieve the same result through district court litigation.

Permitting this suit to proceed would also conflict with the enforcement mechanism Congress established in Section 19(h).  15 U.S.C. § 78s(h).  Congress expressly provided that the SEC "is authorized, by *order*, if in *its opinion* such action is *necessary or appropriate* in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter" to take enforcement actions against an SRO if it "finds, *on the record after notice and opportunity for hearing*, that such [SRO] has violated or is unable to comply with any provision of this chapter, the rules or regulations thereunder, or its own rules."  *Id.* (emphases added).

This suit conflicts with Section 19(h)'s text and purpose in two basic ways.  First, Congress determined that the SEC, not private plaintiffs, should bring enforcement actions based on SROs'

19

failure to comply with their own rules, the Exchange Act, and SEC rules.  Section 19(h) calls for the SEC to exercise informed judgment ("in its opinion") and to satisfy a substantive standard ("necessary or appropriate") before bringing an enforcement action.  Private suits under Section 10(b) displace both.  Second, Congress provided particular procedural protections to SROs ("notice and opportunity for hearing" before the SEC and an "order" subject to appellate review) that are not provided in a private suit under Section 10(b).

These statutorily prescribed procedures are available to address and resolve the allegations in Plaintiffs' complaint.  In particular, the SEC has made clear that it has authority to bring enforcement actions under Section 19(h) when an exchange "conducted a new or modified business practice for which an exchange rule was required, but without having one in place, or conducted such business practice in a manner that was inconsistent with the exchange rule then in effect, or the federal securities laws."  *In re New York Stock Exch. LLC*, 2014 WL 1712113, at *4.  Thus, the SEC has the authority to decide whether the Exchanges' provision of proprietary data feeds, co-location services, and complex order types is consistent with the Exchange Act, the SEC's implementing regulations, and the Exchanges' own rules.

Moreover, even if the Exchanges offered certain products and services without a corresponding rule, as Plaintiffs allege, *see* SCAC ¶ 143, it would make no difference to the preclusion analysis.  That is because the SEC has authority to alter SRO rules under Section 19(c) if the SEC deems a particular rule necessary "to conform [an SRO's] rules to requirements of this chapter and the rules and regulations thereunder."  15 U.S.C. § 78s(c).  And the SEC has authority to bring an enforcement action under Section 19(h) if it concludes that the Exchanges failed to file a necessary rule—as the SEC has done with respect to other exchanges.  *See*, *e.g.*, *In re New York Stock Exchange LLC*, 2014 WL 1712113.  Permitting a private Section 10(b) suit premised on a

supposed failure to file a necessary rule would interfere with the SEC's authority and supervision of SROs under Section 19(c) and (h).

In light of all of these direct conflicts between this suit and the SEC's regulatory authority over and approvals of the Exchanges' rules, it is no answer to say that private actions under Section 10(b) and Rule 10b-5 complement civil enforcement by the SEC.  *See Tellabs*, 551 U.S. 313.  That statement merely means that private plaintiffs can bring some of the Section 10(b) claims that the SEC can bring.  *See Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 382 (2014) ("The scope of the private right of action" under Section 10(b) "is more limited than the scope of the statutes upon which it is based.").  But the SEC does not enforce the requirements of Section 19(b) governing SRO rules through suits under Section 10(b)—it brings actions under Section 19(h). And in any event, the SEC could not possibly bring a Section 10(b) claim alleging that products and services it had approved nonetheless violate the Exchange Act and the SEC's rules.

For all of these reasons, permitting Plaintiffs' claim to proceed would "conflict with, or otherwise obstruct, the Commission's regulation of the exchanges," and, therefore, that claim is "foreclosed."  SEC Amicus Br. 33.

### B.       Preemption Decisions Confirm That Plaintiffs' Suit Is Precluded.

Plaintiffs' theory that products and services the Exchanges offered pursuant to SEC-approved rules constitute manipulative devices conflicts with the SEC's determination that those rules are designed to *prevent* manipulative practices.  Unsurprisingly, courts confronting state-law claims advancing similar theories have held that they are preempted by the Exchange Act.

The Second Circuit held that claims generating a similar conflict with the SEC's views were preempted in *Lanier*.  *See* 838 F.3d at 153 ("To the extent that Lanier's theory of breach conflicts with the SEC's own interpretation of the relevant regulations and statutory language, his claims are preempted.").  The plaintiff there alleged that defendant national securities exchanges

21

breached their contract with him by providing proprietary data feeds that reached subscribers faster than the data reached the processor for the consolidated data feed to which he subscribed. *See id.* The premise of his claims—that SEC regulations required proprietary feed data to be received by subscribers at the same time as consolidated feed data was received by the processor—conflicted with the SEC's own interpretation that the relevant regulations required only that exchanges send the data at the same time. *See id.* Permitting a jury to accept the plaintiff's argument and reach conclusions that differ from the SEC's determinations, the court emphasized, "would defeat Congress's intent that the SEC, with its expertise in the operation of the securities markets, make the rules regulating those markets." *Id.* at 155; *accord* SEC Amicus Br. 33.[11]

Similarly, the Ninth Circuit held that "SRO rules approved by the Commission preempt conflicting state law" in *Credit Suisse v. Grunwald*, 400 F.3d at 1128, a case that demonstrates the applicability of preclusion principles to preemption cases and vice versa. The Ninth Circuit there relied heavily on the Second Circuit's analysis in *Drayer v. Krasner*, 572 F.2d 348, 358 (2d Cir. 1978), which applied preclusion principles to hold that the SEC's "general approval" of SRO arbitration rules displaced the usual application of federal antitrust law. And *Drayer*, in turn, relied on the Supreme Court's preemption analysis in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 119 (1973).

These cases, which are "'instructive' in the federal law-federal law preclusion context," *Church & Dwight Co.*, 843 F.3d at 64, underscore what the text and structure of the Exchange Act make clear: Plaintiffs' Section 10(b) challenge to SEC-approved products and services is precluded.

---

[11] *See also*, *e.g.*, *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 782 (8th Cir. 2009) (claims preempted where alleged damages "stem[med] from activities performed or statements made by the defendants in conformity with . . . Commission approved rules").

C.      The *Billing* Test Confirms That Plaintiffs' Suit Is Precluded.

Any remaining doubt that Plaintiffs' claim is precluded would be dispelled by applying the Supreme Court's *Billing* test.   The relevant factors under that test are:   (1) "the existence of regulatory authority under the securities law to supervise the activities in question"; (2) "evidence that the responsible regulatory entities exercise that authority"; (3) the "risk" that allowing the claims to proceed "would produce conflicting guidance, requirements, duties, privileges, or standards of conduct"; and (4) whether the conduct at issue "lie[s] squarely within an area of financial market activity that the securities law seeks to regulate."   *Billing*, 551 U.S. at 275-76. Here, all of those factors weigh in favor of preclusion.

*First*, as explained above, the SEC has extensive authority to regulate the "activities in question" here.   *See* 15 U.S.C. § 78s.   The SEC recognizes that the Exchanges and other national securities exchanges "must file proposed rule changes" before offering proprietary data feeds, co-location services, and order types because each is a "material aspect of the operation of the facilities of the exchange."   SEC Amicus Br. 11-15.   Consequently, the SEC has authority to approve these rules, 15 U.S.C. § 78s(b), to modify them, *id.* § 78s(c), and to take disciplinary action if an exchange violates them, the Exchange Act, or applicable regulations, *id.* § 78s(h).

*Second*, the SEC has exercised its regulatory authority by approving proprietary data feeds, co-location services, and order types and by bringing enforcement actions when exchanges provide those products and services without conforming to SEC-approved rules.   *See supra* 5-10.

*Third*, there is *actual* conflict between Plaintiffs' claim and the SEC's regulatory authority, and at a minimum the *potential* for such conflict.   The SEC has approved all of the Exchanges' challenged products and services, and concluded that they are "designed to prevent fraudulent and manipulative acts and practices," notwithstanding the ability of HFT firms to use those products and services to implement their trading strategies.   15 U.S.C. § 78f(b)(5).   Permitting a jury to

23

conclude that HFT firms' use of those same products and services violates Section 10(b) and Rule 10b-5 would directly conflict with the SEC's expert judgment.

Even if the SEC had not approved all of the Exchanges' products and services, there can be no dispute that the SEC could do so, and could approve HFT firms' use of the Exchanges' products and services. That potential conflict is sufficient for this factor to support preclusion. *See*, *e.g.*, *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 138 (2d Cir. 2009) (explaining that "potential conflict . . . based on the possibility that the SEC will act upon its authority to regulate the borrowing fees set by prime brokers" tipped "in favor of implied preclusion"). It is indisputable that the SEC has considered the effects of so-called HFT—and the ability of HFT firms to use proprietary data feeds, co-location services, and order types to engage in latency arbitrage and other trading strategies—for more than a decade. *See* Burns Report 19-31. It has "consciously chosen to take a pragmatic approach to the shift toward algorithmic and automated trading and the tools that are used by firms engaged in this type of trading." *Id.* at 23. And it has recognized that overly aggressive regulation could have "unintended adverse consequences" for markets and market participants. *Enhancing Our Equity Market Structure*. Allowing Plaintiffs' claim to proceed risks upending the SEC's careful, pragmatic approach to these issues. *See* Burns Report 23, 31.

*Fourth*, the alleged conduct at issue in this case—the Exchanges' provision of products and services governed by SEC-approved rules and the use of those products and services by so-called HFT firms—"lie[s] squarely within an area of financial market activity that the securities law seeks to regulate." *Billing*, 551 U.S. at 276; *see*, *e.g.*, 15 U.S.C. § 78s(b).

Although the *Billing* test originated in the antitrust context, it applies with even greater force here. *See* SEC Amicus Br. 33 (citing *Billing* in support of position on preclusion). That is

24

because *Billing* was an *implied repeal* case where the Supreme Court discerned a "plain repugnancy" between two different federal statutes.  *See* 551 U.S. at 267.  If the multifactor *Billing* test is sufficient to overcome the strong presumption against implied repeals, *see*, *e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018), it is obviously sufficient here, where the Court need only interpret the provisions of a single federal statute, the Exchange Act, harmoniously.

That is especially true where, as here, the dispositive question is whether to expand Section 10(b)'s "private right of action," which is "a judicial construct."  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 164 (2008).  In this context, the "settled" presumption is "that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one."  *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001)).  And although Section 10(b)'s private right of action "remains the law," the Supreme Court has warned that it "should not be extended beyond its present boundaries."  *Id.* at 165.  Expanding the private right of action to encompass this suit would defy that warning—and conflict with the plain text of the statute, which grants the SEC authority to define by "rules and regulations" what qualifies as a "manipulative or deceptive device or contrivance."  15 U.S.C. § 78j(b).

Applying the *Billing* test here is consistent with the text and structure of the Exchange Act and with preemption cases involving SROs.  The ultimate question in *Billing* and in the preemption cases—just as in this case—is whether a particular suit would interfere with Congress's intent that the SEC make the rules governing the securities market.  Here, where Plaintiffs' suit seeks to impose massive civil liability on the Exchanges for offering products and services approved by the SEC, there can be no doubt that permitting this suit to proceed would undermine Congress's intent.

## CONCLUSION

Because Plaintiffs' Section 10(b) claim is precluded by the Exchange Act's comprehensive regulatory structure, this Court should grant summary judgment to the Exchanges.

25

May 28, 2021

Respectfully submitted,

By: /s/ *Robert F. Serio*

Steven M. Shepard
Arun Subramanian
Elisha Barron
SUSMAN GODFREY LLP
1301 Avenue of the Americas
New York, NY  10019
Telephone: (212) 336-8330

Robert F. Serio
Justine Goeke
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone: (212) 351-3917

Douglas R. Cox
Amir C. Tayrani
Jacob T. Spencer (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500

*Counsel for The Nasdaq Stock Market LLC and Nasdaq BX, Inc.*