## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CITY OF PROVIDENCE, RHODE
ISLAND, *et al.*, Individually and on Behalf of
All Others Similarly Situated,

                Plaintiffs,

v.

BATS GLOBAL MARKETS, INC., *et al.*,

                Defendants.

Case No. 1:14-cv-02811-JMF

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON GROUNDS OF LACK OF ARTICLE III STANDING BY DEFENDANTS NEW YORK STOCK EXCHANGE, LLC, NYSE ARCA, INC., CHICAGO STOCK EXCHANGE, INC. (N/K/A NYSE CHICAGO, INC.), BATS GLOBAL MARKETS, INC. (N/K/A CBOE BATS, LLC), AND DIRECT EDGE ECN, LLC

## <u>TABLE OF CONTENTS</u>

**Pages**

INTRODUCTION ................................................................................................................. 2

STANDARD OF REVIEW .................................................................................................. 5

ARGUMENT ........................................................................................................................ 7

    <u>Plaintiffs Lack Article III Standing</u>.................................................................................. 7

        Plaintiffs Cannot Prove Injury ..................................................................... 8

        Plaintiffs Cannot Prove Redressability ...................................................... 14

        Plaintiffs' Proof Problems Cannot Be Remedied Through Discovery................. 17

        Whole Foods II and Their Progeny Require Summary Judgment Here .............. 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Wright*,
468 U.S. 737 (1984)......................................................................................................7

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................................................6

*In Re Barclays Liquidity Cross And High Frequency Trading Litigation*
126 F. Supp. 3d 342 (2015) ...............................................................................1, 2, 4

*Beard v. Banks*,
548 U.S. 521 (2006)......................................................................................................6

*Brown* v. *Medtronic, Inc.*,
628 F.3d 451 (8th Cir. 2010) .......................................................................................9

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)......................................................................................................6

*City of Providence v. Bats Global Mkts., Inc.*,
878 F.3d 36 (2d Cir. 2017)...........................................................................................8

*Diaz v. Local No. 241 Transport Workers of America*,
2021 WL 1063184, at *5 (S.D.N.Y. Mar. 19, 2021) ...............................1, 6, 10, 22

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005)......................................................................................................8

*Espinueva v. Garrett*,
895 F.2d 1164, 1166 (7th Cir. 1990), ........................................................................1

*Grocery Mfrs. Ass'n v. E.P.A.*,
693 F.3d 169 (D.C. Cir. 2012)...................................................................................15

*In re Grupo Televisa Secs. Litig.*,
No. 18 Civ. 1979 (LLS), 2021 WL 2000005 (S.D.N.Y. May 19, 2021) ...........8, 19

*Hollingsworth v. Perry*,
570 U.S. 693 (2013)......................................................................................................3

*John v. Whole Foods Mkt. Grp., Inc.*,
823 F. App'x 46 (2d Cir. 2020) .............................................................................2, 21

*John v. Whole Foods Mkt. Grp., Inc.*,
858 F.3d 732 (2d Cir. 2017) ....................................................................................2, 6

*Kohen* v. *Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) .......................................................................................8

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994)......................................................................................................3

*Lance v. Coffman*,
   549 U.S. 437 (2007)..................................................................................................3

*Lightfoot v. Union Carbide Corp.*,
   110 F.3d 898 (2d Cir. 1997)....................................................................................7

*Lucas v. S.C. Coastal Council*,
   505 U.S. 1003 (1992) .............................................................................................2

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...................................................................................... *passim*

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................................7

*National Org. for Women, Inc. v. Scheidler*,
   510 U.S. 249 (1994)................................................................................................5

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012)....................................................................................6

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010)..............................................................................7

*Newman-Green, Inc. v. Alfonzo-Larrain*,
   490 U.S. 826 (1989)................................................................................................6

*Scotto v. Almenas*,
   143 F.3d 105 (2d Cir. 1998)....................................................................................6

*SEB Investment Management AB v. Symantec Corp. et ano.*,
   No. C 18-02902 WHA, Slip Op. at 2 (N.D. Ca. Apr. 20, 2021) ............................5

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976)..................................................................................................7

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)............................................................................................3

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)..................................................................................................3

*Taylor* v. *KeyCorp.*,
   680 F.3d 609 (6th Cir. 2012) ..................................................................................8

*United States v. Hays*,
   515 U.S. 737 (1995)................................................................................................5

*Warth v. Seldin*,
   422 U.S. 490 (1975)................................................................................................3

*In re Whole Foods Mkt. Grp., Inc.*,
   397 F. Supp. 3d 406 (S.D.N.Y. 2019)..........................................................2, 16, 21

**Statutes**

15 United States Code
§ 78j ...................................................................................................................4

**Rules and Regulations**

Conference Report, H.R. 104-369, at 32 (Nov. 28, 1995) ............................................5

Federal Rules of Civil Procedure
Rule 12(h)(3).......................................................................................................5
Rule 56(a), (c) ....................................................................................................6

**Other Authorities**

ConvergEx April 29, 2010 Comment Letter (https://www.sec.gov/comments/s7-
02-10/s70210-166.pdf)......................................................................................13

United States Constitution Article III, § 2 .......................................................... *passim*

Defendants New York Stock Exchange, LLC, NYSE Arca, Inc., Chicago Stock Exchange, Inc. (n/k/a NYSE Chicago, Inc.), BATS Global Markets, Inc. (n/k/a Cboe Bats, LLC), and Direct Edge ECN, LLC (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment dismissing Plaintiffs'[1] claim for lack of Article III standing.  Defendants bring this motion at this juncture because they are obligated to inform the Court of questions regarding its power to act whenever such questions become apparent.[2]  *See In re Barclays Liquidity Cross & High Frequency Trading Litig.,* 390 F. Supp. 3d 432, 443 (S.D.N.Y. 2019) (standing is jurisdictional, cannot be waived, and the Court has an independent obligation to determine whether it has jurisdiction); *see also Espinueva v. Garrett,* 895 F.2d 1164, 1166 (7th Cir. 1990) ("Every litigant has an obligation to bring jurisdictional problems to the court's attention."); *Diaz v. Local No. 241 Transport Workers of America,* 2021 WL 1063184, at *5 (S.D.N.Y. Mar. 19, 2021) (Pauley, J.) ("Article III jurisdiction is always an antecedent question to the merits of a case.").

In addressing whether Plaintiffs had adequately *pleaded* Article III standing in connection with Defendants' renewed motion to dismiss, the Court stated:

> Although it is a close question, Plaintiffs here satisfy the [pleading] standard … .  They plausibly *allege* both (1) that they were sufficiently frequent purchasers on the Exchanges and (2) that they were systematically victimized by distorted prices.

---

[1]     Plaintiffs are City of Providence, Rhode Island ("Providence"), Plumbers and Pipefitters National Pension Fund ("PPNPF"), Employees Retirement System of the Government of the Virgin Islands ("VIGERS"), and the State-Boston Retirement System ("Boston").

[2]     Defendants do not intend to waive any other grounds for summary judgment that might be appropriate to assert at a later phase in the case (if there is one).  For the avoidance of doubt, in the event that this case survives this Court's rulings on this motion and Defendants' motion for summary judgment based on preclusion, Defendants expressly reserve their right to file summary judgment motions on other issues during any later proceedings in the case.

*Barclays,* 390 F. Supp. 3d at 445 (emphasis added).  But the Court further observed that:

> Plaintiffs here "may ultimately be unable to *show* [that they were]
> injured under the more demanding standards applicable at
> summary judgment or trial," and therefore "face what may be
> significant evidentiary obstacles on the merits."

*Id.* (citing *John v. Whole Foods*, 858 F.3d 732 (2d Cir. 2017) ("*Whole Foods I*"), quotation

marks in original and emphasis added); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003,

1012-13 n.3 (1992) (plaintiffs face a higher burden to demonstrate standing on summary

judgement compared to the pleadings stage).

It is now time to apply those "more demanding standards," and the "evidentiary

obstacles" confronting Plaintiffs are worse than Defendants previously argued.[3]  *First*, discovery

has revealed that when Plaintiffs filed this case neither they nor their counsel possessed any facts

suggesting that there was market manipulation or that any of their common stock trades were

executed at manipulated prices.  Instead, Plaintiffs *assumed* that (i) conduct described in the

press took place, (ii) such conduct was illegal (if it happened), (iii) their trades were executed on

Defendants' exchanges, and (iv) they were harmed by simply being in the markets.  But Plaintiffs

had no factual bases for any of those assumptions when they filed this case, and there is no

admissible evidence to support them.

*Second*, because the unnamed entities Plaintiffs claim are "bad" "high frequency traders"

("HFTs") are not defendants in this case (having been voluntarily dismissed by Plaintiffs in some

---

[3]     In evaluating Article III standing at the motion to dismiss stage, the Court relied *Whole Foods I*, where the Second Circuit reversed the dismissal of a grocery mispricing class action.  Whole Foods later moved for summary judgment for lack of Article III standing, the district court granted that motion, 397 F. Supp. 3d 406 (S.D.N.Y. 2019), and the Second Circuit affirmed, *John v. Whole Foods Mkt. Grp., Inc.*, 823 F. App'x 46 (2d Cir. 2020) (collectively, "*Whole Foods II*").  The summary judgment decisions in *Whole Foods II* require dismissal here.

instances and never even named in others) any harm caused to anyone by the wrongful conduct alleged by Plaintiffs is not redressable in this action because the relief sought will not bind the HFTs or other exchanges Plaintiffs did not sue but which offer similar products.

Because Article III standing is a constitutional prerequisite that Plaintiffs cannot satisfy, the Court should grant summary judgment in favor of Defendants and dismiss this case.

## PRELIMINARY STATEMENT

Without a justiciable case or controversy raised by plaintiffs with standing, federal courts have no power to act. *See* U.S. Const. art. III, § 2; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). Plaintiffs bear the burden of proving that they have Article III standing. *See Kokkonen v. Guardian Life Ins. Co. of Am*., 511 U.S. 375, 377 (1994); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Named plaintiffs seeking to represent a class must prove that they personally have been injured, not that injury may have been suffered by other purported members of the class they seek to represent. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975).

Article III standing requires (i) an injury-in-fact (ii) that is fairly traceable to the challenged action of the defendant and (iii) is likely to be redressed by a favorable decision. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). An injury in fact is an invasion of a legally protected interest that is *concrete*, *particularized*, and *actual*, not conjectural or hypothetical. *See Lujan*, 504 U.S. at 560. Anything else is a generalized grievance that does not support Article III standing. *See Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013); *Lujan*, 504 U.S. at 575; *Warth*, 422 U.S. at 499. If a plaintiff's claim amounts to a general complaint that somehow the law was not followed by someone, but the plaintiff cannot tie that complaint to both itself and the defendants, it lacks standing. *See Lance v. Coffman*, 549 U.S. 437, 442 (2007).

Plaintiffs cannot prove any injury to themselves at all, let alone one fairly traceable to any Defendant and that could be redressed by this Court. Plaintiffs cannot prove that they suffered

an injury because, *inter alia*, (i) Plaintiffs never tried to determine whether (let alone how) they had been injured before filing this case, (ii) they do not have the records that are necessary to determine whether they might have been injured and cannot obtain them because they failed to ensure that those records were preserved, and (iii) even now, more than seven years after this case was filed, they cannot demonstrate actual injury to themselves.  Instead, discovery revealed that Lead Counsel (or some subset) (i) read FLASH BOYS, (ii) perhaps read some academic articles and other materials, (iii) turned those materials into a complaint, and (iv) recruited Plaintiffs for this case without analyzing whether Plaintiffs (or anyone else) had actually been injured by the conduct alleged (let alone how).  And Plaintiffs themselves did no independent investigation but relied entirely on the say-so of their lawyers.  Article III standing cannot be based on unverified assumptions piled onto other unverified assumptions with no effort to ascertain *facts* establishing the existence of actual injury (let alone the alleged misconduct).

Plaintiffs allege that (i) unidentified HFTs (ii) using "complex" order types together with proprietary data feed products or co-location services (iii) illegally manipulated equity securities prices on Defendants' exchanges between 2009 and the present for their own benefit and (iv) caused Plaintiffs' orders executed on Defendants' exchanges to trade at artificial and less favorable prices.  SCAC ¶¶ 3, 238.  Plaintiffs allege that Defendants developed and provided proprietary data feeds, complex order types, and co-location services to HFTs with the specific intent to provide HFTs with tools to execute an alleged market manipulation scheme.  *Id.* ¶ 3.

Plaintiffs are suing the Defendants, but not any HFTs (some of whom they did originally sue but almost immediately dropped from the case),[4] alleging that *Defendants* violated Section

---

[4]    Plaintiffs themselves do not know how or why the HFTs originally named as defendants were dropped from the case.  Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("SUMF") ¶ 29.  That is telling given Congress' desire that plaintiffs, not lawyers, control securities class action cases.  *See* Conference Report, H.R. 104-369, at

10(b) in connection with market manipulation allegedly committed by unidentified *HFTs*. Plaintiffs seek unspecified compensatory damages, for themselves and a purported class, with respect to every equity trade executed on their behalf on each of Defendants' markets from 2009 to the present.  Plaintiffs also seek mandatory injunctive relief requiring, *inter alia*, that Defendants' change how their markets operate.

The undisputed evidence is that Plaintiffs had no facts to support standing before filing this case, which is sufficient to require dismissal because standing is measured at the time of filing.  *See Lujan*, 504 U.S. at 571 n.5.  But even 18 months of discovery have not enabled Plaintiffs to demonstrate that any of them suffered any concrete actual injury from executing any trade on a Defendant's exchange at an artificial price caused by HFT manipulation.  Because the record is now clear that Plaintiffs assert only the sort of "general grievance" that is insufficient for Article III standing—they think some equities markets could or should operate more favorably to them, but cannot point to any breached legal obligation that negatively affected them—the Court should grant summary judgment for lack of Article III standing.

## THE SUMMARY JUDGMENT STANDARD

Questions about Article III standing cannot be waived, can be raised at any time, and federal courts must examine whether a plaintiff has Article III standing whenever it is questioned.  *See* Fed. R. Civ. P. 12(h)(3); *United States v. Hays*, 515 U.S. 737, 742 (1995); *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994).  Before the Court

---

32 (Nov. 28, 1995); *SEB Investment Management AB v. Symantec Corp. et ano*., No. C 18-02902 WHA, Slip Op. at 2 (N.D. Ca. Apr. 20, 2021) ("The PSLRA established the statutory office of lead plaintiff … for the very specific purpose of converting securities litigation from 'lawyer driven' to 'investor driven' wherein the lead plaintiff actually manages the case for the class, the lawyer no longer being in charge.").

considers any other issue, it must determine whether Plaintiffs have Article III standing. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012).

Although a plaintiff has a "low threshold" and bears "no evidentiary burden" when pleading standing, *Whole Foods I*, 858 F.3d at 736, at summary judgment Plaintiffs must prove, through admissible evidence, all elements of Article III standing in the same way as any other matter on which they bear the burden of proof, *see Lujan*, 504 U.S. at 561. A plaintiff opposing a summary judgment motion challenging its Article III standing cannot rest on allegations in a complaint and must provide sufficient *evidentiary proof* that it had Article III standing when it filed its case. *Lujan*, 504 U.S. at 571 n.5; *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 830 (1989). Whether the SCAC sufficiently *pled* standing is thus irrelevant now.

Summary judgment is appropriate when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a), (c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact, which in this instance is both the lack of evidence establishing that Plaintiffs have standing and contradictory evidence in the record. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Diaz*, 2021 WL 1063184, at *6. Once such a showing has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial," *Beard v. Banks,* 548 U.S. 521, 529 (2006), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248. To withstand summary judgment, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Sufficient *evidence* must exist upon which a reasonable trier of fact could return a verdict for the nonmoving party. "Summary judgment is designed ... to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir. 1997).

## ARGUMENT

### I.     PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs have admitted that they are alleging only a market manipulation claim, not a claim based on an alleged misrepresentation or omission:

> THE COURT: You are not arguing [a] misrepresentation or omission claim?
>
> MR. COUGHLIN: *No, we are not. We are arguing that* combination of these three -- co-location, the data feeds, as well as the complex order types -- *operated as a scheme and manipulated the price of our stock.*

June 18, 2015 Oral Arg. Tr. 37:9-14 (emphasis added) (SUMF ¶ 23); *see also City of Providence v. Bats Global Mkts., Inc.*, 878 F.3d 36, 49 (2d Cir. 2017) (noting Plaintiffs' allegations of a "system where plaintiffs 'purchased and/or sold shares at artificially distorted and manipulated prices'"). Plaintiffs must therefore prove that (i) artificial prices were created by the activities they allege, (ii) Plaintiffs were injured by such prices, and (iii) any injury is traceable to improper conduct by Defendants. *See Allen v. Wright,* 468 U.S. 737, 757 (1984). Plaintiffs must also prove redressability—that if there was an injury, it was caused by Defendants as opposed to someone else. *See, e.g., Newdow v. Roberts*, 603 F.3d 1002, 1011-12 (D.C. Cir. 2010) (when an injury is caused by a third party not before the Court, courts cannot redress injury that results from that independent action); *see also Simon v. E. Ky. Welfare Rights Org*., 426 U.S. 26, 41-42 (1976). Where, as here, speculative inferences are necessary to connect a plaintiff's alleged injury to the challenged actions of defendants, that plaintiff lacks Article III standing. *Simon*, 426 U.S. at 45.

### A.  Plaintiffs Cannot Prove Injury

The SCAC does not identify a single trade by a Plaintiff that was supposedly executed to a Plaintiff's detriment at a manipulated price.  Indeed, Plaintiffs' counsel testified that the PSLRA certifications (ECF No. 169-2) simply list what counsel believed to be all of Plaintiffs' purchases and sales of common stock for subsets of the period covered by the complaint; neither Plaintiffs nor their counsel performed any analysis of whether the transaction prices were the result of manipulation.  *See infra* at 11-12.

Plaintiffs' PSLRA certifications show substantial gains from equity securities trading between 2009 and 2014:  $118 million for Providence,[5] more than $1 billion for PPNPF, more than $244 million for VIGERS, and more than $705 million for Boston (ECF No. 169-2, SUMF ¶¶ 53-56), yet the SCAC alleges that each Plaintiff "suffered substantial damages as a result of Defendants' unlawful conduct" (SCAC ¶¶ 21-24).[6]  But where, as here, Plaintiffs contend that for the period covered by their PSLRA certifications and complaints the price of every equity securities trade on Defendants' exchanges was artificial, the lack of evidence that any specific transaction price was artificial, coupled with the fact that their aggregate trading was profitable, means that they cannot prove that they suffered an actual injury.[7]

---

[5]     Providence admitted it did not take into account its earnings in making the allegations in its original complaint or the SCAC.  SUMF ¶ 58.

[6]     This is not the first time that Robbins Geller has filed an action alleging that a lead plaintiff lost money when it likely made money on the securities in question; Judge Stanton recently disqualified Robbins Geller in a case involving a similar plaintiff.  *See In re Grupo Televisa Secs. Litig.*, No. 18 Civ. 1979 (LLS), 2021 WL 2000005 (S.D.N.Y. May 19, 2021).

[7]     *See Kohen* v. *Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) (to demonstrate Article III standing before a class is certified, a named plaintiff must allege aggregate losses and cannot have "made more money ... by virtue of [an alleged manipulation] than they lost"); *cf. Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 346 (2005) (allegation that "a misrepresentation leads to an inflated purchase price" is not enough to plead actual injury because it may not have "proximately cause[d] any economic loss"); *Taylor* v.

Plaintiffs contend that the entire market was manipulated, from at least 2009 through the present, by HFTs[8] using the complained-of products.  But Plaintiffs have not specified, nor has discovery shown, a single trade where conduct by HFTs using the complained-of products resulted in a manipulated price that disadvantaged Plaintiffs (or anyone else).  Nor will such evidence be presented to the Court:  In their responses to Nasdaq's Fourth Set of Interrogatories (dated April 30, 2021) (the "Contention Interrogatories") Plaintiffs did not identify (i) a single trade that allegedly took place at a manipulated price or (ii) any HFTs that allegedly manipulated prices.[9]  And Plaintiffs confirmed to the Court multiple times on May 26, 2021 that they have not identified, and do not intend to identify, any particular manipulated trades or any actual HFTs that allegedly engaged in manipulation.  *See* May 26, 2021 Hearing Tr. 11:1-8, 11:19-21, 14:14-15:6 (SUMF ¶¶ 1-2).  The Court admonished Plaintiffs that there "would be a failure of proof" if Plaintiffs were required to identify discrete trades where they were harmed or individual HFTs that engaged in manipulation and that Plaintiffs cannot now "alter the [evidentiary] playing field materially down the road whether in expert reports or otherwise."  *Id.* at 16:24-17:8.

Without proving the existence of any specific trades whose prices were manipulated to their disadvantage, Plaintiffs must prove that systemic manipulative conduct caused them to lose money on an aggregate basis.  But the only evidence in the record is that Plaintiffs made

---

*KeyCorp.*, 680 F.3d 609, 613 (6th Cir. 2012) (plaintiff lacks Article III standing if they benefitted from alleged artificial inflation of market prices); *Brown* v. *Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2010) ("[A]t a minimum, a plaintiff must allege a net loss in investment value that is fairly traceable to the defendants' challenged actions.").

[8]     *See, e.g.,* Coughlin Tr. 34:19-23 (███████████████████████████████████
███████████) (emphasis added).  SUMF ¶ 22.

[9]     SUMF ¶¶ 1-2.  And Plaintiffs' representation to the Court "that no responsive information was withheld" in their responses to the Contention Interrogatories (ECF No. 590 at 2) confirms that Plaintiffs cannot identify such transactions.

significant amounts of money trading equity securities prior to filing this action, which means they lack standing.  *See supra* note 5 and accompanying text.[10]

No evidence demonstrates that any of Plaintiffs' actual trades were impacted at all (positively *or* negatively) by any "HFT" activity.  In response to Defendants' Request for Production No. 1, Plaintiffs produced Excel spreadsheets supposedly detailing their trades that were the subjects of the claims in the SCAC.[11]  But those spreadsheets do not match Plaintiffs' PSLRA certifications, and Plaintiffs have never reconciled the spreadsheets with their PSLRA certifications.[12]

Even worse, Plaintiffs did not identify the venues where their trades executed:  They simply assumed that some or all of their trades executed on Defendants' exchanges (SUMF ¶¶ 9-11), but that is both uncertain (because of the highly fragmented nature of the equity securities markets)[13] and in any event insufficient for Article III standing purposes.  *See Diaz*, 2021 WL 1063184, at *6-8 (rejecting attempt to use "averages or statistics" to establish injury-in-fact for standing and holding that "[i]n determining standing at the summary judgment stage, the time for 'might' or 'may' is over"); *Whole Foods*, 397 F. Supp. 3d at 420-23 (a statistical likelihood that plaintiff suffered an injury is not sufficient to establish standing at summary judgment).  Before initiating this litigation, neither Plaintiffs nor their counsel ███████████████████████ ████████████████████████████████ Coughlin Tr. 103:10-12 (SUMF ¶¶ 9, 12-13).

---

[10]     This type of evidentiary failure was also at issue in *Diaz*, where Judge Pauley found that even using the flawed statistics plaintiffs presented, two of the plaintiffs could not show injury-in-fact because their overtime hours were significantly higher than the flawed averages Judge Pauley declined to accept.  *See Diaz*, 2021 WL 1063184, at *8.

[11]     These spreadsheets include names of securities, trade dates, and prices, but not the venues over which the trades were executed.  SUMF ¶ 4.

[12]     SUMF ¶¶ 5-8.

[13]     SUMF ¶¶ 14-21.

Instead, each Plaintiff testified that (i) it relied on counsel to "select" (if what was done could be called that) the securities to include in its PSLRA certification and the spreadsheets produced in response to Request for Production No. 1, (ii) no investment advisor or other intermediary had ever advised it of any manipulation of prices in connection with the trading in its accounts (before *or* after this case was filed), and (iii) it relied on counsel for any factual information supporting the allegations that Defendants committed the manipulation alleged here.[14]  For example, Boston admitted that it joined the lawsuit based on the *assumption* that because its trading volume was so high, the alleged manipulation described to it by counsel must have adversely impacted it.  SUMF ¶ 39.  This is *less* than the evidence the court held was insufficient in *Whole Foods II*.

Neither Plaintiffs nor their counsel did any factual investigation relating to Plaintiffs' particular trades prior to filing this case.  In connection with preparing and filing the complaint (i) no experts or consultants were retained who provided opinions that Plaintiffs' trades were executed at manipulated prices resulting from HFTs' use of the complained-of products to manipulate markets[15] and (ii) Plaintiffs' lawyers did not perform any analysis of Plaintiffs' trades to determine if they were executed at manipulated prices resulting from HFTs' use of the complained-of products.[16]  Instead, counsel principally relied on FLASH BOYS and (perhaps) academic articles about market structure,[17] none of which demonstrated that Plaintiffs' trades—

---

[14]     SUMF ¶¶ 25-39.

[15]     SUMF ¶ 40.

[16]     *See* Coughlin Tr. 71:11-13 (████████████████████████████
████████████████████████████████████████████████████████
████) (SUMF ¶ 41).

[17]     SUMF ¶ 42.

or *any* trades, for that matter—were executed at manipulated prices; indeed, none of the articles

even purported to study "manipulation."  The entirety of Plaintiffs' and their counsel's pre-filing

"investigation" was the assumption, based on FLASH BOYS and (perhaps) academic articles, that

unspecified HFT trading resulted in "market dislocation" (apparently price changes) and

"adverse selection" (apparently some traders having to reprice their orders).[18]  Neither Plaintiffs

nor their counsel ever received information from Plaintiffs' broker-dealers that any of Plaintiffs'

orders had been affected by market dislocation or adverse selection allegedly caused by any HFT

activities.  This is significant because some market participants used by Plaintiffs advertised their

ability to trade in ways that evaded the allegedly bad "HFT" behavior alleged by Plaintiffs,[19] and

yet Plaintiffs testified under oath that they never heard a word from anyone about negative

impacts on their portfolios.  Providence, for example, received positive presentations about its

equity securities portfolio performance from its primary advisor.[20]

It is thus no surprise that prior to filing this case, neither Plaintiffs nor their counsel

conducted any analysis as to whether *any*, let alone *all*, of Plaintiffs' alleged trades were

conducted at manipulated prices or were otherwise adversely affected by what Plaintiffs' counsel

call "market dislocation" or "adverse selection"—they just assumed it across the board.  *See*

---

[18]      *See* Coughlin Tr. 24:22-25:2 (█████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████); *id.* at
66:12-71:21 (███████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████) (SUMF ¶ 44); Coughlin Tr. 78:13-20 ("█████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████) (SUMF ¶ 45).

[19]      *See* SUMF ¶¶ 47-53.

[20]      *See* SUMF ¶¶ 25-26.

Coughlin Tr. 90:10-21 (█████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████) (emphasis added) (SUMF ¶ 24).

The way Plaintiffs' counsel created the theory underlying this case was fundamentally flawed from an Article III standing perspective.  After reading FLASH BOYS and (assuming the truth of their deposition testimony) some academic articles about equity market structure, Plaintiffs' counsel *assumed* that certain entities engaged in "high frequency trading" and that those entities were executing *their own* trades at better prices than Plaintiffs' trades.  But FLASH BOYS and academic articles are inadmissible hearsay and thus cannot support standing (Fed. R. Evid. 801(c) & 802), and the articles identified by Lead Counsel do not conclude that any entities—whether so-called "HFTs" or otherwise—engaged in any market manipulation or that any particular trades were adversely affected by manipulation.

Although the SCAC suggests that Plaintiffs hoped that investigations by regulators would prove for them that "HFTs" were engaged in wide ranging market manipulation using the at-issue products and services (*see, e.g.*, SCAC, ¶¶ 8 n.4, 95, 233, 280-88), that did not happen.  Indeed, the SEC staff came to the *opposite* conclusion:  On August 5, 2020, in response to a statutory mandate, the SEC staff submitted a report to Congress entitled STAFF REPORT ON ALGORITHMIC TRADING IN U.S. CAPITAL MARKETS.  SUMF ¶ 90.  In that report, the SEC staff summarized academic studies on the market effects of algorithmic trading and "high frequency trading," and found that "most academic studies find that algorithmic trading and high frequency trading have improved market quality and reduced transaction costs" and that "[t]here is ample evidence suggesting that, under normal market conditions, algorithmic trading and HFTs improve liquidity and price efficiency and reduce short term volatility."  SUMF ¶¶ 91-94.

Nowhere in its report to Congress did the SEC staff conclude that all "HFT" activity is manipulative or suggest that any action—legislative, regulatory, or otherwise—was necessary to address "HFT" activity.  To the contrary, the SEC staff explained that it actively watches for and pursues manipulative activity by "HFTs."  SUMF ¶ 93.  In light of the statutory obligation that this report state whether the SEC staff believed that statutory or regulatory changes were necessary to address any problems related to the existence of so-called high frequency trading, SUMF ¶ 91, the SEC staff's failure to identify any such problems or changes is further evidence that Plaintiffs cannot demonstrate that they suffered injury as a result of an allegedly massive manipulative scheme by HFTs involving Defendants.

### B.  Plaintiffs Cannot Prove Redressability

Even if Plaintiffs had identified any injury, they could not demonstrate that Defendants are responsible for it.  At the beginning of this case, 11 alleged "HFT" firms were named as defendants.  Even for those 11 entities, Lead Counsel had no information about the five "factors" Lead Counsel claimed were characteristic of supposedly "bad" "HFT" entities.  *Compare* Coughlin Tr. 41:2-20 *with id*. at 41:21-49:25 (SUMF ¶¶ 60-61).  Nevertheless, in April 2014 these 11 entities were alleged to be "primary violators" of Section 10(b) and named as defendants in this case, based on allegations that they used the complained-of products to front-run Plaintiffs' orders.  SUMF ¶ 63.  By the time the SCAC was filed, Plaintiffs dropped these entities as defendants.

That leads to the first aspect of Plaintiffs' redressability proof problem:  They have no evidence of what any particular "HFT" firm actually did, how any "HFT" firm used any of the complained-of products, or how any "HFT's" conduct might have impacted their trades.  This is made clear by Plaintiffs' responses to the Contention Interrogatories, which contain no

substantive responses to questions about which firms supposedly engaged in manipulation.[21]

And although 11 "HFT" entities were initially named as defendants because Plaintiffs "think they are primary violators" (June 18, 2015 Oral Arg. Tr. 39:3-5), Plaintiffs never obtained any discovery from those firms, or any others, regarding their trading methods and activities.  SUMF ¶¶ 61-67.  Without even basic information like this, Plaintiffs cannot prove redressability as required by Article III.

The second aspect of Plaintiffs' redressability proof failure arises from what the record *does* show about Plaintiffs' trades:  They were almost all, perhaps all, executed by broker-dealers that themselves used the complained-of products, if they were executed on Defendants' markets at all (as opposed to being internalized, executed on non-exchange venues, or executed on exchanges that are not defendants).  The broker-dealers used by Plaintiffs' investment advisers utilized, directly or through their agents, the same products about which Plaintiffs complain, making it impossible for Plaintiffs to have been injured as alleged (or to be members of the class they purport to represent).  For example, Potamus Trading, a broker-dealer used by Providence, provided execution services that utilize co-location and direct data feeds, touting *its* "state-of-the art *HFT* infrastructure," which involves being "[c]o-located with NASDAQ, NYSE, and BATS exchanges."[22]  This is critical:  Some of Plaintiffs' own broker-dealers *advertised themselves* as "HFTs."  No trades executed by such broker-dealers, or others utilizing the complained-of products, can support standing for Plaintiffs.

ConvergEx, a broker-dealer Boston recommended its intermediaries use to execute Boston's trades, used proprietary data feeds and co-location for trade executions it routed to

---

[21]     SUMF ¶ 2.

[22]     SUMF ¶ 75.

exchanges and dark pools and also seems to have a different view of how markets work than Boston has asserted in this case.[23]  UBS, another broker-dealer used by Boston, operated dark pools.[24]  Other broker-dealers used by Boston included Virtu and Knight, both of which Plaintiffs identify as "HFTs."[25]  In the end, Plaintiffs admitted that they did not know whether any of the broker-dealers that executed their trades used the complained-of products in connection with those transactions.  SUMF ¶¶ 80-84.

It is thus not disputed that prior to initiating this case, Plaintiffs did not know whether any of their trades had been executed using the complained-of products.  And Plaintiffs (through counsel) conceded that it is not illegal for any market participant to use any of the order types complained about by Plaintiffs.  SUMF ¶ 85.  Because the complained-of products are not *per se* illegal (to the contrary, they are *per se* legal) and Plaintiffs' own trades were executed by market participants that used the same products, Plaintiffs could not prove that any damages were "fairly traceable to the challenged action of the" Defendants even if there was evidence that one or more "HFTs" misused any of the complained-of products.

Finally, at the very end of this phase of the case, Plaintiffs began to back away from their focus on "complex" order types, asserting in response to Contention Interrogatory No. 17 that "given the speed and informational advantages conferred by proprietary data feeds and the co-location services provided by Defendants, High Frequency Trading firms could potentially have

---

[23]     *See* ConvergEx April 29, 2010 Comment Letter at 16 (https://www.sec.gov/comments/s7-02-10/s70210-166.pdf) ("We believe that, as long as market centers offer co-location services to all … members/subscribers that want those services on the same terms, these services are 'fair.'  Again, we reiterate our view that the fact that one party is willing to pay for a product or service that another party may not want or may not be able to afford does not make the market 'unfair.'") (SUMF ¶¶ 76-77).

[24]     SUMF ¶ 78.

[25]     SUMF ¶ 79.

an advantage over other investors with *any* order type."  SUMF ¶ 46.  Putting to the side that this is not the claim pled in the SCAC or argued in this Court and the Second Circuit (and thus is an untimely attempt to amend in violation of the Case Management Order), Plaintiffs' last-minute attempt to widen the case makes Plaintiffs' redressability problem vastly worse:  Even if Plaintiffs were to forego damage claims and seek only injunctive relief (which they have not done), Plaintiffs dismissed the "HFTs" they originally sued and contended misused the Defendants' products when manipulating the securities markets (SUMF ¶ 23), and there are no HFTs that would be bound by any injunctive relief.  Now that Plaintiffs have backed away from their focus on "complex" order types and affirmatively asserted that "bad" "HFTs" could manipulate the market with "any order type," no injunctive relief could be effective without all alleged misusers of Defendants' products (whoever Plaintiffs think they are) before the Court.  Article III redressability cannot rest on an assumption that nonparties (especially unidentified nonparties) will act in a certain way on the basis of a judicial decision in a plaintiff's favor.  *Simon*, 426 U.S. at 42-44.

### C.  Plaintiffs' Proof Problems Cannot Be Remedied Through Additional Discovery

The Article III proof problems which existed when this action was filed cannot be fixed through further discovery.  *First*, only after the initial case management conference with the Court did Defendants learn that Plaintiffs did not have their own trading data and had to subpoena it from hundreds of investment managers and broker-dealers.  When this case was filed, Plaintiffs had no information about the characteristics of their particular trades, let alone any way to analyze whether they might have been injured by alleged manipulation.  As

demonstrated above, this case was filed with no investigation into whether any Plaintiff had Article III standing.[26]

Worse still, even Plaintiffs' investment managers never had the information necessary for Plaintiffs to evaluate their Article III standing, including such critical information as evidence establishing the venues where Plaintiffs' trades were executed.  It might have been possible for Plaintiffs to get some of the necessary information from the broker-dealers that executed their trades, except for two extraordinary problems:

- Neither Plaintiffs nor Lead Counsel made any efforts to ensure that the broker-dealers that executed Plaintiffs' trades preserved their trade data, assuming that their investment managers would take care of that.[27]  That did not happen, and most of the broker-dealers Plaintiffs haphazardly subpoenaed do not have data pre-dating 2015.[28]

- Plaintiffs did not even subpoena most of their broker-dealers.

---

[26]   This may be why Providence's Rule 30(b)(6) witness was surprised by how quickly Providence filed the first complaint (on April 18, 2014) after the release of FLASH BOYS on March 31, 2014:



Dana Tr. 77:2-80:13 (SUMF ¶ 43).

[27]   SUMF ¶¶ 68-71.

[28]   SUMF ¶¶ 72-74.

Plaintiffs thus cannot demonstrate what their trades were, let alone whether any particular trades were impacted at all by "HFT" manipulation.  Plaintiffs are unable to identify the venue, time, and price information for their transactions, which they previously conceded to the Court are "*fundamental*" to proving their claims,[29] including for Article III purposes.

*Second*, Plaintiffs' investment advisors and broker-dealers often placed "block" orders combining orders for Plaintiffs with orders for other clients.  As a result, each participant in such a block order was assigned an average price for the entire block order, not an individual order price.  SUMF ¶ 86.  Plaintiffs cannot account for the fact that these average prices might include executions at prices better than allegedly manipulated prices even if Plaintiffs could prove that there *were* manipulated prices (which they have not done).

*Third*, at least two Plaintiffs earned money from participating in State Street stock lending programs.[30]  Providence does not know whether it did any investigation prior to filing its complaint as to whether the manipulative acts alleged here were facilitated by stock loans from the State Street stock lending program in which it participated.  *See* Dana Tr. 224:17-23. Plaintiffs thus cannot demonstrate that the activity they complain of was not facilitated by Plaintiffs themselves.  *Compare Grocery Mfrs. Ass'n v. E.P.A.,* 693 F.3d 169, 178 (D.C. Cir. 2012) (no standing where harm was "self-inflicted, ... so completely due to the [complainants'] own fault as to break the causal chain"); *cf. Grupo Televisa*, 2021 WL 2000005 at *2 (plaintiff's short sales disqualified it from leading class).  Redressability is defeated if a plaintiff's own conduct resulted in the alleged injury, because "there must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly ... trace[able] to the

---

[29]      *See generally* ECF No. 480 at 2 (Plaintiffs' assertion that "[t]rading data related to Plaintiffs' orders and executions is fundamental to resolving the issues in this case.").

[30]      SUMF ¶¶ 87-89.

challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court.'"  *Lujan,* 504 U.S. at 560-61.

Another redressability problem is the more general issue of the independent actions of third parties.  Plaintiffs' claims expressly depend on actions by whoever they believe are "bad" "HFTs," which is even worse under *Lujan* because at least some of those entities *were* before the Court until Plaintiffs mysteriously dismissed them.

### D. *Whole Foods II* and Their Progeny Require Summary Judgment Here

In evaluating Article III standing at the motion to dismiss stage, the Court relied on *Whole Foods I*, in which the Second Circuit reversed the pleading-stage dismissal for lack of standing of a grocery mispricing class action.  Whole Foods later moved for summary judgment for lack of Article III standing.  In the *Whole Foods II* cases, the district court granted summary judgment in favor of Whole Foods and the Second Circuit affirmed.  These cases and others require dismissal for lack of standing here.

In *Whole Foods I*, plaintiff Sean John's claims were based on reports of a New York City Department of Consumer Affairs ("DCA") investigation finding systematic underweighting of food products, resulting in customers being overcharged.  The Second Circuit held that, at the motion to dismiss stage, Mr. John sufficiently alleged standing by alleging that he purchased products (cupcakes and cheese) that were systematically underweighted at stores that the DCA had investigated, even if Mr. John did not weigh the products he purchased himself to prove direct injury.

But after discovery, the district court held that Mr. John had failed to present admissible evidence that he had actually suffered an injury:  "Although [plaintiff's] testimony can establish that he purchased cupcakes and cheeses from two Whole Foods stores, there is no competent, non-speculative, evidence that any cupcake or cheese item [plaintiff] bought weighed less than

the weight used to price it." *Whole Foods*, 397 F. Supp. 3d at 408.  In sum, the mere assertion

that Mr. John had purchased some of the grocery items that the DCA investigation had found

were weighed incorrectly 89% of the time was not enough to withstand summary judgment.

The Second Circuit affirmed, noting that Mr. John did not present direct proof that any

items he purchased were underweighted, but instead claimed, based on the DCA report, "that

the cupcakes and cheeses he purchased must have been underweight because Whole Foods used

identical practices of weighting across all its New York stores that resulted in systematically

underweight" food products.  823 F. App'x at 48.  The Second Circuit agreed with the district

court that Mr. John "failed to adduce evidence from which a jury could reasonably find such a

unitary practice and therefore failed to sufficiently establish injury-in-fact."  *Id.* at 48-49.

The record here on standing is even more speculative than in *Whole Foods II*.  At least

in *Whole Foods II*, the plaintiff specifically identified two products whose pricing someone

(the DCA) had actually analyzed across Whole Foods' stores, which showed a *probability* of

potential injury suffered by *someone*.  But at summary judgment Mr. John offered no evidence

that he himself had been injured, as opposed to someone else.  Plaintiffs have nothing like the

DCA investigation to rely upon:  the original complaint contains only general assertions about

"HFTs," without tying any of those alleged activities to a harm suffered by Plaintiffs resulting

from manipulative conduct.

We also now know that Plaintiffs simply tried to add up all their equity securities trades

from parts of 2009 through parts of 2013 or 2014 (depending on the Plaintiff), but they had no

basis to believe that any of those transactions were actually executed at manipulated prices

*because they did not even think about such issues*.  In contrast to Mr. John, who identified two

products he bought that the DCA had determined were often mis-weighted, Plaintiffs (i) cannot

show they actually executed any trades that were affected by any manipulative acts and (ii) cannot show that even if they did suffer harm, it was not caused by something else, perhaps their own or their agents' actions.  All Plaintiffs have ever had were assumptions upon assumptions, and that is not enough for Article III standing at the summary judgment stage. *See Diaz*, 2021 WL 1063184, at *6-8; *see also id.* at *11 ("a dismissal for lack of standing is not an invitation to engage in a dialogue with this Court in which Plaintiffs attempt to plug the holes in the record with facts that should have been proffered in the first instance").

## CONCLUSION

For the reasons set forth above, the Court should grant summary judgment dismissing the SCAC for lack of Article III standing.

Dated: May 28, 2021

By: /s/ Douglas W. Henkin
Douglas W. Henkin
Justine N. Margolis
Kiran Patel
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6832
Facsimile: (212) 768-6800

Stephen J. Senderowitz
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
(312) 876-8000
stephen.senderowitz@dentons.com

*Counsel for New York Stock Exchange LLC,*
*NYSE Arca Inc.,*
*and Chicago Stock Exchange, Inc.*

By: /s/ Paul E. Greenwalt III
Paul E. Greenwalt III
Michael Molzberger
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606
Telephone: (312) 258-5702
Facsimile: (312) 258-5600

*Counsel for BATS Global Markets, Inc.*
*(n/k/a Cboe Bats, LLC) and Direct Edge*
*ECN, LLC*